# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

|  |  |
|---|---|
|  | **Case No.** _____ |
| Viewpoint Neutrality Now!, Evan Smith and Isaac Smith, | |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| Regents of the University of Minnesota, Kendall J. Powell, Chair, Steven A. Sviggum, Vice Chair, Thomas J. Anderson, Richard B. Beeson, Mary A. Davenport, Kao Ly Ilean Her, Michael D. Hsu, Mike O. Kenyanya, Janie S. Mayeron, David J. McMillan, Darrin M.Rosha, Randy R. Simonson, in their respective official capacities or their successors; Joan T.A. Gabel, President of the University of Minnesota, in her respective official capacity or her successor; Maggie Towle, Interim Vice Provost For Student Affairs and Dean of Students, in her respective official capacity or her successor. | |
| Defendants. | |

## INTRODUCTION

The Plaintiffs, Viewpoint Neutrality Now!, Evan Smith and Isaac Smith, bring

this civil rights action under 42 U.S.C.A. § 1983, based on First Amendment and

Fourteenth Amendment requirements that public universities administer the

disbursement of mandatory student services fees and the allocation of student-

services-fees-subsidized lounges in a viewpoint-neutral manner and that public universities provide students who pay student services fees an administrative appeal to constitutionally challenge the university's disbursements as violating viewpoint neutrality. The University of Minnesota and its Board of Regents and members (collectively, Board of Regents) have adopted policies, handbooks and practices which violate viewpoint neutrality.

The Plaintiffs seek a declaration, injunction, and judgment that the University of Minnesota and the Board of Regents adopted policies, handbooks, and practices violate the First and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal-question jurisdiction), 28 U.S.C. § 2201 (declaratory-judgment jurisdiction), and 42 USC §§ 1983, 1988 (civil-rights statutes).

2.      Venue is proper in this Court under 28 U.S.C. § 1391 because the Defendants are found within this district, or because the events or omissions giving rise to the claims presented occurred within this district or both

3.      Plaintiffs also seek attorney's fees, costs of suit, and interest pursuant to 42 U.S.C.A. § 1988, and any other relief this Court deems just or available under the law.

## PARTIES

**Plaintiffs**

4.     The individual Plaintiffs, Evan Smith and Isaac Smith, are, and at all times mentioned, were students of the University of Minnesota, Twin Cities (Minneapolis-St. Paul) Campus, and residents of Hennepin County, Minnesota. Evan Smith and Isaac Smith have paid mandatory student services fees to the University for the 2019-2020 school year and will continue to pay mandatory student services fees as University students.

5.     Plaintiff Viewpoint Neutrality Now! is an association of University of Minnesota students who pay student services fees to the University of Minnesota which was formed to support and advocate for viewpoint neutrality and other reforms relating to the University of Minnesota's student services fee disbursement system. Viewpoint Neutrality Now! is not a student organization recognized by the University of Minnesota. Viewpoint Neutrality Now! has never applied, nor will it ever apply, for disbursements from student services fees administered by the University of Minnesota at any of its campuses.

**Defendants**

6.     The University of Minnesota, governed by the Board of Regents, is a state agency existing under the laws of the State of Minnesota, with its principal office in Hennepin County at 600 McNamara Alumni Center, 200 Oak Street SE,

Minneapolis, Minnesota 55455-2020. The University of Minnesota has five distinct

campuses: Twin Cities, Crookston, Duluth, Morris, Rochester and Twin Cities.

7.      The individual Defendants constituting the University of Minnesota's

Board of Regents are: Kendall J. Powell, Chair, Steven A. Sviggum, Vice Chair,

Thomas J. Anderson, Richard B. Beeson, Mary A. Davenport, Kao Ly Ilean Her,

Michael D. Hsu, Mike O. Kenyanya, Janie S. Mayeron, David J. McMillan, Darrin M.

Rosha, and Randy R. Simonson.  They are sued in their respective official capacities

only.

8.      Defendant Joan T.A. Gabel is President of the University of Minnesota.

Gabel is sued in her official capacity only.

9.      Defendant Maggie Towle is Interim Vice Provost For Student Affairs

and Dean of Students (shortened, hereafter, to "Vice Provost for Student Affairs").

Towle is sued in her official capacity only.

## CONSTITUTIONAL PROVISIONS INVOLVED

10.     The First Amendment to the U.S. Constitution, incorporated against

state and local officials by the Fourteenth Amendment, states:

> Congress shall make no law respecting an establishment of
> religion, or prohibiting the free exercise thereof; or abridging the
> freedom of speech, or of the press; or the right of the people
> peaceably to assemble, and to petition the Government for a
> redress of grievances.

11.     The Fourteenth Amendment to the U.S. Constitution, Section 1, states:

4

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## STATEMENT OF FACTS

**I.    The University of Minnesota's actions collecting and disbursing student services fees at the Twin Cities Campus are subject to federal court review under *Southworth* for viewpoint neutrality.**

12.    The Board of Regents, the President, and the Vice Provost for Student Affairs adopt policies, handbooks, and practices for collecting and disbursing student services fees at the Twin Cities Campus which are subject to federal court review under *Southworth* for viewpoint neutrality. *See Southworth v. Board of Regents of the University of Wisconsin System,* 529 U.S. 217, 233 (2000) and *Southworth v. Board of Regents of the University of Wisconsin System,* 307 F.3d 566 (7th Cir. 2002).

13.    In *Southworth*, the University of Wisconsin was found to have violated First and Fourteenth Amendment viewpoint neutrality regarding the absence of standards in awarding student group travel grants and regarding standards which allowed the consideration of the length of an organization's existence or past amount(s) received. *Id.*

14.    While *Southworth* was pending, parallel litigation against the University of Minnesota was in federal court.

15.     In 1998, a group of Twin Cities campus students, as payers of student services fees, challenged the constitutionality of the University of Minnesota's mandatory student fee disbursements. *Curry v. Regents of the University of Minnesota,* U.S. District Court for the District of Minnesota, Case No. 98-CV-00583 (PAM/JGL).

16.     The district court dismissed the claims in August of 1998 prior to the U.S. Supreme Court deciding *Southworth* in 2000.

17.     The Eighth Circuit affirmed the district court's decision in February of 1999 prior to the U.S. Supreme Court deciding *Southworth* in 2000.

18.      Immediately following the U.S. Supreme Court's *Southworth* decision, the students in *Curry* moved to amend their complaint in accordance with the *Southworth* opinion which established the viewpoint neutrality test; but the district court denied the motion to amend. A copy of the U.S. District Court's decision in *Curry v. Regents of the University of Minnesota,* Case No. 98-583, is attached as Exhibit A.

19.     Since the district court's denial of the motion to amend in 2000, there has been no known similar lawsuits since, meaning that the University of Minnesota's mandatory student fee system has never been reviewed under the *Southworth* viewpoint neutrality test as established by the U.S. Supreme Court.

20.     After the *Curry* case was dismissed, the University of Minnesota Student Services Fee Committee conducted a review of its process.

21.     On April 17, 2001, University of Minnesota Student Services Fee Committee made its initial recommendations.

22.     A copy of the University of Minnesota Student Services Fee Committee

Initial Recommendations dated April 17, 2001 is attached as Exhibit B.

23.     The University of Minnesota Student Services Fee Committee Initial

Recommendations on April 17, 2001 acknowledged the U.S. Supreme Court decision

in *Southworth* and that the University of Minnesota's student services fees collection-

and-disbursement system may not meet the viewpoint neutrality standard:

> So, the University of Minnesota has a temporary reprieve from
> legal action but by no means can we be sure that our current fees
> system would satisfy the courts.

Ex. B at 6.

24.     Since then, the Board of Regents and predecessors have adopted

policies, handbooks, and practices regulating the University's collection and

disbursements of the mandatory student services fees.

25.     The current University of Minnesota's Policy regarding student services

fees was last amended on June 10, 2005.

26.     Since 2005, the Board of Regents has deferred to the President and Vice

Provost for Student Affairs to adopt policies, handbooks, and practices regulating the

University's collection and disbursement of the mandatory student services fees.

27.     The President and Vice Provost for Student Affairs have adopted

policies, handbooks, and practices regulating the University's collection and

disbursement of the mandatory student services fees.

28.     The Board or Regents has a policy to govern the "assessment of the University of Minnesota student services fee", which funds "non-instructional programs and activities", "supplements the academic curriculum", and "is an integral part of the University's educational experience."

29.     A copy of the University of Minnesota's Policy regarding student services fees is attached as Exhibit C.

30.     The University of Minnesota has adopted a "Student Services Fee Request Handbook for Media Groups."

31.     The President and Vice Provost for Student Affairs implement the policies of this Student Services Fee Request Handbook for Media Groups.

32.     A copy of the University of Minnesota's current handbook titled "Student Services Fee Request Handbook for Media Groups" is attached as Exhibit D.

33.     The University of Minnesota has adopted a "Student Services Fee Request Handbook for Student Organizations."

34.     The President and Vice Provost for Student Affairs implement the policies of this Student Services Fee Request Handbook for Student Organizations.

35.     A copy of the University of Minnesota's current handbook titled "Student Services Fee Request Handbook for Student Organizations" is attached as Exhibit E.

36.     The University of Minnesota has adopted a "Student Services Fee Request Handbook for Administrative Units."

37.     The President and Vice Provost for Student Affairs implement the policies of this Student Services Fee Request Handbook for Administrative Units.

38.     A copy of the University of Minnesota's current handbook titled "Student Services Fee Request Handbook for Administrative Units" is attached as Exhibit F.

39.     The President is ultimately responsible for collecting the student services fees paid and for disbursing the collected student services fees.

**II.     University of Minnesota students at the Twin Cities campus pay approximately $36,000,000 in mandatory student services fees every year – $900 per student per academic year.**

40.     University of Minnesota students at the Twin Cities campus pay approximately $36,000,000 in mandatory student services fees every year.

41.     Students at the University of Minnesota, at the Twin Cities campus, pay approximately $900.00 per student per academic year in mandatory student services fees or approximately $450.00 per semester.

42.     For the 2018-2019 academic year, the following fees per semester were in place for students at the Twin Cities campus:

- Undergraduate student: $445.44

- Graduate student: $453.33

- Professional student: $459.56

43.     The University of Minnesota has provided a semester breakdown of the distribution of those fees at the Twin Cities Campus for the 2018-2019 academic year:

| Fee | Amount |
|---|---|
| **Student Life, Health, and Well-being fee—Subtotal** | **$411.50** |
| Aurora Center | $4.80 |
| Boynton Health Facility Support | $10.07 |
| Boynton Health Operational | $127.53 |
| Student Conflict Resolution Center | $5.17 |
| Student Fee Administration | $2.15 |
| Student Legal Service | $16.75 |
| Student Parent Grants | $1.97 |
| Student Unions and Activities - Bond Repayment | $44.71 |
| Student Unions and Activities - Facility Support | $53.01 |
| Student Unions and Activities – Operating | $31.30 |
| University Recreation and Wellness - Facility Support | $74.48 |
| University Recreation and Wellness – Operational | $39.54 |
| **Student Activity fee—Subtotal** | **$18.91** |
| Student Activity | $18.91 |
| **Media fee—Subtotal** | **$12.59** |
| MN Daily | $6.44 |

| | |
|---|---|
| Radio K - One-time requirement to paint tower | - |
| Radio K DJ Equipment Replacement | $0.39 |
| Radio K – Operating | $3.58 |
| Students for a Conservative Voice | $1.36 |
| Studio U | $0.26 |
| Wake Student Magazine | $0.55 |
| **TOTAL STUDENT SERVICES FEE** | **$443.00** |

44.     The University of Minnesota has charged similar mandatory student services fees and made similar disbursements in the 2019–2020 academic year.

## III.   The University of Minnesota treats student organizations which are designated media groups differently than other student organizations.

45.     The University of Minnesota's policies, handbooks, and practices single out media student organizations over other student organizations for preferential treatment.

46.     The University of Minnesota's "Student Services Fee Request Handbook for Media Groups" states:

In order to gain approval to apply as a Media Group, a group must meet the following minimum criteria:

1.   Have a mission that indicates that the group's primary focus is to provide a media-related service (not exclusive to social media) to campus

2. Be a University Unit, Registered Student Organization (RSO) or Campus Life Program (CLP) currently registered and in good standing with Student Unions and Activities

3. Meet all minimum requirements for applying for Student Services Fee Funding (see pages 10-11)

4. Gain approval from the VPSA[Vice Provost for Student Affairs]/DoS [Dean of Students] (or designee) to apply for SSF funds as a Media Group. The VPSA/DoS shall have the exclusive authority to determine which applicants may apply to a SSF committee.

Ex. D at 15.

47.     Under the University of Minnesota policy, the Vice Provost for Student Affairs/Dean of Students or designee has the "exclusive authority" to invite preferred student organizations to apply as media groups. *Id.*

48.     If a student organization is not invited to apply as a media group by the Vice Provost for Student Affairs, it is precluded from applying. *Id.*

49.     The University of Minnesota offers no appeal for student organizations who are denied an invitation to be a media group by the Vice Provost for Student Affairs.  Ex. D.

50.     If the student organization is not selected by the Vice Provost for Student Affairs to be a media group, then the student organization must apply for funding under the Student Services Fee Request Handbook for Student Organizations (Ex. D) which has disbursement limits which media groups do not have in their Student Services Fee Request Handbook for Media Groups (Ex. E).

51.    Media groups can apply for unlimited event and project-related costs. Ex. D at 16-17.

52.    In contrast, student organizations' "requests for over $30,000 in event or project-related costs will not be considered by the SSFC [Student Services Fee Committee]." Ex. E at 22.

53.    Media groups can apply for unlimited operational costs which include equipment, operational space, and utilities, stipends, and salaries, insurance for off-campus events, travel, and taxes. Ex. D at 16.

54.    In contrast, student organizations' applications may only apply "for up to $25,000 in operational funds during the annual request cycle." Ex. E at 23.

55.    At least two student organizations at the Twin Cities Campus who have benefitted greatly under the University of Minnesota's preferential policies, handbooks, and practices are Minnesota Daily and Radio KUOM.

56.    For the 2018-2019 academic year, the Minnesota Daily—a media group— received approximately $12.88 from each student for a total of $512,400.

57.    For the 2018-2019 academic year, Radio KUOM—a media group— received $7.94 from each student for a total of $314,400.

58.    In contrast, student organizations which are not designated media groups are limited to $55,000.

59.     Student organizations designated by the University of Minnesota as media groups receive preferential treatment over student organizations not so designated as media groups by the University of Minnesota.

## IV.    The University of Minnesota treats student organizations which are designated "Coffman Memorial Union Student Cultural Centers" preferentially over other student organizations—and allows them to exclude other students from these "safe places."

61.     The Board of Regents, President, and Vice Provost for Student Affairs treat student organizations which are designated "Coffman Memorial Union Student Cultural Centers" preferentially over other student organizations.

62.     The University of Minnesota uses student services fees to subsidize the Coffman Memorial Union as a student amenity.

63.     For the 2018-2019 academic year, disbursements of over $10,000.000 from student services fees were made at the University of Minnesota for student union and activities:

Student Union and Activities-Bond Repayment          $3,559,021

Student Union and Activities-Facility Support Fee     $4,210,325

Student Union and Activities-Operating Fee            $2,489,007

64.     For the 2018-2019 academic year, each student paid the following amount per semester for student union and activities:

Student Unions and Activities—Bond Repayment       $44.71

Student Unions and Activities—Facility Support       $53.01

Student Unions and Activities—Operating          $31.30

65.    The Board of Regents does not have a policy designating student organizations as "Coffman Memorial Union Student Cultural Centers."

66.    Nonetheless, the President and Vice Provost for Student Affairs, and their predecessors have permanently designated nine student organizations as Coffman Memorial Union Student Cultural Centers.

67.    The Board of Regents, President, and Vice Provost for Student Affairs do not provide an administrative appeal for students objecting to the University of Minnesota's designation of student organizations as Coffman Memorial Union Student Cultural Centers.

68.    When the University of Minnesota designates student organizations as "Coffman Memorial Union Student Cultural Centers," the University of Minnesota provides free student lounge space in the Coffman Memorial Union and University promotion or sponsorship by identifying them as such on the University of Minnesota's web pages.

69.    Coffman Memorial Union is a prestigious, centrally-located location for student organizations. There are nine lounge locations for student organizations in Coffman Memorial Union.

70.    The University of Minnesota promote a student organization on its website is similarly prestigious and valuable to a student organization. Other student organizations do not receive the same type of promotion or sponsorship. Notably, the

location of the student organizations in Coffman Memorial Union, centrally located within the Twin Cities campus, is an optimal location for students generally, and the organizations specifically. This action by the University is also a form of promotion or sponsorship.

71.     Meanwhile, other student organizations under their Handbook are subject to disbursement caps without free student lounge space and no University sponsorships on the University's website.

72.     The University of Minnesota has permanently designated the following nine student organizations as "Coffman Memorial Union Student Cultural Centers": Black Student Union, La Raza Student Cultural Center, Disabled Student Cultural Center, Feminist Student Activist Collective, Queer Student Cultural Center, Asian-American Student Union, Minnesota International Student Association, American Indian Student Cultural Center, and Al-Madinah Cultural Center.

73.     Student organizations who do not receive one of the nine Coffman Memorial Union lounge locations are left with only sub-optimal alternatives (both on campus or off campus). For instance, some student organizations will only have temporary use of classrooms which do not have storage space and consistent location for recruitment. (For example, it would be difficult to run a barber shop out of a temporary hotel room; it's the same for student organizations operating out of temporary classrooms.)

74.     Other student organizations, who do not receive Coffman Memorial Union lounges, but who need permanent office space, are forced by the University's policies to attempt to lease office space off-campus which is complicated and expensive to do. But, leasing off-campus space requires resources, organization, and sophistication which often most, if not all, student organizations, year-to-year, do not have. The University does not assist these student organizations in acquiring off-campus office space when it has the resources to do so.

75.     Recently, reasonably-priced off-campus office space is more difficult to come by in Dinkytown and other nearby areas because the new light rail installation has caused economic development including construction of new condominiums, apartment and more expensive office space. This new construction has crowded the more affordable office spaces out.

76.     Nonetheless, the University of Minnesota continues to provide free lounge space in Coffman Memorial Union to these nine student organizations exclusively: Black Student Union, La Raza Student Cultural Center, Disabled Student Cultural Center, Feminist Student Activist Collective, Queer Student Cultural Center, Asian-American Student Union, Minnesota International Student Association, American Indian Student Cultural Center, and Al-Madinah Cultural Center.

77.     No other student organizations receives free office space anywhere on the Twin Cities campus.

78.     The University has for multiple years promoted on its website and elsewhere these same nine student organizations as "Coffman Memorial Union Student Cultural Centers" located in Coffman Memorial Union: Black Student Union, La Raza Student Cultural Center, Disabled Student Cultural Center, Feminist Student Activist Collective, Queer Student Cultural Center, Asian-American Student Union, Minnesota International Student Association, American Indian Student Cultural Center, and Al-Madinah Cultural Center.

79.     A copy of printed pages viewed from the Coffman Memorial Union webpage on the University of Minnesota website is attached as Exhibit G.

80.     It is prestigious and advantageous for a student organization to be highlighted on the University of Minnesota's web page as a "Coffman Memorial Union Student Cultural Center."

81.     No other student organizations are referred to as Coffman Memorial Union Student Cultural Centers by the University.

82.     No other student organizations are similarly sponsored by the University of Minnesota on its websites.

83.     A copy of printed pages viewed from the Multicultural Center for Academic Excellence webpage on the University's website is attached as Exhibit H. These pages also show the University's support of the nine student organizations as "Coffman Memorial Union Student Cultural Centers." *Id.*

84.     The Coffman Memorial Union Student Cultural Centers have nine

lounges at the Coffman Memorial Union occupied by the nine University-designated

Coffman Memorial Union Student Cultural Centers:

| Student organization | Coffman Memorial Union Lounge |
|---|---|
| Black Student Union | 209 |
| La Raza Student Cultural Center | 211 |
| Disabled Student Cultural Center | 213 |
| Feminist Student Activist Collective | 215 |
| Queer Student Cultural Center | 217 |
| Asian-American Student Union | 226 |
| Minnesota International Student Association | 232 |
| American Indian Student Cultural Center | 234 |
| Al-Madinah Cultural Center | 236 |

Ex. E at 4.

85.     Student organizations who are not one of the nine Coffman Memorial

Union Student Cultural Centers do not have access to these lounges.

86.     Thus, student organizations with different memberships, political, and

cultural views from the Coffman Memorial Union Student Cultural Centers are

excluded from these lounges at the Coffman Memorial Union.

87.     Student organizations which are not one of the Coffman Memorial Union Student Cultural Centers do not have access to the University's sponsorship on its webpage.

88.     Thus, these student organizations with different memberships, political, and cultural views from the Coffman Memorial Union Student Cultural Centers are excluded from the University's sponsorship on its webpages.

89.     People who are not members of any one of the Coffman Memorial Union Student Cultural Centers do not have access to Coffman Memorial Union lounges.

90.     Thus, people with different political and cultural views from the Coffman Memorial Union Student Cultural Centers are excluded from these Coffman Union lounges.

91.     At the University of Minnesota, student organizations such as the Coffman Memorial Union Student Cultural Centers are allowed to exclude others because the University of Minnesota does not have an "accept-all-comers" policy. *See Christian Legal Society v. University of California--Hastings*, 561 US 661 (2010).

92.     The Coffman Memorial Union Student Cultural Centers are able to exclude others because of the University-provided lease to Coffman Memorial Union and the fact that the University does not have an "accept-all-comers" policy that applies to its student organizations.

93.     Because of the University of Minnesota's policies, handbooks, and practices, the Plaintiffs are excluded from the nine lounges leased to the Coffman Memorial Union Student Cultural Centers—despite the fact they are required to pay student services fees that fund it.

94.     The University of Minnesota has a long administrative history associated with the preferential treatment of the Coffman Memorial Union Student Cultural Centers.

95.     The University of Minnesota President's Recommended Fiscal Year 2018 Operating Budget lists the nine Coffman Memorial Union Student Cultural Centers as occupying "semi-permanent" office space on the second floor of Coffman Memorial Union.

96.     For decades, the Coffman Memorial Union Student Cultural Centers have not paid rent for their lounge space at Coffman Memorial Union.

97.     The estimated value of the permanent lease is $30,000 per year.

98.     For some of the Coffman Memorial Union Student Cultural Centers, which have been there for decades, that means they have received over $1,000,000 in free rent in the Coffman Memorial Union which is subsidized by student services fees.

99.     These student organizations are: Black Student Union, La Raza, Al Madinah Student Cultural Center, American Indian Student Cultural Center, Minnesota International Student Association, Asian American Student Union,

Feminist Student Activist Collective, Disabled Student Cultural Center, and Queer Student Cultural Center.

100.   The student government at the University of Minnesota has an office on the second floor of Coffman Memorial Union. It is not deemed a "Coffman Memorial Union Student Cultural Center."

101.   There has never been written standards nor an appeal process regarding whether a student organization is deemed a Coffman Memorial Union Student Cultural Center.

102.   The Associate Director of Student Unions and Activities, Jason Hancock, confirmed in a December 27, 2016 email that "[t]here are currently no office spaces available in Coffman Memorial Union" for student organizations which are not Coffman Memorial Union Student Cultural Centers.

103.   A copy of the December 27, 2016 email from Associate Director of Student Unions and Activities Jason Hancock is attached as Exhibit I.

104.   There is no application procedure for office space listed on the Student Unions & Activities website.

105.   Other student organizations have no opportunity to obtain free student organization office space anywhere on campus.

106.   The history of student organizations, such as Collegians for a Constructive Tomorrow (CFACT), failing in their applications for space in Coffman Memorial Union is complicated by the University's changing statements.

107.   First, the University implemented "traffic counts" against the nine Coffman Memorial Union Student Cultural Centers. "Traffic counts" meant in practice that as long as the Coffman Memorial Union Student Cultural Center was using its space when the University officials randomly dropped by, they could keep their space. No Coffman Memorial Union Cultural Center has been displaced for low traffic counts.

108.   So, practically, there is never an open space at Coffman Memorial Union for other student organizations. Student organizations who are renting in Dinkytown and elsewhere off campus, or who merely aspire to get space, can never seek space at Coffman Memorial Union.

109.   Second, the non-student-cultural-center student organizations at least got an opportunity to share cubicles in Coffman Memorial Union up until the 2010/2011 renovation of Coffman Memorial Union, while the Coffman Memorial Union Student Cultural Centers had exclusive use of hard-walled lounges.

110.   After the renovation of the Coffman Memorial Union, the cubicles are gone. Hence, student organizations which are not Coffman Memorial Union Student Cultural Centers are left to their own devises, such as unused classrooms or to rent off-campus as many student organizations do and must.

111.   The Student Services Fee Review Task Force established in 2012 that, among other things, "Student Unions & Activities must establish and maintain a

grievance procedure for student organizations in the event that a space allocation issue arises."

112.    This requirement was printed in subsequent SSFC Handbooks, including the handbook for the 2016-17 school year.

113.    In response to an e-mail request about the grievance process from the 2017-18 treasurer of CFACT, Jason Hancock confirmed on January 25, 2017 that there is no grievance process for Coffman Memorial Union office space. Ex. I.

114.    Hancock wrote, "There is no grievance process related to the allocation of space through the fees committee. Also, in looking in the fees handbook for 2017-2018, it appears that the language regarding the fees grievance process has been removed. I'm not involved in the fees process, but I suggest that you contact Sara Carvell at scarvell@umn.edu if you have any questions regarding the 2017-2018 process." *Id.*

115.    As recently as fiscal year 2018, the University of Minnesota has adopted a Student Group Space Renewal Process for the Coffman Memorial Union Student Cultural Centers.

116.    Under the new policy, the Coffman Memorial Union Student Cultural Centers apply to renew their leases to the lounges at the Coffman Memorial Union.

117.    No other student organization can apply for a lease to the lounge space.

118.    A copy of the University of Minnesota's fiscal year 2018 Student Group Space Renewal Process is attached as Exhibit J.

119.    The Student Group Space Renewal Process basically grandfathers in the nine current Coffman Memorial Union Student Cultural Centers.

120.    The nine Coffman Memorial Union Student Cultural Centers are treated in the University of Minnesota's Student Group Space Renewal Process as legacies with codified rights against termination of their permanent leases on the lounges at Coffman Memorial Union which is subsidized by student services fees.

121.    Further, the University of Minnesota's Student Group Space Renewal Process, under General Criteria for Renewal, paragraph 7, requires that the "mission of the group complements the mission of the SUA [Student Unions and Activities] and the U of M."

122.    So, even if other student organizations could apply for a vacant lounge in the Coffman Memorial Union, only student organizations with missions complimentary to the Student Unions and Activities and the University of Minnesota could apply to be Coffman Memorial Union Student Cultural Centers.

123.    Despite the clear requirement for a grievance process in the rules governing the 2016-17 allocation of funds to Coffman Memorial Union, no grievance process existed during the 2016-17 school year—nor thereafter.

124.    The Student Services Fees Appeal Committee's response to CFACT's operational appeal noted, "The allocation of space in Coffman Memorial Union is provided by SUA, a unit of the University that operates independently of the SSFC. The SUA space allocation process is not part of the responsibilities of the Student

Groups SSFC. Hence, any issues regarding space allocation cannot be addressed by this committee."

125.    Between Student Unions and Activities and the Student Services Fees Committee, there was no appeal, due process, or oversight of the allocation of office space to the Coffman Memorial Union Student Cultural Centers who are all receiving student services fees.

126.    In 1987, the Final Report of the Special Committee on Minority Programs in Support of Commitment to Focus (Taborn Committee) recommended "physically attractive" lounges for minority cultural centers.

127.    In the late 1980s, the University evicted an art gallery and a credit union from Coffman Memorial Union in order to provide more centrally located offices and lounges for the Coffman Memorial Union Student Cultural Centers.

128.    The four original cultural centers (Africana, Asian American, American Indian, and Chicano/Latino) were connected to the Office of Minority and Special Student Affairs (OMSSA), each with their own Learning Resource Center.

129.    Today, the racially separate Learning Resource Centers are combined into the Multicultural Center for Academic Excellence.

130.    Five of the student organizations that receive free rent in Coffman Memorial Union were not part of the Taborn Committee's recommendation.

131.    None of the Coffman Memorial Union Student Cultural Centers have ever been part of the University administration.

132.    The Coffman Memorial Union Student Cultural Centers have historically been and are independent student organizations.

133.    The Coffman Memorial Union Student Cultural Centers engage in expressive activities separate and apart from the University.

134.    As student organizations, each of the Coffman Memorial Union Student Cultural Centers has a constitution, name and membership list.

135.    The students who are members of the Coffman Memorial Union Student Cultural Centers, not the University, determine the student organization's constitution, name and membership list.

136.    Many of the Coffman Memorial Union Student Cultural Centers, as student organizations, have changed their names over the decades.

137.    The students who are members of the respective Coffman Memorial Union Student Cultural Centers, not the University, changed the student organization's names.

138.    Over the decades, the Black Student Union was previously known as Africana Student Cultural Center and Black Student Cultural Center. These name changes were authorized by the student organization's members, not the University.

139.    Over the decades, the La Raza Student Cultural Center was previously known as Chicano/Latino Student Cultural Center. This name change was authorized by the student organization's members, not the University.

140.    Over the decades, the Feminist Students Activist Collective was previously known as the Women's Student Activist Collective, University Young Women and as a university chapter of the YWCA (Young Women Christian Association). These name changes were authorized by the student organization's members, not the University.

141.    According to Wikipedia's entry for the Queer Students Cultural Center, over the decades, the Queer Students Cultural Center was previously named "The Association of GLBT Student Organizations and their Friends"—as student organization created to obtain University of Minnesota funding:

> Upon its creation, QSCC was named "The Association of GLBT Student Organizations and Their Friends" upon its inception in 1994 at the U of MN. The group was created by Dave McPartlin and founded by the President of the University Gay Community (Dave McPartlin), the co-presidents of the University Bisexual Community (Jage Miller and Jonas Duca) and a co-facilitator of the University Lesbians (Susanna de Campos Salles) overseen by adviser Doug Halverson. The group was later renamed The Queer Student Cultural Center in 1998.

> Approved by the Minnesota Student Association and then University President, Nils Hasselmo, and Vice-President of Student Affairs, Marvalene Hughes, the Association was one of the earlier student groups to get University funding to combat homophobia and tackle issues specific to LGBT students. The group was created to become a 'cultural center' but did not take the name until several years afterwards for fear that inclusion of the word 'culture' would prevent them from security minority status and University status.

These name changes were authorized by the student organization's members, not the University.

142.   From at least as far back as the 1983-84 school year until 1992-93, the four original cultural centers were funded by a line item in the mandatory fee assessment entitled "Cultural Programs" in the amount of $1.47 per student, per academic quarter (trimester).

143.   In the 1993-94 school year, the budget was broken down further to create line items for the four original cultural centers and a "Cultural Activities Grant Fund."

144.   The Disabled Student Cultural Center received a line item mandatory fee ($0.21) for the first time in the 1993-94 school year.

145.    The Association of GLBT Student Organizations and their Friends, which later became the Queer Student Cultural Center, received its first mandatory fee of ($0.20) in the 1991-92 school year.

146.   Although not called a "cultural center" by the fees committee initially, the University chapter of the YWCA, now called Feminist Student Activist Collective, first received mandatory fee funding in 1985-86.

147.   Using student services fees subsidizing Coffman Memorial Union, the University provides free lounges exclusively to the nine Coffman Memorial Union Student Cultural Centers who, in turn, engage in ideological speech.

148.   No other student organization has been and is allowed to apply to occupy these lounges.

149.   Prior to the 2004-05 school year, student organizations applied to the fees committee for a line item rent allocation that they would pay to the student union.

150.   In 2004, the same student organizations were given free rent in exchange for a dollar-for-dollar increase in the student fee allocation directly to the student union.

151.   Student organization office space is paid for by mandatory student fees.

152.   During the early 2000's renovation of the entire Coffman Memorial Union, the Coffman Memorial Union Student Cultural Centers that had previously held space in the student union were considered by the University of Minnesota to be "grandfathered" into the student-services-fee-funded, improved facility.

153.   The Coffman Memorial Union Student Cultural Centers were allowed input into the design of their lounges, which were in excess of 1,000 square feet.

154.   The grandfathering rights of the Coffman Memorial Union Student Cultural Centers was confirmed by Jason Hancock (then Operations Director of Twin Cities Student Unions) in an e-mail to student Anthony Reel dated March 22, 2002.

155.   Al Madinah Student Cultural Center, a student group for Muslims, was provided a lounge when the building completed construction and reopened in 2003 with an additional lounge on the second floor of the Coffman Memorial Union intended for Al Madinah Student Cultural Center.

156.    Al Madinah Student Cultural Center had not held space prior to the renovation and had not even been awarded a student services fee disbursement when the lounge was constructed and provided to it.

157.    The University of Minnesota provided no application process for other student organizations to apply for the vacant lounge still occupied by the Al Madinah Student Cultural Center since 2003.

158.    In 2010, the Student Services Fees Committee questioned the legality of the then-current allocation of space in Coffman Memorial Union.

159.    In January, 2011, the Student Unions & Activities Board of Governors put a "freeze" on allocation of student space, meaning that groups that held office space in 2010-11 did not have to reapply for space while the issues of space allocation were considered.

160.    Following protests, the nine Coffman Memorial Union Student Cultural Centers listed above were allowed to continue permanent office space on the second floor of Coffman Memorial Union. Despite the University in some documents referring to the office space as "semi-permanent," the University's policy remained constant: no other student organization could apply to occupy the Coffman Memorial Union lounges.

161.    The University explicitly authorized the nine Coffman Memorial Union Student Cultural Centers to use 68% of the space on the second floor in perpetuity.

162.    This protest controversy received media coverage.

31

163.    In 2013, the protest controversy also led to the University using more student services fees to renovate the Coffman Memorial Union lounges. According to JeDunn Construction, the University's construction company which used student services fees to remodel the Coffman Memorial Union Student Cultural Centers' lounges, the purpose of the project was to recruit and retain a "diverse population of students":

> This 23,700-square-foot campus building remodel project contributes to the recruitment and retention of a diverse population of students. This was accomplished by redesigning and renovating the whole of Coffman Union's second floor. Spaces for cultural student groups, student government, and commuters were retained and improved…

*See* https://jedunn.com/projects/university-minnesota-coffman-union-second-floor-remodel (last viewed on April 24, 2020.

164.    JeDunn Construction's use of the phrase "diverse population of students" contradicts the reality that the University's policy is to grandfather in the Coffman Memorial Union Student Cultural Centers' lounges to exclude others from the remodeled lounges—not to include them.

165.    The protest controversy and subsequent remodeling was featured in one academic journal: McDowell, Anise Mazone, and Jeanne L. Higbee, "Responding to the concerns of student cultural groups: Redesigning spaces for cultural centers." Contemporary Issues in Education Research (Online) 7.3 (2014): 227.

CASE 0:20-cv-01055-PJS-TNL   Document 1   Filed 04/30/20   Page 33 of 68

166.   In the 1998 *Curry* federal action, three Coffman Memorial Union Student Cultural Centers sued to intervene in order to protect their exclusive use of student services fees for their ideological speech.

167.   The Coffman Memorial Union Student Cultural Centers use student-services-fee-funded lounge space to exclude individuals and groups with whom their ideology conflicts.

168.   The University of Minnesota policy is that the Coffman Memorial Union Student Cultural Centers, granted free lounges, are not required to "take all comers."

169.   Specifically, in 2012, the Student Fees Committee considered an interpretation of the Equal Opportunity Statement for student organizations that the University has rejected. The General Counsel informed the 2012 Student Service Fees Reform Task Force that the University does not require student groups to "take all comers."

170.   The University's Equal Opportunity Statement itself acknowledges the First Amendment rights of association and free exercise of religion, and sets forth a disciplinary process.

171.   In the 1980s, the University defended the exclusive membership of WSAC (then U-YWCA) and MPIRG in court.

172.   In 1994, the University allowed Christian Legal Society and Graduate Christian Fellowship to register as student groups, despite their faith statement membership requirements.

33

173.   In 2004, the University settled a lawsuit with Maranatha Christian Fellowship establishing student organizations' rights to exclude students at the University.

174.   Over the decades, the Coffman Memorial Union Student Cultural Centers, and University of Minnesota officials, claim that lounges for each Coffman Memorial Union Student Cultural Center is their "safe space"—meaning others are excluded.

175.   The University of Minnesota encourages this self-segregation by sponsoring the Coffman Memorial Union Student Cultural Centers on its website and designing and furnishing the lounges for "socializing."

176.   The Gopherlink page for Queer Student Cultural Center says, "The Queer Student Cultural Center provides a safe space in Coffman 217 for any GLBTA person on the U of M campus."

177.   The Asian-American Student Union Facebook page says, "If you need a safe space to heal or talk, our office is located in Coffman Memorial Union room 226. The Asian-American Student Union is open Monday-Friday from 9am-5pm."

178.   The Black Student Union Gopherlink page says, "We provide a place for students on campus to relax, socialize, and take a break from classes. We are involved with greater Twin-Cities community political issues facing minorities and students on campus. The Black Student Union carries out annual events such as Unity Dinner, Political Awareness Events, Black History Events, Ebony Ball and many more."

179.    Much of the protest in 2011 surrounding the proposed renovations of the Coffman Memorial Union second floor centered around the idea of "safe spaces"—as indicated in the academic article referenced above.

180.    "Safe places," in the context of the Coffman Memorial Union Student Cultural Centers, means excluding students who are not members of the student organizations identified by University of Minnesota as Coffman Memorial Union Student Cultural Centers.

181.    The Coffman Memorial Union Student Cultural Centers, even though student-services-fee-funded student organizations, are not required to accept "all comers" for making programming, ideological, and leadership decisions for the group.

182.    This was confirmed by the University's Associate General Counsel at the February 3, 2012 meeting of the Student Service Fees Reform Task Force.

183.    The Coffman Memorial Union Student Cultural Centers are allowed to preserve their own ideological identity by excluding others from their lounges.

184.    There never has been any University prohibition against the Coffman Memorial Union Student Cultural Centers from engaging in ideological activities, except they cannot use funds "on behalf of a candidate for public office in a political campaign."

185.    The Coffman Memorial Union Student Cultural Centers, over the years, have engaged in democratic activities such as protests, pamphleting, and hosting events just like other student organizations.

186.    Currently, the University of Minnesota's policies, handbooks, and practices provide the Coffman Memorial Union Student Cultural Centers for preferential treatment compared to other student organizations. Ex. C.

187.    When the nine Coffman Memorial Union Student Cultural Centers obtained the University's historical approval, over the decades, the Coffman Memorial Union Student Cultural Centers gained permanent access to student-services-fees-subsidized free lounge space and University-sponsorship on its webpages—this subsidization is above and beyond the limited funding a student organization may receive under the handbook for student organizations (Ex. E).

188.    A student-services-fee-paying student-plaintiff has no appeal process to object to the University's historical approval of Coffman Memorial Union Student Cultural Centers and the beneficial regulations and additional student-service-fees disbursements that flow from the University's approval of Coffman Memorial Union Student Cultural Centers.

189.    The University of Minnesota's "Student Services Fee Request Handbook for Student Organizations" (Exhibit E) does not distinguish between Coffman Memorial Union Student Cultural Centers and other student organizations despite the fact the Coffman Memorial Union Student Cultural Centers receive free office space and University support other student organizations do not receive.

190.    As a Coffman Memorial Union Student Cultural Center, that student organization has free office space and University support even before it applies for

funding under the "Student Services Fee Request Handbook for Student Organizations." Exhibit E.

191.   The Coffman Memorial Union Student Cultural Centers are treated in the application for disbursement process as if they were a student organization which has not received free office space and free University sponsorship as a Coffman Memorial Union Student Cultural Center.

192.   Consequently, Coffman Memorial Union Student Cultural Centers have access to more funding and resources under the handbook for student organizations (Ex. #) than other student organizations do.

193.   For example, Coffman Memorial Union Student Cultural Centers can request up to $30,000 in event or project-related costs and up to $25,000 in operational funds on top of their free office space (estimated value of $30,000 per year) and free University support.

194.   Other student organizations would have to lease office space and pay for similar support which would apply against the University of Minnesota's respective $30,000 and $25,000 caps.

195.   The University of Minnesota's preferential treatment of Coffman Memorial Union Student Cultural Centers leads to preferential funding of these student organizations and the exclusion of people of different political and cultural views from Coffman Memorial Union.

196.    The Plaintiffs are prohibited by the University's Coffman Memorial Union Student Cultural Centers to enter the nine lounges in Coffman Memorial Union unless they have obtained memberships (if they want them) in the student organizations occupying the nine lounges.

197.    Meanwhile, the Board of Regents provides no application process for other student organizations to receive the free office space and University support that the Coffman Memorial Union Student Cultural Centers enjoy.

198.    The University of Minnesota has no application process for other student organizations to apply for those nine lounges in the Coffman Memorial Union—nor administrative appeal process to challenge the University of Minnesota's designations of student organizations as Coffman Memorial Union Student Cultural Centers.

199.    For decades, different student organizations have inquired about obtaining possession of the lounges at Coffman Memorial Union and obtaining University sponsorship as a Coffman Memorial Union Student Cultural Center, but the University has denied each request.

200.    When challenged on this point, University officials have stated that the Coffman Memorial Student Cultural Centers are "grandfathered" into the nine lounges at the Coffman Memorial Union and into the University's sponsorship on its webpages.

201.   The University of Minnesota's policies, handbooks and practices provide preferential treatment to Coffman Memorial Union Student Cultural Centers over other student organizations.

202.   The University of Minnesota's policies, handbooks and practices were the same or similar for the 2019-2020 school year and appear unchanged for the new 2020-2021 school year.

## V.   The University of Minnesota bans disbursements of student services fees to partisan organizations.

203.   The University of Minnesota's policies, handbooks, and practices single out and exclude "partisan political organizations" from any disbursement of mandatory student services fees.

204.   Specifically, the Student Services Fee Request Handbook for Student Organizations states:

> MINIMUM REQUIREMENTS FOR APPLYING FOR STUDENT SERVICES FEE FUNDING
>
> In order for a group to be eligible to apply for funds, <u>all</u> of the following criteria must be met:
>
> ***
> (7) Partisan political organizations are not eligible for the general student services fee funding. "Partisan political organizations" are organizations affiliated with a registered political party or candidates for election which are formed for the purpose of supporting a political party or candidate for election.

Ex. C at 12.

205.    Specifically, if the student organization does not fall within the Handbook's definition of a "political party organization," although it engages in political events, it may apply for funding for political events.

206.    But, if a student organization falls within the Board of Regent's definition of a "political party organization," such as a Republican student organization or a Democratic student organization, it is not eligible for funding for political events.

207.    So, non-partisan student organizations have access to funding for political events while partisan political organizations do not.

208.    Instead of banishing partisan political organizations from disbursements, the Board of Regents could have focused on what the disbursement was going to be used for. After all, non-partisan student organizations can obtain disbursements for promoting an event for a partisan candidate while a partisan student organization cannot.

209.    For example, a non-partisan student organization could sponsor a debate between Presidential candidates Joe Biden and Bernie Sanders.

210.    But, under the Handbook's definition, a partisan political organization could not receive a disbursement for the same candidate meeting.

211.    Additionally, the University of Minnesota policy permits student organization to lobby on or off campus on federal or state issues.

212.    So, a student organization can received funding to lobby and protest on issues that are part of political parties' platforms, such as immigration.

213.    But, there is a prohibition on funding student organizations the exact same thing if they support partisan political candidates.

214.    An example of a student circumvention of this policy is the University's GOP (Republican) student organization was prohibited from funding; but, after it changed its name to Campus Conservative Cultural Program (CCCP), it thereafter received funding.

## VI.    The University of Minnesota bans disbursements of student services fees to new organizations.

215.    The University of Minnesota's policies, handbooks and practices single out and exclude "new student organizations" from any disbursement of mandatory student services fees.

216.    The Board of Regents has left it to the individual campuses whether new student organizations are prohibited from disbursements.

217.    At the Morris campus, three years of existence is required for a student organization before applying for funding.

218.    At the Duluth campus, two years of existence is required for a student organization before applying for funding.

219.    At the Twin Cities campus, the campus at issue in this case, 12 months of financial history is required before a student organization can apply for funding. Even then, the student organization can be denied funding for being too "new."

220.    Specifically, for the Twin Cities Campus the Student Services Fee Request Handbook for Student Organizations states:

> MINIMUM REQUIREMENTS FOR APPLYING FOR STUDENT SERVICES FEE FUNDING
>
> In order for a group to be eligible to apply for funds, <u>all</u> of the following criteria must be met:
>
> ***
> (3) The group must be able to provide financial documentation (in the form of bank statements—or EFS report for CLPs—that can be supported by a general ledger) for the 12 (consecutive) months prior to applying.

Exhibit E at 12.

221.    If a new student organization does satisfy the Board of Regent's requirement of 12 months of financial history, it may not apply for funding under the Handbook. Exhibit E.

222.    Even if a student organization can meet the 12 month requirement, it doesn't mean that funding can't still be denied because the student organization is new.

223.    Recently, this happened at the University of Minnesota in the case of Students for Alcohol, Tobacco, and Firearms.

224.    The student organization met the 12 month requirement of financial

history, but were still being turned down for being too new.

225.    Thus, existing students groups have access to funding under the

Handbook (Ex. E) while new student organizations do not.

**VII.    The University of Minnesota does not provide an administrative
appeal to a student who pays student services fees to challenge the
viewpoint neutrality of the policies, handbooks, and practices
adopted by the Board of Regents, President, and Vice Provost for
Student Affairs**

226.    The University of Minnesota's policies, handbooks, and practices do not

provide and administrative appeal regarding the University of Minnesota's

determinations favoring media groups and Coffman Memorial Union Student Cultural

Centers and banning funding to partisan political organizations and new student

organizations.

227.    Absent an administrative appeal, the University of Minnesota exercises

unbridled discretion over its disbursements of student services fees.

228.    The Student Services Fee Request Handbook for Student Organizations

(Exhibit E), page 24, provides a limited administrative appeal:

> Appeals… In order to appeal a funding recommendation by the SSFC
> [student services fee committee], individual SSF [student services fees]-
> paying students and student groups must provide evidence that one (or
> more) of the following criteria were met:
>
> 1) The SSFC violated its own rules
> 2) The SSFC exhibited bias against an organization
> 3) The SSFC did not make a decision in a viewpoint-neutral manner.

But, nowhere does the text authorize the individual University student-services-fees-paying student to appeal from the Board of Regent's policy or handbooks.

229.    The Handbook limited the scope of the administrative appeal meaning that the University of Minnesota's policies and handbooks are not subject to administrative appeal themselves.

230.    For example, the Handbook's limitations on administrative appeal mean that a student-services-fee-paying student cannot challenge University of Minnesota's determinations favoring media groups and Coffman Memorial Union Student Cultural Centers and banning funding to partisan political organizations and new student organizations.

231.    Even if there were an appellate right, it's not clear it would be worth much, the University of Minnesota, Vice Provost for Student Affairs, has recently discontinued the practice of recording deliberations of the Student Services Fee Committee at the Twin Cities campus.

## Count I

### First and Fourteenth Amendment Claims
### Under 42 U.S.C. § 1983

**The University of Minnesota's policies, handbooks and practices unconstitutionally favor media student organizations such as MN Daily and Radio K over other student organizations for preferential treatment—showing a violation of viewpoint neutrality.**

232.    The paragraphs written above are incorporated as if fully restated.

233.    The University of Minnesota has adopted policies, handbooks, and practices which in practice permanently designate certain student organizations such as Minnesota Daily and Radio KUOM as media groups for beneficial student-services-fees disbursements.

234.    The University does not provide for an administrative appeal of its media groups policy or its determination of media groups.

235.    As to public university administration of student services fees, to protect a student's First Amendment and Fourteenth Amendment rights, viewpoint neutrality is constitutionally required in the allocation of funding to student organizations and to student activities.

236.    "The proper measure, and the principal standard of protection for objecting students… is the requirement of viewpoint neutrality in the allocation of funding support." *Southworth v. Board of Regents of the University of Wisconsin System,* 529 U.S. 217. 233 (2000).

237.    Viewpoint neutrality means that funding decisions cannot be based on the university's or a particular group's point of view.

238.    The First Amendment free speech protections are incorporated against the states and their agencies through the Fourteenth Amendment of the U.S. Constitution.

239.    The named student Plaintiffs in this action were not involved in any previous litigation proceedings. They are individuals, not student organizations.

240.   The named Plaintiff association consists of University of Minnesota students.

241.   The Plaintiffs are not challenging whether a specific organization did or did not get money but, instead are challenging the University's mandatory student fee system, its process, as violating constitutionally-required viewpoint neutrality.

242.   The plaintiffs object to the University of Minnesota exercising unbridled discretion to distribute mandatory student services fees to media groups such as the Minnesota Daily and Radio KUOM (also known as "Radio K") while imposing expense caps on other student organizations.

243.   The University of Minnesota's policies, handbooks, and practices single out media student organizations over other student organizations for preferential treatment.

244.   The University of Minnesota's "Student Services Fee Request Handbook for Media Groups" states:

In order to gain approval to apply as a Media Group, a group must meet the following minimum criteria:

1.   Have a mission that indicates that the group's primary focus is to provide a media-related service (not exclusive to social media) to campus;

2.   Be a University Unit, Registered Student Organization (RSO) or Campus Life Program (CLP) currently registered and in good standing with Student Unions and Activities;

3.   Meet all minimum requirements for applying for Student Services Fee Funding (see pages 10-11); and

4. Gain approval from the VPSA[Vice Provost for Student Affairs]/DoS [Dean of Students] (or designee) to apply for SSF funds as a Media Group. The VPSA/DoS shall have the exclusive authority to determine which applicants may apply to a SSF committee.

Exhibit D at 15.

245. Under the policy, the Vice Provost for Student Affairs has exclusive authority to invite preferred student organizations to apply as media groups.

246. If a student organization is not invited to be a media group, it is precluded from applying.

247. The University of Minnesota offers no appeal to student organizations who are denied an invitation to be a media group.

248. If the student organization is not approved as a media group by the University of Minnesota under this policy, then it must apply for funding under the University of Minnesota's handbook titled "Student Services Fee Request Handbook for Student Organizations." Exhibit E.

249. Here, the University of Minnesota's policy violates viewpoint neutrality by authorizing the Vice Provost for Student Affairs to exclusively invite certain student organizations such as the Minnesota Daily and Radio K to apply as media groups—while denying other student organizations the right to apply.

250. The Board of Regents abandons viewpoint neutrality in favor of the University of Minnesota's point of view of "media groups" and in favor of its frame-of-reference on "media groups."

251.   For example, many student organizations provide podcasts and blogs to support their mission; but, the Vice Provost for Student Affairs will not invite these student organizations to apply as a "media group."

252.   Meanwhile, a student-services-fee-paying student has no meaningful appeal to object to the University's approval of media groups and the beneficial regulations and additional moneys that flow from the University's approval of media groups.

253.   Once the media groups obtain University's approval, media groups have access to more funding under the University of Minnesota's handbook as media groups (Exhibit D) than they would if they were applying under the University of Minnesota's handbook for student organizations. (Exhibit E)

254.   The Board's preferential treatment of media groups leads to preferential funding of media groups.

255.   Minnesota Daily and Radio K, a newspaper and a radio station, respectively, received disbursements as a media group (Exhibit. D) which they could not have received as a student organization (Exhibit E) because student organizations have a $30,000 limit on event or project-related expenses and a $25,000 limit on operational expenses.

256.   For example, a student organization, despite podcasts and blogs, cannot become a media group unless invited and approved by the University of Minnesota.

257.    The University of Minnesota's designation of media groups is based on its preferences for media—a violation of viewpoint neutrality.

258.    The University of Minnesota's policies, handbooks and practices violate viewpoint neutrality by favoring media groups such as Minnesota Daily and Radio K over other student organizations.

259.    The University of Minnesota's policies, handbooks, and practices were the same or similar for the 2019-2020 school year and remain unchanged for the new 2020-2021 school year.

260.    The University of Minnesota's policies, handbooks, and practices requiring mandatory student services fee disbursement to favor media groups over other groups violates the First and Fourteenth Amendments to the U.S. Constitution—and causes damage to the Plaintiffs.

261.    The portion of the student activity fees that went to media groups reflects unconstitutional disbursements made according to the University's preferences.

262.    The University's unconstitutional disbursements to media groups caused an unnecessary increase in the student activity fees.

263.    The Plaintiffs have been damaged in the amount of the student activity fee increase to pay for the disbursements to media groups.

264.    Because of the continuing damage to Plaintiffs, the Plaintiffs seek declaratory judgment and injunctive relief against the Defendants.

## Count II

### First and Fourteenth Amendment Claims
### Under 42 U.S.C. § 1983

**The University of Minnesota's policies, handbooks and practices unconstitutionally favor "grandfathered" student organizations called Coffman Memorial Union Student Cultural Center over other student organizations for preferential treatment and for "safe places" excluding other students— showing a violation of First and Fourteenth Amendments.**

265.   The paragraphs written above are incorporated as if fully restated.

266.   The First Amendment free speech protections are incorporated against the states and their agencies through the Fourteenth Amendment of the U.S. Constitution.

267.   The Board of Regents does not have a specific policy as to the designation of student organizations as Coffman Memorial Union Student Cultural Centers.

268.   Since 2005, the year the Board of Regents last amended its policy on student services fees, the Board of Regents has given unbridled discretion to the administration at the Twin Cities campus to permanently designate and prefer nine student organizations as the Coffman Memorial Union Student Cultural Centers.

269.   The Vice Provost for Student Affairs and her predecessors have been the public officials responsible for making and implementing policy for the Coffman Memorial Union Student Cultural Centers.

270.    The University of Minnesota provides no administrative appeal of their

decisions relating to permanently designating the nine student organizations as the

Coffman Memorial Union Student Cultural Centers.

271.    The Plaintiffs object to the Vice Provost for Student Affairs exercising

unbridled discretion to provide free lounge space in the Coffman Memorial Union

and University sponsorship to the following groups as "Coffman Memorial Union

Student Cultural Centers" while imposing expense caps without free-office space and

no University sponsorships for other student organizations: Black Student Union, La

Raza Student Cultural Center, Disabled Student Cultural Center, Feminist Student

Activist Collective, Queer Student Cultural Center, Asian-American Student Union,

Minnesota International Student Association, American Indian Student Cultural

Center, and Al-Madinah Cultural Center.

272.    Coffman Memorial Union is maintained, at least in part, by the student

services fees; under the University of Minnesota's report heading, "Student Life,

Health and Well-being fee", the University acknowledges the following disbursements

from a student's student services fees every semester:

Student Unions and Activities—Bond Repayment     $44.71

Student Unions and Activities—Facility Support     $53.01

Student Unions and Activities—Operating     $31.30

273.    The University has for multiple years consistently provided free office

space in Coffman Memorial Union to these nine student organizations: Black Student

Union, La Raza Student Cultural Center, Disabled Student Cultural Center, Feminist Student Activist Collective, Queer Student Cultural Center, Asian-American Student Union, Minnesota International Student Association, American Indian Student Cultural Center, and Al-Madinah Cultural Center.

274.   No other student organizations receive free office space at Coffman Memorial Union.

275.   A copy of printed pages viewed from the Coffman Memorial Union webpage on the University of Minnesota website are attached as Exhibits G and H.

276.   The University has for multiple years promoted on its website and elsewhere these same nine student organizations as "Coffman Memorial Union Student Cultural Centers" located in Coffman Memorial Union: Black Student Union, La Raza Student Cultural Center, Disabled Student Cultural Center, Feminist Student Activist Collective, Queer Student Cultural Center, Asian-American Student Union, Minnesota International Student Association, American Indian Student Cultural Center, and Al-Madinah Cultural Center.

277.   It is prestigious for a student organization to be highlighted on the University of Minnesota's web page as a "Coffman Memorial Union Student Cultural Center."

278.   No other student organizations are referred to as Coffman Memorial Union Student Cultural Centers by the University.

279.    Student organizations who are not one of the nine Coffman Memorial Union Student Cultural Centers do not have access to these lounges; thus, student organizations with different political and cultural views from the Coffman Memorial Union Student Cultural Centers are excluded from these lounges at the Coffman Memorial Union.

280.    Student organizations which are not one of the Coffman Memorial Union Student Cultural Centers do not have access to the University's sponsorship on its webpages; thus, student organizations with different political and cultural views from the Coffman Memorial Union Student Cultural Centers are excluded from the University's sponsorship on its webpages.

281.    People who are not members of any one of the Coffman Memorial Union Student Cultural Centers do not have access to these lounges; thus, people with different political and cultural views from the Coffman Memorial Union Student Cultural Centers are excluded from these lounges at the Coffman Memorial Union.

282.    At the University of Minnesota, student organizations such as the Coffman Memorial Union Student Cultural Centers are allowed to exclude others because the University of Minnesota does not have an "accept-all-comers" policy.

283.    The Coffman Memorial Union Student Cultural Centers are able to exclude others because of the University-provided lease to Coffman Memorial Union and the fact that the University does not have an "accept-all-comers" policy that applies to its student organizations.

284.     The Plaintiffs are excluded from the nine lounges leased to the Coffman Memorial Union Student Cultural Centers.

285.     The University of Minnesota's policies, handbooks and practices, in violation of viewpoint neutrality, favor the Coffman Memorial Union Student Cultural Centers for preferential treatment compared to other student organizations.

286.     The Board of Regents abandons viewpoint neutrality in favor of the University's point of view of "Coffman Memorial Union Student Cultural Centers" and in favor of the University's frame-of-reference regarding "Coffman Memorial Union Student Cultural Centers."

287.     Meanwhile, a fee-paying student-plaintiff has no meaningful appeal to object to the University's approval of Coffman Memorial Union Student Cultural Centers and the beneficial regulations and additional student-service-fees disbursements that flow from the University's approval of Coffman Memorial Union Student Cultural Centers.

288.     Once the Coffman Memorial Union Student Cultural Centers obtain the University's approval, the Coffman Memorial Union Student Cultural Centers have exclusive access to student-services-fees-subsidized lounges and University-sponsorship on its webpages—this subsidization is above and beyond the limited funding a student organization may receive under the University of Minnesota's handbook for student organizations.

289.    The University of Minnesota's "Student Services Fee Request Handbook for Media Groups" (Exhibit D) does not distinguish between Coffman Memorial Union Student Cultural Centers and other student organizations despite the fact the Coffman Memorial Union Student Cultural Centers receive free office space and University support other student organizations do not receive.

290.    As a Coffman Memorial Union Student Cultural Center, that student organization has free office space and University support even before it applies for funding under the Student Services Fee Request Handbook for Student Organizations. (Exhibit E)

291.    The Coffman Memorial Union Student Cultural Centers are treated in the application for disbursement process as if they were a student organization which has not received free office space and free University sponsorship as a Coffman Memorial Union Student Cultural Center.

292.    Consequently, Coffman Memorial Union Student Cultural Centers have access to more funding and resources under the Handbook (Exhibit E) than other student organizations do.

293.    For example, Coffman Memorial Union Student Cultural Centers can request up to $30,000 in event or project-related costs and up to $25,000 in operational funds on top of their free office space and free University support.

294.    Other student organizations would have to lease office space and pay for similar support which would apply against the University of Minnesota's respective $30,000 and $25,000 caps.

295.    The University of Minnesota's preferential treatment of Coffman Memorial Union Student Cultural Centers leads to preferential funding of these student organizations and the exclusion of people of different political and cultural views from Coffman Memorial Union.

296.    The Plaintiffs are not prohibited from the University's Coffman Memorial Union Student Cultural Centers in the nine lounges in Coffman Memorial Union because they are not member of those nine organizations.

297.    Meanwhile, the University of Minnesota provides no application process for other student organizations to receive the free office space and University support that the Coffman Memorial Union Student Cultural Centers enjoy.

298.    The University of Minnesota has no application process for other student organizations to apply for those nine lounges in the Coffman Memorial Union.

299.    For decades, different student organizations have inquired about obtaining new, free office space at Coffman Memorial Union and University sponsorship as a Coffman Memorial Union Student Cultural Center, but the University has denied each request.

300.   When challenged on this point, University officials have stated that the Coffman Memorial Student Cultural Centers are "grandfathered" into the nine lounges at the Coffman Memorial Union and into the University's sponsorship on its webpages.

301.   The University of Minnesota's policies, handbooks and practices violate First Amendment viewpoint neutrality by favoring Coffman Memorial Union Student Cultural Centers over other student organizations.

302.   The University of Minnesota's policies, handbooks and practices were the same or similar for the 2019-2020 school year and remain unchanged for the new 2020-2021 school year.

303.   The University of Minnesota's policies, handbooks and practices requiring mandatory student services fee disbursement favoring Coffman Memorial Union Student Cultural Centers violates the viewpoint neutrality required by the First Amendment to the U.S. Constitution—and causes damage to the Plaintiffs.

304.   The University of Minnesota's policies, handbooks and practices endorsing the nine Coffman Memorial Union Student Cultural Centers and their exclusionary policies as to "safe places" as to other student groups and other student groups using those nine offices/lounges in Coffman Memorial Union violate the First Amendment to the U.S. Constitution, the rights to speech, assembly, association and to expressive association, and the Fourteenth Amendment's Equal Protection and Due Process Clauses—and causes damage to the Plaintiffs.

305.    The portion of the student activity fees that went to Coffman Memorial Union Student Cultural Centers reflects unconstitutional disbursements made according to the University's preferences and in violation of the First and Fourteenth Amendments.

306.    The University's unconstitutional disbursements to Coffman Memorial Union Student Cultural Centers caused an unnecessary increase to student activity fees.

307.    The Plaintiffs have been damaged in the amount of the student activity fee increase to pay for the disbursements to Coffman Memorial Union Student Cultural Centers.

308.    Because of the continuing damages to the Plaintiffs, the Plaintiffs seek declaratory judgment and injunctive relief against the Defendants.

## Count III

### First and Fourteenth Amendment Claims
### Under 42 U.S.C. § 1983

**The University of Minnesota's policies, handbooks and practices unconstitutionally exclude partisan political organizations from receiving any disbursements of student services fees—showing a violation of viewpoint neutrality.**

309.    The paragraphs written above are incorporated as if fully restated.

310.    The First Amendment free speech protections are incorporated against the states and their agencies through the Fourteenth Amendment of the U.S. Constitution.

311.    The University of Minnesota's policies, handbooks, and practices single

out and exclude "partisan political organizations" from any disbursement of

mandatory student services fees. Specifically, the University of Minnesota's Student

Services Fee Request Handbook for Student Organizations states:

> MINIMUM REQUIREMENTS FOR APPLYING FOR STUDENT
> SERVICES FEE FUNDING
>
> In order for a group to be eligible to apply for funds, all of the following
> criteria must be met:
>
> ***
> (7) Partisan political organizations are not eligible for the general student
> services fee funding. "Partisan political organizations" are organizations
> affiliated with a registered political party or candidates for election which
> are formed for the purpose of supporting a political party or candidate for
> election.

Exhibit E at 12.

312.    The University of Minnesota violates viewpoint neutrality by adopting a

rule that categorically bans disbursements to any partisan political organization.

313.    Specifically, if the student organization does not fall within the Board of

Regent's definition of a "political party organization," it may apply for funding under

the Student Services Fee Handbook for Student Organizations. (Exhibit E)

314.    However, if the student organization does fall within the Handbook's

definition of a "political party organization," such as the Republican student

organization or the Democratic student organization, it is not eligible for funding

under the Handbook. Exhibit E.

315.    Thus, non-partisan students groups have access to funding under the Handbook (Exhibit E) while partisan political organizations do not.

316.    Instead of banishing partisan political organizations from disbursements, the University of Minnesota could have focused on what the disbursement was going to be used for. After all, non-partisan student organizations can obtain disbursements for promoting an event for a partisan candidate.

317.    For example, a non-partisan student organization could sponsor a debate between Presidential candidates Joe Biden and Bernie Sanders. But, under the Board of Regent's rule, a partisan political organization could not receive a disbursement for the same candidate meeting.

318.    Also, University policy permits student organization to lobby on or off campus on federal or state issues. So, a student organization can received funding to lobby and protest on issues that are part of political parties' platforms, such as immigration. But, there is a prohibition on funding student organizations for the exact same thing if they support partisan political candidates.

319.    An example of a student circumvention of this policy is the University's GOP (Republican) student organization changed its name to Campus Conservative Cultural Program (CCCP) and thereafter received funding.

320.    A more carefully-drafted rule would have met constitutional requirements and made sense to everyone; instead, the rule arbitrarily discriminates against partisan organizations.

321.   The University of Minnesota's policies, handbooks and practices violate viewpoint neutrality by favoring non-partisan student organizations over partisan student organizations.

322.   The University of Minnesota's policies, handbooks and practices were the same or similar for the 2019-2020 school year and remain unchanged for the new 2020-2021 school year.

323.   The University of Minnesota's policies, handbooks, and practices banning student-services-fees disbursement to partisan student organizations violates the First and Fourteenth Amendments to the U.S. Constitution.

324.   The Plaintiffs seek declaratory judgment and injunctive relief against the Defendants.

## Count IV

### First and Fourteenth Amendment Claims
### Under 42 U.S.C. § 1983

**The University of Minnesota's policies, handbooks, and practices exclude new student organizations from any student-services-fees disbursements—showing a violation of viewpoint neutrality.**

325.   The paragraphs written above are incorporated as if fully restated.

326.   The First Amendment free speech protections are incorporated against the states and their agencies through the Fourteenth Amendment of the U.S. Constitution.

327.   The Board of Regents and the University officials at the Twin Cities, Duluth and Morris campuses have different longevity requirements for student organizations to apply for student-services-fees funding.

328.   At the Duluth campus, two years of existence is required before applying for funding.

329.   At the Morris campus, three years of existence is required before applying for funding.

330.   At the Twin Cities campus, 12 months of financial history is required before applying for funding.

331.   At the Twin Cities campus, the University of Minnesota's policies, handbooks and practices single out and exclude new organizations with fewer than 12 months of financial history from any disbursement of mandatory student services fees.

332.   Specifically, the Student Services Fee Request Handbook for Student Organizations states:

> MINIMUM REQUIREMENTS FOR APPLYING FOR STUDENT SERVICES FEE FUNDING
>
> In order for a group to be eligible to apply for funds, all of the following criteria must be met:
>
> ***
> (3) The group must be able to provide financial documentation (in the form of bank statements—or EFS report for CLPs—that can be supported by a general ledger) for the 12 (consecutive) months prior to applying.

Ex. E at 12.

333.    The University's policies violate viewpoint neutrality by favoring existing groups over new groups.

334.    If a new student organization does satisfy the Board of Regent's requirement of 12 months of financial history, it may not apply for funding under the Handbook. (Exhibit E)

335.    Even if a student organization can meet the 12 month requirement, it doesn't mean that funding can't still be denied because the student organization is new.

336.    Recently, this happened at the University of Minnesota in the case of Students for Alcohol, Tobacco, and Firearms. The student organization met the 12 month requirement of financial history, but were still being turned down by the University of Minnesota for being too "new."

337.    Thus, existing students groups have access to funding under the University of Minnesota's Handbook (Exhibit E) while new student organizations do not.

338.    The University of Minnesota's policies, handbooks and practices violate viewpoint neutrality by favoring existing student organizations over new student organizations.

339.   The University of Minnesota's policies, handbooks and practices were the same or similar for the 2019-2020 school year and remain unchanged for the new 2020-2021 school year.

340.   The University of Minnesota's policies, handbooks, and practices banning student services fee disbursement to new student organizations violates the First and Fourteenth Amendments to the U.S. Constitution.

341.   The Plaintiffs seek declaratory judgment and injunctive relief against the Defendants.

## Count V

### First and Fourteenth Amendment Claims
### Under 42 U.S.C. § 1983

**The University of Minnesota's policies, handbooks and practices fail to provide an administrative appeal process for individuals challenging the University of Minnesota's policies, handbooks and practices as unconstitutional—violating viewpoint neutrality and due process.**

342.   The paragraphs written above are incorporated as if fully restated.

343.   The First Amendment free speech protections are incorporated against the states and their agencies through the Fourteenth Amendment of the U.S. Constitution.

344.   The University of Minnesota's omitting an administrative appeal process for individual University students to challenge University of Minnesota's policies, handbooks and practices which violate viewpoint neutrality violates the First

Amendment's and Fourteenth Amendment's guarantees of viewpoint neutrality and due process.

345.   The University of Minnesota is collecting and distributing the student services fees violating viewpoint neutrality and without due process of law.

346.   The University of Minnesota's policies, handbooks and practices limit the administrative appeals of individual University students in such a way to exclude constitutional challenges to University of Minnesota's policies, handbooks and practices.

347.   The University of Minnesota's Student Services Fee Request Handbook for Student Organizations (Exhibit E), page 24, states as to appeals:

> Appeals… In order to appeal a funding recommendation by the SSFC [student services fee committee], individual SSF [student services fees]-paying students and student groups must provide evidence that one (or more) of the following criteria were met:
>
> 1) The SSFC violated its own rules
> 2) The SSFC exhibited bias against an organization
> 3) The SSFC did not make a decision in a viewpoint-neutral manner.

Nowhere does the text authorize the individual University student-services-fees-paying student to appeal from the Board of Regent's policy or handbooks.

348.   The University of Minnesota limited the scope of the administrative appeal meaning that its own policy and handbooks cannot be constitutionally challenged.

349.   Even if there were an appellate right, it's not clear it would be worth much, the University of Minnesota, Vice Provost for Student Affairs, has recently discontinued the practice of recording deliberations of the Student Services Fee Committee at the Twin Cities campus.

350.   The SSF-paying student has no administrative appeal process to have his or her constitutional claims heard.

351.   The University of Minnesota's policies, handbooks, and practices were the same or similar for the 2019-2020 school year and remain unchanged for the new 2020-2021 school year.

352.   The University of Minnesota's policies, handbooks, and practices by omitting an administrative appeal right for an SSF-paying student to constitutionally challenge the University of Minnesota's policies, handbooks and practices violates the First and Fourteenth Amendments to the U.S. Constitution.

353.   These violations of the First and Fourteenth Amendments through omitting a comprehensive administrative appeal have damaged Plaintiffs; with such an appeal, the student services fees could have been reduced in a successful administrative appeal by enjoining unconstitutional disbursements.

354.   For example, the student services fees could be reduced by stopping the unconstitutional disbursements to media groups and to Coffman Memorial Union Student Cultural Centers, as explained above.

355.    Because the Plaintiffs are suffering continuing damages, the Plaintiffs seek declaratory judgment and injunctive relief against the Defendants.

## COUNT VI

### Remedies Under 42 U.S.C.A. § 1988

356.    Plaintiff also seeks attorney's fees, costs of suit, and interest pursuant to 42 U.S.C.A. § 1988.

## JURY TRIAL REQUESTED

357.    A jury trial is requested for contested facts or other issues as deemed necessary to be resolved by a jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, Viewpoint Neutrality Now!, Evan Smith and Isaac Smith requests:

1.    A declaration that the aforementioned policies, handbooks, and practices of Defendants violate the First and Fourteenth Amendment of the United States Constitution;

2.    The issuance of an injunction requiring the Defendants to enjoin from policies and procedures which violate viewpoint neutrality;

3.    Judgment in favor of the Plaintiffs;

4.    Costs and attorney's fees pursuant to 42 U.S.C.A. § 1988; and

5.    Such other and further relief as the court deems just and proper.


Dated: April 30, 2020                   /s/Erick G. Kaardal
                                        Erick G. Kaardal, 229647
                                        Mohrman, Kaardal & Erickson, P.A.
                                        150 South Fifth Street, Suite 3100
                                        Minneapolis, Minnesota 55402
                                        Telephone: 612-341-1074
                                        Facsimile: 612-341-1076
                                        Email: kaardal@mklaw.com
                                        *Attorneys for Plaintiffs*