UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Matthew Curry, Jessie Roos,
Amber Harpel, Aaron Fagerness,
and Grant Buse

Civ. File No. 98-583 (PAM/JGL)

Plaintiffs,

v.

**MEMORANDUM AND ORDER**

Regents of the University of
Minnesota, William E. Hogan II,
Patricia B. Spence, Robert S. Bergland,
Julie A. Bleyhl, Warren C. Larson,
David R. Metzen, H. Bryan Neel III,
Michael O'Keefe, William R. Peterson,
Jessica J. Phillips, Thomas R. Reagan,
and Maureen K. Reed, all in their official
capacities as members of the University
of Minnesota Board of Regents,

Defendants.

---

This matter is before the Court on the Motion to Amend the Complaint filed by Plaintiffs Matthew Curry, Jessie Roos, Amber Harpel, Aaron Fagerness, and Grant Buse and the Motion to Dismiss filed by Defendant Regents of the University of Minnesota. For the reasons that follow, the Motion to Amend will be denied, and the Motion to Dismiss will be denied as moot.

**BACKGROUND**

Plaintiffs are students or former students of the University of Minnesota. They brought suit in February 1998, challenging the University's collection of a mandatory

FILED **NOV 0 9 2000**
FRANCIS E. DOSAL, CLERK
JUDGMENT ENT'D **NOV 0 9 2000**
DEPUTY CLERK

EXHIBIT A

Student Services Fee. Plaintiffs alleged that the collection of this fee violated their First Amendment rights because portions of the fee were used to fund groups with whose beliefs Plaintiffs disagreed. The action was stayed in April 1999, pending a decision from the U.S. Supreme Court in a similar case arising out of a fee collected by the University of Wisconsin. The Supreme Court handed down its decision in March 2000, see Board of Regents v. Southworth, 120 S. Ct. 1346 (2000), and this case was reopened in May 2000.

In Southworth, the Supreme Court determined that a student's First Amendment rights were not violated by the use of a mandatory fee to fund groups with whom the student disagreed. See id. at 1350. The parties here agree that Southworth vitiates the claims in Plaintiffs' original Complaint. Plaintiffs now seek to amend their Complaint to assert a claim that the manner in which the University allocates the fees violates their First Amendment rights. Defendant contends that Plaintiffs should not be allowed to amend the Complaint, and that, even if Plaintiffs' Motion to amend is granted, the Amended Complaint fails to state a claim and should be dismissed.

## DISCUSSION

### A.    Motion to Amend

1.    Standard of Review

After the defendant has filed an answer to the complaint, the plaintiff may amend that complaint only by leave of the Court. See Fed. R. Civ. P. 15(a). The Rule provides that "leave shall be freely given when justice so requires." Id. Leave to amend is properly within the discretion of the Court, however, and may be denied for a "good reason" such as undue delay, bad faith, undue prejudice to the nonmoving party, or futility. Fuller v. Secretary of Defense, 30 F.3d 86, 88 (8th Cir. 1994).

EXHIBIT A

2.    <u>Merits</u>

The claims in the Amended Complaint are qualitatively different from those raised in the Complaint. As discussed above, the Complaint challenged the mere collection of fees. The Amended Complaint challenges the University's standards for the allocation of those fees, arguing that the standards are not viewpoint neutral. This is a new claim clearly not contemplated by the previous claims. The Amended Complaint "substantially change[s] the focus of the action." <u>Fuller</u>, 30 F.3d at 89. Neither the Rules nor justice require the Court to allow Plaintiffs to amend their Complaint in this manner. <u>See id.</u>

B.    <u>Motion to Dismiss</u>

Defendant argues, correctly, that Plaintiffs' original Complaint should be dismissed in light of the holding in <u>Southworth.</u> Defendant also asserts that the claims in Plaintiffs' Amended Complaint should be dismissed because they fail to state a claim upon which relief may be granted. <u>See</u> Fed. R. Civ. P. 12(b)(6). Because Plaintiffs' Motion to Amend is denied, however, Defendant's Motion to Dismiss the Amended Complaint is moot.

**CONCLUSION**

For the foregoing reasons, and upon all of the files, records, and proceedings herein, the Court denies Plaintiffs' Motion to Amend, grants the Defendant's Motion to Dismiss the Complaint, and denies as moot the Defendant's Motion to Dismiss the Amended Complaint.

Accordingly, **IT IS HEREBY ORDERED** that:

1.    Plaintiffs' Motion to Amend (Clerk Doc. No. 28) is **DENIED**;

2.    Defendant's Motion to Dismiss the Amended Complaint (Clerk Doc. No. 33) is **DENIED AS MOOT**;

EXHIBIT A

3. Defendant's Motion to Dismiss the Complaint (Clerk Doc. No. 33) is **GRANTED**; and

4. Plaintiffs' Complaint (Clerk Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: _November 9_, 2000

_Paul A. Magnuson_
Paul A. Magnuson
United States District Court Judge

4

EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES: **NOV 0 9 2000**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

*This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.*

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

EXHIBIT A

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

EXHIBIT A

**Initial Recommendations
Student Services Fees Task Force**

**April 17, 2001**

**University of Minnesota**

EXHIBIT B

Letter of Transmittal

EXHIBIT B

## Task Force Membership

### *Chairs*

System-Wide Chair & TC Chair - Paul Enever
Crookston Co-Chairs - Jon Ackerman & Shane Roers
Duluth Chair - Allison Rhody
Morris Chair - Tim Dunn

### *Members*

Crookston

Jon Ackerman - student
Pamela Holsinger-Fuchs - Student Activities/Service Learning
Jim Myers - student
Shane Roers - student

Duluth

Paula Knudson - First Year Experience
Mike Miller - student
Allison Rhody - student

Morris

Simon Chabel - student
Tim Dunn - student
Rickey Hall - Student Personnel
Sara Haugen - Student Activities
Reid LeBeau - student
Sandra Olson-Loy - Student Personnel

Twin Cities

Jessica Barker - Residence Hall Association
Kristen Berning - Graduate and Professional Student Assembly
Rose Brewer - faculty
Percy Chaby - at-large
Saari Csallany - faculty
Paul Enever - at-large
Duane Johnson - Africana Student Cultural Center
Julien Kubesh - at-large
Vicki Larson - Fee Committee Advisor
Tim Lee - Students Against Fee Excess
Sue Lindgren & Thomas Luong - Student Cultural Centers
Kjersten Nelson - Minnesota Public Interest Research Group
Kevin Nicholson - Minnesota Daily

EXHIBIT B

June Nobbe - Campus Involvement Center
Sharon Olson - Office of the Executive VP & Provost
Jason Reed - Student Senate
Tracy Smith - Office of the General Counsel
Jason Vorbeck - Minnesota Student Association

EXHIBIT B

**Table of Contents**

| | |
|---|---|
| **Task Force Membership** | i |
| *Chairs* | i |
| *Members* | i |
| Crookston | i |
| Duluth | i |
| Morris | i |
| Twin Cities | i |
| **Table of Contents** | **iii** |
| **Executive Summary** | **1** |
| **Task Force Charge and Approach** | **4** |
| **System-Wide Issues** | **5** |
| *Mechanism for Further Process Review* | 5 |
| *Viewpoint Neutrality Issues* | 6 |
| Changes to the Current System | 7 |
| *Refusable/Refundable Fee* | 9 |
| **Individual Campus Issues** | **12** |
| *Crookston* | 12 |
| *Duluth* | 12 |
| *Morris* | 12 |
| *Twin Cities* | 12 |
| Separation of Administrative Units from Student Groups | 12 |
| Fee Process for Administrative Units | 15 |
| Fee Process for Student Activities | 17 |
| Other Recommendations | 21 |
| Establishing a New Granting Board | 21 |
| Faculty and Administrative Participation in the Fees Processes | 21 |
| **Conclusion** | **23** |
| **Appendix 1 – Regent's Policy on Student Services Fee** | **A1-1** |
| **Appendix 2 – Proposed Bylaw Amendment for the Senate Committee on Student Affairs** | |
| | **A2-1** |

EXHIBIT B

**Appendix 3 – Memo from Associate General Counsel Tracy Smith Regarding Viewpoint Neutrality**     **A3-1**

**Appendix 4 – MPIRG's List of Potential Areas for Funding Criteria**     **A4-1**

**Appendix 5 – 1998 TC Fees Committee Resolution on Refusable/Refundable Fees**     **A5-1**

**Appendix 6 – Current Refusable/Refundable Fee Registration Screen**     **A6-1**

**Appendix 7 – Suggested Mechanism for Selecting Student Representatives to the "Student Support" Fee Committee**     **A7-1**

EXHIBIT B

## Executive Summary

The Student Services Fees Task Force (SSFTF) was charged with reviewing the system-wide processes for allocating student fees to provide recommendations on how they may be reformed or improved and to help ensure that they are viewpoint neutral. Given this broad charge, we arrived at a similarly broad set of recommendations. While some of these recommendations are designed to reinforce protections of students' First Amendment rights, some of our most significant proposals are designed help the process better meet the needs of all University community members.

Most importantly, we recommend the creation of a standing system-wide student, faculty, and administrative consultative body that is charged with oversight of the student services fees process as no such oversight body currently exists. This body would logically fall under the auspices of the University Senate. Herein we propose the formation of a standing subcommittee of the Senate Committee on Student Affairs to fill this role.

Regarding the issue of ensuring viewpoint neutrality, the SSFTF is limited in its ability to provide a clear direction by the ongoing litigation at other Universities. Only once these court challenges have been resolved will the University of Minnesota be able to know with certainty what constitutes a viewpoint neutral student fees process and whether or not ours meets that standard. The SSFTF believes that our current system meets a reasonable definition of viewpoint neutrality. However, we recommend that each campus carefully review its funding criteria to ensure that none of them are viewpoint discriminatory. Operating procedures on each campus should then be modified so that funding decisions are based upon clearly defined, uniformly applied funding criteria and that written funding recommendations clearly address the funding criteria so that the basis for the funding decision is clearly documented for both the fee-requesting group and the University community as a whole. The SSFTF leaves it to each campus to conduct the necessary review and reforms as they see fit given their unique circumstances.

The SSFTF was also asked to review the issue of the refusable/refundable fee used by some fee-receiving groups that engage in lobbying activities. Specifically, we were asked to evaluate the impact of additional information at the time of registration on student awareness about the optionality of these fees. Because of the recent system-wide change in the University's registration system and the resulting new implementation of the refusable/refundable fee information screen for on-line registration (the registration method used by most students), there is insufficient data at this time to evaluate the effectiveness of additional registration information on fee optionality awareness. However, the SSFTF believes that the current implementation by the Office of the Registrar of the refusable/refundable fee information screen is superior to prior implementations. We, therefore, recommend that the current system be maintained so that further evaluations of fee optionality awareness (primarily through surveys) can be conducted.

The Twin Cities component of the SSFTF (TC SSFTF) has recommended significant changes to the fees process on that campus. Specifically, the TC SSFTF recommends that the administrative units that currently receive fee funding be separated from the current fee process

1

and receive their fee funding via a similar yet distinct process. The administrative units are fundamentally different in several ways from the rest of the organizations that receive fees, but most importantly, they are arms of the University that report to and are accountable to the University administration. They submit budgets to the Office of Budget and Finance and their employees are full-fledged University employees with all the corresponding rights and benefits. It does not make sense to fund these organizations through the same process that funds dozens of independent, mostly student-run organizations. The TC SSFTF recommends that these administrative units be segregated into a "student support" fee which would be allocated by a six-member (four students, one faculty, one administrator) committee specially trained to evaluate their unique budgets. Training of the "student support" fees committee members and oversight of the fees process would be coordinated by a member of the Office of Budget and Finance whose salary, benefits, and support costs would be paid for by the student fee but via a mechanism outside the "student support" fee process. Hence, the "student support" fee coordinator is accountable to the student body but has the knowledge and expertise necessary to help oversee the frequently large (multimillion dollar) and complex budgets of the administrative units.

Non-administrative units would remain under the current fee process on the TC campus. With the administrative units now gone, the financial portion of the fees request could be significantly streamlined which would be a significant benefit to both the groups applying for fees and the fees committee members who must review their budgets. Incentives should also be put in place to encourage fee-receiving groups to use a common accounting system to help facilitate the fees process and required audits. Given that poor student group financial accountability has been a serious recurring problem, any effort to increase uniformity and oversight would significantly improve the process.

The TC SSFTF also recommends the creation of a programmatic granting board under the auspices of the Campus Involvement Center. Currently there are approximately 400 registered student groups on campus but only about 30 receive fee funding. Many do not have the resources to complete a fee request but, nonetheless, desire to develop programs of value to the University community. A programmatic granting board for registered, non-fee receiving groups would help provide funding for these activities. Organizations would be encouraged to seek funding from this board for a number of activities throughout the year and to reapply for funding year after year. This is unlike most of the grant opportunities currently available on campus which are usually limited to one-time funding, discourage multiple awards in a year to the same organization, and serve both fee-receiving and non-fee receiving groups.

Last year on the TC campus the role of faculty and administrators on the fees committee was called into question. The SSFTF reaffirms the participation of faculty and administrative staff as full-voting members of the fees committee, but insists that all fees committee members be held to uniform standards. All fees committee members should be appointed by December 31 so as to ensure sufficient opportunity for necessary training activities. Members appointed after December 31 but before fees presentations begin (typically late January or early February) may be seated as voting members on the committee but only at the discretion of the fees committee chair. No one (student, faculty, or staff) may be seated on the fees committee once presentations

2

EXHIBIT B

begin.  It is the responsibility of the designated appointing bodies to ensure that they meet the necessary deadlines.

EXHIBIT B

## Task Force Charge and Approach

In Spring 2000 the Student Services Fees Task Force (SSFTF) was charged with:
1. developing a plan to ensure that the student services fees processes at the University of Minnesota are viewpoint neutral, and
2. providing any other recommendations related to the processes of applying for fees, reviewing requests, and forwarding recommendations for each campus.

Wherever possible, the SSFTF has attempted to take a system-wide approach to this charge. However, early in our review of current operating practices and procedures, it became apparent that under the broadly defined Regents Policy (Appendix 1) each campus had developed a process that best suits its individual nature, needs, and concerns. The SSFTF sees this individuality as a strength of the current fee process and sought not to conduct its review in a manner that would run counter to this principle of autonomy. Therefore, each campus conducted a review of its own fees processes and procedures with the findings to be reported to and shared with the system-wide SSFTF. This summary of findings and recommendations treats each campus individually except where a system-wide analysis was deemed appropriate.

4

EXHIBIT B

## System-Wide Issues

### *Mechanism for Further Process Review*

The first task of the SSFTF was to review the history of the fee process and past attempts at reform/change. Task forces/review teams were established in 1986 and 1992 to address concerns primarily with the fees process on the Twin Cities (TC) campus. In both cases, these reviews were called for in response to what at the time were perceived to be pressing concerns with the fee structure or process. This crisis-response basis for fees process review seems to be the rule rather than the exception as the SSFTF was formed in response to the then impending Supreme Court ruling in the Board of Regents of the Univ. of Wisconsin System v. Southworth et al. case on mandatory student fees at public universities. It is the finding of the SSFTF that such a mode of process review is sub-optimal. Frequent, regular reviews of the fees process could allow for regular adjustments as opposed to infrequent but extensive overhauls. Ultimately, it would be desirable to address concerns/issues before they reach the level of a crisis where a task force becomes necessary.

Given that a regular review of the fees process is desirable, the mechanism and nature of such a review must be determined. In arriving at its recommendation, the SSFTF defined several key principles. Specifically, the review body:
1. must have adequate student, faculty, and administrative representation;
2. must have adequate representation from all campuses;
3. should have staff support to help provide continuity, institutional memory, and follow-through on any recommendations; and
4. should play a consultative role while the ultimate decisions about policies and procedures should rest with the administration.

Further, it was the feeling of the SSFTF that the review body should not play an activist role of unnecessarily reshaping what is currently a largely effective student fees process. It should serve as a resource for helping to address problems and concerns as they arise but before they become more serious concerns. It should also serve as a forum for the exchange of information and ideas between the campuses to facilitate the adoption of best practices. Finally, it should serve as the representative body to which the fees process is ultimately accountable since currently there is no single advisory body with clear jurisdiction over this joint student, faculty, and administrative process other than the Board of Regents itself.

The SSFTF determined that the best place for such a review body would be within the University Senate. The Senate presents an existing mechanism for student, faculty, administrative, and cross-campus representation. The Senate already has a staff hence eliminating the inefficiency associated with providing new staffing for a non-Senate review body. Senate committees are, by nature, consultative bodies, so the mission of the fees committee review body would be consistent with the mission of the Senate as a whole. Finally, the Senate does not receive its funding from the student service fee. This eliminates the financial conflict of interest that would arise if the review body fell under the auspices of the Campus Involvement Center (CIC) or the Minnesota Student Association/Graduate and Professional Student Assembly as these organizations receive at least part of their income through the fees process.

EXHIBIT B

After consultation with the Senate office, it was determined that the most appropriate form of the review body would be as a standing subcommittee under the Senate Committee on Student Affairs. The language of the proposed amendment to the Student Affairs charge is presented in Appendix 2. The subcommittee would have two faculty representatives, five student representatives, and one administrative representative from each campus. The five student seats shall be filled by one representative from each coordinate campus, a TC undergraduate representative, and a TC graduate/professional representative. The faculty and student membership of the subcommittee would be drawn from the Student Affairs Committee unless there is no one on the Student Affairs committee meeting the desired criteria (e.g. a TC graduate/professional representative). In that case, the open seat would be filled by a representative from the Senate Consultative Committee or his/her designee meeting the desired criteria. It is intended that the administrative representatives would either be the fee process advisors for each campus or someone else familiar with the implementation of the fee process. While it is possible and likely that the student and faculty members of the subcommittee would have experience with the fees process on their respective campuses, it is also possible that they would have no prior knowledge of the fees process. Membership of administrative representatives having experience with the fees process on each campus will help ensure that the subcommittee has familiarity with the current fees processes.

The proposed Senate Bylaw amendment has been presented to the Senate for review.

### *Viewpoint Neutrality Issues*

In the Board of Regents of the Univ. of Wisconsin System v. Southworth et al., the Supreme Court held that mandatory student fees at public universities are constitutional as long as they are allocated in a viewpoint neutral manner. Unfortunately, the issue of viewpoint neutrality is still unfolding. Following the Supreme Court's ruling in Southworth, the original lawsuit was amended to assert that Wisconsin's current system does not meet the criterion of viewpoint neutrality because the student government is given too much discretion in awarding student fees. Judge John C. Shabaz ruled in December 2000 in favor of the plaintiffs and ordered Wisconsin to revise its system. Wisconsin proposed a series of modifications to their system (summarized in a memo from Associate General Council Tracy Smith in Appendix 3), but the judge ruled in March 2001 that these changes were not sufficient to ensure viewpoint neutrality. The Board of Regents of the University of Wisconsin has indicated that they plan to appeal the ruling.

There are some key points to note. First, the University of Wisconsin's student fees process is markedly similar to ours though there are differences. Second, the plaintiffs in Curry et al. v. the Regents of the University of Minnesota (a suit paralleling the original Southworth case) sought to amend their lawsuit following the Supreme Court ruling in Southworth along similar lines by asserting that our fees process is not viewpoint neutral. However, Judge Paul Magnuson denied the motion to amend on the grounds that the amended lawsuit was sufficiently different from the original one and that the University of Minnesota deserved time in order to assess and, if necessary, alter its fees process. So, the University of Minnesota has a temporary reprieve from legal action but by no means can we be sure that our current fees system would satisfy the courts. However, it should be noted that Judge Shabaz is the same judge whose original ruling in

EXHIBIT B

Southworth was overturned by the Supreme Court. It is, therefore, not a forgone conclusion that the current ruling regarding the Wisconsin fee system will be upheld. A higher court may overturn that ruling just as the Supreme Court overturned Southworth. To provide contrast, we point to a recent decision by the Supreme Court not to grant certiorari in a case against an Oregon community college. This decision upheld the constitutionality of its referendum-based fee allocation system despite the fact that the Supreme Court's ruling in Southworth strongly indicated that a referendum-based system would not ensure viewpoint neutrality.

Ultimately, the law surrounding mandatory fees is still evolving and there is no clear indication whether or not our system would be viewed as constitutionally sound by the courts. Not unlike the Wisconsin system, our system does allow for considerable discretion on the part of fees committee members when awarding fee monies. Even if we take steps to reduce the discretion in our process, it is unclear whether our system would satisfy the courts (i.e. is any discretion too much discretion when it comes to viewpoint neutrality in the eyes of the courts?). However, how can any fee process exist in the absence of discretion? Without a clear indication as to whether our current fee system or ones like it satisfy the constitutional requirement of viewpoint neutrality and without more explicit direction from the courts as to what would constitute a constitutionally acceptable system, the SSFTF does not recommend *significant* changes to the University of Minnesota's fee process to address the issue of viewpoint neutrality at this time.

Instead, we recommend the following course of action:
1. make minor adjustments to the current fees process to strengthen the protections of students' First Amendment rights;
2. continue to monitor the developing law (particularly the Southworth case) and, as necessary, make further modifications to our current fees process as the courts provide further direction; and
3. be prepared for the contingency that a court ruling that may require us to replace our current fee system with one that is radically different from the one we use today.

## Changes to the Current System

Enhanced training for fees committee members must be incorporated into the fees process. Specifically, all fees committee members are to be made aware that funding decisions must be made without regard to the viewpoint of an organization's programming. While this has essentially been the policy of the fees committee for many years, there has been some question as to whether decisions have truly reflected this policy.

The implications of applying viewpoint neutrality standards are subtle yet profound. All organizations should be held to the same standards and the fees committee cannot put itself in the position of deciding whether certain viewpoints are desirable. In the past, the some fees committees have tolerated late, inaccurate, and generally less rigorous applications from "valuable," "diverse," or "under-represented" groups while simultaneously penalizing other groups for similarly inadequate applications. These sorts of exceptions cannot be allowed to occur because non-viewpoint neutral value judgements lie at the heart of them. Fees committee members need to be made aware that by "giving a break" to a "valued" cultural group they undermine the principle of viewpoint neutrality. Further, fees committee members must be

EXHIBIT B

careful not insert their own beliefs into the decision making process. For example, if a campus branch of the KKK applied for fee funding, most students and fee committee members would balk at funding them. However, if the organization meets all of the other requirements for fee funding (or meets those requirements to the same extent that other fee-receiving groups do) then the fee committee should be prepared to offer them *comparable* funding despite strong personal opposition to the content of their programming. Training can play a critical role in ensuring that fee committee members understand these issues.

Furthermore training must present a consistent message. Fee committee members currently receive training in a number of areas including diversity training. We must be careful to ensure that the message of diversity training is consistent with the requirement of viewpoint neutrality. We cannot in one breath instruct fee committee members to value the content and contributions of select groups (diversity promotion) in the fee allocation and in the next breath tell them to pay no regard to viewpoint in programmatic content as part of their decision-making (viewpoint neutrality). This is not to say that the promotion of diversity and viewpoint neutrality are incompatible. They can be compatible if the messages are coordinated and a viewpoint neutral approach to diversity is taken.

The current line of legal attack on our fee process and the one employed by Wisconsin is that too much discretion in the decision-making process gives rise to an inherently non-viewpoint neutral process. So far, the courts have accepted this argument. While the SSFTF does not necessarily agree that discretion and viewpoint neutrality are incompatible, current court rulings indicate that a viewpoint neutral system should limit discretion. One way to do so is to clarify decision-making criteria. For example, on the TC campus, we should replace decision-making "guidelines" with decision-making "criteria" or "rules". Currently, the TC fees process has guidelines for decision-making but whether these guidelines are actually considered in the decision-making process is entirely up to the fees committee. By turning these guidelines into clear policies, we can create uniform standards for evaluating fees requests. MPIRG has volunteered a list of areas that potential criteria might include; this list is presented in Appendix 4.

As critical as defining decision-making criteria is ensuring that these criteria are uniformly applied. Once decision-making criteria are defined, fees applications must be designed to address these criteria, and the funding decisions must be clearly based upon these clear, uniform, and consistent criteria. For example, on the TC campus the fees application and the written funding rationales must directly address the decision-making criteria; in the past they have not always. The SSFTF therefore recommends that each campus review its decision-making criteria, ensure that its fees application addresses those criteria, and develop a system that ensures that funding decisions address each of the criteria in a uniform manner. It may be appropriate for the Office of the General Counsel to review the initial funding recommendations to ensure that criteria have been applied in a viewpoint neutral manner before the decisions are finalized by the fees committee.

One problem with the fees process, particularly on the TC campus, is its ill-defined nature. Issues of viewpoint neutrality pertain to the funding of student groups that contribute to the social, cultural, and political dialog on campus. However, the fee is also used to fund

8

EXHIBIT B

administrative units such as the student health service and the student unions. These units provide essential services on campus and do not generally engage in political speech so there are no First Amendment concerns with respect to funding these groups through a mandatory student fee. Currently, we have a system where both student groups and administrative units are shoehorned together into a single, uniform process. The result is a dual purpose fee process that serves neither purpose ideally. It would be easier to ensure the viewpoint neutrality of the fee process if that process only served to fund groups for which viewpoint neutrality was a concern (e.g. those engaging in political speech). Later on in this report we talk about other motivations for breaking up the current fee process on the TC campus and mechanisms for doing so. It would, no doubt, be easier to ensure viewpoint neutrality if student groups (i.e. those whose funding must be based on viewpoint neutral criteria) and student services (i.e. those that deliver student services but do not seek to forward or promote a single ideology, belief, or viewpoint) could be evaluated separately. Therefore, each campus may wish to consider structural changes in its fees process such as separating service units from student groups so as to facilitate viewpoint neutral fee allocations.

As noted above, the law regarding viewpoint neutrality is still evolving. The ultimate outcome of the Wisconsin case should provide a much clearer picture of what is and is not permissible by the courts. The current fee process at the University of Minnesota has been developed over many years to best suit the needs of the University community. Whenever possible we should seek to preserve the current system. As new rulings occur in relevant court cases, we should be prepared to adapt our system to the evolving law. The need for an adaptive approach underlines the need for a standing review body such as the one proposed for the University Senate. It is the hope of the SSFTF that with the minor changes proposed herein and the regular review in light of the evolving case law, our current system can be preserved.

Certainly, the fee receiving units, particularly student groups, have made it clear that preserving the current system is in their best interest. However, it is possible that the courts will rule that any discretionary fee allocation system such as our own cannot meet the test of viewpoint neutrality. If that is indeed the case, the University of Minnesota will have no choice but to completely replace the existing system. One possible replacement structure would have funds for programmatic activities disbursed separately from funds for overhead and support services. Some form of granting board would then distribute funding for programming activities. Such program grants would be awarded via a viewpoint neutral mechanism such as first come, first serve until all monies were exhausted. However, let there be no mistake that such a radical change would meet considerable opposition from many of the student groups that currently receive fee funding. Therefore, such a change should only be considered as a last resort after the courts have determined that despite modification, the current discretionary system cannot satisfy viewpoint neutral requirements.

### Refusable/Refundable Fee

In 1997 a Task Force was formed on the TC campus to study the issue of non-mandatory student fees, specifically the refusable/refundable fee mechanism used by two organizations: the Minnesota Public Interest Research Group (MPIRG) and the Student Legislative Coalition (SLC). The Task Force recommended that more information be provided online at the time of

EXHIBIT B

registration so that students can make an informed decision about whether or not to pay these fees. Based upon the findings of that Task Force the 1998 TC Fees Committee reaffirmed the negative check-off system used by these two groups but issued a resolution calling for the impact of additional information at registration to be assessed in 2001 (Appendix 5). The 2001 Fees Committee asked the SSFTF to take up this issue because there was insufficient time to address it in depth during the tight fee process schedule.

Most students (≈75%) register via the web, so additional information can be readily provided at the time of registration through the web registration system. In the three years since the issuance of the 1997 Task Force recommendations, the University has undergone a system-wide replacement of its on-line registration system. As a result, the optional nature of these fees has been presented in different ways over the three-year period. The mechanism in effect for the first two years provided a radio button check-off that allowed students to refuse these fees. However, the additional descriptive information was available only by following a hyper-link. Under the current PeopleSoft registration system, all students are presented with a screen in the registration process that simultaneously provides descriptions of the two organizations and provides students with the opportunity to refuse the fees (Appendix 6). Clearly the new system is superior because the description of the organizations, the optional nature of the fees, and the opportunity to refuse the fees are presented all at once to maximize student awareness. In fact, the SSFTF would like to thank the Office of the Registrar for this improved implementation.

Unfortunately, there is no way to tell at this juncture whether the additional information and improved registration screen has improved student awareness about these fee. The CIC conducts a biennial survey to track student awareness about the optional nature of these fees in addition to other fee related information on the TC campus. However, no survey was conducted in 2000 in part because of the activities of the SSFTF; it was suggested that the survey be postponed so that SSFTF recommendations might be included in the survey. Even if the survey had been completed, it would provide only one data point, not enough to establish a trend of increased student awareness about the refusable/refundable fees. Therefore, the SSFTF is unable to demonstrate any effect of additional information at the time of registration on student awareness about the refusable/refundable fee at this time.

Nevertheless, the SSFTF feels that some observations and recommendations are appropriate. First, the new registration screen is a significant improvement and should be maintained at least until its effectiveness can be properly assessed. Second, the CIC and the coordinate campus fee administrators should continue to conduct surveys to assess student awareness on this issue. Surveys over the next four to six years will help determine if student awareness has increased due to a combination of increased use of the web registration system and the enhanced web presentation of the optional nature of these fees. Finally, the University must continually strive for increased student awareness on this issue. The SSFTF recommends an awareness benchmark of 75% of surveyed students. If awareness of the refusable/refundable nature of these fees is unable to meet this benchmark in the surveys over the next four years, then the issue should be revisited. If the awareness benchmark cannot be achieved through the current system, then an alternative check-off structure may be appropriate. For example, current web technology now allows for a heretofore impossible check-off option—the neutral check-off—in addition to the exhaustively debated negative and positive check-off arrangements. Under a neutral-check-off,

EXHIBIT B

students would not be allowed to proceed in the registration system software until they had either accepted or refused the fees, but neither "refuse" nor "accept" would be the default choice. Such a system would force students to make an active, conscious decision rather than passively accepting the default. Furthermore, it would take the University out of the position of having to decide whether the default option should be for students to pay or to not pay the fee. Without a clear indication (i.e. survey data) that the awareness benchmark is not being met, there is no justification to incur the costs of reworking the registration fee check-off system. Therefore, the SSFTF sees no need to alter the current system in any way at this time.

One further issue should be raised. How does the Supreme Court ruling in the Southworth case affect the refusable/refundable fee mechanism? Legally, it appears that as long as fees are allocated in a viewpoint neutral manner, they can be mandatory (i.e. do not have to be refusable/refundable). Since the MPIRG and SLC fees are allocated through the same fee processes on each campus as the rest of the student service fees and since we are operating under the assumption that our current fee process is viewpoint neutral, it would seem as though these fees could be made mandatory. The SSFTF would oppose any such move to make these fees mandatory. First, the refusable/refundable fee is a legally tested mechanism for ensuring the protection of student's First Amendment rights. In contrast, the viewpoint neutrality of our current fee system has not yet been legally tested. To make these fees mandatory would change them from being assessed in a clearly constitutional manner to one whose constitutionality is being questioned. Second, while there may be no legal difference between the nature of SLC and MPIRG versus the rest of the fee receiving units, there is a practical one. Both SLC and MPIRG engage in lobbying activities. It is unclear whether the courts would object to the use of mandatory student fees for lobbying activities even if they are allocated in a viewpoint neutral manner. Several Supreme Court Justices expressed concern over the mandatory funding of the Wisconsin Public Interest Research Group (WisPIRG) in the Southworth case, but by overturning the lower court's ruling they appear to have upheld mandatory fees for WisPIRG. The SSFTF strongly believes that students should have the right to refuse the payment of student fees that support lobbying activities with which they may not agree even if the courts were to decide that no such right is constitutionally required. The right to refuse these fees is well established on this campus and should not be abridged. Note that the latest fee assessment data show that only about 45% of students elect to pay these non-mandatory fees. While the majority may support the right of these groups to be fee funded (as demonstrated by surveys) the majority also elects not to support these groups. Hence, the SSFTF opposes any initiative to eliminate refusable/refundable fee funding for MPIRG and SLC in favor of mandatory fee funding.

EXHIBIT B

## Individual Campus Issues

Having covered each of the issues of concern to the University of Minnesota system as whole, we now turn to the findings of the individual campuses.

### *Crookston*

Pending.

### *Duluth*

Pending.

### *Morris*

Pending.

### *Twin Cities*

Separation of Administrative Units from Student Groups

The student service fee on the TC campus has evolved into a catchall funding mechanism for any activity or service outside the curriculum. As a result, there are significant differences in the nature of the various fee-receiving units. Specifically the administrative units of Boynton Health Service (BHS), the Twin Cities Student Unions (TCSU), and the Recreational Sports (Rec Sports) are only three of roughly 30 groups receiving funding but account for more than 85% of the fee dollars and have budget requests in the millions of dollars. The administrative units report directly to the University administration, participate in the University budget process, are bound by University rules and regulations, and consist of University employees. In contrast, most groups requesting fee funding operate independently of the University administration and typically request financial support under $100,000. Hence we have a mix of substantially different organizations being funded through a system without an overarching organizing principle.

Currently, the fee process channels all groups through the same application and fee-funding process. The uniform application and funding process established after 1992 have helped bring fairness and consistency to the process but have not allowed the unique needs of two broad fee-receiving units—administrative units and student groups—to be properly addressed. For example, the uniform fee request is, in general, viewed as overly complex by representatives of most student groups but is not sufficiently detailed to illuminate the activities of the multi-million dollar administrative units. Currently, administrative units must expend resources to prepare the fee request budget in addition to their more detailed University budgets. In contrast,

12

EXHIBIT B

the fees request budget is the only budget many student groups assemble in a given year. Further, the current budget request is, largely for the benefit of the administrative units, based upon the CUFS accounting system, yet student groups are not allowed access to the CUFS system. Therefore, they are forced to prepare a budget in an unfamiliar format which may contain much more detail than is necessary to evaluate their typically $20,000 to $100,000 annual operations.

Further, the current fee process is designed so that each fee receiving unit presents its case to one of three subcommittees, and these subcommittees are charged with the responsibility of presenting the fee request to the full fee committee. Given the complexity of their budgets, many administrative units feel at a disadvantage under this arrangement because they face a far greater challenge in adequately educating the subcommittee members on their multimillion-dollar requests than the $20,000 to $100,000 student groups. As a result, they often feel that they do not fare as well as they otherwise would in the fee process because they have difficulty advancing their case to the full fees committee. To address this problem, some have urged that administrative units be granted an exception from the current fee process structure and be allowed to present their request to the full 19-member fee committee and bypass the 6-member subcommittee. However, some student group representatives have objected strenuously to the idea that the some fee-receiving units, especially the better funded, more advantaged ones (i.e. the administrative units), receive further advantage in the form of preferential treatment under the current system. Since roughly 30 groups currently receive fee funding and new groups apply each year, it would not be possible to allow all groups to present directly to the full 19-member committee. Given the objections to the administrative units receiving special treatment, it appears that the desire of some administrative units to bypass the subcommittee cannot be met under the current system.

So, we are left with a dilemma. The current process is sub-optimal for different reasons from the point of view of both the small student groups and the large administrative units. However, there is a clear motivation—equity—for treating all fee-requesting units the same in the current process. This motivation has added importance with the need to ensure viewpoint neutrality in the disbursal of fee monies.

An alternative approach has been advocated in one form or another on at least two occasions. In 1992, the Student Services Fee Review Team proposed removing the administrative units from the current fee process as part of a broader reform package. Ultimately, student groups opposed the package because the proposal also recommended that all programming dollars would be allocated through a pool accessible to all groups including non-fee funded groups; student groups felt this increased competition would seriously hinder their ability to secure funding. In 1999, independent consultant Toby Egan recommended separation of the fee into a service fee (mostly administrative units) and an activities fee (student groups). Mr. Egan's recommendation was predicated on the assumption that the Supreme Court would uphold the lower court's ruling in Southworth and that our fee system would almost immediately be ruled unconstitutional. Therefore, the activities component of the fee would be allocated in some new, viewpoint neutral manner such as first come, first served. Ultimately, the Southworth ruling was overturned, and, hence, the motivation for Mr. Egan's proposal was undermined. Given strong student group opposition to the proposed viewpoint neutral allocation mechanism, this idea was also shelved.

13

EXHIBIT B

The TC SSFTF believes that despite past concerns with "administrative split" proposals, dividing fee-receiving groups into two broad categories and then tailoring the process to the two separate categories would go a long way to addressing some of the major concerns with the current system.  Therefore, the TC SSFTF sought to identify the conditions under which both the student groups and the administrative units as well as the University community as a whole could support such a proposal.

First, both the students and representatives of the administrative units are adamant that the administrative units should continue to be funded through a fee process controlled by the students.  There is genuine concern that if these administrative units where not funded via a student process, they would no longer be accountable to the students.  Moreover, there is concern that these units would not receive the same level of support if they were funded through central administration because they are not perceived in some corners as central to the educational mission of the University despite demonstrated student support.

Second, the fee process for the administrative units must be coordinated by an individual or organization that is funded by the students and accountable to the students.  The budget requests of the administrative units are detailed and complex.  There is a significant knowledge differential between the students who would evaluate these budgets and the administrators who would prepare and oversee them.  While there is no reason to expect that these administrators would not serve the interests of the students, there is at least the possibility that the knowledge differential could be used to skew the process to the advantage of the administrators and the administrative units they represent.  Even if such exploitation were never to occur, the opportunity for it to occur would undermine the integrity of the process.  One need only point to the current Coffman renovation project to find a situation where many students feel they have lost control of a project that they are funding.  The best way to "level the playing field" between the administrative units and the students who evaluate them is to have the fee process coordinator/advisor be directly accountable to the students.  The way to accomplish this is to have the fee process coordinator's salary funded by the students just as the salary of the coordinator of the existing fee process is.  However, the current fee process coordinator is an employee of one of the administrative units.  To have that person supervise the administrative fee process would be a clear conflict of interest.  Therefore, the administrative unit fee process coordinator's salary must be funded by the students but via a mechanism external to the administrative unit fee process.

Third, there should be no substantive changes to the current fee process for the student groups.  They should all continue to have access to the fee as they do now.  At this time, there is no compelling reason (e.g. viewpoint neutrality concerns) to drastically alter this funding process to one such as a grant-based system for programmatic funding.  However, the removal of the administrative units from the student group fee process will allow for some minor changes that should enhance the process.  These include the simplification of the current application and more specific training regarding the issue of viewpoint neutrality.

14

EXHIBIT B

*Fee Process for Administrative Units*

Given these conditions, the TC SSFTF has sought to identify an administrative unit fee process that balances the needs of all parties. We designate this fee the "student support" fee since many of the administrative units provide essential student support services. The groups that shall be funded via this process are the administrative units that currently receive student fee funding: Boynton Health Service, Campus Involvement Center, Radio KUOM, Recreational Sports, Twin Cities Student Unions, University Student Legal Services, and Summer Cultural Programs. While the budgets of these administrative units are complex, they are small in number so there is no need for the "student support" fee committee to be as large as the current 19-member student service fee committee which breaks into subcommittees to distribute the workload. A committee the size of one subcommittee of the current student service fee committee (6 members) should be sufficient. There should be four student representatives, one faculty representative, and one administrative representative. A proposed procedure for selecting the student representatives is outlined in Appendix 7. The faculty representative shall be selected by the University Senate Committee on Committees. The administrative representative will be from the Office of the Executive VP and Provost (the motivation for this choice is explained below). An ability to understand and analyze complex budgets should be an important selection criterion for all members. Fee committee members should also receive extensive financial training to be provided by the "student support" fee advisor. All committee members shall be appointed for one year though they may reapply to serve in subsequent years. The chair of the committee shall be a student.

The advisor or coordinator of the "student support" fee process shall be a member of the Office of Budget and Finance. The advisor shall report directly to the Director of the Office of Budget and Finance. The Director of the Office of Budget and Finance shall consult with the TC representatives to the Senate Committee on Student Affairs Fees Subcommittee on hiring decisions regarding this position and will apprise those subcommittee members of the fee advisor's performance on an annual basis. The salary and benefits of the advisor along with basic support expenses shall be provided for by the student body through the auspices of the student fee. Specifically, the advisor position will be funded through a fee request to the "student activities" fee process (i.e. the fee process for student groups and other organizations exclusive of the administrative units). A schematic indicating the relationship between the "student activities" fee process and the "student support" fee process is shown in Figure 1. This structure allows the fee advisor to be financially independent of the University administration yet intimately acquainted with the financial operations and conditions of the administrative units in particular and the University in general. It also ensures that the advisor is directly accountable to the students, but the advisor's salary is funded via a fee process external to the one he/she oversees thereby eliminating a direct conflict of interest.

EXHIBIT B



Figure 1  Schematic showing the relationship between the "student activities" fees process and the "student support" fees process. The two fees processes run in parallel with similar operating procedures. However, the "student support" fees process consists of a smaller fees committee that reviews only the administrative fee-receiving units. The Campus Involvement Center, an administrative fee-receiving unit, oversees the "student activities" fees process (much as it does now). The "student support" fee advisor, a position within the Office of Budget and Finance, oversees the "student support" fee process, but the advisor position is funded within the "student activities" fee process. This structure ensures that the fees advisors for both processes are financially accountable to the student body but that neither is funded in the process that the position oversees thereby eliminating a direct conflict of interest.

EXHIBIT B

Under the current fee process, three administrative reps serve on the fee committee. They represent the offices of Student Development, Executive VP and Vice Provost (Academic Affairs), and Budget and Finance. Since the advisor to the "student support" fee process shall reside within the Office of Budget and Finance, the TC SSFTF feels that it would be inappropriate and unnecessary for the one administrative representative on the committee to come from Budget and Finance. Since several of the administrative units report to the Office of Student Development, it would also be inappropriate and inefficient for the administrative representative to come from the Office of Student Development because the representative would have to abstain on votes for most of the units being evaluated. Therefore, the administrative representative to the "student support" fee committee should be from the Office of the Executive VP and Provost.

The operating procedures for the "student support" fee process should be based upon those of the current fee process but should be refined and modified prior to initial implementation by the fee coordinator in consultation with a working group consisting of one representative from the Minnesota Student Association, one representative from the Graduate and Professional Student Assembly, one student representative from either a past or current fee committee (existing process), the advisor to the current fee process, and one representative designated by the administrative units. It is expected that the timing and duration of the "student support" fee process should be similar to that of the current fee process. The "student support" fee committee should issue final and initial recommendations, and there should be one or more public hearings held between the publishing of initial recommendations and the deliberations resulting in the final recommendations. The working group should determine the format of the "student support" fee request. The TC SSFTF recommends that the narrative portion of the current fee request be employed with minimal modification. The financial portion of the request should be modified to provide more detail and to make the information easier to assemble for the administrative units. For those administrative units who undertake various programmatic activities and who have significant revenue streams (e.g. greater than 10% of total revenue) other than student fees, the financial portion of the request must indicate how student fee dollars are allocated amongst the various programmatic activities. Possible formats of this financial report include the University budgets for the administrative units, any internal/working budgets that they may routinely use, or the special budget format currently being developed for Boynton Health Service by the 2001 Student Services Fee Committee and Boynton Health Service.

While some representatives of the administrative units have expressed a desire to have any separate administrative unit fee process conducted on a biennial basis, the TC SSFTF feels strongly that the process should remain an annual process at least for the first few years until the process is established and tested. The transition to a biennial process can be reconsidered at a later time, but issues such as multi-year student appointments and contingencies for emergency funding in off-cycle years must be considered.

*Fee Process for Student Activities*

With the administrative units separated from the current fee process, some minor changes can be made to that process so that it better suits the needs of the remaining fee-receiving units. While a

EXHIBIT B

variety of types of organizations will remain under the current process, we will refer to these organizations simply as "student activities."

One of the elements of the process most in need of change is the fee application. A workgroup consisting of the current fee process advisor, one or two representatives from fee-receiving student activities, and one or two current or former fee committee members should be formed for the purpose of revising the current application. There are two elements to this revision: revision of the narrative component of the application and revision of the financial section of the application. Changes to the narrative section should not be significant. Some sections may be consolidated and/or eliminated. However, the TC SSFTF would like to see the measures of performance section modified to encourage groups to report their specific programmatic activities and their expenditures on those activities over the course of the past fiscal year. The purpose of the "student activities" fee is to provide for activities that educate and enrich the campus community. Therefore, the most important "measure of performance" is how much of the fee money is being returned to the campus community in the form of such activities. The goal of all student groups should be to produce as much programming with the least cost and to spend as much of their fee funding as possible on those programmatic activities and not overhead and other expenses.

As for the financial section of the fee request, the removal of the administrative units should allow for considerable simplification. Since student groups do not typically have access to the University CUFS system, there would no longer be any reason to base the financial section on that accounting system. Further, there are far more income and expense categories in the current application than needed by most student groups. These should be consolidated or eliminated. Finally, the financial section of the fee request is currently provided only in Microsoft Excel format. Most fee-receiving groups do not do their budgeting and accounting in Excel, so they must transfer their financial information to the Excel format in order to complete the request. Certainly, the use of one financial submission format (i.e. Excel) promotes uniformity in the financial information and such uniformity is absolutely critical if the fees committee is to be expected to review a large number of budgets. However, the TC SSFTF would like to allow for more flexibility in the financial reporting while maintaining uniformity. For example, perhaps two or three financial reporting formats could be allowed. This would maintain standardization but increase flexibility which would be a great benefit to many student groups if one of the acceptable standards is one that they already employ for their accounting and budgeting.

The motivation for such a change is also rooted in a desire to increase financial accountability. Currently, there are many software programs on the market that, unlike Excel, provide accounting and budgeting capability. Ones in use by several current fee-receiving units include Quicken, MS Money, and Quickbooks. Quickbooks in particular not only tracks financial transactions but allows users to design and export a chart of accounts. It is conceivable, that the "student activities" fee advisor could define a standardized chart of accounts to be distributed to all student groups that use Quickbooks. They could then use this standardized chart to record all their transactions. Using one of the pre-defined income/expense reports they can then automatically generate the financial information needed for the fee request in the desired format because they are using the standardized chart of accounts. This confers several advantages:

18

1. Preparation of the financial information required for the fee request then becomes much easier (i.e. generating a report with a few mouse clicks) than under the current system using Excel (i.e. converting the accounting information into the Excel format and transferring it to the Excel workbook).
2. Transcription errors arising from the transfer of data from each group's accounting software to Excel are reduced or eliminated.
3. An incentive is created (i.e. ease of producing the financial reports needed for the fee request) for all groups to migrate towards one or two uniform accounting systems approved by the "activities" fee advisor. The use of one or two computer-based accounting programs by most student groups would likely improve the accuracy and precision of their financial accounting—a frequent problem for many small fee-receiving organizations—and make it easier for the "activities" fee advisor to identify problems and aid financial planning.

The value of point three cannot be overstated. Inaccurate financial information is frequently encountered within fee requests. An increase in accounting uniformity and rigor would go a long way to reducing this recurring problem. However, the TC SSFTF does not feel that organizations should be compelled to move to a uniform accounting mechanism, only encouraged to do so through appropriate incentives. One drawback is that technology and software change at a rapid rate. It would undesirable to commit student groups to an accounting package that becomes obsolete or incompatible. Careful research before settling on one or two standard packages would minimize this concern. Further, the Internet is now expanding the possibilities in this realm. For example, the Morris campus hopes to move their fee request to an online submission system. An online accounting package (e.g. Quickbooks for the Web, ePeachtree, or NetLedger) might confer further advantages in the form of ease of reporting, uniformity, and accessibility since the system could potentially be accessed from any web-enabled computer. The "activities" fee advisor could initially set up the on-line account and would be able to log in remotely to monitor financial activity or generate reports. These advantages should be weighed against implementation, ease of use, cost, and other issues of concern. Whatever software packages are adopted as acceptable standards, either the "activities" fee committee or the CIC in its role as "activities" fee advisor should help defray part or all of the cost of purchase of the accounting packages so as to facilitate widespread use and more fully realize the advantages highlighted in point three above.

Further changes to the "student activities" fees process have been suggested. More training for fees participants might be beneficial. As noted earlier, fee committee members should receive training in issues of viewpoint neutrality. This training might most readily be provided by the Office of the General Counsel. It has also been suggested that fees-requesting groups could benefit from more training activities, perhaps in the form of workshops, on how to prepare the fees request. However, it should be noted that before receiving the fees request packet, fees-requesting groups are currently required to send a representative to brief training session on how to fill out the request. Student groups did not provide the SSFTF with any indication as to what additional training would be useful or how the current training could be modified to better suit their needs.

MPIRG volunteered a number of suggestions as to how the "student activities" fees process could be improved. The creation of performance benchmarks was suggested for some of the

19

EXHIBIT B

evaluation criteria. For example, the fees committee could establish a reserve benchmark of 10% of annual revenue, but reserves in the range of 8% to 12% would be considered acceptable. The SSFTF believes that the fees committee should evaluate its funding criteria and determine where benchmarks are appropriate and what form they should take. Any benchmark proposal would appropriately be reviewed by the Senate Committee on Student Affairs Fees Subcommittee.

MPIRG also advocated a move to a biennial fees process on the grounds that the it would reduce the workload for both fees committee members and fees-requesting groups in light of the long and complicated fees process. However, because the fees process is long and complicated, institutional memory within student groups is critical in their ability to successfully complete the fees process. Given that student groups, by their nature, have a high rate of membership turnover, the SSFTF was concerned that a biennial process would make it more difficult for some groups to complete the fees process as institutional memory would be lost in the as members leave the group in the time between fees requests. Furthermore, a biennial process would tend to favor student groups with paid, non-student staff members (i.e. groups with a longer institutional memory) than those who are wholly student run. The SSFTF felt that this would be undesirable. The annual structure of the fees process is also important in holding student groups accountable, through the fees committee, to the students who financially support them. However, it should be noted that under MPIRG's suggested biennial process, student groups would be expected to submit an annual financial report in the intervening year between requests. Ultimately, the SSFTF was unconvinced that the advantages of a biennial process for student groups outweighed the risks. While the fees process is burdensome, that annual burden is the price student groups must pay for the privilege of receiving monetary support from the student body. The SSFTF believes that the implementation of the reforms presented herein will reduce that burden to a reasonable level.

Finally, MPIRG recommended that "grievances or appeals regarding either the conduct of individual committee members or the process or decisions of the committee should be heard and arbitrated by a body separate from the fees committee." As noted by MPIRG, the "fees process is very long, involved, difficult, and time consuming." It is therefore important that an appeals mechanism not significantly lengthen or complicate the fees process. The SSFTF agrees that fees-receiving organizations should be able to appeal decisions to a body apart from the fees committee itself, though all efforts should be made to resolve disputes in partnership with the fees committee first. Any appeals process must also discourage or prevent frivolous appeals that would unnecessarily undermine the authority of the fees committee or significantly lengthen the fees process timeline. The SSFTF believes that the current administrative hearing and review process of the fees committee recommendations which is separate from the fees committee itself provides an appropriate appeal mechanism within necessary practical constraints. The proposed Senate Committee on Student Affairs Fees Subcommittee would also provide another avenue for appealing and/or modifying fees committee processes or procedures outside of the fees committee itself.

EXHIBIT B

Other Recommendations

*Establishing a New Granting Board*

A major drawback of the current fee process is that it provides funding to only a small fraction of the over 400 registered student organizations on the TC campus. A fee process that provided access to funding for all of these groups would be unwieldy. However, the purpose of the fee is to provide for activities that educate and enrich the campus community. Clearly a wider distribution of fees would better serve this purpose. To accomplish this goal we can turn to the example provided by the Morris campus. At Morris, the fee committee system is supplemented with a granting system which non-fee-receiving groups can apply to for funding. The grant pool itself comes from the fee process and is redistributed in the form of programmatic grants to student groups. This allows smaller student groups that would otherwise not have the organization, resources, or manpower to complete a fee request to receive fee money indirectly. While there are grant resources available on the TC campus, they are limited in number and not necessarily targeted at non fee-receiving groups. Furthermore, many of these grants will not fund the same group more than once per year or the same activity more than once ever.

Therefore the TC SSFTF recommends that the CIC establish a programmatic granting board that would allow non-fee funded groups indirect access to fee dollars for their programming activities. The allocation procedure could be adapted from the one currently used for CIC administrative grants. Awards should be distributed in a viewpoint neutral manner. Organizations should be allowed to receive multiple awards in a year and may re-apply for funding for the same activities year after year. Fee-receiving groups would not be eligible for these grants. Given that these grants are to be used to promote student group programmatic activities, the CIC should consider requesting funding for these grants through the "student activities" fee process. This would not introduce a conflict of interest as long as the money is used exclusively for the grants, not general CIC operations and certainly not for the salary of the "student activities" fee process advisor.

*Faculty and Administrative Participation in the Fees Processes*

In March 2000, TC undergraduates voted overwhelmingly in favor of a ballot referendum that called for faculty and administrative representatives to the fees committee to serve only in a non-voting capacity since they do not pay the fee. This vote followed a particularly contentious fees process in which the faculty representatives were appointed to the process late after fees presentations had begun and the fees committee chair agreed to seat them only in a non-voting capacity. At the time there was no clear policy on late appointments of faculty and administrative representatives though there was such policy for student members.

The TC SSFTF determined that faculty and staff would not likely want to devote the large amounts of time required for participation in the process if they were not allowed to vote. Since the knowledge and experience of faculty and, particularly, administrative representatives is essential to the smooth functioning of the process, it would not be practical to restrict faculty and administrative representatives to a non-voting capacity. Therefore, faculty and administrative representatives should continue to be full voting members of the fees process and by extension the new "student support" fee process.

21

EXHIBIT B

However, late appointment of ANY committee members is a critical concern. All fee-receiving units have the absolute right to present their case for funding to the fees committee members who evaluate their requests. Furthermore, the fees process begins well in advance of the first fees presentation. Fees committee members are expected to review each of the fees requests before the presentations. They are also encouraged to visit several of the fee-requesting groups so as to make more informed funding decisions. Finally, fees committee members must receive training in understanding the fees request, diversity, and, now, viewpoint neutrality. It is essential that fee committee members participate in this training especially in light of the rising concerns about viewpoint neutrality. Therefore, all fees committee members must be appointed well in advance of the first budget presentation to allow time for appropriate training. The TC SSFTF recommends that ALL fees committee members be appointed by December 31. Those appointed after December 31 but before the beginning of fees presentations may be appointed to the committee only at the discretion of the chair after having completed all training activities, and the chair alone may determine in what capacity they may serve (e.g. voting or non-voting). Once fees presentations begin, no new members should be seated on the committee; this is already the policy for student members and it should be extended to faculty and administrative representatives.

EXHIBIT B

## Conclusion

There are many areas for possible change within the current student services fees process. The SSFTF has attempted to focus on those changes that are likely to bring the most benefit to all participants in the fees process and the University community as a whole. Ultimately, we believe the formation of a representative consultative body with jurisdiction over the fees process as the most critical step to creating a fees system that can adapt to changing law, changing student needs, and a dynamic University structure in a constant state of renewal.

EXHIBIT B

**Appendix 1 – Regent's Policy on Student Services Fee**

A1-1

EXHIBIT B

**Appendix 2 -- Proposed Bylaw Amendment for the Senate Committee on Student Affairs**

EXHIBIT B

**STUDENT AFFAIRS COMMITTEE**

...

**Duties and Responsibilities**

...

e.   To provide for a Student Services Fee Subcommittee composed of two faculty representatives, five student representatives (one each from Crookston, Duluth, Morris, Twin Cities graduate/professional, and Twin Cities undergraduate), and four voting ex officio staff members (one each from Crookston, Duluth, Morris, and Twin Cities with the coordinate campus representatives appointed by the Vice Chancellor of each campus and the Twin Cities representative appointed by the Office of Student Development). The student and faculty membership of the Subcommittee shall be taken from the membership of the Senate Committee on Student Affairs unless there is no representative meeting the designated criteria. In such case, the seat in question shall be filled by a member of the Senate Consultative Committee, or their designee, meeting the designated criteria. The chair of the Student Affairs Committee shall serve as the chair of the Subcommittee and will fill one of the designated seats as appropriate. Staff support for the Subcommittee will be provided by the Senate Office. Duties and Responsibilities of the Subcommittee include:

1.   To receive and review an annual report from the Chair of the Student Services Fee Committee operating on each campus, as well as any other reports pertaining to fees such as an annual summary of waivers granted permitted in the Regents Policy.

2.   To recommend to the Vice Chancellor or the Office of Student Development (as appropriate), in consultation with the senior administrator of the Student Services Fee process on each campus, any changes in the individual campus policies and/or procedures for the allocation of the Student Services Fee on that campus, as well as to address issues noted in resolutions submitted annually by fees committees on that campus.

3.   To review any changes to the Student Services Fee policies and/or procedures on each of the campuses.

4.   To recommend to the Student Senate Consultative Committee, changes to the Regents Policy on the Student Services Fee.

e. f.   To recommend to the Senate Consultative Committee such actions or policies as it deems appropriate.

f. g.   To submit an annual report to the Senate.

A2-2

EXHIBIT B

**Appendix 3 – Memo from Associate General Counsel Tracy Smith
Regarding Viewpoint Neutrality**

EXHIBIT B

April 2, 2001

## MEMORANDUM

TO:         Student Services Fee Task Force

FROM:      Tracy M. Smith
           Associate General Counsel

RE:         *Items for Discussion Regarding Viewpoint Neutrality in Fee Allocations*

I.    **University of Wisconsin Experience**

A.    **Elements of the Wisconsin Plan**

Below are elements of the Wisconsin plan put forward by the University as safeguards against viewpoint discrimination in fee allocations.

➢ Record of funding decisions.  All financial decisions must be made in meetings that are audiotaped; and all records are public
➢ Public hearings.
➢ Express eligibility criteria.  If meet those criteria, group is guaranteed fixed minimum funding.  If additional criteria are met, group can qualify for higher funding.
➢ Express rationale for funding decisions, using a standardized evaluation form
➢ Groups denied funding are entitled to a written statement of the reasons for the denial upon request
➢ Conflict of interest provisions prohibiting group members from voting on own group's request
➢ Appeals process:  First, go through student government, then appeal to the Chancellor, with possibility of appeal to the Regents
➢ Prohibition against viewpoint discrimination, & requirement that student government members making decisions take oath not to engage in viewpoint discrimination

A3-2

EXHIBIT B

**B.    Wisconsin Eligibility Criteria**

1.    RSO must have been awarded 2 years of operation grant funding;
2.    RSO must have written governing documents;
3.    RSO must provide specific and identifiable educational benefit & service to the students of the University;
4.    RSO must have clear purpose & mission statement;
5.    RSO must have clear plan and goals:
      a.    Objectives intended to achieve, which must be evaluated affirmatively, negatively, or numerically;
      b.    Logistical support necessary to achieve objectives;
      c.    Accurate estimate of the cost of that logistical support;
6.    Group must be registered student organization;
7.    RSO must demonstrate that substantially equivalent service is not being provided elsewhere at the University;
8.    RSO must completely & accurately fill out eligibility application;
9.    RSO must adequately answer questions of the committee;
10.    RSO representatives must attend the hearing;
11.    RSO must not violate its own governing documents, student government bylaws, U policy, or state or federal law;
12.    RSO must not have knowingly violated student government financial policies within previous 2 years.

A student group qualifies for "minimum funding" if it meets these criteria.  A group may obtain additional funding if it meets additional criteria:

1.    RSO has demonstrated the ability to expense the funds that the group was awarded in the manner proposed;
2.    RSO has demonstrated that it has accomplished the objectives it set out to accomplish in the past;
3.    RSO has demonstrated that the request for funds is reasonable within the objectives it has set;
4.    RSO has demonstrated a need for the request for funding to achieve its objectives;
5.    RSO has demonstrated that it has submitted accurate requests for funding in the past;
6.    RSO has established that its eligibility criteria have not changed.

**C.    Coordinate campuses' eligibility criteria.**

Discussed at earlier meeting.

A3-3

EXHIBIT B

## II.     University of Minnesota

Below are some areas for discussion.  We may already have incorporated many of these features into our system.

### A.     Application Process

Should the application track the criteria for decision making, so that applicants are directly addressing the criteria?

### B.     Hearing Process

All hearings will be open to the public.  Any meeting at which a financial decision occurs will be audiotaped.  No official financial business may occur at any meeting that is not taped.

### C.     Evaluation and Decision Forms.

Should subcommittees use standardized evaluation forms in evaluating fee applicants? Should recommendations be on standardized forms?  Should recommendations address all the criteria for decisionmaking?

### D.     Criteria for Decisionmaking.

We should explicitly state in procedures that viewpoint discrimination is prohibited. (The manual says this for nonmandatory-fee-funded groups, but not for mandatory-fee-funded.)

We should consider our criteria and Wisconsin's criteria.  We should also review past rationales to see whether there are other valid, but not expressly listed, criteria that are important.

Should we call the criteria something other than "guidelines?"  Affirmatively state that discretion in making funding decisions is limited by application of certain objective factors, and that members must make decisions only according these factors.

**Twin Cities' present guidelines for decisionmaking:**

➢ Programs and services targeted to the largest number of students consistent with need
➢ Programs and services consistent with the mission of the University
➢ Uniqueness of programs and services.  Are the provided elsewhere on campus or in the community?
➢ Programs and services provided (measures might include, but not be limited to, contribution to diversity, attendance, numbers at events, number of phone calls/office visits/inquiries, etc. Method of tabulation should be specified)
➢ Alternative and/or additional sources of funding
➢ Contribution to the University educational experience beyond the academic curriculum
➢ Justification of financial support from students not involved in the services and programs

EXHIBIT B

➢ Any requests from fees receiving organizations (extensions, special considerations) will be considered by the full committee.

> **NOTE:** *Fulfillment of the above does NOT guarantee funding. Previous access to funding from student services fees does NOT guarantee funding from year to year.*

**Possible other criteria:**

➢ Significantly contributes to student development (Regents' Policy)
➢ Stimulates advocacy and debate on diverse points of view
➢ Enables participation in political activity
➢ Promotes student participation in campus administrative activity
➢ Provides opportunities to develop social skills
➢ Demonstrated ability/effort to obtain other funding
➢ Financial reserves?
➢ History of existence w/o student fees?

### E.    Appeal Process.

A student organization may challenge a recommendation of the Student Fees Committee as viewpoint discriminatory by raising that claim to the administration in the administrative hearing portion of the fee allocation process.  We should discuss process.

### F.    Administrative or General Counsel Review?

The General Counsel's Office should continue doing fees training every year.  In addition, should there be training of writers of rationales?  Should there be review of rationales in consultation with fees committee?

### G.    Fixed funding levels

Does it make sense?

TMS

A3-5

EXHIBIT B

**Appendix 4 – MPIRG's List of Potential Areas for Funding Criteria**

EXHIBIT B

Fiscal Responsibility
- Comparison of proposed and actual budgets
- Amount of either deficit or debt
- Size of reserves
- Completion of audits
- Use of generally accepted accounting principles
- Etc.

Educational Value
- General educational opportunities
- Trainings
- Internships
- Leadership positions
- Popular (or general public) education
- Events
- Involvement of faculty
- Etc.

Student Development Value
- Opportunities for civic (and political) engagement
- Opportunities for student participation in administrative activity
- Stimulates advocacy and debate on diverse points of view
- Etc.

Target Population Served
- Size of target population
- Percentage of population served
- Methods of population served
- Etc.

Promotion of Service and Outreach to the Campus
- Individuals contacted
- Class or group presentations
- Newsletters or brochures distributed
- Etc.

Student Involvement in Running Organization and Providing Service
- Percentage of U of M students on governing board
- Number on governing board
- Number involved as volunteers/members
- Number attending meetings
- Etc.

EXHIBIT B

**Appendix 5 – 1998 TC Fees Committee Resolution on Refusable/Refundable Fees**

EXHIBIT B

**Resolution 3 (97-98) -- Refusable/Refundable Funding Mechanism**
**Approved May 13, 1998**

**WHEREAS** the 1996-97 Student Services Fees committee, concerned with the funding mechanism for MPIRG and SLC, passed a resolution to create a task force to explore the implications and any changes in funding under various funding mechanisms; and

**WHEREAS** the task force presented their comprehensive report to the 1997-98 Student Services Fee Committee; and

**WHEREAS** the 1997-98 Fees Committee accepted this report and its findings and thanked the task force for its work; and

**WHEREAS** the report stated that a change from the current funding system refusable/refundable fees for MPIRG and SLC to a positive check off or a yes/no fee system would negatively effect the budgets of both groups; and

**WHEREAS** both organizations must commit considerable time and resources to prepare several budgets each year to take into account multiple funding mechanisms; and

**WHEREAS** the budgets of MPIRG and SLC should be considered on the basis of their merits and not the basis of their funding mechanism; and

**WHEREAS** there are preparations in place to better inform students at the time of registration of what MPIRG and SLC are/do and their options for the refusable/refundable fee; and

**WHEREAS** the discussion of funding mechanisms is time consuming and rarely arrives at a majority consensus;

**THEREFORE BE IT RESOLVED** that the issue of the funding mechanism for MPIRG and SLC not be revisited again by the fees committee until 2001, to see if providing more information at the time of registration will result in students being more informed about the options.

EXHIBIT B

**Appendix 6 – Current Refusable/Refundable Fee Registration Screen**

EXHIBIT B

**UNIVERSITY OF MINNESOTA**

*Office of the Registrar*

## Non-Mandatory Student Fees

There are three types of student services fees assessed: mandatory student services fees, special assessments for specific student groups, and non-mandatory fees. Non-mandatory fees are assessed for student organizations that lobby off-campus, and can be declined at the time of first enrollment in a term, or refunded during the term by contacting the organization.

Name:   Lee,Timothy B

◉  **MPIRG** - The Minnesota Public Interest Research Group is a non-profit, non-partisan student-run advocacy group which gives students the opportunity to speak out on public issues and work for social change. Students work through MPIRG to advocate for consumer rights, environmental preservation, good government and social justice. In addition, MPIRG fosters increased student activism, student leadership, and civic education. The MPIRG fee is $4.12 for Duluth, $3.75 for Morris, and $4.13 for Twin Cities students. If you do not respon you will be charged the fee which later can be refunded by MPIRG.

○  I decline to pay the MPIRG student fee.

◉  **SLC** - The Student Legislative Coalition is a standing committee of University of Minnesota Student Senate ar a non-partisan, student-run organization devoted to lobbying on behalf of U of M students on issues related to the cost and quality of a U of M education and the availability of financial aid for U of M students. The SLC fe is estimated at $3.00 for Crookston, $3.40 for Duluth, $3.38 for Morris, and $3.19 for Twin Cities students. If you do not respond, you will be assessed the fee.

○  I decline to pay the SLC student fee.

You may decline to pay these fees only during your first enrollment. If you have been billed for these fees and do not want to pay them, you must get a refund directly from the MPIRG and SLC offices.

Please make your selection for each fee, and then click the **Submit** button.

[ Submit ]

New registration screen presents all students with a description of the refusable/refundable fee-receiving groups alongside the option to decline the fees.  Image courtesy Mary Koskan, Office of the Registrar.

A6-2

EXHIBIT B

**Appendix 7 – Suggested Mechanism for Selecting Student Representatives to the "Student Support" Fee Committee**

EXHIBIT B

Applications would be made available by the advisor to the "Student Support" Fee Committee and the openings should be publicized in various venues such as the MN Daily and announced at the meetings of various student organizations. Applications would focus on the applicant's ability to assess the detailed budgets and financial statements of the administrative units as well as the student's involvement in the campus or community and any unique perspectives he/she may bring to the committee.

A selection committee would be formed of the BLANK of the Minnesota Student Association, the Executive Vice President of the Graduate and Professional Student Assembly, and the TC undergraduate and graduate/professional representatives to the Senate Committee on Student Affairs Student Fees Subcommittee. These four individuals would review the applications, interview several of the candidates, and select four student members and two alternates for the committee.

Employees and board members of administrative fees-receiving units are eligible to serve on the "Student Support" Fee Committee but they must abstain from deliberating and voting on any organization of which they are an employee or a board member.

EXHIBIT B



# BOARD OF REGENTS POLICY:
## *Student Services Fee*

### SECTION I. SCOPE.

This policy governs assessment of the University of Minnesota (University) student services fee, which funds non-instructional programs and activities; supplements the academic curriculum; and is an integral part of the University's educational experience.

### SECTION II. DEFINITIONS.

#### Subd. 1. Student Services Fee.
*Student services fee* shall mean the mandatory annual fee assessed on designated students to provide funding for student programs, activities, and services on each campus.

#### Subd. 2. Student Services Fee Committee.
*Student Services Fee Committee* shall mean the committee established on each campus to review and recommend annually the student services fee.

#### Subd. 3. Designated Students.
*Designated students* shall mean all students registered for:

- (a) six or more credits per semester; or
- (b) three or more credits per summer session.

Credits for off-campus distance classes are excluded from the total credit count.

### SECTION III. GUIDING PRINCIPLES.

The following principles shall guide the assessment of the student services fee:

- (a) Fee-supported programs, activities, and services shall be available to all students assessed the fee.
- (b) All persons involved in the development of the student services fee shall recognize the relationship of the student services fee to the total tuition and other costs of education for students.
- (c) The University's educational mission is well served when students have the means to engage in dynamic discussions of diverse topics in their extracurricular campus life.

EXHIBIT C

(d) Decisions regarding the allocation of fees among student groups shall be made in a viewpoint-neutral manner.

## SECTION IV. ASSESSMENT AND USE OF THE STUDENT SERVICES FEE.

### Subd. 1. Assessment.
The student services fee shall be assessed on all designated students.

### Subd. 2. Fee Exemptions.
The following students shall be exempt from assessment of the student services fee:

(a) non-degree seeking students;
(b) post-secondary education option students and concurrent high school enrollment program students;
(c) those students not designated, as defined in Section II; and
(d) others as approved by the president or delegate.

### Subd. 3. Special Assessments.
Special assessments of the student services fee may be authorized by the Student Services Fee Committee for clearly defined classes of students.

### Subd. 4. Optional Fees.
Registered students exempt from paying the student services fee have the option of paying the full student services fee or paying optional fees if offered by individual fee-receiving units.

### Subd. 5. Prohibited Uses.
The student services fee may not be used to fund courses or activities for which academic credit is offered within a department where credit is the primary focus of the course or activity.

### Subd. 6. Capital Improvements.
A request for funding of a capital improvement shall be approved by the Student Services Fee Committee on each campus. Such improvements shall not be subject to revision except in the most severe circumstances.

## SECTION V. STUDENT SERVICES FEE COMMITTEE.

The Student Services Fee Committee established on each campus shall adhere to the following:

### Subd. 1. Representation.
The Student Services Fee Committee shall have at least a student majority, and all members shall have the right to vote. Student, faculty, and administrative staff members shall be appointed under Student Services Fee Committee procedures in effect on each campus.

### Subd. 2. Validation of Fee Payment.
Student members of the Student Services Fee Committee shall demonstrate payment of the student services fee each semester of their appointment. Summer session payment is not required.

### Subd. 3. Administrative Assistance.
Each Student Services Fee Committee shall receive administrative assistance from the respective campus administrations and student associations.

EXHIBIT C

## SECTION VI. DELEGATION OF AUTHORITY.

### Subd. 1. Recommendations.
The president shall recommend for Board of Regents action student services fees for each campus in the *Annual Operating Budget*.

### REVISION HISTORY

**Adopted:** July 9, 1982
**Amended:** June 12, 1987; February 12, 1999; June 10, 2005

**EXHIBIT C**

# University of Minnesota – Twin Cities

## Student Services Fee Request Handbook
## For Media Groups

## 2019-2020 Academic Year Requests

The Student Services Fee process for the University of Minnesota – Twin Cities Campus underwent a comprehensive review during 2015-2016. This document contains information based on the approved recommendations from this review. Historical documents can be found at www.studentservicesfees.umn.edu.

**EXHIBIT D**

1

# Table of Contents

| Topic | Page |
|---|---|
| Timeline | 3 |
| University of Minnesota Board of Regents Policy | 4-5 |
| Twin Cities Campus Student Services Fee (SSF) Committee Roles, Procedures, and Guidelines | |
| **Roles** | |
| The Institutional Role of the Student Services Fee Committee | 6-7 |
| Expectations of Student Services Fee Committee Members | 7 |
| Removal of Student Services Fee Committee Members | 7 |
| The Role of the Student Services Fee Advisor | 7-8 |
| **Procedures** | |
| Reviewing the SSF Process | 8 |
| Fee Committee Resolutions | 8 |
| Reviewing the SSF Administration Budget | 8 |
| General Operating Procedures | 8-10 |
| Committee Records | 9 |
| Public Participation | 9-10 |
| **Guidelines** | |
| Minimum Requirements for Applying for Student Services Fee Funding | 10-11 |
| Group Eligibility Requirements | 10 |
| Application Criteria | 11 |
| Guidelines for Decision Making | 11-12 |
| Viewpoint Neutrality | 13-14 |
| Media Groups Student Services Fee Information and Guidelines | |
| Student Groups Student Services Fee Committee (SSFC) Membership & Responsibilities | 15 |
| Membership | 15 |
| Appointment | 15 |
| Time Commitment | 15 |
| Compensation | 15 |
| **Allowable Expenses for Media Group Requests** | 16-17 |
| Operational Costs | 16 |
| Programmatic/Project-Related Costs | 16-17 |
| **Expenses Not Allowed for Media Group Requests** | 17 |
| **Media Group Request Process** | 17-21 |
| Required Meetings | 17 |
| Budget Request Process | 17-18 |
| Budget Request Documents | 18 |
| Supplemental Information | 18 |
| Presentations to the SSFC | 18-19 |
| Large Scale Programming/Project Requests | 19 |
| Deliberations | 19 |
| Public Feedback | 19 |
| Appeals | 20-21 |
| **Accountability Procedures** | 21-22 |
| **Other Financial Requirements** | 21-22 |
| All-Funds Budgeting | 22 |
| Media Group Reserves | 22 |

**EXHIBIT D**

2

**Timeline – Media Groups\***
**\*All dates and times are subject to change. Go to http://ssf.umn.edu/applicants for more detailed and current information**

**2019-2020 Academic Year - Media Group Request**
**Deadlines are 11:59 p.m. unless otherwise noted**

**November**
Friday 30th            Information sessions

**January**
Monday 21st          Deadline for groups to confirm application as a Media Group

**February**
Monday 4th           Application due at 9:00 a.m. CST - groups must complete all required application
                     documents and place them in their SSF Google Folder

Friday 8th           Presentations

TBA                  Public Forum

Friday 15th          Deliberations

**March**
Tuesday 12th         Recommendations published on website

Tuesday 19th         Appeals due

**April**
Thursday 23rd        Public Forum

**May**
Friday 3rd           Appeals Hearings

EXHIBIT D

**UNIVERSITY OF MINNESOTA BOARD OF REGENTS POLICY**
**STUDENT SERVICES FEE**

## SECTION I. SCOPE

This policy governs assessment of the University of Minnesota (University) student services fee, which funds non-instructional programs and activities; supplements the academic curriculum; and is an integral part of the University's educational experience.

## SECTION II. DEFINITIONS

**Subd. 1. Student Services Fee.** *Student services fee* shall mean the mandatory annual fee assessed to designated students to provide funding for student programs, activities, and services on each campus.

**Subd. 2. Student Services Fee Committee.** *Student Services Fee Committee* shall mean the committee established on each campus to review and recommend annually the student services fee.

**Subd. 3. Designated Students.** *Designated students* shall mean all students registered for:
(a)  six or more credits per semester; or
(b)  three or more credits per summer session.

Credits for off-campus distance classes are excluded from the total credit count.

## SECTION III. GUIDING PRINCIPLES

The following principles shall guide the assessment of the student services fee:

(a) Fee-supported programs, activities, and services shall be available to all students assessed the fee;

(b) All persons involved in the development of the student services fee shall recognize the relationship of the student services fee to the total tuition and other costs of education for students;

(c) The University's educational mission is well served when students have the means to engage in dynamic discussions of diverse topics in their extracurricular campus life;

(d) Decisions regarding the allocation of fees among student groups shall be made in a viewpoint-neutral manner.

## SECTION IV. ASSESSMENT AND USE OF THE STUDENT SERVICES FEE

**Subd. 1. Assessed Students.** The student services fee shall be assessed on all designated students.

**Subd. 2. Fee Exemptions.**  The following students shall be exempt from assessment of the student services fee:          **EXHIBIT D**
(1) non-degree seeking students;
(2) post-secondary education option students and concurrent high school

4

(3) those students not designated, as defined in Section II; and

(4) others as approved by the president or delegate.

**Subd. 3. Special Assessments.** Special assessments to the student services fee may be authorized by the fees committee for clearly defined classes of students.

**Subd. 4. Optional Fees.** Registered students exempt from paying the student services fee have the option of paying the full fee or paying optional fees if offered by individual fee-receiving units.

**Subd. 5. Prohibited Uses.** The student services fee may not be used to fund courses or activities for which academic credit is offered within a department where credit is the primary focus of the course or activity.

**Subd. 6. Capital Improvements.** A request for funding of a capital improvement shall be approved by the fees committee on each campus. Such improvements shall not be subject to revision except in the most severe circumstances.

## SECTION V.  STUDENT SERVICES FEE COMMITTEE

The student services fee committee established on each campus shall adhere to the following.

**Subd. 1. Representation.** The student services fee committee shall have at least a student majority, and all members of the committee shall have the right to vote. The student, faculty, and administrative staff members shall be appointed under committee procedures in effect on each campus.

**Subd. 2. Validation of Fee Payment.** Student members of the student services fee committee shall demonstrate payment of the student services fee each semester throughout their terms. Summer session payment is not required.

**Subd. 3. Administrative Assistance.** Each student services fee committee shall receive administrative assistance from the respective campus administrations and student associations.

## SECTION VI.  DELEGATION OF AUTHORITY

**Subd. 1. Recommendations.**  The president shall recommend for Board of Regents action student services fees for each campus in the *Annual Operating Budget*.

| Adopted: | July 9, 1982 |
|----------|--------------|
| Amended: | June 12, 1987 |
|          | February 12, 1999 |
|          | June 10, 2005 |

# EXHIBIT D

## TWIN CITIES CAMPUS STUDENT SERVICES FEES COMMITTEE ROLES, PROCEDURES AND GUIDELINES

### THE INSTITUTIONAL ROLE OF THE STUDENT SERVICES FEES COMMITTEE

The Board of Regents requires that a representative process be established on each campus to recommend the level of the student service fee and the specific allocations to requesting organizations. (Note: Throughout this document "Fee Committee" shall refer to all committees described below, unless otherwise specified.)

### The process that has been established on the Twin Cities Campus includes the following:

Administrative Units:

- The administrative units & media groups committee will be composed of the Student Affairs Chief Financial Manager and 7 students. In the case of administrative units, 1 student representative of the student advisory board of the unit presenting the budget request will also participate in providing feedback and recommendations to the Vice Provost for Student Affairs and Dean of Students (VPSA/DoS).
- This committee, along with the VPSA/DoS, will hear presentations by students and staff representing administrative units; the committee will provide feedback and recommendations to the VPSA/DoS.
- Based on feedback from the committee and student input from public hearings, the VPSA/DoS will make decisions on administrative requests and forward funding recommendations to the Executive Vice President and Provost for inclusion in the University's proposed annual operating budget

Student Groups:

- The student groups fee committee will be composed of at least 16 voting, at-large student members, at least 2 faculty/staff representatives, and at least 4 non-deliberating student members will hear presentations and serve on the appeals committee
- This group will work in sub-committees to determine funding recommendations for student groups and will forward these recommendations to the Vice Provost for Student Affairs and Dean of Students (VPSA/DoS)
- After review, the VPSA/DoS will either approve or amend the allocations before forwarding them to the Executive Vice President and Provost for inclusion in the University's proposed annual operating budget.

Media Groups:

- The administrative units & media groups committee will be composed of 7 students and the Student Affairs Chief Financial Manager. In the case of media groups, one University of Minnesota – Twin Cities faculty or staff member (preferably from the Journalism School)
- This committee will hear presentations by media groups, make recommendations, and forward these recommendations to the VPSA/DoS
- The VPSA/DoS will either approve or amend the recommendations of the committee before forwarding them to the Executive Vice President and Provost for inclusion in the University's proposed annual operating budget.

Special Assessments:

- Groups requesting special assessments will work with their advisor(s) and within their respective general membership bodies early each spring to determine and pass (by majority vote) budget requests.
- Group leadership will present their respective budget requests to the VPSA/DoS for review
- The VPSA/DoS will either approve or amend the requests before forwarding them to the Executive Vice President and Provost for inclusion in the University's proposed annual operating budget

All requests:

- The Board of Regents approves final monetary recommendations as part of the University's annual operating budget.

Given this charge, the Fee Committees have the flexibility to:

- Develop procedures for organizations to present requests to the committee
- Develop timelines
- Establish operating procedures (within the Regent's guidelines)
- Propose specific monetary and non-monetary resolutions
- Maximize accountability of funds received from student service fees

**EXHIBIT D**

6

Methods for dealing with conflicts/challenges:
- An open forum following the final recommendations to receive input on the process
- Challenges/conflicts should be directed first to the respective fee committee
- Procedures for dealing with unforeseen circumstances should be incorporated into the operating procedures that are reviewed and approved on an annual basis by the Fee Committees and the Office for Student Affairs.

## EXPECTATIONS OF STUDENT SERVICES FEE COMMITTEE MEMBERS

**All Members:**
- Members must agree to the time commitment of their committee of appointment, and should be cognizant of this time commitment when applying to serve on the SSFC. Approximate time commitments for each committee are available in this handbook
- Members must maintain good academic standing throughout their term(s) of appointment
- Members must demonstrate payment of the Student Services Fee during each semester of appointment
- Members must be appointed, attend all training sessions for the committee of their appointment, and complete training prior to the beginning of presentations during each fee cycle
- Members must identify, on their application and in subsequent processes, their membership in and whether they serve as an officer or in a leadership role of a fee-receiving organization. Members must recuse themselves from deliberation on these organizations, and must make every effort to communicate potential conflicts of interest to the relevant Student Groups SSFC Leadership, and the SSFC Advisor. Members may not participate in presentations to the SSFC.
- Members who participate in the preparation of a fee request will communicate the level and scope of participation to the Committee Chair or SSFC Advisor.  The Chair or Advisor will provide the information to the committee prior to presentations.  This information will be received without prejudice.
- Members must develop a thorough understanding of the budget request process, forms, and SSFC handbook information relevant to their committee of appointment
- Members must attend all budget request presentations relevant to their committee of appointment
- Members must attend all deliberations relevant to their committee of appointment, unless the member is a non-deliberating member
- Members must attend public hearings relevant to their committee of appointment

It should be noted that SSFC members are required to attend all committee activities, including training sessions, meetings, presentations, deliberations, and hearings.  Members will only be excused from committee activities due to legitimate absences as defined by University policy - Makeup Work for Legitimate Absences, Section 1. Committee member absences, even for academic reasons, can severely impact the ability of the SSFC to function efficiently; all SSFC members must be transparent about absence requests and communicate their scheduling needs to the SSFC Advisor during the application period. Failure to do so may result in termination.

The Student Services Fee Committee advisor may request documentation of illness or other conflicts.  Repeated absences will not be tolerated and may result in an adjustment in stipend and/or removal from the SSFC.

## REMOVAL OF STUDENT SERVICES FEE COMMITTEE MEMBERS
A member may be expelled from the Committee by a two-thirds vote. Charges against the member may not be made public.

## THE ROLE OF THE STUDENT SERVICES FEE ADVISOR

**EXHIBIT D**

The Board of Regents requires that administrative assistance be provided to the fee committee. An advisor is provided for the fee committee. The advisor is charged with the following:
- Assisting in the selection of the fees committees

7

- Communicating with student groups and units about the fees process, timeline, and application requirements
- Training the fee committees
- Providing support and advice to the committee during the fees decision-making process
- Ensuring that all fee-receiving groups complete accountability procedures

It should be noted that the advisor is not involved in the decisions of the fee committees and does not participate in the deliberation and allocation process. The advisor, however, is the primary resource for determining answers to procedural questions or ambiguities.

## REVIEWING THE SSF PROCESS

SSFC Resolutions will be reviewed and considered on an annual basis.  Given a charge provided by the Vice Provost for Student Affairs and Dean of Students, issues that arise within the SSF process may be reviewed at any time. Generally, a 4-year comprehensive review cycle shall be maintained.

## FEE COMMITTEE RESOLUTIONS

Although the committees can make resolutions at any time, they are generally made after the committee approves their final recommendations. These resolutions are made in an effort by the committee to pass on the thoughts of one year's committee to future committees; although resolutions are not officially binding, they are intended to alert future committees to the concerns, commitments, and rationales of past committees.

Resolutions and recommendations are the ways in which the committee communicates to the public. If you would like access to these files, please contact the Student Services Fee Advisor.

1) At the end of each annual Fee cycle, the chair of each committee will prepare a written memorandum to the Fee Advisor regarding any resolutions approved by the committee, as well as specific suggestions, advice, or dissenting opinions for the next year's Fee committee to consider while evaluating requests.
2) The Fee Advisor will provide the language and rationale for the approved resolutions to the VPSA/DoS, who will review them for consistency with University policy, impact on the overall SSF process, and impact on the University student community.
3) The VPSA/DoS, committee chairs, and the Fee Advisor will meet to discuss perspectives regarding the resolutions. The VPSA/DoS will communicate approval of any resolutions to the SSFC Advisor.
4) The Fee Advisor will determine how to incorporate the intent of the approved resolutions in the SSFC handbook and guidelines.
5) All resolutions (approved and not approved) will be archived by the Fee Advisor for future reference.

## REVIEWING THE SSF ADMINISTRATION BUDGET

The SSF Administration Budget will be shared with and approved annually by the Vice Provost for Student Affairs and Dean of Students.  Debating and voting on the SSF Administrative Budget is outside the scope of the Student Services Fee Committee.  The SSF Administration Budget covers the cost of administering the Student Services Fee process, and thus is best determined by the Vice Provost for Student Affairs in consultation with committees established to review the SSF process as described above.

## GENERAL OPERATING PROCEDURES
### Parliamentary Procedure

Using Robert's Rules of Order creates a framework for conducting SSFC business.  As such, Robert's Rules provides for constructive and democratic meetings, to help, not hinder, the business of the Committee. Under no circumstances should "undue strictness" be allowed to intimidate members or limit full participation.

**EXHIBIT D**

1. All business conducted by the Student Services Fees Committee, to include procedures not specifically expressed in this document, will be guided by Robert's Rules of Order. These rules may be set aside or

8

amended by the Committee at any time and for any length of time by a two-thirds vote. (Student Groups committee only)

2.  A quorum will consist of a majority of the members appointed. Of the quorum, the majority must consist of students versus other representatives. This rule may be amended at the beginning of a meeting by a majority vote, but only after quorum has been initially established and the Committee is aware of members who must depart before business can be concluded. The amended rule will automatically be nullified once the Committee has adjourned for that business day.

3.  The Chair cannot assign a member to act as Chair on a future date.  In the event of the Chair's absence, the Committee, by majority vote, appoints a Chair pro tem (temporary). The entrance of the Chair will terminate the appointment.

**Voting**

1.  Votes by proxy are not allowed.
2.  Absentee ballots are not allowed.
3.  Any elections will be done by secret ballot.
4.  Any official action requires majority approval of those casting a yes or no vote.
5.  Fee committee members shall not vote on the allocation of a group of which they are elected, appointed, or employed.

**Quorum**

A quorum is declared as over 50 percent of the filled seats of the voting members on a committee or sub-committee

**Rules of Conduct**

The Committee reserves the right, by two-thirds vote, to set the rules of conduct for its members.

**Committee Records**

All committee business is open to the public. Written recommendations and minority statements, along with resolutions adopted by the committee will be shared publicly.

**Public Participation**

Prior to committee deliberations, there will be one public forum for student groups and one public forum for administrative units and media groups. Attendance at public forum is mandatory for all members of the relevant fee committees. A final public forum will be held with the Vice Provost for Student Affairs after the committee has completed their work.

Meetings of all Student Services Fee Committees and Sub-Committees are open to the public for observation. Participation by guests is permitted only by 2/3 vote of those committee members in attendance.

Speaking policy for SSF public forums

1)  Enrolled students should be allowed to speak.
2)  Staff of administrative units should be allowed to speak – but their student advisory boards should be encouraged to speak on the unit's behalf.
3)  University of Minnesota faculty and staff should be allowed to speak, as decisions by the SSFC often can impact the broader campus.
4)  People who are not identified above should not be allowed to speak.
5)  Advisors/affiliates of student groups can coach/prepare their student group members, but should not be allowed to speak unless they are also University of Minnesota faculty/staff.  Given the choice between advisors and students, students should always be encouraged to speak.

**EXHIBIT D**

9

6) Speakers should be allowed to speak multiple times, but still limited to one minute per opportunity.

## MINIMUM REQUIREMENTS FOR APPLYING FOR STUDENT SERVICES FEE FUNDING

**In order for a group to be eligible to apply for funds, all of the following criteria must be met:**

1. The applicant must be an Administrative Unit, Registered Student Organization (RSO), or Campus Life Program (CLP) that is currently registered and in good standing with Student Unions & Activities. RSOs, CLPs, and Media Groups must remain registered and in good standing throughout the duration of their approved funding in order to receive allocated funds.

2. Starting with requests for Fall 2019 Programming & Academic Year 2019-2020 Operations, groups that receive pass-through funding from special assessment groups (the Council of Graduate Students, Professional Student Government, or the Minnesota Student Association) may not request funds through the SSF process.

3. The group must be able to provide financial documentation (in the form of bank statements – or EFS report for CLPs - that can be supported by a general ledger) for the 12 (consecutive) months prior to applying

4. RSOs must be in compliance with Student Activities Financial Policies for RSOs

5. During the academic year in which groups apply for Student Services Fee funding, one current budget preparer from each applicant group must complete the Student Services Fee Canvas Course.

6. During the academic year in which groups apply for Student Services Fee funding, one current officer from each applicant group must complete the Financial Management Workshop offered by the Student Activities Office.

7. Groups must operate as non-profit organizations

8. Partisan political organizations are not eligible for the general student services fee funding. "Partisan political organizations" are organizations affiliated with a registered political party or candidates for election which are formed for the purpose of supporting a political party or candidate for election. Such groups may seek funding for their nonpartisan political activities (e.g., candidate forums available to all qualified candidates, nonpartisan educational programs, etc.) through other University grant and student funding programs.

9. Groups receiving student services fee funding must have students participating in deciding how fee money is spent. Students must be involved in the development of policies and budgets for any proposal that comes before the Student Services Fee Committee. Students must present budget requests to the SSFC. Non-students may not participate in presentations.

10. Groups receiving Student Services Fee funds must demonstrate expenditures in general compliance with their submitted budgets.

11. All budgets and all financial records for groups currently receiving Student Services Fee funding must be made available upon request for inspection

12. All groups currently receiving Student Services Fee funds must meet accountability/audit requirements

13. Membership of the organization and access to programs and services must comply with the University of Minnesota's Equal Opportunity Statement.

14. All fee-receiving groups must adhere to accounting procedures approved by the Student Services Fees Advisor and the Office for Student Affairs.

**EXHIBIT D**

15. All student groups, special assessment groups, and media groups must indicate "SSF Funded" on all marketing for all events and activities funded either partially or fully by SSF funds.

**If a group meets all the above criteria and applies for funds, the application must meet <u>all</u> the following criteria:**

1) Applicants must apply for a minimum of $2,000 in programming *per request*, and/or a minimum of $1,000 *per year* for operations. Below this threshold, applicants are encouraged to find alternate sources of income such as grants, fundraisers, etc. Student Unions & Activities can provide information regarding available grant opportunities.

2) Groups must be in compliance with accountability procedures in order to request funds. Groups must keep ledgers updated and upload receipts within two weeks of respective transactions.

3) Groups must provide documentation or information requested by the SSFC, SSFC Advisor (or their designee), within 5 business days of the request.

4) All groups applying for student services fee funds must fully and accurately complete the standardized request form(s) required for their request(s).

5) It is recommended that RSOs operate from their own bank account, separate from a parent group/organization, and that CLPs operate from an EFS chart string unique to their organization. If an account is shared, groups should highlight their own expenses on bank statements or EFS reports that are submitted as part of their application materials.

6) All groups applying for student services fee funds must present their request(s) to the Student Services Fee Committee as required

7) All groups applying for student fee funds must comply with all deadlines established by the Student Services Fee Committee. Requests for exceptions must be submitted in writing and received at least ***five days*** prior to the deadline for submission. Exceptions require approval of the Student Services Fee Advisor and a majority vote of the SSFC Chair and Subcommittee Chairs.

8) All SSF applicants must submit original application documents unique to the organization presenting them. All documents must be composed of work original to the organization presenting them, and must not be plagiarized, copied or duplicated from the application of another fee-receiving group or any other entity without proper citation or permission.

## STUDENT SERVICES FEE COMMITTEE GUIDELINES FOR DECISION MAKING

The Student Services Fee Committee is charged with making responsible, viewpoint-neutral recommendations for awarding fee funding to administrative units, student groups, and media groups. The committees must evaluate requests according to the viewpoint-neutral criteria listed below. While each committee has the authority to weigh and apply the criteria, each committee must consistently apply all criteria to each group applying for student services fee funds. The committees may not consider the viewpoint of requesting groups in making funding decisions.

All funding recommendations from the Student Services Fee Committee must be accompanied by references to the applicants' fulfillment of the Guidelines for Decision-Making. The SSF Committees will endeavor to include all issues that affect the level of funding of an applicant in the recommendations.

**Fulfillment of the following does not guarantee approval for funding:**

1) Extent of contribution to one or more of the following:
   - Providing a service to the student body.
   - Supplementing the academic curriculum.
   - Helping to foster a sense of community on the Twin Cities campus.

**EXHIBIT D**

2) Quality and quantity of programs and services provided to the student body, consistent with the mission of the organization.

3) Extent of and demand for the programs and services provided. Groups must quantify their answer by such things as attendance numbers at events, number of phone calls / office visits, inquiries, etc.  Groups must specify the method of tabulation and provide specific documentation upon request.

4) Breadth of service to students across academic departments or academic units.

5) Targeting of programs and services to the largest number of students consistent with the need.

6) Demonstration of benefits of programs and services to students who pay the student services fees but do not participate in the programs and services.

7) Efforts to secure funding in addition to the student services fee

8) Demonstration of financial need that cannot be fulfilled with alternative sources of income.

9) All organizations (student groups, media groups, special assessment groups, and administrative units) must fully justify their fee request, including any financial reserves.
   - In response to its own needs, operating risks (i.e. fluctuations in enrollment) and budgeting practices, organizations should establish an internal requirement for reserve funds.
   - This requirement is not translated into an arbitrary SSF rule, i.e. 10% of operating funds. Operating reserves for student groups may be between 0-10%, but a minimum reserve is not required.
   - Administrative units are not required to maintain minimum or maximum reserves.
   - The SSFC may reduce an allocation for any group if it finds reserve balances in excess of justified needs

10) Demonstration of compliance with the accountability procedures outlined by the Office for Student Affairs

11) Demonstration of the group's ability to manage the amount of funds requested from the SSFC

12) Written justification of significant deviation from the proposed budget outlined in the prior year's student services fee request

13) Previous access to Student Services Fee funding does not guarantee future funding, in full or in part, from the SSFC.

**EXHIBIT D**

**VIEWPOINT NEUTRALITY**
In the context of collecting and allocating student fees, "viewpoint neutrality" means ensuring that there is no bias toward any particular viewpoint. Because student fee funded activities involve a wide range of projects and programs that can require vastly different levels of funding, "neutrality" is not measured by the particular *outcome* of funding allocations, but by the *process* by which those decisions are made. The goal is to have a process that is neutral and bias-free, not to create an artificial 'balance' of views and activities.

It is easier to describe the elements an allocation system may *not* have in order to prevent bias rather than to design a bias-free system. The key elements are:

- Funding decisions may not have any relationship to the particular viewpoint of the group or activity. Requests for funding based on criteria that are neutral toward the views of the organization.
- Funding may not be contingent on a particular level of support or popularity of an organization, although the amount of funds to be allocated to an organization may take into account student involvement in the organization.
- Criteria used to evaluate funding proposals must be consistently applied.

**Common Misconceptions about Viewpoint Neutrality (adapted from the Center for Campus Free Speech, Guide to Student Activity Fees)**
Although viewpoint neutrality is a relatively simple concept, in the years since the Supreme Court's ruling some have misunderstood what viewpoint neutrality means in practice. For the most part, these misconceptions are caused by one central misunderstanding—that the *outcome* of the allocation process must be neutral or balanced towards viewpoints rather than that the *process* for allocating funds needs to be neutral towards viewpoints. The following discussion highlights three of the more common ways this central misunderstanding comes up in practice:

- Misconception 1: Viewpoint neutrality means that fee allocation decisions cannot take into account the results of a student referendum
    - o It is understood that requiring a showing of majority support, through a referendum or otherwise, as a condition for funding would be constitutionally suspect. The forum may not be open only to those organizations that command broad support. The essence of viewpoint neutrality is that all points of view—even those espoused by small minorities—must be given equal access to the forum. However, nothing in the Southworth Supreme Court decision holds that schools must turn a blind eye towards indications of student support, such as a referendum or petition. Indeed, a system that did not consider, at least to some extent, student support would likely violate the Constitution. The confusion about viewpoint neutrality and referenda is understandable since the Southworth Supreme Court *did* raise concerns about the use of a referendum as the sole determinant in deciding whether groups were eligible for funding. The Court suggested, but did not rule, that such a method of determining eligibility would not be viewpoint neutral. If referenda are the *sole* means by which eligibility for funding is determined, then the majority could easily silence a minority view, violating the principle of viewpoint neutrality. If a funding allocation system is designed in that manner, it should be changed to allow both popular and unpopular views access to funding. Though the constitutionality of using referenda in allocation decisions is not a settled question, there remains a strong argument that referenda and other tools to measure student involvement and interest can be useful in making allocation decisions provided they are used in the right way. A critical distinction exists between the use of referenda to determine a group's *eligibility* to receive funds and the use of referenda as a tool for gauging student interest in the group for use in determining the *amount of funds allocated* to a group that has already been deemed eligible. When a referendum is used to inform the amount of an allocation for a group or activity, the referendum can serve as a useful measure of the amount of services provided by the group and future student interest/involvement. It is common sense that the amount of funds allocated should be, at least in part, a function of the number of students who

EXHIBIT D

13

benefit from the group's presence on campus. There is a strong argument that allocation decisions must be made, at least in part, by considering the level of student support in order to avoid running afoul of viewpoint neutrality principles. Using referenda is simply one method of considering student interest in allocation decisions. Provided that referenda are employed as one of the criteria considered in setting allocation levels and do not harm an organization's access to the forum in the first place, a measure of student interest and likely involvement can be useful.

- Misconception 2: Viewpoint neutrality means that all groups must be allocated the same amount of funding.
  - o A related misconception is that the only way to allocate fees in a viewpoint neutral manner is to give every group the exact same amount of funding again, arguing that the outcome of allocation decisions must be neutral rather than focusing on the process by which funds are allocated. There are three problems with this misconception. First, different types of groups have very different resource needs. A chess club requires different resources than a student legal services program. Second, groups with different levels of student involvement on campus would also need different levels of resources. If a campus group has a large number of participants, they will use more resources to meet that demand than one that has a small number of participants. Third, there is a serious viewpoint neutrality problem in treating dissimilar groups alike. To build on the prior illustration, there is a strong argument that giving equal funding for Students for Choice and Students for Life both unfairly amplifies the voice of the smaller group and unfairly suppresses the voice of the larger group. While strict proportionality is not required, a strict equality rule is unlikely to survive First Amendment attack.
- Misconception 3: Viewpoint neutrality means that a group cannot be funded unless a group that advocates the "opposite" view also receives funding
  - o While there is no coherent legal basis for this concern, it is a point that is made frequently by opponents of student fee programs. The typical argument is that groups working of a "liberal" side of an issue—for example, tolerance for gays—may not be funded unless the school is equally willing to fund an organization that takes the opposite position, say an organization of formerly gay individuals who believe that homosexuality is a personal life choice that one is free to change. The problem with this argument is that it is *not* an equality argument. If such an organization existed, principles of viewpoint neutrality would require the school to permit it to seek funds on an equal footing with the tolerance for gays organization. Nor is it a viewpoint neutrality argument. The objection does *not* go to the criteria used to determine eligibility—it is an objection based solely on the orientation or viewpoint of the group receiving funding. Rather, it is the classic sore-loser argument that seeks to defund organizations—not because an opposition group is not receiving funds, but because an opposition group simply does not exist. Under Southworth, this argument is without merit because it has nothing to do with the viewpoint neutral tools used to determine funding eligibility.

EXHIBIT D

## MEDIA GROUPS

In order to gain approval to apply as a Media Group, a group must meet the following minimum criteria:
1.  Have a mission that indicates that the group's primary focus is to provide a media-related service (not exclusive to social media) to campus
2.  Be a University Unit, Registered Student Organization (RSO), or Campus Life Program (CLP) currently registered and in good standing with Student Unions and Activities
3.  Meet all minimum requirements for applying for Student Services Fee Funding (see pages 10-11)
4.  Gain approval from the VPSA/DoS (or designee) to apply for SSF funds as a Media Group. The VPSA/DoS shall have the exclusive authority to determine which applicants may apply to a SSF committee

Media Groups must maintain the minimum criteria to request SSF funds throughout the duration of their funding recommendations in order to receive allocated funds.

### Administrative & Media Groups Student Services Fee Committee
**Membership**
Committee members who are active participants in any fee-requesting media group may not be a part of presentations made to the SSFC, deliberate on organizations for which they have conflict of interest, or in other ways communicate information regarding their respective organizations to the SSFC. In addition, committee members may not communicate to their respective organizations regarding SSFC business outside their role as a member of the SSFC.

**Appointment**
The Administrative Unit & Media Group will be hired by a committee including the SSFC Advisor and at least 3 members of the Twin Cities Delegation of the University Senate. At least 2 members from the University Senate must be students.

Faculty/staff members of the Media Groups SSFC will be appointed by the VPSA/Dos or their designee.

**Time Commitment**
Members of the Administrative Units & Media Groups SSFC should expect to spend approximately 30 hours (including training) on committee business during the month of February, with the majority of work taking place on Fridays.

**Compensation**
At the beginning their term on the Administrative & Media Groups SSFC, members will sign a contract outlining their expectations. Failure to comply with these expectations will result in partial or full loss of stipend. If a committee member is terminated or resigns from the committee prior to the end of a semester, no stipend will be awarded. Stipends will be disbursed in full at the conclusion of each committee's work each semester.

The Chair will receive $400
General Members will receive $300
The faculty/staff member will receive $300

In addition to stipends, Administrative Unit & Media Group SSFC members will be provided with meals during **EXHIBIT D** working time.

15

**Allowable Expenses for Media Group Requests**

**Operational Costs:**

- Equipment: If requesting funds for equipment, the group must:
  1) Maintain a standardized inventory list and provide the list to the SSFC as part of the operations request
  2) Complete the usage plan (included in the request form), replacement schedule, and provide costs for alternative options for each piece of equipment requested
  3) Using the operations request form, articulate how equipment purchases are critical to the mission, function, and existence of the organization
- Operational Space & Utilities: If requesting funds for operational/office space, groups must:
  1) Articulate and justify the specific purpose(s) for the space (e.g. storage, group work, etc.)
  2) Complete the standardized usage plan for the space
  3) On request forms provided, the group must articulate and document what efforts have been made to secure on-campus or lower-cost space alternatives
  4) On the request forms provided, the group must articulate how student group space is critical to the mission, function, and existence of the organization
- Stipends & Salaries: Groups may request funds for compensating individuals with the following stipulations:
  1) Groups may request stipends or salaries – stipends are recommended (instead of hourly or salary rates) for student staff
  2) All requests to compensate individuals must be accompanied by a position description
  3) All individuals who receive compensation through SSF funds must be subject to performance review by applicant groups. These reviews must take place regularly, be objective in nature, and must be shared with the Financial Advisor or student SSF financial assistants as part of the accountability process.
- Insurance for off-campus events: If requesting insurance for an off-campus event, the group must:
  1) Articulate why the program is being held off-campus instead of an on-campus location
- Travel: Groups may request funds for operational travel under the following circumstances:
  1) Travel costs are directly related to day-to-day activities of the group
  2) Travel is requested for an activity that cannot take place on campus
- Taxes: Groups may request funds one time to pay for the process of registering as a 501(c)3 Organization
- Food for operational use other than general meetings
- General office supplies
- Printing, copying
- Postage
- Operational costs not included in "expenses not allowed for student group requests"

**Programmatic/Project-Related Costs**

- Space rental
- Entertainment/speaker fees
- Food
- Advertising
- Travel: For all travel requests, groups must demonstrate that they have made an effort to keep travel costs as low as possible, and should contribute to travel costs as part of their request. Groups must provide documentation of drive vs. fly comparison, include any days students will be away from class, and should consider weather conditions as part of their request.

**EXHIBIT D**

Each request a group makes for travel is equivalent to one program and must be included in a program request.

16

Groups may apply for travel under the following circumstances:

i)   Travel that is programmatic or project-related in nature and relates to the mission of the group.

ii)   Travel for professional development and conference travel that is related to the mission of the group.

iii)  Groups may request up to $250 in funds for travel for one retreat – this retreat will count as one program

iv)  Groups may request funds for travel to competitions related to the mission of the group

v)   Groups may request funds for travel and accommodations for speakers/entertainers

- Programmatic or project-related expenses not included in "expenses not allowed for student group requests"

## Expenses Not Allowed for Media Group Requests

1)   Clothing – including uniforms or other items for group members or volunteers

2)   Food for general meetings

3)   Pass-through funding*

4)   Grant funding*

5)   Alcohol

6)   Expenses related to activities for which students receive academic credit or complete degree requirements

7)   Direct or indirect contributions to charitable organizations or philanthropic causes

*Groups must apply for funds independently and may not share or provide SSF funds to other groups or individuals unless explicitly approved by the SSFC during the budget allocation process.

## Media Group Request Process
### Required Meetings
Prior to each funding cycle, Media Groups must attend an Informational Meeting with the SSF Advisor, as well as a SSF Financial Management Workshop. The SSF Advisor will schedule the Media Groups Informational Meeting and communicate the information with Media Group Officers provided by the organization. At least one officer from each Media Group should attend a SSF Financial Management Workshop for Student Groups – information on these workshops is available on the SSF website.

### Budget Request Process
The request process for Media Groups will take place annually. Groups must submit requests on forms provided by the SSFC Advisor and the Student Affairs Chief Financial Manager. Media Groups will request funds for event/project-related and operational costs on one request (per group).

Media Groups may request up to $30,000 per academic year (September-August) for event or project-related purposes. Media groups may request funds for up to 10 events per semester. If groups choose to request funds for events/projects, they should use the Media Group Event Request Form provided by the SSF Advisor to create and justify these requests.

Requests for over $30,000 for event or project-related expenses, or over 10 programs per semester will not be considered by the SSFC. Budget preparers should contact the SSFC Advisor if they have questions about how much they are allowed to request in any given cycle.

**EXHIBIT D**

Once Media Group representatives attend the mandatory information session, the SSF Advisor will provide Media Groups with a standardized SSF Media Group Information Form and Media Group Public Forum Summary.

Groups may create other budget request documents at their discretion, however, these must be easily readable by the committee. The summary will be published on the SSF website at least one week prior to a public forum.

**Budget Request Documents**
A complete SSF request for Media Groups includes the following:
1) Two years of financial records, including bank statements (EFS reports for CLPs) and general ledger information
2) Media Group Information Form (provided by SSF Advisor)
3) Media Group Public Forum Summary (provided by SSF Advisor)
4) Budget request forms (created by group – groups requesting events must include the standardized form provided by the SSF Advisor)
5) Evidence of product (media output – for example: hours on air; number of publications; number of print/online articles; number of podcasts; number of advertisements; number of videos; number of page views; etc.) – September 2017-August 2018

All groups applying for student fees must comply with all deadlines established by the Student Services Fee Committee. Requests for exceptions must be submitted in writing and received at least five days prior to the deadline for submission. Exceptions require approval of the Student Services Fee Advisor and a majority vote of the Administrative Unit & Media Groups SSFC.

Groups that submit budget requests that include mathematical errors and/or inaccurate or inconsistent information may be penalized up to 20% (per instance) of their final recommended allocation.

All SSF applicants must submit original application documents unique to the organization presenting them. All documents must be composed of work original to the organization presenting them, and must not be plagiarized, copied or duplicated from the application of another fee-receiving group or any other entity without proper citation or permission.

Requests that are submitted late, are incomplete/have missing information, or do not meet all application criteria outlined on pages 10-11 of this handbook will not be accepted by the SSFC.

**Supplemental Information**
Groups may provide supplemental information to the SSFC by placing documents into the "Supplemental Information" folder located in the group's SSF Google Folder (provided by the SSF Advisor/designee). If not requested by the SSFC, this information must be shared by the budget request deadline.

The SSFC, SSFC Advisor, or their designee may request supplemental information or documentation from Student Group applicants. This information must be submitted by the group (via the SSF Google Folder) within 5 business days of the request. Failure to respond in a timely manner may result in a penalty of up to 20% (each instance) of the group's final recommended allocation.

**Presentations to the SSFC**
All Media Group presentations to the SSFC will be open to the public.

**EXHIBIT D**

The SSFC Advisor and/or designee will coordinate the scheduling of Media Group presentations. Media Groups will have a maximum of 60 minutes for presentations to the SSFC, including time for questions and answers. It is

advised that Media Groups allow for at least 20 minutes for SSFC questions. Time allotted for presentations is dependent upon complexity of requests and size of the applicant's overall budget.

All media groups applying for SSF funds must present their request(s) to the SSFC as required. If a group is late for their presentation time, they may be penalized by the SSFC for up to 20% of their final recommended allocation. Groups that do not attend their presentation as scheduled will not be eligible to receive funds.

### Large Scale Programming/Project Requests
Groups may request one special/ large scale program/project per academic year outside their regular group budget request. In order to make this request, the group must:
1) Meet with the SSF Advisor to discuss the request
2) Request the standardized Special Event Form from the SSF Advisor
3) Complete the standardized Special Event Form
4) Follow the Student Group Large Event protocol/guidelines as outlined by Student Unions & Activities (SUA) and meet with a Student Activities Advisor at least 2 weeks prior to the SSF application deadline
5) Provide the SUA Advisor with evidence that the group is in the process of planning a large event and has reserved space, considered logistics and security, and has a feasible plan for the execution of the event

The SSFC will consider the cost of the event and weigh the following factors (along with the Guidelines for Decision-Making) while evaluating the overall request:
1) Number of groups involved in planning and execution of the event
2) Ability of the organization to execute the event
3) Location of the event

The SSFC will consider the following criteria to evaluate and fund the request:
1) Documentation from the Student Activities Office that confirms the group met with an advisor and was provided with the Large Event protocol/guidelines
2) Existing criteria for programming requests
3) Availability of funds to the SSFC
4) Proximity of the event to campus

### Deliberations
All deliberations of the Administrative Unit and Media Groups SSFC will be open to the public. Groups are encouraged to attend deliberations. The SSFC Advisor or SSFC Leadership Team will communicate logistical information about deliberations to student group applicants.

Groups attending their own deliberations may be given an opportunity to respond to misinformation or misunderstanding on the part of the SSFC during deliberation on their requests. During this time groups may provide clarifying information (not new information) to the SSFC, as well as answer questions from the SSFC should they arise. Time limits for providing clarifying information will be at the discretion of the SSFC Chair.

### Public Feedback
Feedback on Media Group requests will be gathered from the University Community on two occasions. One public forum will be held prior to when the SSFC deliberates on Media Group requests. Another public forum will be held EXHIBIT D following the publication of final recommendations.

At any time, members of the University Community can provide feedback to the SSFC Advisor.

**Appeals**

Appeals for Media Groups will take place after recommendations are published by the Administrative Unit and Media Groups SSFC.

In order to appeal a funding recommendation by the SSFC, individual SSF-paying students and media groups must provide evidence that one (or more) of the following criteria were met:
1) The SSFC violated its own rules
2) The SSFC exhibited bias against an organization
3) The SSFC did not make a decision in a viewpoint-neutral manner

Individual SSF-paying students (individuals) who wish to appeal the recommendations of the SSFC must follow this process:
1) Individuals will have 5 business days following publication of recommendations to appeal a recommendation of the SSFC.
2) Individuals must complete the standardized appeal form (Individual Appeal Form on the SSF website), and must provide evidence that their case meets one or more of the criteria for appeal.  The Individual Appeal Form will be made available when each set of recommendations is published, and will remain open for 5 business days.
3) Individuals must submit the Individual Appeal Form based on the instructions included on the SSF Website.

Media Groups that wish to appeal the recommendations of the Student Groups SSFC must follow this process:
1) Media Groups will have at least 5 business days following publication of recommendations to appeal a recommendation of the SSFC
2) Groups must complete the standardized appeal form (Media Group Appeal Form on the SSF website), and must provide evidence that their case meets one or more of the criteria for appeal
3) Groups must submit the form according to the instructions provided by the SSFC Chair in their correspondence regarding the group's recommendation

The SSF Advisor will share with appeals with the Vice Provost for Student Affairs and Dean of Students (VPSA/DoS) who will take the following action:
1) Review the appeals submitted by individuals and media groups and determine whether sufficient evidence was provided that one (or more) of the appeal criteria were met.
   a. If the VPSA/DoS determines that criteria were not met (sufficient evidence was not provided), the appealing individual or group will not receive a formal hearing.
   b. If the VPSA/DoS determines that criteria were met (the group provided sufficient evidence), the SSFC Advisor will work with the group to schedule a formal hearing.
2) Formal appeals hearings will include:
   a. In the case of individual appeals, the student who submitted the appeal will be invited to participate. In the case of media group appeals, 1-2 designated student representative(s) from the appealing group will be invited to speak on behalf of the group – the student group may appoint their own representative(s)
   b. The Administrative Unit and Media Groups Chair
3) Process of the Appeal Hearing:
   a. VPSA/DoS and Administrative Unit & Media Groups Chair review all submitted documents prior to the hearing

**EXHIBIT D**

    b. Appealing individual or group has 5 minutes to discuss their case – no new information may be presented

    c. Administrative Unit and Media Groups Chair has 5 minutes to discuss their case/rationale

    d. The VPSA/DoS may ask questions of the appealing individual/group and/or SSFC Chair or SC Chair

    e. The VPSA/DoS will make a decision on the appeal and inform the SSF Advisor of the status and rationale

    f. The SSF Advisor will inform the appealing individual/group of the status of the appeal

**Accountability Procedures**

Student Groups will be held accountable for the use of SSF funds.

Accountability measures will include:

1) Groups must pick up and deposit their SSF checks in a timely manner (within 2 weeks of notification of check availability)
2) Groups must meet with the SSF Advisor (or designee) when requested
3) Groups must spend their money in the way it was allocated by the SSFC
4) Groups must maintain a general ledger
5) Groups must provide itemized receipts and bank statements that support their general ledger
6) Groups that receive SSF funds for operational costs must provide documents such as tax forms (stipends), leases, and utility bills to support their general ledger and budget request (as applicable)
7) Groups must submit budget requests that reflect their current financial standing
8) Groups must submit documentation of attendance at programs when requested by the SSFC
9) Groups must submit documentation of efforts to acquire income outside the SSF process (i.e., fundraising, collection of member dues, receipt of sponsorships, partnerships with external organizations, grant-writing efforts, etc.) when requested by the SSFC
10) Groups must report balances from previous SSF requests to the SSFC Advisor and to the SSFC upon request.

Groups requesting SSF funds must appoint two members as budget preparers/responsible parties. One of these members must attend mandatory SSF information sessions and financial management workshops, and the names, phone numbers, and (umn.edu) email addresses of these students must be included in the budget request. The group may include a group email address (umn.edu) in addition to the two budget preparers/responsible parties. If there is turnover of these members, the group must immediately provide contact information of the new preparers/responsible parties to the SSFC Advisor.

The SSFC Advisor (or their designee) may schedule meetings with the budget preparers/responsible parties. All designated budget preparers/responsible parties must:

1) Respond to messages/invitations regarding scheduling of meetings from the SSF Advisor (or designee) within 5 business days
2) Bring all requested/required documentation to any meeting. If requested/required documentation is not provided, the meeting may be re-scheduled.
3) Provide any requested financial documentation to the SSF Advisor (or designee) or the SSFC within 5 business days of the request

**Other Financial Requirements**

**All-Funds Budgeting**

# EXHIBIT D

The practice of reporting all sources of income and expenses (i.e. an "all-funds budget") is required for all Student Services Fee requests and is consistent with how other budgets are reviewed at the University of Minnesota.

Expectations will be defined and budget worksheets provided for what information should be provided by applicants.

**Statement on Student Services Fee Reserves**

It is prudent for student services fee-receiving administrative units and media groups to hold funds allocated to them through the student services fees process in reserve for certain purposes. Examples of the most common types of reserves are listed below. It should be recognized that fee-receiving administrative units and media groups differ considerably in terms of size of operating budget, space, plant and equipment needs, revenue volatility, etc.; therefore, there is not a standard rule that can be applied to all groups. Balances and reserves should be described in the budget submission and reviewed during the unit presentation.

Examples of potential fee reserves:

1. Operational Reserves – to mitigate operating risks (i.e. fluctuations in enrollment, revenue volatility)
2. Equipment Reserves – to cover replacement cost of standard equipment. Method to determine appropriate equipment reserve amount should be outlined in budget submission.
3. Facility Reserves – to cover repair and replacement costs of facilities which may include furniture, furnishings and equipment (FFE) and minor space remodeling projects. Method to determine appropriate facility reserve amount should be outlined in budget submission.
4. Long Range Reserves – designated for one-time special needs, large-scale projects such as major renovation or building projects and related expenses (e.g. moving, planning and design).

At any time, the SSFC may require media groups to meet their own budget needs through utilization of their reserve funds.

The SSFC, with the assistance of the SSF Advisor, will closely monitor the amount of SSF funds spent by media groups. Groups may be required to return SSF funds (over $500) that have not been spent or otherwise allocated for summer programs/operations or upcoming budget requests. Budget preparers/responsible parties will be accountable for this task.

Funds returned to the University may be used for future SSF expenditures.

**EXHIBIT D**

# University of Minnesota – Twin Cities

## Student Services Fee Request Handbook
## For Student Organizations

## Spring & Fall 2020 Event/Project Requests
## 2020-2021 Academic Year Operations Requests

The Student Services Fee process for the University of Minnesota – Twin Cities Campus underwent a comprehensive review during 2015-2016. This document contains information based on the approved recommendations from this review. Historical documents can be found at www.studentservicesfees.umn.edu.

EXHIBIT E

## Table of Contents

| Topic | Page |
|---|---|
| Timeline | 3-5 |
| University of Minnesota Board of Regents Policy | 6-7 |
| Twin Cities Campus Student Services Fee (SSF) Committee Roles, Procedures, and Guidelines | |
| **Roles** | |
| The Institutional Role of the Student Services Fee Committee | 8-9 |
| Expectations of Student Services Fee Committee Members | 9 |
| Removal of Student Services Fee Committee Members | 9 |
| The Role of the Student Services Fee Advisor | 10 |
| **Procedures** | |
| Reviewing the SSF Process | 10 |
| Fee Committee Resolutions | 10 |
| Reviewing the SSF Administration Budget | 10 |
| General Operating Procedures | 11-12 |
| Committee Records | 11 |
| Public Participation | 11-12 |
| **Guidelines** | |
| Minimum Requirements for Applying for Student Services Fee Funding | 12-13 |
| Group Eligibility Requirements | 12-13 |
| Application Criteria | 13 |
| Guidelines for Decision Making | 13-14 |
| Viewpoint Neutrality | 15-16 |
| **Student Groups Student Services Fee Information and Guidelines** | |
| Student Groups Student Services Fee Committee (SSFC) Membership & Responsibilities | 17-19 |
| Membership | 17 |
| Appointment | 17 |
| Time Commitment | 17-18 |
| Compensation | 18 |
| Duties | 18-19 |
| Allowable Expenses for Student Group Requests | 19-21 |
| Operational Costs | 19-20 |
| Event/Project-Related Costs | 20-21 |
| Expenses Not Allowed for Student Group Requests | 21 |
| **Student Group Request Process** | 21-26 |
| Required Training | 21 |
| Event/Project Requests | 21-22 |
| Large Scale Event/Project Requests | 22 |
| Operational Requests | 22-23 |
| Budget Request Forms | 23 |
| Supplemental Information | 23 |
| Presentations to the SSFC | 23-24 |
| Deliberations | 24 |
| Public Feedback | 24 |
| Appeals | 24-26 |
| Accountability Procedures | 26 |
| Other Financial Requirements | 26-27 |
| All-Funds Budgeting | 26 |
| Student Group Reserves | 27 |

2

EXHIBIT E

**Student Services Fee Timeline**
**Student Groups**
**2019-2020 Academic Year**
*Dates and times subject to change*
**All deadlines are 11:59 p.m. unless otherwise noted*

**August 2019**

Monday 26th -          Fall 2019 Event & 2019-2020 Operations Checks Available
Friday 9/27            *Check pick-up & SSF orientation sessions ongoing*

**September 2019**

Tuesday 3rd-           Fall 2019 Event & 2019-2020 Operations Checks Available
Friday 9/27            *Check pick-up & SSF orientation sessions ongoing*

Monday 16th            Canvas course opens (12:00 noon)

Wednesday 18th         Applications available for Spring 2020 events (Modules 1&2 of
                       Canvas course must be complete in order to access application)

Wednesday 25th-        Budget request workshops & advising office hours
Wednesday 10/23

**October 2019**

Thursday 24th          Deadline to request forms for Spring 2020 events application
                       *Groups must complete 'Request for Spring 2020 Events*
                       *Application' quiz on Canvas*

Sunday 27th            Spring 2020 Events requests due
                       *Groups must complete 'Submit an Application for Spring 2020 SSF*
                       *Events Funds' quiz on Canvas*

Tuesday 29th-          Sign-ups for Spring 2020 Events presentations
Wednesday 30th         *Detailed information will be emailed to applicants*

**November 2019**

Friday 1st-            Spring 2020 Events presentations
Sunday 3rd

Friday 8th-            Spring 2020 Events deliberations
Sunday 10th

Friday 15th-           Spring 2020 Events deliberations
Sunday 17th

Tuesday 19th           Spring 2020 Events recommendations published

TBA                    Public Forum

3

EXHIBIT E

| | |
|---|---|
| Tuesday 26th | Appeals Due at **4:30 p.m.** (Spring 2020 Events recommendations) |

**December 2019**

| | |
|---|---|
| Friday 6th-<br>Saturday 7th | Appeals Hearings |

**January 2020**

| | |
|---|---|
| Wednesday 15th-<br>Thursday 3/5 | Spring 2020 Events Checks Available |
| Wednesday 22nd | Canvas course opens for 2020-2021 Operations Requests<br>*Request access to the SSF Canvas course here* |
| Friday 24th | Applications available for 2020-2021 Operations (Modules 1 &2 of<br>Canvas course must be complete in order to access application) |
| Monday 28th-<br>Thursday 3/14 | Budget request workshops & SSFC advisor office hours |

**February 2020**

| | |
|---|---|
| Wednesday 12th | Deadline to request forms for 2020-2021 Operations Requests<br>*Groups must complete 'Request for 2020-2021 Operations<br>Application' quiz on Canvas* |
| Thursday 13th | Canvas course opens for Fall 2020 events requests<br>*Request access to the SSF Canvas course here* |
| Sunday 16th | 2020-2021 Operations requests due<br>*Groups must complete 'Submit an Application for 2020-2021 SSF<br>Operations Funds' quiz on Canvas* |
| Tuesday 18th-<br>Wednesday 19th | Sign-ups for 2020-2021 Operations presentations<br>*Detailed Information will be emailed to applicants* |
| Thursday 21st | Applications available for Fall 2020 events requests |
| Saturday 22nd-<br>Sunday 23rd | 2020-2021 Operations presentations |
| Friday 28th-<br>March 1 | 2020-2021 Operations deliberations |

**March 2020**

| | |
|---|---|
| Friday 2/28-<br>Sunday 1st | 2020-2021 Operations deliberations |
| Tuesday 3rd | 2020-2021 Operations recommendations published |

4

EXHIBIT E

| | |
|---|---|
| Tuesday 10th | 2020-2021 Operations appeals due at 4:30 p.m. CST |
| Wednesday 11th | Deadline to request forms for Fall 2020 events requests<br>*Groups must complete 'Request for Fall 2020 Events<br>Application' quiz on Canvas* |
| Sunday 15th | Fall 2020 Events requests due<br>*Groups must complete 'Submit an Application for Fall 2020 SSF<br>Events Funds' quiz on Canvas* |
| Tuesday 17th-<br>Wednesday 18th | Sign-ups for Fall 2020 Event presentations<br>*Detailed information will be emailed to applicants* |
| Friday 20th-<br>Sunday 22nd | Fall 2020 Events presentations |
| Friday 27th-<br>Sunday 29th | Fall 2020 Events deliberations |
| **April 2020** | |
| Friday 3rd-<br>Sunday 5th | Fall 2020 Events deliberations |
| Tuesday 7th | Fall 2020 Events recommendations published |
| Tuesday 14th | Fall 2020 Events appeals due at **4:30 p.m.** |
| TBA | Public Forum |
| Friday 17th-<br>Saturday 18th | Appeals hearings (2020-2021 Operations & Fall 2020 Events<br>requests) |

EXHIBIT E

**UNIVERSITY OF MINNESOTA BOARD OF REGENTS POLICY**
STUDENT SERVICES FEE

### SECTION I.  SCOPE

This policy governs assessment of the University of Minnesota (University) student services fee, which funds non-instructional programs and activities; supplements the academic curriculum; and is an integral part of the University's educational experience.

### SECTION II.  DEFINITIONS

**Subd. 1. Student Services Fee.** *Student services fee* shall mean the mandatory annual fee assessed to designated students to provide funding for student programs, activities, and services on each campus.

**Subd. 2. Student Services Fee Committee.** *Student Services Fee Committee* shall mean the committee established on each campus to review and recommend annually the student services fee.

**Subd. 3.  Designated Students.**  *Designated students* shall mean all students registered for:
(a)  six or more credits per semester; or
(b)  three or more credits per summer session.

Credits for off-campus distance classes are excluded from the total credit count.

### SECTION III.  GUIDING PRINCIPLES

The following principles shall guide the assessment of the student services fee:

(a) Fee-supported programs, activities, and services shall be available to all students assessed the fee;

(b) All persons involved in the development of the student services fee shall recognize the relationship of the student services fee to the total tuition and other costs of education for students;

(c) The University's educational mission is well served when students have the means to engage in dynamic discussions of diverse topics in their extracurricular campus life;

(d) Decisions regarding the allocation of fees among student groups shall be made in a viewpoint-neutral manner.

### SECTION IV.  ASSESSMENT AND USE OF THE STUDENT SERVICES FEE

**Subd. 1. Assessed Students.** The student services fee shall be assessed on all designated students.

**Subd. 2. Fee Exemptions.**  The following students shall be exempt from assessment of the student services fee:
(1) non-degree seeking students;
(2) post-secondary education option students and concurrent high school

6

**EXHIBIT E**

(3) those students not designated, as defined in Section II; and

(4) others as approved by the president or delegate.

**Subd. 3. Special Assessments.** Special assessments to the student services fee may be authorized by the fees committee for clearly defined classes of students.

**Subd. 4. Optional Fees.** Registered students exempt from paying the student services fee have the option of paying the full fee or paying optional fees if offered by individual fee-receiving units.

**Subd. 5. Prohibited Uses.** The student services fee may not be used to fund courses or activities for which academic credit is offered within a department where credit is the primary focus of the course or activity.

**Subd. 6. Capital Improvements.** A request for funding of a capital improvement shall be approved by the fees committee on each campus. Such improvements shall not be subject to revision except in the most severe circumstances.

## SECTION V.  STUDENT SERVICES FEE COMMITTEE

The student services fee committee established on each campus shall adhere to the following.

**Subd. 1. Representation**. The student services fee committee shall have at least a student majority, and all members of the committee shall have the right to vote. The student, faculty, and administrative staff members shall be appointed under committee procedures in effect on each campus.

**Subd. 2. Validation of Fee Payment.** Student members of the student services fee committee shall demonstrate payment of the student services fee each semester throughout their terms. Summer session payment is not required.

**Subd. 3. Administrative Assistance.** Each student services fee committee shall receive administrative assistance from the respective campus administrations and student associations.

## SECTION VI.  DELEGATION OF AUTHORITY

**Subd. 1. Recommendations.** The president shall recommend for Board of Regents action student services fees for each campus in the *Annual Operating Budget*.

| Adopted: | July 9, 1982 |
|---|---|
| Amended: | June 12, 1987 |
| | February 12, 1999 |
| | June 10, 2005 |

7

EXHIBIT E

## TWIN CITIES CAMPUS STUDENT SERVICES FEES COMMITTEE ROLES, PROCEDURES AND GUIDELINES

### THE INSTITUTIONAL ROLE OF THE STUDENT SERVICES FEES COMMITTEE

The Board of Regents requires that a representative process be established on each campus to recommend the level of the student service fee and the specific allocations to requesting organizations. (Note: Throughout this document "Fee Committee" shall refer to all committees described below, unless otherwise specified.)

### The process that has been established on the Twin Cities Campus includes the following:

Administrative Units:

- The administrative units, media groups, and special assessments committee will be composed of the Student Affairs Chief Financial Manager (or their designee) and 7 students. In the case of administrative units, 1 student representative of the student advisory board of the unit presenting the budget request will also participate in providing feedback and recommendations to the Vice Provost for Student Affairs and Dean of Students (VPSA/DoS).
- This committee, along with the VPSA/DoS, will hear presentations by students and staff representing administrative units; the committee will provide feedback and recommendations to the VPSA/DoS.
- Based on feedback from the committee and student input from public hearings, the VPSA/DoS will make decisions on administrative requests and forward funding recommendations to the Executive Vice President and Provost for inclusion in the University's proposed annual operating budget

Student Groups:

- The student groups fee committee will be composed of at least 16 voting, at-large student members, at least 2 faculty/staff representatives, and at least 3 non-deliberating student members will hear presentations and serve on the appeals committee
- This group will work in sub-committees to determine funding recommendations for student groups and will forward these recommendations to the Vice Provost for Student Affairs and Dean of Students (VPSA/DoS)
- After review, the VPSA/DoS will either approve or amend the allocations before forwarding them to the Executive Vice President and Provost for inclusion in the University's proposed annual operating budget.

Media Groups:

- The administrative units, media groups, and special assessments committee will be composed of 7 students and the Student Affairs Chief Financial Manager (or their designee). In the case of media groups, one University of Minnesota – Twin Cities faculty or staff member (preferably from the Journalism School) will also participate in providing feedback and recommendation to the VPSA/DoS.
- This committee will hear presentations by media groups and provide feedback to the VPSA/DoS
- Based on feedback from the committee and student input from public hearings, the VPSA/DoS will make decisions on media group requests and forward funding recommendations to the Executive Vice President and Provost for inclusion in the University's proposed annual operating budget

Special Assessments:

- The administrative units, media groups, and special assessments committee will be composed of 7 students and the Student Affairs Chief Financial Manager (or their designee).
- This committee will hear presentations by special assessment groups and provide feedback to the VPSA/DoS
- Based on feedback from the committee and student input from public hearings, the VPSA/DoS will make decisions on special assessment requests and forward funding recommendations to the Executive Vice President and Provost for inclusion in the University's proposed annual operating budget

All requests:

- The Board of Regents approves final monetary recommendations as part of the University's annual operating budget.

Given this charge, the Fee Committees have the flexibility to:

- Develop procedures for organizations to present requests to the committee
- Develop timelines
- Establish operating procedures (within the Regents guidelines)

8

EXHIBIT E

- Propose specific monetary and non-monetary resolutions
- Maximize accountability of funds received from the student service fee

Methods for dealing with conflicts/challenges:

- An open forum following the final recommendations to receive input on the process
- Challenges/conflicts should be directed first to the respective fee committee
- Procedures for dealing with unforeseen circumstances should be incorporated into the operating procedures that are reviewed and approved on an annual basis by the Fee Committees and the Office for Student Affairs.

## EXPECTATIONS OF STUDENT SERVICES FEE COMMITTEE MEMBERS

**All Members:**

- Members must agree to the time commitment of their committee of appointment, and should be cognizant of this time commitment when applying to serve on the SSFC. Approximate time commitments for each committee are available in this handbook
- Members must maintain good academic standing throughout their term(s) of appointment
- Members must demonstrate payment of the Student Services Fee during each semester of appointment
- Members must be appointed, attend all training sessions for the committee of their appointment, and complete training prior to the beginning of presentations during each fee cycle
- Members must identify, on their application and in subsequent processes, their membership in and whether they serve as an officer or in a leadership role of a fee-receiving organization. Members must recuse themselves from deliberation on these organizations, and must make every effort to communicate potential conflicts of interest to the relevant Student Groups SSFC Leadership, and the SSFC Advisor. Members may not participate in presentations to the SSFC.
- Members who participate in the preparation of a fee request will communicate the level and scope of participation to the Committee Chair or SSFC Advisor. The Chair or Advisor will provide the information to the committee prior to presentations. This information will be received without prejudice.
- Members must develop a thorough understanding of the budget request process, forms, and SSFC handbook information relevant to their committee of appointment
- Members must attend all budget request presentations relevant to their committee of appointment
- Members must attend all deliberations relevant to their committee of appointment, unless the member is a non-deliberating member
- Members must attend public hearings relevant to their committee of appointment

It should be noted that SSFC members are required to attend all committee activities, including training sessions, meetings, presentations, deliberations, and hearings. Members will only be excused from committee activities due to legitimate absences as defined by University policy - Makeup Work for Legitimate Absences, Section 1. Committee member absences, even for academic reasons, can severely impact the ability of the SSFC to function efficiently; all SSFC members must be transparent about absence requests and communicate their scheduling needs to the SSFC Advisor during the application period. Failure to do so may result in termination.

The Student Services Fee Committee advisor may request documentation of illness or other conflicts. Repeated absences will not be tolerated and may result in an adjustment in stipend and/or removal from the SSFC.

## REMOVAL OF STUDENT SERVICES FEE COMMITTEE MEMBERS

A member may be expelled from the Committee by a two-thirds vote. Charges against the member may not be made public.

EXHIBIT E

**THE ROLE OF THE STUDENT SERVICES FEE ADVISOR**

The Board of Regents requires that administrative assistance be provided to the fee committee. An advisor is provided for the fee committee. The advisor is charged with the following:

- Assisting in the selection of the fees committees
- Communicating with student groups and units about the fees process, timeline, and application requirements
- Training the fee committees
- Providing support and advice to the committees during the fee decision-making processes
- Ensuring that all fee-receiving groups complete accountability procedures

It should be noted that the advisor is not involved in the decisions of the fee committees and does not participate in the deliberation and allocation process. The advisor, however, is the primary resource for determining answers to procedural questions or ambiguities.

**REVIEWING THE SSF PROCESS**

SSFC Resolutions will be reviewed and considered on an annual basis. Given a charge provided by the Vice Provost for Student Affairs and Dean of Students, issues that arise within the SSF process may be reviewed at any time. Generally, a 4-year comprehensive review cycle shall be maintained.

**FEE COMMITTEE RESOLUTIONS**

Although the committees can make resolutions at any time, they are generally made after the committee approves their final recommendations. These resolutions are made in an effort by the committee to pass on the thoughts of one year's committee to future committees; although resolutions are not officially binding, they are intended to alert future committees to the concerns, commitments, and rationales of past committees.

Resolutions and recommendations are the ways in which the committee communicates to the public. If you would like access to these files, please contact the Student Services Fee Advisor.

1) At the end of each annual Fee cycle, the chair of each committee will prepare a written memorandum to the Fee Advisor regarding any resolutions approved by the committee, as well as specific suggestions, advice, or dissenting opinions for the next year's Fee committee to consider while evaluating requests.
2) The Fee Advisor will provide the language and rationale for the approved resolutions to the VPSA/DoS, who will review them for consistency with University policy, impact on the overall SSF process, and impact on the University student community.
3) The VPSA/DoS, committee chairs, and the Fee Advisor will meet to discuss perspectives regarding the resolutions. The VPSA/DoS will communicate approval of any resolutions to the SSFC Advisor.
4) The Fee Advisor will determine how to incorporate the intent of the approved resolutions in the SSFC handbook and guidelines.
5) All resolutions (approved and not approved) will be archived by the Fee Advisor for future reference.

**REVIEWING THE SSF ADMINISTRATION BUDGET**

The SSF Administration Budget will be shared with and approved annually by the Vice Provost for Student Affairs and Dean of Students. Debating and voting on the SSF Administrative Budget is outside the scope of the Student Services Fee Committee. The SSF Administration Budget covers the cost of administering the Student Services Fee process, and thus is best determined by the Vice Provost for Student Affairs in consultation with committees established to review the SSF process as described above.

EXHIBIT E

## GENERAL OPERATING PROCEDURES

### Parliamentary Procedure

Using Robert's Rules of Order creates a framework for conducting SSFC business. As such, Robert's Rules provides for constructive and democratic meetings, to help, not hinder, the business of the Committee. Under no circumstances should "undue strictness" be allowed to intimidate members or limit full participation.

1. All business conducted by the Student Services Fees Committee, to include procedures not specifically expressed in this document, will be guided by Robert's Rules of Order. These rules may be set aside or amended by the Committee at any time and for any length of time by a two-thirds vote. (Student Groups committee only)
2. A quorum will consist of a majority of the members appointed. Of the quorum, the majority must consist of students versus other representatives. This rule may be amended at the beginning of a meeting by a majority vote, but only after quorum has been initially established and the Committee is aware of members who must depart before business can be concluded. The amended rule will automatically be nullified once the Committee has adjourned for that business day.
3. The Chair cannot assign a member to act as Chair on a future date. In the event of the Chair's absence, the Committee, by majority vote, appoints a Chair pro tem (temporary). The entrance of the Chair will terminate the appointment.

### Voting

1. Votes by proxy are not allowed.
2. Absentee ballots are not allowed.
3. Any elections will be done by secret ballot.
4. Any official action requires majority approval of those casting a yes or no vote.
5. Fee committee members shall not vote on the allocation of a group of which they are elected, appointed, or employed.

### Quorum

A quorum is declared as over 50 percent of the filled seats of the voting members on a committee or sub-committee

### Rules of Conduct

The Committee reserves the right, by two-thirds vote, to set the rules of conduct for its members.

### Committee Records

All committee business is open to the public. Written recommendations and minority statements, along with resolutions adopted by the committee will be shared publicly.

### Public Participation

Prior to committee deliberations, there will be one public forum for student groups and one public forum for administrative units and media groups. Attendance at public forum is mandatory for all members of the relevant fee committees. A final public forum will be held with the Vice Provost for Student Affairs after the committee has completed their work.

Meetings of all Student Services Fee Committees and Sub-Committees are open to the public for observation. Participation by guests is permitted only by 2/3 vote of those committee members in attendance.

Speaking policy for SSF public forums

1) Enrolled students should be allowed to speak.

11

EXHIBIT E

2) Staff of administrative units should be allowed to speak – but their student advisory boards should be encouraged to speak on the unit's behalf.
3) University of Minnesota faculty and staff should be allowed to speak, as decisions by the SSFC often can impact the broader campus.
4) People who are not identified above should not be allowed to speak.
5) Advisors/affiliates of student groups can coach/prepare their student group members, but should not be allowed to speak unless they are also University of Minnesota faculty/staff.  Given the choice between advisors and students, students should always be encouraged to speak.
6) Speakers should be allowed to speak multiple times, but still limited to one minute per opportunity.

## MINIMUM REQUIREMENTS FOR APPLYING FOR STUDENT SERVICES FEE FUNDING

**In order for a group to be eligible to apply for funds, all of the following criteria must be met:**
1) The applicant must be an Administrative Unit, Registered Student Organization (RSO), or Campus Life Program (CLP) that is currently registered and in good standing with Student Unions & Activities. RSOs, CLPs, and Media Groups must remain registered and in good standing throughout the duration of their approved funding in order to receive allocated funds.

2) Groups that receive pass-through funding from special assessment groups (the Council of Graduate Students, Professional Student Government, or the Minnesota Student Association) may not request funds through the SSF process.

3) The group must be able to provide financial documentation (in the form of bank statements – or EFS report for CLPs - that can be supported by a general ledger) for the 12 (consecutive) months prior to applying

4) RSOs must be in compliance with Student Activities Financial Policies for RSOs

5) During the academic year in which groups apply for Student Services Fee funding, one current budget preparer from each applicant group must complete the Student Services Fee Canvas Course, to include the financial management workshop.

6) Groups must operate as non-profit organizations

7) Partisan political organizations are not eligible for the general student services fee funding.  "Partisan political organizations" are organizations affiliated with a registered political party or candidates for election which are formed for the purpose of supporting a political party or candidate for election. Such groups may seek funding for their nonpartisan political activities (e.g., candidate forums available to all qualified candidates, nonpartisan educational events, etc.) through other University grant and student funding programs.

8) Groups receiving student services fee funding must have students participating in deciding how fee money is spent. Students must be involved in the development of policies and budgets for any proposal that comes before the Student Services Fee Committee. Students must present budget requests to the SSFC. Non-students may not participate in presentations.

9) Groups receiving Student Services Fee funds must demonstrate expenditures in general compliance with their submitted budgets.

10) All budgets and all financial records for groups currently receiving Student Services Fee funding must be made available upon request for inspection

11) All groups currently receiving Student Services Fee funds must meet accountability/audit requirements

12

## EXHIBIT E

12) Membership of the organization and access to events and services must comply with the University of Minnesota's Equal Opportunity Statement.

13) All fee-receiving groups must adhere to accounting procedures approved by the Student Services Fees Advisor and the Office for Student Affairs.

14) All student groups, special assessment groups, and media groups must indicate "SSF Funded" on all marketing for all events, projects, and activities funded either partially or fully by SSF funds.

**If a group meets all the above criteria and applies for funds, the application must meet all the following criteria:**

1) Applicants must apply for a minimum of $2,000 in events/projects *per request*, and/or a minimum of $1,000 *per year* for operations. Below this threshold, applicants are encouraged to find alternate sources of income such as grants, fundraisers, etc. Student Unions & Activities can provide information regarding available grant opportunities.

2) Groups must be in compliance with accountability procedures in order to request funds. Groups must keep ledgers updated and upload receipts within two weeks of respective transactions.

3) Groups must provide documentation or information requested by the SSFC, SSFC Advisor (or their designee), within 5 business days of the request.

4) All groups applying for student services fee funds must fully and accurately complete the standardized request form(s) required for their request(s).

5) All groups applying for student services fee funds must fully outline advertising plans in requests for events and projects in the space provided on the standardized form, even if no funds are being requested for advertising. Advertising plans must clearly describe how groups will promote events and projects to the campus community.

6) It is recommended that RSOs operate from their own bank account, separate from a parent group/organization, and that CLPs operate from an EFS chart string unique to their organization. If an account is shared, groups should highlight their own expenses on bank statements or EFS reports that are submitted as part of their application materials.

7) All groups applying for student services fee funds must present their request(s) to the Student Services Fee Committee as required.

8) All groups applying for student fee funds must comply with all deadlines established by the Student Services Fee Committee. Requests for exceptions must be submitted to the SSF Advisor in writing and received at least *five days* prior to the deadline for submission. Exceptions require approval of the Student Services Fee Advisor and a majority vote of the SSFC Chair and Subcommittee Chairs.

9) All SSF applicants must submit original application documents unique to the organization presenting them. All documents must be composed of work original to the organization presenting them, and must not be plagiarized, copied or duplicated from the application of another fee-receiving group or any other entity without proper citation or permission.

## STUDENT SERVICES FEE COMMITTEE GUIDELINES FOR DECISION MAKING

The Student Services Fee Committee is charged with making responsible, viewpoint-neutral recommendations for awarding fee funding to administrative units, student groups, and media groups. The committees must evaluate requests according to the viewpoint-neutral criteria listed below. While each committee has the authority to weigh and apply the criteria, each committee must consistently apply all criteria to each group applying for student

EXHIBIT E

services fee funds. The committees may not consider the viewpoint of requesting groups in making funding decisions.

All funding recommendations from the Student Services Fee Committee must be accompanied by references to the applicants' fulfillment of the Guidelines for Decision-Making. The SSF Committees will endeavor to include all issues that affect the level of funding of an applicant in the recommendations.

**Fulfillment of the following does not guarantee approval for funding:**

1) Extent of contribution to one or more of the following:
    - Providing a service to the student body.
    - Supplementing the academic curriculum.
    - Helping to foster a sense of community on the Twin Cities campus.

2) Quality and quantity of events and services provided to the student body, consistent with the mission of the organization.

3) Extent of and demand for the events and services provided. Groups must quantify their answer by such things as attendance numbers at events, number of phone calls / office visits, inquiries, etc. Groups must specify the method of tabulation and provide specific documentation upon request.

4) Breadth of service to students across academic departments or academic units.

5) Targeting of events and services to the largest number of students consistent with the need.

6) Events, projects, resources, and services requested from the SSFC must be open to all fee-paying students regardless of academic classification (undergraduate, graduate, or professional student) or course of study.

7) Efforts to secure funding in addition to the student services fee

8) Demonstration of financial need that cannot be fulfilled with alternative sources of income.

9) All organizations (student groups, media groups, special assessment groups, and administrative units) must fully justify their fee request, including any financial reserves.
    - In response to its own needs, operating risks (i.e. fluctuations in enrollment) and budgeting practices, organizations should establish an internal requirement for reserve funds.
    - This requirement is not translated into an arbitrary SSF rule, i.e. 10% of operating funds. Operating reserves for student groups may be between 0-10%, but a minimum reserve is not required.
    - Administrative units are not required to maintain minimum or maximum reserves.
    - The SSFC may reduce an allocation for any group if it finds reserve balances in excess of justified needs

10) Demonstration of compliance with the accountability procedures outlined by the Office for Student Affairs

11) Demonstration of the group's ability to manage the amount of funds requested from the SSFC

12) Written justification of significant deviation from the proposed budget outlined in the prior year's student services fee request

13) Previous access to Student Services Fee funding does not guarantee future funding, in full or in part, from the SSFC.

EXHIBIT E

## VIEWPOINT NEUTRALITY

In the context of collecting and allocating student fees, "viewpoint neutrality" means ensuring that there is no bias toward any particular viewpoint. Because student fee funded activities involve a wide range of projects and programs that can require vastly different levels of funding, "neutrality" is not measured by the particular *outcome* of funding allocations, but by the *process* by which those decisions are made. The goal is to have a process that is neutral and bias-free, not to create an artificial 'balance' of views and activities.

It is easier to describe the elements an allocation system may *not* have in order to prevent bias rather than to design a bias-free system. The key elements are:

- Funding decisions may not have any relationship to the particular viewpoint of the group or activity. Requests for funding based on criteria that are neutral toward the views of the organization.
- Funding may not be contingent on a particular level of support or popularity of an organization, although the amount of funds to be allocated to an organization may take into account student involvement in the organization.
- Criteria used to evaluate funding proposals must be consistently applied.

## Common Misconceptions about Viewpoint Neutrality (adapted from the Center for Campus Free Speech, Guide to Student Activity Fees)

Although viewpoint neutrality is a relatively simple concept, in the years since the Supreme Court's ruling some have misunderstood what viewpoint neutrality means in practice. For the most part, these misconceptions are caused by one central misunderstanding—that the *outcome* of the allocation process must be neutral or balanced towards viewpoints rather than that the *process* for allocating funds needs to be neutral towards viewpoints. The following discussion highlights three of the more common ways this central misunderstanding comes up in practice:

- Misconception 1: Viewpoint neutrality means that fee allocation decisions cannot take into account the results of a student referendum
    - o It is understood that requiring a showing of majority support, through a referendum or otherwise, as a condition for funding would be constitutionally suspect. The forum may not be open only to those organizations that command broad support. The essence of viewpoint neutrality is that all points of view—even those espoused by small minorities—must be given equal access to the forum. However, nothing in the Southworth Supreme Court decision holds that schools must turn a blind eye towards indications of student support, such as a referendum or petition. Indeed, a system that did not consider, at least to some extent, student support would likely violate the Constitution. The confusion about viewpoint neutrality and referenda is understandable since the Southworth Supreme Court *did* raise concerns about the use of a referendum as the sole determinant in deciding whether groups were eligible for funding. The Court suggested, but did not rule, that such a method of determining eligibility would not be viewpoint neutral. If referenda are the *sole* means by which eligibility for funding is determined, then the majority could easily silence a minority view, violating the principle of viewpoint neutrality. If a funding allocation system is designed in that manner, it should be changed to allow both popular and unpopular views access to funding. Though the constitutionality of using referenda in allocation decisions is not a settled question, there remains a strong argument that referenda and other tools to measure student involvement and interest can be useful in making allocation decisions provided they are used in the right way. A critical distinction exists between the use of referenda to determine a group's *eligibility* to receive funds and the use of referenda as a tool for gauging student interest in the group for use in determining the *amount of funds allocated* to a group that has already been deemed eligible. When a referendum is used to inform the amount of an allocation for a group or activity, the referendum can serve as a useful measure of the amount of services provided by the group and future student interest/involvement. It is common sense that the amount of funds allocated should be, at least in part, a function of the number of students who

15

EXHIBIT E

benefit from the group's presence on campus. There is a strong argument that allocation decisions must be made, at least in part, by considering the level of student support in order to avoid running afoul of viewpoint neutrality principles. Using referenda is simply one method of considering student interest in allocation decisions. Provided that referenda are employed as one of the criteria considered in setting allocation levels and do not harm an organization's access to the forum in the first place, a measure of student interest and likely involvement can be useful.

- Misconception 2: Viewpoint neutrality means that all groups must be allocated the same amount of funding.
  - o A related misconception is that the only way to allocate fees in a viewpoint neutral manner is to give every group the exact same amount of funding again, arguing that the outcome of allocation decisions must be neutral rather than focusing on the process by which funds are allocated. There are three problems with this misconception. First, different types of groups have very different resource needs. A chess club requires different resources than a student legal services program. Second, groups with different levels of student involvement on campus would also need different levels of resources. If a campus group has a large number of participants, they will use more resources to meet that demand than one that has a small number of participants. Third, there is a serious viewpoint neutrality problem in treating dissimilar groups alike. To build on the prior illustration, there is a strong argument that giving equal funding for Students for Choice and Students for Life both unfairly amplifies the voice of the smaller group and unfairly suppresses the voice of the larger group. While strict proportionality is not required, a strict equality rule is unlikely to survive First Amendment attack.
- Misconception 3: Viewpoint neutrality means that a group cannot be funded unless a group that advocates the "opposite" view also receives funding
  - o While there is no coherent legal basis for this concern, it is a point that is made frequently by opponents of student fee programs. The typical argument is that groups working of a "liberal" side of an issue—for example, tolerance for gays—may not be funded unless the school is equally willing to fund an organization that takes the opposite position, say an organization of formerly gay individuals who believe that homosexuality is a personal life choice that one is free to change. The problem with this argument is that it is *not* an equality argument. If such an organization existed, principles of viewpoint neutrality would require the school to permit it to seek funds on an equal footing with the tolerance for gays organization. Nor is it a viewpoint neutrality argument. The objection does *not* go to the criteria used to determine eligibility—it is an objection based solely on the orientation or viewpoint of the group receiving funding. Rather, it is the classic sore-loser argument that seeks to defund organizations—not because an opposition group is not receiving funds, but because an opposition group simply does not exist. Under Southworth, this argument is without merit because it has nothing to do with the viewpoint neutral tools used to determine funding eligibility.

16

**EXHIBIT E**

**STUDENT GROUPS**

In order to apply for Student Services Fee (SSF) funding, student groups must be Registered Student Organizations (RSOs) or Campus Life Programs (CLPs) currently registered and in good standing with Student Unions and Activities, and meet all minimum requirements for applying for Student Services Fee Funding (see pages 12-13).

Student Groups must maintain the minimum criteria to request SSF funds throughout the duration of their funding recommendations in order to receive allocated funds.

## Student Groups Student Services Fee Committee
### Membership
The Student Groups SSFC will be composed of 1 chair, at least 3 subcommittee (SC) chairs, 4 general members per SC, 1 non-deliberating member per SC, and at least 2 faculty/staff members. For example, if three SCs are utilized, there would be 1 Chair, 3 SC Chairs, 12 general members, 3 non-deliberating members, and 2 faculty/staff members.

Committee members who are active participants in any fee-requesting student group may not be a part of presentations made to the SSFC, deliberate on organizations for which they have conflict of interest, or in other ways communicate information regarding their respective organizations to the SSFC. In addition, committee members may not communicate to their respective organizations regarding SSFC business outside their role as a member of the SSFC.

### Appointment
The Student Groups SSFC Leadership (Chair and SC Chairs) will be hired by a committee including the SSFC Advisor, a University staff member from outside the Office for Student Affairs, and at least 2 student members of the Twin Cities delegation of the Student Senate.

The Student Groups SSFC Leadership, along with the SSFC Advisor, will interview and hire the General and Non-Deliberating student members of the Student Groups SSFC.

It is preferred that students hired in the fall to serve on the Student Groups SSFC make a commitment to serving for a full academic year. Students who would like to continue to serve on the Student Groups SSFC after their initial appointment may request an extension to their contract from the SSFC Advisor. In this case, the SSFC Advisor will consult with Student Groups SSFC Leadership and make a decision on extending the contract. If an extension is granted, the student may serve a second consecutive year without re-applying. If the student would like to continue after serving a second consecutive year, they must re-apply.

At the beginning of each academic year, at least 1/3 of the Student Groups SSFC should be composed of new members.

Faculty/staff members of the Student Groups SSFC will be appointed by the VPSA/Dos or his/her designee.

### Time Commitment
#### Student Groups SSFC Leadership:
Fall semester:   4 weekends (including hiring/training) during October/November (approximately 70 hours)
           Regular (weekly or every other week) 1-hour meetings of the SSFC Leadership Team
Spring semester: 2-3 weekends during late February - early March (approx. 40 hours)
           3-4 weekends during mid-March/April (approx. 60 hours)

17

**EXHIBIT E**

1 evening/weekend day for training (approx. 4 hours)
Regular (weekly or every other week) 1-hour meetings of the SSFC Leadership Team

**Student Groups SSFC General Members:**
Fall semester:    3-4 weekends (including training) during October/November (approximately 70 hours)
Spring semester: 3 weekends during late March/April (approx. 60 hours)

**Student Groups SSFC Non-Deliberating (appeals) Members:**
Fall semester:    2-3 weekends (including training) during October/November (approximately 50 hours)
Spring semester: 2-3 weekends during late March/April (approx. 40 hours)

**Compensation**
At the beginning of each semester served on the SSFC, members will sign a contract outlining their expectations. Failure to comply with these expectations will result in partial or full loss of stipend. If a committee member is terminated or resigns from the committee prior to the end of a semester, no stipend will be awarded. Stipends will be disbursed in full at the conclusion of each committee's work each semester.

The Chair will receive a total of $1,750 for the academic year ($800 fall, $950 spring)
Sub-Committee Chairs will receive a total of $1,500 for the academic year ($650 fall, $850 spring)
General Members will receive a total of $700 for the academic year ($350 fall, $350 spring)
Non-Deliberating (appeals) members will receive a total of $650 for the academic year ($300 fall, $350 spring)
The Appeals Chair will receive a total of $1000 for the academic year ($450 fall, $550 spring)
The faculty/staff member who hears and deliberates on operations requests in addition to advising event
        requests will receive a total of $1000 for the academic year ($300 fall, $700 spring)
Non-Deliberating faculty/staff members will receive a total of $750 for the year ($300 fall, $450 spring)

In addition to stipends, Student Groups SSFC members will be provided with meals during working time

**Duties of the Student Groups SSFC**
Chair: Assists with the hiring of general and non-deliberating members of the SSFC; Hears and deliberates on student group operations requests; Hears and deliberates on 20-30 student group event/project requests per semester; Serves as tie-breaking vote for sub-committees if need be; Participates in appeals process if need be; Meets regularly with the SSFC Leadership Team to complete committee business; Coordinates record-keeping for the SSFC; Communicates with student group applicants; Serves as spokesperson for the SSFC; Assists SSFC Advisor with training of the Student Groups SSFC; Assists SSFC Advisor in logistics and administrative tasks

Sub-Committee Chairs: Assist with the hiring of general and non-deliberating members of the SSFC; Hear and deliberate on student group operations requests; Hear and deliberate on 40-60 student group event/project requests per semester; Participate in appeals process if need be; Meets regularly with the SSFC Leadership Team to complete committee business; Coordinate record-keeping for assigned sub-committee; Communicate with student group applicants

General Members: Observe 5-10 student group presentations and deliberations facilitated by the SSFC Leadership Team; Hear and deliberate on approximately 40 student group event/project requests per semester; Assist with record-keeping within sub-committee as directed by Sub-Committee Chair

18

EXHIBIT E

Appeals Chair: Hears student group operations requests; Hears 40-60 student group event/project requests per semester; Coordinates record-keeping for the Appeals Committee; Communicates with appealing student groups; Assists SSF Advisor in logistics and administrative tasks

Non-Deliberating (Appeals) Members: Observe 5-10 student group presentations facilitated by the SSFC Leadership Team; Hear approximately 40 student group event/project requests per semester; Serve on Appeals Committee; Assist with record-keeping within sub-committee as directed by Sub-Committee or Appeals Chair

Faculty/Staff Members:
Deliberating Faculty/Staff Member (1): Hears and deliberates on student group operations requests; Hears 40-60 student group event/project requests per semester; Serves as an advisor to a Sub-Committee

Non-Deliberating Faculty/Staff Member (1+): Hears 40-60 student group event/project requests per semester; Serves as an advisor to a Sub-Committee

**Allowable Expenses for Student Group Requests**
**Operational Costs:**
On the standardized forms provided, groups must accurately outline their requests. For operations requests, items that fall into the same category for a total of $100 or less may be combined to create one line item. In this case, groups should provide a comprehensive list of items they plan to purchase in the description of the line item, but a cost breakdown is not necessary. Items that cost more than $100 must be listed as separate line items.
*Example: A request for $90 for office supplies does not need a link or description for each requested item. Instead, groups may provide a simple list of items they plan to purchase with the funds requested (markers, paper, etc.)*
**Allowable Expenses:**
1) Equipment: If requesting funds for equipment, the student group must:
    a) Maintain a standardized inventory list and provide the list to the SSFC as part of the operations request
    b) Complete the usage plan (included in the request form), replacement schedule, and provide costs for alternative options for each piece of equipment requested
    c) Using the operations request form, articulate how equipment purchases are critical to the mission, function, and existence of the organization
    d) Provide a copy of a contract or estimate from the proposed contractor/service provider along with the operations request (place this document in the supplemental information folder)
2) Operational Space & Utilities: If requesting funds for operational/office space, student groups must:
    a) Articulate and justify the specific purpose(s) for the space (e.g. storage, group work, etc.)
    b) Complete the standardized usage plan for the space
    c) On request forms provided, the group must articulate and document what efforts have been made to secure on-campus or lower-cost space alternatives
    d) On the request forms provided, the group must articulate how student group space is critical to the mission, function, and existence of the organization
    e) Provide a copy of a lease or estimate from the proposed contractor/service provider along with the operations request (place this document in the supplemental information folder)
3) Stipends: Groups may request funds for stipends for student members/leaders with the following stipulations:
    a) Groups may request up to a total of $5,000 in funding for stipends
    b) Groups may request stipends for up to 5 individual student group officers

19

**EXHIBIT E**

c) Groups must recognize that stipends are not hourly wages and should not compare or calculate stipends based on an hourly rate of pay

d) All stipend requests must be accompanied by a position description

4) Insurance for off-campus events: If requesting insurance for an off-campus event, the group must:

   a) Articulate why the event is being held off-campus instead of an on-campus location

5) Travel: Groups may request funds for operational travel under the following circumstances:

   a) Travel costs are directly related to day-to-day activities of the group

   b) Travel is requested for an activity that cannot take place on campus

   c) Groups must provide detailed cost estimates for travel requests, as outlined on application forms.

   d) Groups must provide documentation of how their travel estimates were developed by placing itemized invoices or screenshots of items such as hotel costs or airline tickets in their supplemental documents, and linking those to the standardized request forms.

6) Taxes: Groups may request funds one time to pay for the process of registering as a 501(c)3 Organization

7) Food for operational use other than general meetings

8) General office supplies

9) Printing, copying

10) Postage

11) Operational costs not included in "expenses not allowed for student group requests"

**Event/Project-Related Costs**

On the standardized forms provided, groups must accurately outline their requests. For event or project-related requests, items that fall into the same category for a total of $100 or less may be combined to create one line item. In this case, groups should provide a comprehensive list of items they plan to purchase in the description of the line item, but a cost breakdown is not necessary. Items that cost more than $100 must be listed as separate line items.

*Example: A request for $90 for place settings does not need a link or description for each requested item. Instead, groups may provide a simple list of items they plan to purchase with the funds requested (paper plates, flatware, cups, napkins, etc.)*

**Allowable Expenses:**

1) Space rental

2) Entertainment/speaker fees

3) Food

4) Advertising

5) Prizes up to $100 in value for University of Minnesota students

6) Registration Fees

   a) If groups wish to request SSF funds for registration fees, they should request funds during the cycle that aligns with when registration fees for the respective event are due. Groups may request funds for travel for the respective event during a different fee cycle, as applicable.

      i) For example, if registration for an event that will be held in September 2020 is due in April of 2020, groups may request registration fees in their spring 2020 request, then for other event expenses in their fall 2020 request.

7) Travel: For all travel requests, groups must demonstrate that they have made an effort to keep travel costs as low as possible, and should contribute to travel costs as part of their request. Groups must provide documentation of drive vs. fly comparison, include any days students will be away from class, and should consider weather conditions as part of their request.

   a) Each request a group makes for travel is equivalent to one event and must be included in an event request.

20

**EXHIBIT E**

b) Groups may apply for travel under the following circumstances:
   i) Travel that is event or project-related in nature and relates to the mission of the group.
   ii) Travel for professional development and conference travel that is related to the mission of the group.
   iii) Groups may request up to $250 in funds for travel for one retreat – this retreat will count as one event
   iv) Groups may request funds for travel to competitions related to the mission of the group
   v) Groups may request funds for travel and accommodations for speakers/entertainers
c) Groups must provide documentation of how their travel estimates were developed by placing itemized invoices or screenshots of items such as hotel costs or airline tickets in their supplemental documents, and linking those to the standardized request forms.
8) Event or project-related expenses not included in "expenses not allowed for student group requests"

### Expenses Not Allowed for Student Group Requests
1) Salaries/Hourly Wages for student or non-student members, interns, or staff
2) Compensation for non-student members, interns, or staff
3) Clothing – including uniforms or other items for group members or volunteers
4) Food for general meetings
5) Prizes over $100 in value
6) Prizes for non-University of Minnesota students
7) Hourly parking on-campus for operational purposes
8) Pass-through funding*
9) Grant funding*
10) Alcohol
11) Expenses related to activities for which students receive academic credit or complete degree requirements
12) Direct or indirect contributions to charitable organizations or philanthropic causes

*Student groups must apply for funds independently and may not share or provide SSF funds to other groups or individuals unless explicitly approved by the SSFC during the budget allocation process.

### Student Group Request Process
#### Required Training
Prior to each funding cycle, information about the student group request process will be posted to the SSF website and shared in the Student Group Newsletter. If a student group would like to apply for SSF funds, at least one student from the group who is responsible for the preparation and management of the group's SSF request (budget preparer/responsible party) must complete the 2019-2020 Student Services Fee Module on Canvas, including the Financial Management Workshop. At least one representative from each applicant group must complete the components of the Student Services Fee Module via Canvas noted on the SSF timeline prior to the deadline for submitting an application for SSF funds.

#### Event/Project Requests
The request process for student group event/project-related funds will take place twice per academic year. The request process for fall events/projects will take place during spring semester. The request process for spring and summer events/projects will take place during fall semester.

All student groups that apply for event/project-related funds must complete the standardized request forms, submit their request through the Student Services Fee Canvas Course, and present to the SSFC.

# EXHIBIT E

In order to apply for event or project-related funds through the SSF process, student groups must request at least $2,000 for the semester in which they would like to spend the funds. Groups may request up to $30,000 per academic year (September-August) for event or project-related purposes.

Student groups may request funds for up to 10 events per event/project request cycle. If the event/project spans across the dates below, the group should make the request for the cycle in which the event/project will begin.
- Spring event requests should include events/projects that take place January 1 – July 31.
- Fall event requests should include events/projects that take place August 1 - December 31.

Requests for over $30,000 for event or project-related expenses, or over 10 events per semester will not be considered by the SSFC. Budget preparers should contact the SSFC Advisor or Financial Advisor if they have questions about how much they are allowed to request in any given cycle.

### Large Scale Event/Project Requests

Groups may request one special/ large scale event/project per academic year outside their regular group budget request. These requests will be heard by the Student Groups SSFC Leadership Team. In order to make this request, the group must:
1) Meet with the SSF Advisor to discuss the request
2) Request the standardized Special Event Form from the SSF Advisor
3) Complete the standardized Special Event Form
4) Follow the Student Group Large Event protocol/guidelines as outlined by Student Unions & Activities (SUA) and meet with a Student Activities Advisor at least 2 weeks prior to the SSF application deadline
5) Provide the SUA Advisor with evidence that the group is in the process of planning a large event and has reserved space, considered logistics and security, and has a feasible plan for the execution of the event

The SSFC will consider the cost of the event and weigh the following factors (along with the Guidelines for Decision-Making) while evaluating the overall request:
1) Number of groups involved in planning and execution of the event
2) Ability of the organization to execute the event
3) Location of the event

The SSFC will consider the following criteria to evaluate and fund the request:
1) Documentation from the Student Activities Office that confirms the group met with an advisor and was provided with the Large Event protocol/guidelines
2) Existing criteria for event requests
3) Availability of funds to the SSFC
4) Proximity of the event to campus

### Operational Requests

The request process for student group operational funding will take place on an annual basis, early in spring semester.

In order to apply for operational funds through the SSF process, student groups must complete the standardized request forms, submit their request through the Student Services Fee Canvas Course, and request at least $1,000 for operational costs. If a group requests $1,000-$4,000 in operational funds, they must submit their request to the

22

EXHIBIT E

SSFC, but will not present to the SSFC. If a student group requests more than $4,000 in operational funds, they must submit their request and present to the SSFC.

Student groups may apply for up to $25,000 in operational funds during the annual request cycle. Operational requests for over $25,000 will not be considered by the SSFC.

**Budget Request Forms**
Groups may gain access to budget request forms by completing the SSF Canvas Course, as instructed by the SSF Advisor and as outlined on the timeline on the SSF website. Any request forms submitted to the SSFC that were not provided to groups by the SSFC Advisor or designee will not be accepted by the SSFC for review.

All groups applying for student fees must comply with all deadlines established by the Student Services Fee Committee. Requests for exceptions must be submitted in writing to the SSF Advisor and received at least five days prior to the deadline for submission. Exceptions require approval of the Student Services Fee Advisor and a majority vote of the SSFC Chair and Subcommittee Chairs.

All SSF applicants must submit original application documents unique to the organization presenting them. All documents must be composed of work original to the organization presenting them, and must not be plagiarized, copied or duplicated from the application of another fee-receiving group or any other entity without proper citation or permission.

Requests that are submitted late, are incomplete/have missing information, or do not meet all application criteria outlined on page 13 will not be accepted by the SSFC.

**Supplemental Information**
Groups may provide supplemental information to the SSFC by placing documents into the "Supplemental Information" folder located in the group's SSF Google Folder (provided by the SSF Advisor/designee). If not requested by the SSFC, this information must be shared by the budget request deadline. Groups should link their supplemental documents to their standardized request forms as applicable.

The SSFC or the SSFC Advisor (or their designee) may request supplemental information or documentation from Student Group applicants. This information must be submitted by the group (via the SSF Google Folder) within 5 business days of the request.

**Presentations to the SSFC**
All Student Group presentations to the SSFC will be open to the public.

The SSFC Advisor and/or designee will coordinate the scheduling of Student Group presentations. The SSFC Leadership Team will hear presentations from approximately 20 student groups, along with requests for large-scale events/projects. It should be noted that groups must include information for large-scale events/projects in their presentation for their overall event request. The remaining groups will be divided between the sub-committees.

Student groups requesting over $4,000 in SSF funds for operational costs are required to present to the SSFC. These presentations will be a maximum of 15 minutes, and include a question and answer period.

23

**EXHIBIT E**

Student groups requesting SSF funding for any event or project-related expenses must present to the SSFC. These presentations will be a maximum of 15 minutes, and include a question and answer period.
Groups that do not attend their presentation as scheduled will not be eligible to receive funds.

**Deliberations**
All deliberations of the Student Groups SSFC will be open to the public. Groups are encouraged to attend deliberations. The SSFC Advisor or SSFC Leadership Team will communicate logistical information about deliberations to student group applicants.

The SSFC Leadership Team will deliberate on their respective budget requests and the requests for large-scale events prior to sub-committee deliberations.

Groups attending their own deliberations may be given an opportunity to respond to misinformation or misunderstanding on the part of the SSFC during deliberation on their requests. During this time groups may provide clarifying information (not new information) to the SSFC, as well as answer questions from the SSFC should they arise. Time limits for providing clarifying information will be at the discretion of the SSFC Chair.

**Penalties**
The SSFC may issue penalties of up to 20% per instance for issues including, but not limited to, the following:
1. Incomplete forms
2. Mathematical errors
3. Inaccurate or inconsistent information
4. Lack of documentation
5. Failure of a group to provide information to the committee within 5 business days of a request
6. Groups arriving late for presentation times
7. Failure of a group to follow instructions given by the SSFC or the SSF Advisor
8. Significant deviation between prior SSF allocations and actual spending of those funds

**Public Feedback**
Feedback on Student Group requests will be gathered from the University Community following the publication of final recommendations.

At any time, members of the University Community can provide feedback to the SSFC Advisor.

**Appeals**
Appeals will take place twice during each academic year. First, after the Student Groups SSFC publishes recommendations for spring events requests in late fall semester, and then again after the Student Groups SSFC publishes recommendations for annual operations and fall events in late spring semester.
In order to appeal a funding recommendation by the SSFC, individual SSF-paying students and student groups must provide evidence that one (or more) of the following criteria were met:
1) The SSFC violated its own rules
2) The SSFC exhibited bias against an organization
3) The SSFC did not make a decision in a viewpoint-neutral manner

Individual SSF-paying students (individuals) who wish to appeal the recommendations of the SSFC must follow this process:

24

**EXHIBIT E**

1) Individuals will have 5 business days following publication of recommendations to appeal a recommendation of the SSFC.
2) Individuals must complete the standardized appeal form (Individual Appeal Form on the SSF website), and must provide evidence that their case meets one or more of the criteria for appeal.  The Individual Appeal Form will be made available when each set of recommendations is published, and will remain open for 5 business days.
3) Individuals must submit the Individual Appeal Form based on the instructions included on the SSF Website.

Student Groups that wish to appeal the recommendations of the Student Groups SSFC must follow this process:
1) Student Groups will have at least 5 business days following publication of recommendations to appeal a recommendation of the SSFC
2) Groups must complete the standardized appeal form (Student Group Appeal Form on the SSF website), and must provide evidence that their case meets one or more of the criteria for appeal
3) Groups must submit the form according to the instructions provided by the SSFC Chair in their correspondence regarding the group's recommendation

When the Appeals Committee (AC) convenes, they will take the following action with individual and student group appeals:
1) The AC will review the forms submitted by individuals and student groups and determine whether sufficient evidence was provided that one (or more) of the appeal criteria were met.
   a. If the AC determines that criteria were not met (sufficient evidence was not provided), the appealing individual or group will not receive a formal hearing.
      i. The SSFC Advisor will share this information with the VPSA/DoS for final review. If the VPSA/DoS believes there is sufficient evidence for appeal, he/she will request that the AC hear the appeal and a formal hearing will be scheduled.
   b. If the AC determines that criteria were met (the group provided sufficient evidence), the AC Chair will work with the group to schedule a formal hearing.
2) Formal appeals hearings will include:
   a. In the case of individual appeals, the student who submitted the appeal will be invited to participate. In the case of student group appeals, 1-2 designated student representative(s) from the appealing group will be invited to speak on behalf of the group – the student group may appoint their own representative(s)
   b. The SSFC Chair and/or SC Chair whose committee made the decision being appealed
   c. The Appeals Committee
3) Process of the Appeal Hearing:
   a. Appeals Committee reviews all submitted documents prior to the hearing
   b. Appealing individual or group has 5 minutes to discuss their case – no new information may be presented
   c. SSFC Chair or SC Chair has 5 minutes to discuss their case/rationale
   d. Appeals Committee may ask questions of the appealing individual/group and/or SSFC Chair or SC Chair
   e. Appeals Committee will deliberate and make recommendations to the VPSA/DoS
   f. All Appeals Committee recommendations will be reviewed by the VPSA/DoS and delivered to individuals/groups

The Student Groups SSFC Appeals Committee will include:
1) Non-Deliberating SSFC Members (3-5)

EXHIBIT E

2) Office for Student Affairs Chief Financial Manager or designee (votes is the case of a tie)
3) The SSFC Chair/SC Chair of whose committee heard the presentation of the appealing organization (non-voting)

**Accountability Procedures**
Student Groups will be held accountable for the use of SSF funds.

Accountability measures will include:
1) Groups must pick up and deposit their SSF checks in a timely manner (within 2 weeks of notification of check availability)
2) Groups must meet with the SSF Advisor (or designee) when requested
3) Groups must spend their money in the way it was allocated by the SSFC
4) Groups must maintain a general ledger
5) Groups must provide itemized receipts and bank statements that support their general ledger
6) Groups that receive SSF funds for operational costs must provide documents such as leases and utility bills to support their general ledger and budget request (as applicable)
7) Groups must submit budget requests that reflect their current financial standing
8) Groups must submit documentation of attendance at events when requested by the SSFC
9) Groups must submit documentation of efforts to acquire income outside the SSF process (i.e., fundraising, collection of member dues, receipt of sponsorships, partnerships with external organizations, grant-writing efforts, etc.) when requested by the SSFC
10) Groups must report balances from previous SSF requests to the SSFC Advisor and to the SSFC upon request.
11) Decisions of the SSFC are final. Groups must report deviations in spending between their allocation and actual spending of SSF funds.

Groups requesting SSF funds must appoint two members as budget preparers/responsible parties. One of these members must complete the SSF Canvas Course (including the financial management workshop), and the names, phone numbers, and (umn.edu) email addresses of these students must be included in the budget request. The group may include a group email address (umn.edu) in addition to the two budget preparers/responsible parties. If there is turnover of these members, the group must immediately provide contact information of the new preparers/responsible parties to the SSFC Advisor.

The SSFC Advisor (or their designee) may schedule meetings with the budget preparers/responsible parties. All designated budget preparers/responsible parties must:
1) Respond to messages/invitations regarding scheduling of meetings from the SSF Advisor (or designee) within 5 business days
2) Bring all requested/required documentation to any meeting. If requested/required documentation is not provided, the meeting may be re-scheduled.
3) Provide any requested financial documentation to the SSF Advisor (or designee) or the SSFC within 5 business days of the request

**Other Financial Requirements**
**All-Funds Budgeting**
The practice of reporting all sources of income and expenses (i.e. an "all-funds budget") is required for all Student Services Fee requests and is consistent with how other budgets are reviewed at the University of Minnesota. Expectations will be defined and budget worksheets provided for what information should be provided by applicants.

EXHIBIT E

**Statement on Student Group Reserve Funds**

While the SSFC will consider all assets of a student group when making decisions regarding funding recommendations, there is no cap for reserve funds of student groups.

Student groups may maintain reserve funds that have not come from Student Services Fee awards. These funds must be accurately reflected on all request documents, and groups must provide financial documentation consistent with what they report for reserve funds.

At any time, the SSFC may require student groups to meet their own budget needs through utilization of their reserve funds.

The SSFC, with the assistance of the Financial Advisor, will closely monitor the amount of SSF funds spent by student groups. At the end of the spring semester, groups may be required to return SSF funds (over $500) that have not been spent or otherwise allocated for summer events/operations or upcoming budget requests. Budget preparers/responsible parties will be accountable for this task.

Funds returned to the University may be used for future SSF expenditures.

EXHIBIT E

# University of Minnesota – Twin Cities

## Student Services Fee Request Handbook
## For Administrative Units

## Requests for funding for FY20
## (2019-2020 Academic Year)

The Student Services Fee process for the University of Minnesota – Twin Cities Campus underwent a comprehensive review during 2015-2016. This document contains information based on the approved recommendations from this review. Historical documents can be found at www.studentservicesfees.umn.edu.

EXHIBIT F

## Table of Contents

| Topic | Page |
|---|---|
| University of Minnesota Board of Regents Policy | 3-4 |
| **Twin Cities Campus Student Services Fee (SSF) Committee Roles, Procedures, and Guidelines** | |
| **Roles** | |
| The Institutional Role of the Student Services Fee Committee | 5-6 |
| Expectations of Student Services Fee Committee Members | 6 |
| Removal of Student Services Fee Committee Members | 6 |
| The Role of the Student Services Fee Advisor | 6-7 |
| **Procedures** | |
| Reviewing the SSF Process | 7 |
| Fee Committee Resolutions | 7 |
| Reviewing the SSF Administration Budget | 7 |
| General Operating Procedures | 8 |
| Committee Records | 8 |
| Public Participation | 8 |
| **Guidelines** | |
| Minimum Requirements for Applying for Student Services Fee Funding | 8-10 |
| Guidelines for Decision Making | 10-11 |
| Viewpoint Neutrality | 12-13 |
| **Administrative Units Student Services Fee Information and Guidelines** | |
| **Administrative Unit Definition** | 14 |
| **Approval to Apply as an Administrative Unit** | 14 |
| **Current Administrative Units** | 14 |
| **Administrative Unit  Student Services Fee Committee (SSFC) Membership & Responsibilities** | |
| Membership | 14 |
| Appointment | 14-15 |
| Time Commitment | 15 |
| Compensation | 15 |
| **Administrative Unit  Request Process** | |
| Process | 15 |
| Presentations to the Committee | 15 |
| Deliberations | 15-16 |
| Public Feedback | 16 |
| **Statement on Student Services Fee Reserves** | 16 |
| **Other Financial Issues for Administrative Units** | |
| Bond Repayments | 16 |
| All-Funds Budgeting | 16 |

EXHIBIT F

**UNIVERSITY OF MINNESOTA BOARD OF REGENTS POLICY**
STUDENT SERVICES FEE

SECTION I.  SCOPE

This policy governs assessment of the University of Minnesota (University) student services fee, which funds non-instructional programs and activities; supplements the academic curriculum; and is an integral part of the University's educational experience.

SECTION II.  DEFINITIONS

> **Subd. 1. Student Services Fee.** *Student services fee* shall mean the mandatory annual fee assessed to designated students to provide funding for student programs, activities, and services on each campus.

> **Subd. 2. Student Services Fee Committee.** *Student Services Fee Committee* shall mean the committee established on each campus to review and recommend annually the student services fee.

> **Subd. 3. Designated Students.** *Designated students* shall mean all students registered for:
> (a)  six or more credits per semester; or
> (b)  three or more credits per summer session.

> Credits for off-campus distance classes are excluded from the total credit count.

SECTION III.  GUIDING PRINCIPLES

> The following principles shall guide the assessment of the student services fee:

> (a) Fee-supported programs, activities, and services shall be available to all students assessed the fee;

> (b) All persons involved in the development of the student services fee shall recognize the relationship of the student services fee to the total tuition and other costs of education for students;

> (c) The University's educational mission is well served when students have the means to engage in dynamic discussions of diverse topics in their extracurricular campus life;

> (d) Decisions regarding the allocation of fees among student groups shall be made in a viewpoint-neutral manner.

SECTION IV.  ASSESSMENT AND USE OF THE STUDENT SERVICES FEE

> **Subd. 1. Assessed Students.** The student services fee shall be assessed on all designated students.

> **Subd. 2. Fee Exemptions.**  The following students shall be exempt from assessment of the student services fee:
> (1) non-degree seeking students;
> (2) post-secondary education option students and concurrent high school

3

**EXHIBIT F**

(3) those students not designated, as defined in Section II; and

(4) others as approved by the president or delegate.

**Subd. 3. Special Assessments.** Special assessments to the student services fee may be authorized by the fees committee for clearly defined classes of students.

## TWIN CITIES CAMPUS STUDENT SERVICES FEES COMMITTEE ROLES, PROCEDURES AND GUIDELINES

### THE INSTITUTIONAL ROLE OF THE STUDENT SERVICES FEES COMMITTEE

The Board of Regents requires that a representative process be established on each campus to recommend the level of the student service fee and the specific allocations to requesting organizations. (Note: Throughout this document "Fee Committee" shall refer to all committees described below, unless otherwise specified.)

### The process that has been established on the Twin Cities Campus includes the following:
Administrative Units:
- The administrative units & media groups committee will be composed of the Student Affairs Chief Financial Manager and 7 students. In the case of administrative units, 1 student representative of the student advisory board of the unit presenting the budget request will also participate in providing feedback and recommendations to the Vice Provost for Student Affairs and Dean of Students (VPSA/DoS).
- This committee, along with the VPSA/DoS, will hear presentations by students and staff representing administrative units; the committee will provide feedback and recommendations to the VPSA/DoS.
- Based on feedback from the committee and student input from public hearings, the VPSA/DoS will make decisions on administrative requests and forward funding recommendations to the Executive Vice President and Provost for inclusion in the University's proposed annual operating budget

Student Groups:
- The student groups fee committee will be composed of at least 16 voting, at-large student members, at least 2 faculty/staff representatives, and at least 4 non-deliberating student members will hear presentations and serve on the appeals committee
- This group will work in sub-committees to determine funding recommendations for student groups and will forward these recommendations to the Vice Provost for Student Affairs and Dean of Students (VPSA/DoS)
- After review, the VPSA/DoS will either approve or amend the allocations before forwarding them to the Executive Vice President and Provost for inclusion in the University's proposed annual operating budget.

Media Groups:
- The administrative units & media groups committee will be composed of 7 students and the Student Affairs Chief Financial Manager. In the case of media groups, one University of Minnesota – Twin Cities faculty or staff member (preferably from the Journalism School)
- This committee will hear presentations by media groups, make recommendations, and forward these recommendations to the VPSA/DoS
- The VPSA/DoS will either approve or amend the recommendations of the committee before forwarding them to the Executive Vice President and Provost for inclusion in the University's proposed annual operating budget.

Special Assessments:
- Groups requesting special assessments will work with their advisor(s) and within their respective general membership bodies early each spring to determine and pass (by majority vote) budget requests.
- Group leadership will present their respective budget requests to the VPSA/DoS for review
- The VPSA/DoS will either approve or amend the requests before forwarding them to the Executive Vice President and Provost for inclusion in the University's proposed annual operating budget

All requests:
- The Board of Regents approves final monetary recommendations as part of the University's annual operating budget.

Given this charge, the Fee Committees have the flexibility to:
- Develop procedures for organizations to present requests to the committee
- Develop timelines
- Establish operating procedures (within the Regent's guidelines)
- Propose specific monetary and non-monetary resolutions
- Maximize accountability of funds received from student service fees

5

EXHIBIT F

Methods for dealing with conflicts/challenges:
- An open forum following the final recommendations to receive input on the process
- Challenges/conflicts should be directed first to the respective fee committee
- Procedures for dealing with unforeseen circumstances should be incorporated into the operating procedures that are reviewed and approved on an annual basis by the Fee Committees and the Office for Student Affairs.

## EXPECTATIONS OF STUDENT SERVICES FEE COMMITTEE MEMBERS

**All Members:**
- Members must agree to the time commitment of their committee of appointment, and should be cognizant of this time commitment when applying to serve on the SSFC. Approximate time commitments for each committee are available in this handbook
- Members must maintain good academic standing throughout their term(s) of appointment
- Members must demonstrate payment of the Student Services Fee during each semester of appointment
- Members must be appointed, attend all training sessions for the committee of their appointment, and complete training prior to the beginning of presentations during each fee cycle
- Members must identify, on their application and in subsequent processes, their membership in and whether they serve as an officer or in a leadership role of a fee-receiving organization. Members must recuse themselves from deliberation on these organizations, and must make every effort to communicate potential conflicts of interest to the relevant Student Groups SSFC Leadership, and the SSFC Advisor. Members may not participate in presentations to the SSFC.
- Members who participate in the preparation of a fee request will communicate the level and scope of participation to the Committee Chair or SSFC Advisor. The Chair or Advisor will provide the information to the committee prior to presentations. This information will be received without prejudice.
- Members must develop a thorough understanding of the budget request process, forms, and SSFC handbook information relevant to their committee of appointment
- Members must attend all budget request presentations relevant to their committee of appointment
- Members must attend all deliberations relevant to their committee of appointment, unless the member is a non-deliberating member
- Members must attend public hearings relevant to their committee of appointment

It should be noted that SSFC members are required to attend all committee activities, including training sessions, meetings, presentations, deliberations, and hearings. Members will only be excused from committee activities due to legitimate absences as defined by University policy - Makeup Work for Legitimate Absences, Section 1. Committee member absences, even for academic reasons, can severely impact the ability of the SSFC to function efficiently; all SSFC members must be transparent about absence requests and communicate their scheduling needs to the SSFC Advisor during the application period. Failure to do so may result in termination.

The Student Services Fee Committee advisor may request documentation of illness or other conflicts. Repeated absences will not be tolerated and may result in an adjustment in stipend and/or removal from the SSFC.

## REMOVAL OF STUDENT SERVICES FEE COMMITTEE MEMBERS
A member may be expelled from the Committee by a two-thirds vote. Charges against the member may not be made public.

## THE ROLE OF THE STUDENT SERVICES FEE ADVISOR
The Board of Regents requires that administrative assistance be provided to the fee committee. An advisor is provided for the fee committee. The advisor is charged with the following:
- Assisting in the selection of the fees committees

6

EXHIBIT F

- Communicating with student groups and units about the fees process, timeline, and application requirements
- Training the fee committees
- Providing support and advice to the committee during the fees decision-making process
- Ensuring that all fee-receiving groups complete accountability procedures

It should be noted that the advisor is not involved in the decisions of the fee committees and does not participate in the deliberation and allocation process. The advisor, however, is the primary resource for determining answers to procedural questions or ambiguities.

## REVIEWING THE SSF PROCESS
SSFC Resolutions will be reviewed and considered on an annual basis.  Given a charge provided by the Vice Provost for Student Affairs and Dean of Students, issues that arise within the SSF process may be reviewed at any time. Generally, a 4-year comprehensive review cycle shall be maintained.

## FEE COMMITTEE RESOLUTIONS
Although the committees can make resolutions at any time, they are generally made after the committee approves their final recommendations. These resolutions are made in an effort by the committee to pass on the thoughts of one year's committee to future committees; although resolutions are not officially binding, they are intended to alert future committees to the concerns, commitments, and rationales of past committees.

Resolutions and recommendations are the ways in which the committee communicates to the public. If you would like access to these files, please contact the Student Services Fee Advisor.

1) At the end of each annual Fee cycle, the chair of each committee will prepare a written memorandum to the Fee Advisor regarding any resolutions approved by the committee, as well as specific suggestions, advice, or dissenting opinions for the next year's Fee committee to consider while evaluating requests.
2) The Fee Advisor will provide the language and rationale for the approved resolutions to the VPSA/DoS, who will review them for consistency with University policy, impact on the overall SSF process, and impact on the University student community.
3) The VPSA/DoS, committee chairs, and the Fee Advisor will meet to discuss perspectives regarding the resolutions. The VPSA/DoS will communicate approval of any resolutions to the SSFC Advisor.
4) The Fee Advisor will determine how to incorporate the intent of the approved resolutions in the SSFC handbook and guidelines.
5) All resolutions (approved and not approved) will be archived by the Fee Advisor for future reference.

## REVIEWING THE SSF ADMINISTRATION BUDGET
The SSF Administration Budget will be shared with and approved annually by the Vice Provost for Student Affairs and Dean of Students.  Debating and voting on the SSF Administrative Budget is outside the scope of the Student Services Fee Committee.  The SSF Administration Budget covers the cost of administering the Student Services Fee process, and thus is best determined by the Vice Provost for Student Affairs in consultation with committees established to review the SSF process as described above.

EXHIBIT F

## GENERAL OPERATING PROCEDURES
### Committee Records
All committee business is open to the public. Written recommendations and minority statements, along with resolutions adopted by the committee will be shared publicly.

### Public Participation
Prior to committee deliberations, there will be one public forum for student groups and one public forum for administrative units and media groups. Attendance at public forum is mandatory for all members of the relevant fee committees. A final public forum will be held with the Vice Provost for Student Affairs after the committee has completed their work.

Meetings of all Student Services Fee Committees and Sub-Committees are open to the public for observation. Participation by guests is permitted only by 2/3 vote of those committee members in attendance.

Speaking policy for SSF public forums
1) Enrolled students should be allowed to speak.
2) Staff of administrative units should be allowed to speak – but their student advisory boards should be encouraged to speak on the unit's behalf.
3) University of Minnesota faculty and staff should be allowed to speak, as decisions by the SSFC often can impact the broader campus.
4) People who are not identified above should not be allowed to speak.
5) Advisors/affiliates of student groups can coach/prepare their student group members, but should not be allowed to speak unless they are also University of Minnesota faculty/staff.  Given the choice between advisors and students, students should always be encouraged to speak.
6) Speakers should be allowed to speak multiple times, but still limited to one minute per opportunity.

## MINIMUM REQUIREMENTS FOR APPLYING FOR STUDENT SERVICES FEE FUNDING

### In order for a group to be eligible to apply for funds, all of the following criteria must be met:
1) The applicant must be an Administrative Unit, Registered Student Organization (RSO), or Campus Life Program (CLP) that is currently registered and in good standing with Student Unions & Activities. RSOs, CLPs, and Media Groups must remain registered and in good standing throughout the duration of their approved funding in order to receive allocated funds.

2) Starting with requests for Fall 2019 Programming & Academic Year 2019-2020 Operations, groups that receive pass-through funding from special assessment groups (the Council of Graduate Students, Professional Student Government, or the Minnesota Student Association) may not request funds through the SSF process.

3) The group must be able to provide financial documentation (in the form of bank statements – or EFS report for CLPs - that can be supported by a general ledger) for the 12 (consecutive) months prior to applying

4) RSOs must be in compliance with Student Activities Financial Policies for RSOs

5) During the academic year in which groups apply for Student Services Fee funding, one current budget preparer from each applicant group must complete the Student Services Fee Canvas Course.

6) During the academic year in which groups apply for Student Services Fee funding, one current officer from each applicant group must complete the Financial Management Workshop offered by the Student Activities Office.

7) Groups must operate as non-profit organizations

8

EXHIBIT F

8)  Partisan political organizations are not eligible for the general student services fee funding.  "Partisan political organizations" are organizations affiliated with a registered political party or candidates for election which are formed for the purpose of supporting a political party or candidate for election. Such groups may seek funding for their nonpartisan political activities (e.g., candidate forums available to all qualified candidates, nonpartisan educational programs, etc.) through other University grant and student funding programs.

9)  Groups receiving student services fee funding must have students participating in deciding how fee money is spent. Students must be involved in the development of policies and budgets for any proposal that comes before the Student Services Fee Committee. Students must present budget requests to the SSFC. Non-students may not participate in presentations.

10)  Groups receiving Student Services Fee funds must demonstrate expenditures in general compliance with their submitted budgets.

11)  All budgets and all financial records for groups currently receiving Student Services Fee funding must be made available upon request for inspection

12)  All groups currently receiving Student Services Fee funds must meet accountability/audit requirements

13)  Membership of the organization and access to programs and services must comply with the University of Minnesota's Equal Opportunity Statement.

14)  All fee-receiving groups must adhere to accounting procedures approved by the Student Services Fees Advisor and the Office for Student Affairs.

15)  All student groups, special assessment groups, and media groups must indicate "SSF Funded" on all marketing for all events and activities funded either partially or fully by SSF funds.

**If a group meets all the above criteria and applies for funds, the application must meet** all **the following criteria:**
1)  Applicants must apply for a minimum of $2,000 in programming *per request*, and/or a minimum of $1,000 *per year* for operations. Below this threshold, applicants are encouraged to find alternate sources of income such as grants, fundraisers, etc. Student Unions & Activities can provide information regarding available grant opportunities.

2)  Groups must be in compliance with accountability procedures in order to request funds. Groups must keep ledgers updated and upload receipts within two weeks of respective transactions.

3)  Groups must provide documentation or information requested by the SSFC, SSFC Advisor (or their designee), within 5 business days of the request.

4)  All groups applying for student services fee funds must fully and accurately complete the standardized request form(s) required for their request(s).

5)  It is recommended that RSOs operate from their own bank account, separate from a parent group/organization, and that CLPs operate from an EFS chart string unique to their organization. If an account is shared, groups should highlight their own expenses on bank statements or EFS reports that are submitted as part of their application materials.

6)  All groups applying for student services fee funds must present their request(s) to the Student Services Fee Committee as required

7)  All groups applying for student fee funds must comply with all deadlines established by the Student Services Fee Committee. Requests for exceptions must be submitted in writing and received at least *five days* prior to the deadline for submission. Exceptions require approval of the Student Services Fee Advisor and a majority vote of the SSFC Chair and Subcommittee Chairs.

9

**EXHIBIT F**

8) All SSF applicants must submit original application documents unique to the organization presenting them. All documents must be composed of work original to the organization presenting them, and must not be plagiarized, copied or duplicated from the application of another fee-receiving group or any other entity without proper citation or permission.

## STUDENT SERVICES FEE COMMITTEE GUIDELINES FOR DECISION MAKING

The Student Services Fee Committee is charged with making responsible, viewpoint-neutral recommendations for awarding fee funding to administrative units, student groups, and media groups. The committees must evaluate requests according to the viewpoint-neutral criteria listed below. While each committee has the authority to weigh and apply the criteria, each committee must consistently apply all criteria to each group applying for student services fee funds. The committees may not consider the viewpoint of requesting groups in making funding decisions.

All funding recommendations from the Student Services Fee Committee must be accompanied by references to the applicants' fulfillment of the Guidelines for Decision-Making. The SSF Committees will endeavor to include all issues that affect the level of funding of an applicant in the recommendations.

### Fulfillment of the following does not guarantee approval for funding:

1) Extent of contribution to one or more of the following:
   - Providing a service to the student body.
   - Supplementing the academic curriculum.
   - Helping to foster a sense of community on the Twin Cities campus.

2) Quality and quantity of programs and services provided to the student body, consistent with the mission of the organization.

3) Extent of and demand for the programs and services provided. Groups must quantify their answer by such things as attendance numbers at events, number of phone calls / office visits, inquiries, etc. Groups must specify the method of tabulation and provide specific documentation upon request.

4) Breadth of service to students across academic departments or academic units.

5) Targeting of programs and services to the largest number of students consistent with the need.

6) Demonstration of benefits of programs and services to students who pay the student services fees but do not participate in the programs and services.

7) Efforts to secure funding in addition to the student services fee

8) Demonstration of financial need that cannot be fulfilled with alternative sources of income.

9) All organizations (student groups, media groups, special assessment groups, and administrative units) must fully justify their fee request, including any financial reserves.
   - In response to its own needs, operating risks (i.e. fluctuations in enrollment) and budgeting practices, organizations should establish an internal requirement for reserve funds.
   - This requirement is not translated into an arbitrary SSF rule, i.e. 10% of operating funds. Operating reserves for student groups may be between 0-10%, but a minimum reserve is not required.
   - Administrative units are not required to maintain minimum or maximum reserves.
   - The SSFC may reduce an allocation for any group if it finds reserve balances in excess of justified needs

10

# EXHIBIT F

10) Demonstration of compliance with the accountability procedures outlined by the Office for Student Affairs

11) Demonstration of the group's ability to manage the amount of funds requested from the SSFC

12) Written justification of significant deviation from the proposed budget outlined in the prior year's student services fee request

13) Previous access to Student Services Fee funding does not guarantee future funding, in full or in part, from the SSFC.

EXHIBIT F

VIEWPOINT NEUTRALITY

In the context of collecting and allocating student fees, "viewpoint neutrality" means ensuring that there is no bias toward any particular viewpoint. Because student fee funded activities involve a wide range of projects and programs that can require vastly different levels of funding, "neutrality" is not measured by the particular *outcome* of funding allocations, but by the *process* by which those decisions are made. The goal is to have a process that is neutral and bias-free, not to create an artificial 'balance' of views and activities.

It is easier to describe the elements an allocation system may *not* have in order to prevent bias rather than to design a bias-free system. The key elements are:

- Funding decisions may not have any relationship to the particular viewpoint of the group or activity. Requests for funding based on criteria that are neutral toward the views of the organization.
- Funding may not be contingent on a particular level of support or popularity of an organization, although the amount of funds to be allocated to an organization may take into account student involvement in the organization.
- Criteria used to evaluate funding proposals must be consistently applied.

## Common Misconceptions about Viewpoint Neutrality (adapted from the Center for Campus Free Speech, Guide to Student Activity Fees)

Although viewpoint neutrality is a relatively simple concept, in the years since the Supreme Court's ruling some have misunderstood what viewpoint neutrality means in practice. For the most part, these misconceptions are caused by one central misunderstanding—that the *outcome* of the allocation process must be neutral or balanced towards viewpoints rather than that the *process* for allocating funds needs to be neutral towards viewpoints. The following discussion highlights three of the more common ways this central misunderstanding comes up in practice:

- Misconception 1: Viewpoint neutrality means that fee allocation decisions cannot take into account the results of a student referendum
    - It is understood that requiring a showing of majority support, through a referendum or otherwise, as a condition for funding would be constitutionally suspect. The forum may not be open only to those organizations that command broad support. The essence of viewpoint neutrality is that all points of view—even those espoused by small minorities—must be given equal access to the forum. However, nothing in the Southworth Supreme Court decision holds that schools must turn a blind eye towards indications of student support, such as a referendum or petition. Indeed, a system that did not consider, at least to some extent, student support would likely violate the Constitution. The confusion about viewpoint neutrality and referenda is understandable since the Southworth Supreme Court *did* raise concerns about the use of a referendum as the sole determinant in deciding whether groups were eligible for funding. The Court suggested, but did not rule, that such a method of determining eligibility would not be viewpoint neutral. If referenda are the *sole* means by which eligibility for funding is determined, then the majority could easily silence a minority view, violating the principle of viewpoint neutrality. If a funding allocation system is designed in that manner, it should be changed to allow both popular and unpopular views access to funding. Though the constitutionality of using referenda in allocation decisions is not a settled question, there remains a strong argument that referenda and other tools to measure student involvement and interest can be useful in making allocation decisions provided they are used in the right way. A critical distinction exists between the use of referenda to determine a group's *eligibility* to receive funds and the use of referenda as a tool for gauging student interest in the group for use in determining the *amount of funds allocated* to a group that has already been deemed eligible. When a referendum is used to inform the amount of an allocation for a group or activity, the referendum can serve as a useful measure of the amount of services provided by the group and future student interest/involvement. It is common sense that the amount of funds allocated should be, at least in part, a function of the number of students who

12

EXHIBIT F

benefit from the group's presence on campus. There is a strong argument that allocation decisions must be made, at least in part, by considering the level of student support in order to avoid running afoul of viewpoint neutrality principles. Using referenda is simply one method of considering student interest in allocation decisions. Provided that referenda are employed as one of the criteria considered in setting allocation levels and do not harm an organization's access to the forum in the first place, a measure of student interest and likely involvement can be useful.

- Misconception 2: Viewpoint neutrality means that all groups must be allocated the same amount of funding.
  - A related misconception is that the only way to allocate fees in a viewpoint neutral manner is to give every group the exact same amount of funding again, arguing that the outcome of allocation decisions must be neutral rather than focusing on the process by which funds are allocated. There are three problems with this misconception. First, different types of groups have very different resource needs. A chess club requires different resources than a student legal services program. Second, groups with different levels of student involvement on campus would also need different levels of resources. If a campus group has a large number of participants, they will use more resources to meet that demand than one that has a small number of participants. Third, there is a serious viewpoint neutrality problem in treating dissimilar groups alike. To build on the prior illustration, there is a strong argument that giving equal funding for Students for Choice and Students for Life both unfairly amplifies the voice of the smaller group and unfairly suppresses the voice of the larger group. While strict proportionality is not required, a strict equality rule is unlikely to survive First Amendment attack.

- Misconception 3: Viewpoint neutrality means that a group cannot be funded unless a group that advocates the "opposite" view also receives funding
  - While there is no coherent legal basis for this concern, it is a point that is made frequently by opponents of student fee programs. The typical argument is that groups working of a "liberal" side of an issue—for example, tolerance for gays—may not be funded unless the school is equally willing to fund an organization that takes the opposite position, say an organization of formerly gay individuals who believe that homosexuality is a personal life choice that one is free to change. The problem with this argument is that it is *not* an equality argument. If such an organization existed, principles of viewpoint neutrality would require the school to permit it to seek funds on an equal footing with the tolerance for gays organization. Nor is it a viewpoint neutrality argument. The objection does *not* go to the criteria used to determine eligibility—it is an objection based solely on the orientation or viewpoint of the group receiving funding. Rather, it is the classic sore-loser argument that seeks to defund organizations—not because an opposition group is not receiving funds, but because an opposition group simply does not exist. Under Southworth, this argument is without merit because it has nothing to do with the viewpoint neutral tools used to determine funding eligibility.

EXHIBIT F

## ADMINISTRATIVE UNITS

Administrative Units are non-academic units whose mission is to provide programming, services and facilities to support students and enhance their experience while at the University. These units are legally part of the University and typically report to a Vice Provost or Vice President. A majority of the funding for these units comes from Student Services Fees or other external, self-generated income sources. Administrative units must have approval to be considered for Student Services Fees by the Provost or his/her designee responsible for the Student Services Fee process.

In order to gain approval to apply as an Administrative Unit, a unit must meet the following minimum criteria:
1. Meet the above definition of "administrative unit"
2. Have a student advisory board, with the following parameters:
   a. Members who vote on items related to SSF Funding must be currently-enrolled students (non-students may serve in an ex-officio role)
   b. Each Recognized Student Governance Association (RSGA) will have the opportunity to appoint at least one student to serve on the advisory board. It is the responsibility of these representatives to serve as liaisons to the RSGAs throughout the budget development process
   c. Provide current data on how the unit's programming enhances student life and the student experience through student learning and development
3. Have approval from the Dean/Department Head of the requesting unit
4. Gain approval from the VPSA/DoS. The VPSA/DoS shall have the exclusive authority to determine which applicants may apply to a SSF committee
5. In rare circumstances, the President, Executive Vice President and Provost, and the VPSA/DoS may establish an administrative unit fee that does not meet the criteria described above. In order to do so, the fee must have the support of students on the SSFC or a review task force. These units must present to the SSFC and follow all other SSF guidelines.

Administrative Units currently approved to request SSF funding include: The Aurora Center for Education and Advocacy, Boynton Health, University Recreation and Wellness, the Student Conflict Resolution Center, the Student Parent Help Center (Child Care Assistance Grant only), Student Services Fee Administration, Student Unions & Activities, and University Student Legal Service.

Administrative Units must maintain the minimum criteria to request SSF funds on a yearly basis, as determined by the VPSA/DoS.

### Administrative Units Student Services Fee Committee
**Membership**
Along with the VPSA/DoS and the Student Affairs Chief Financial Manager (ex-officio), the Administrative Units SSFC membership will include 7 students.

**Appointment**
The Administrative Unit & Media Group will be hired by a committee including the SSFC Advisor and at least 3 members of the Twin Cities Delegation of the University Senate. At least 2 members from the University Senate must be students.

The Director of each Administrative Unit will appoint 1 student representative from the unit's advisory board to participate in providing feedback to the VPSA/DoS for the request of the respective unit.

14

## EXHIBIT F

Appointment to the Administrative Units SSFC will take place on a yearly basis. Students may serve multiple terms with the permission of the SSFC Advisor.

**Time Commitment**

Members of the Administrative Units & Media Groups SSFC should expect to spend approximately 30 hours (including training) on committee business during the month of February, with the majority of work taking place on Fridays.

**Compensation**

At the beginning their term on the Administrative & Media Groups SSFC, members will sign a contract outlining their expectations. Failure to comply with these expectations will result in partial or full loss of stipend. If a committee member is terminated or resigns from the committee prior to the end of a semester, no stipend will be awarded. Stipends will be disbursed in full at the conclusion of each committee's work each semester.

The Chair will receive $400
General Members will receive $300
The faculty/staff member will receive $300

In addition to stipends, Administrative Unit & Media Group SSFC members will be provided with meals during working time.

## Administrative Unit Request Process
**Process**

Administrative Units must request Student Services Fee funds on an annual basis, using instructions delivered by the Student Services Fee Advisor and the Student Affairs Chief Financial Manager.

Administrative Units must provide a summary of their annual request to the SSF Advisor by the established deadline. This summary will be published on the SSF website at least one week prior to a public hearing.

A public forum for Administrative Units will be held in mid-February. This forum will provide an opportunity for members of the University community to provide feedback on Administrative Unit requests prior to the committee providing written, final feedback to the VPSA/DoS. Information from the public forum will help inform committee feedback on Administrative Unit requests.

**Presentations to the Committee**

All Administrative Unit presentations will be open to the public.

Administrative Units with facilities requests will have up to 90 minutes for presentation to the Committee, including questions and answers.

Administrative Units that do not request funds for facilities will have up to 60 minutes for presentation to the Committee, including questions and answers.

**Deliberations**

All deliberations on Administrative Unit requests will be open to the public.

EXHIBIT F

After each Administrative Unit presentation, the Committee will have 30 minutes to provide feedback to the VPSA/DoS, in order to inform decision-making on budget requests. The Chair will provide final, written feedback to the VPSA/DoS regarding Administrative Unit requests. Using the information gathered from the committee, the VPSA/DoS will make final decisions on Administrative Unit requests.

**Public Feedback**
In addition to the public forum prior to the committee providing final feedback to the VPSA/DoS regarding Administrative Unit presentations, a public forum will be held after final recommendations have been published in order to gather feedback from the University community.

At any time, members of the University Community can provide feedback to the SSFC Advisor.

### Statement on Student Services Fee Reserves
It is prudent for student services fees-receiving administrative units and media groups to hold funds allocated to them through the student services fees process in reserve for certain purposes. Examples of the most common types of reserves are listed below. It should be recognized that fee-receiving administrative units and media groups differ considerably in terms of size of operating budget, space, plant and equipment needs, revenue volatility, etc.; therefore, there is not a standard rule that can be applied to all groups. Balances and reserves should be described in the budget submission and reviewed during the unit presentation.

Examples of potential fee reserves:
1. Operational Reserves – to mitigate operating risks (i.e. fluctuations in enrollment, revenue volatility)
2. Equipment Reserves – to cover replacement cost of standard equipment. Method to determine appropriate equipment reserve amount should be outlined in budget submission.
3. Facility Reserves – to cover repair and replacement costs of facilities which may include furniture, furnishings and equipment (FFE) and minor space remodeling projects. Method to determine appropriate facility reserve amount should be outlined in budget submission.
4. Long Range Reserves – designated for one-time special needs, large-scale projects such as major renovation or building projects and related expenses (e.g. moving, planning and design).

### OTHER FINANCIAL ISSUES FOR ADMINISTRATIVE UNITS

**Bond Repayments**
Given that bonds issued by the University are generally obligations of debt, and the Board of Regents accepts and approves SSF-funded projects based on a finance agreement approved and signed by the Vice Provost for Student Affairs, the Chief Finance Officer of the University and the President of the University, it is not reasonable that future Student Services Fee Committee would be allowed to defund debt payment obligations. Therefore, any debt service requests must be originally approved by a Student Services Fee Committee. The debt service portion of any SSF request must be reported to the SSFC in subsequent years, but no action will be taken on its continuance.

**All-Funds Budgeting**
The practice of all student groups and administrative units showing all sources of income and expenses (i.e. an "all-funds budget") is required for all Student Services Fee requests and is consistent with how other budgets are reviewed at the University of Minnesota. Expectations will be defined and budget worksheets provided for what information should be provided by applicants and modest flexibility in how an all-funds budget is shown should be allowed.

EXHIBIT F

≡
UNIVERSITY OF MINNESOTA

- Get Involved ›
    ◦ ‹Get Involved
    ◦ Student Groups
    ◦ About GopherLink
    ◦ Student Events And Entertainment
    ◦ Board of Governors
    ◦ Student Jobs
- Eat ›
    ◦ ‹Eat
    ◦ Coffman Memorial Union
    ◦ St. Paul Student Center
    ◦ West Bank Skyway
- Events
- Reserve Space ›
    ◦ ‹Reserve Space
    ◦ Technology Services
    ◦ Permits & Policies
    ◦ All Spaces
    ◦ FAQ
- Visit ›
    ◦ ‹Visit
    ◦ Locations
    ◦ Arts & Culture

- About
- Student Jobs
- Student Events And Entertainment
- Student Groups

- Student Unions & Activities›
- Visit›
- Locations›
- Coffman Memorial Union

# Coffman Memorial Union

🖸 Coffman Memorial Union

- ⊙Building Hours
- ♀Directions
- ◆Directory
- ⊙Services
- 🍴Food & Drink
- 🗔Lounge & Study
- 👤Cultural Centers

## Coffman Memorial Union Building Hours

### Fall Hours

**Sept. 3, 2019 - Dec. 11, 2019**

Sunday 12:00 p.m. - 11:00 p.m.
Monday 7:00 a.m. - 11:00 p.m.
Tuesday 7:00 a.m. - 11:00 p.m.
Wednesday 7:00 a.m. - 11:00 p.m.
Thursday 7:00 a.m. - 1:00 a.m.
Friday 7:00 a.m. - 2:00 a.m.
Saturday 8:00 a.m. - 2:00 a.m.

CASE 0:20-cv-01055-PJS-TNL   Document 1-1   Filed 04/30/20   Page 121 of 212
Coffman Memorial Union | Student Unions & Activities

Page 2 of 11

## Thanksgiving Break Hours

**Nov. 27, 2019 - Dec. 1, 2019**

Nov. 27, 2019 7:00 a.m. - 6:00 p.m.
Nov. 28, 2019 Closed
Nov. 29, 2019 8:00 a.m. - 6:00 p.m.
Nov. 30, 2019 9:00 a.m. - 5:00 p.m.
Dec. 1, 2019 Closed

## Final Exam Week Hours

**Dec. 12, 2019 - Dec. 19, 2019**

Dec. 12, 2019 7:00 a.m. - 1:00 a.m.
Dec. 13, 2019 7:00 a.m. - 1:00 a.m.
Dec. 14, 2019 8:00 a.m. - 1:00 a.m.
Dec. 15, 2019 12:00 p.m. - 1:00 a.m.
Dec. 16, 2019 7:00 a.m. - 1:00 a.m.
Dec. 17, 2019 7:00 a.m. - 1:00 a.m.
Dec. 18, 2019 7:00 a.m. - 1:00 a.m.
Dec. 19, 2019 7:00 a.m. - 7:00 p.m.

## Coffman Memorial Union Directions

**Coffman Memorial Union**

300 Washington Ave. S.E.
Minneapolis, MN 55455

 Google Maps

### By Car

**From the South**

Take 35W and merge onto I-94 East and follow the I-94 directions below.

**From the North**

From 35W, take the University Avenue/4th Street exit. Turn left at University Avenue and head toward the East Bank. Turn right onto Oak Street, then right onto Fulton Street SE. Fulton Street becomes East River Road. Go down the hill and the East River Road parking garage entrance will be on your right.

**From the East and West**

Take the Huron Boulevard exit from I-94 (north exit only). Take first left onto Fulton Street SE. Fulton Street becomes East River Road. Go down the hill and the East River Road parking garage entrance will be on your right.

### By Bus

The University of Minnesota offers free campus shuttles between the West Bank, East Bank, and St. Paul campuses. Check the Parking and Transportation Services website for shuttle schedules.

**From St. Paul Campus**

Shuttles depart in front of the St. Paul Student Center on Buford Avenue. Trip time to Coffman Union is approximately 15 minutes.

**From West Bank Campus**

From the West Bank, shuttles stop at the lower level of Blegen Hall on Washington Avenue. When you arrive at the Coffman Union stop, walk south to arrive at Coffman Union. Trip time to Coffman Union is approximately 5 minutes.

**Departing Coffman Union**

Shuttles depart in front of the building on Washington Ave.

### Parking

**Coffman Disability and Short-term Parking**

The 1,900 space East River Road Garage provides both disability and short-term parking for Coffman and the East Bank campus. With an attached entrance to the south side of the building, the East River Road Garage is easily accessible from Delaware Street. For rates and maps please visit Parking and Transportation Services.

**Loading Docks**

EXHIBIT G

Coffman Memorial Union has two loading docks, one next to each entrance on the east and west sides of the building. For loading dock utilization, please contact the Event Services office at 612-624-9954. Parking at the loading docks is prohibited and Parking & Transportation Services will ticket if necessary.

If you have questions about these options, please contact Parking and Transportation Services (612-626-7275 or parking@umn.edu).

## Coffman Memorial Union Building Directory

**Basement**

🖹 CMU Basement

B-60 Computer Lab
B-32 Goldy's Gameroom
B-2 Security Monitors Program (612-624-WALK)
B-52 Whole Music Club

**Ground Floor**

🖹 CMU Ground Floor

G-63 Coffman Facilities Management
G-12 Gopher Express
G-26 Great Hall
G-33 Hennepin County Government Services
G-37 Erbert & Gerbert's
G-44 Minnesota Marketplace
G-14 Printing Services Copy Center
P-1 Riverbend Plaza
G-7 Starbucks Coffee
G-57 TCF Bank
G-22 U Card Office
G-54 University Bookstore
G-11 Postal Station

**First Floor**

EXHIBIT G

Coffman Memorial Union | Student Unions & Activities

 CMU First Floor

134 Coffman Information Desk
103 Commuter Lounge & Campus Link
103A Quiet Study
116 West Fireplace Lounge
117 East Fireplace Lounge
120 Fountain Terrace
105 Jamba Juice/Refreshments
P-2 Front Plaza
101 Technology Help
126 Student Activities Office
131 Student Programming, Board of Governors
110 Coffman Theater and Art Gallery

**Second Floor**

 CMU Second Floor

236 Al-Madinah Cultural Center
234 American Indian Student Cultural Center
226 Asian-American Student Union
209 Black Student Union
204 Commuter Connection
213 Disabled Student Cultural Center
211 La Raza Student Cultural Center
232 Minnesota International Student Association
202 Minnesota Student Association (MSA)
202 Professional Student Government
202 Council of Graduate Students
217 Queer Student Cultural Center
215 Feminist Student Activist Collective

**Third Floor**

EXHIBIT G

 CMU Third Floor

307 Board Room
309 Event Services Office
301-305 Conference Rooms (301, 302, 303 A/B/C, 304, 305)
319 Conference Room
323-326 Conference Rooms
322 Mississippi Lounge
321 Mississippi Room
315 Orientation and First-Year Programs
333 President's Reception Room
332 President's Room

## Coffman Memorial Union Services

🖻 Tickets

### Discount Tickets

The information desks offer various year-round and seasonal discount tickets. For more information on tickets available today and prices, visit the Info Desk.

🖻 Bus Passes

### Bus Passes

**U Pass**

Order your U-Pass online. Bring your U Card and pick up your U-Pass during regular Information Desk hours.

**Campus Zone Pass**

This pass allows you to ride between the three campus light-rail stops on the Metro Green Line without paying a fare.

**Go-To Card**

Go-To Cards are an easy way to pay for Metro Transit fare. Cards can hold stored value or various Metro Transit passes.

EXHIBIT G

Coffman Memorial Union | Student Unions & Activities

🔳 Flyer Posting

## Flyer Posting

Want to advertise your upcoming event?

Drop off your flyers at the Coffman or St. Paul Information Desk and get them displayed. Approval of postings must be received *before* they will be displayed at posting locations offered around each building.

In Coffman Memorial Union, approval will not be given for flyers advertising personal sales of items (i.e. cars, furniture, etc.) or for individuals seeking roommates.

Note: Due to space restrictions, we do not allow postings larger than 11" x 17" (tabloid printer size).

🔳 Lost & Found

## Lost and Found

Each Information Desk serves as a lost and found for their building. Items are held for two weeks from the day they're turned in. Visit us or call one of the numbers below to inquire about a lost item.

**Coffman Memorial Union**

612-624-4636

**St. Paul Student Center**

612-625-9794

🔳 Lockers

## Locker Rentals

The student union locations rent out lockers around campus for your convenience. To reserve a locker, fill out the Locker Rental Contract and print it for your records. Locker rentals start on the contract start date.

Once you have filled out this form, you must bring your U Card to the Info Desk to complete the rental process. Appropriate locations are listed below:

- East Bank rentals: Return the contract to Coffman Union Information Desk

🔳 UCard

EXHIBIT G

### Satellite U Card Office

In order to serve you better, our Information Desks operate as satellite station locations for the U Card Office.

Services offered:

- Replacement U Cards

### Coffman Information Desk

The Coffman Information Desk is available to produce U Cards during operating hours when the U Card Office is closed.

- Monday – Thursday • 4:30pm – 9:00pm
- Friday • 4:30pm - 10:00pm
- Saturday • 9:00am - 10:00pm
- Sunday • 1:00pm - 8:00pm

### St. Paul Student Center Information Desk

The St. Paul Student Center Information Desk is available to produce U Cards during operation hours.

🖃 Post Office

### Postal Station

Buy stamps and mail letters and packages at this on-campus postal station.

🖃 Printing Services

### Printing Services

Offers the convenience of a full-service copy center, including full serve B/W and color copying, digital and full-color printing, and more.

🖃 IT

### Technology Help

A central location for students, faculty, and staff to receive face-to-face technology support.

## Coffman Memorial Union Food & Drink

EXHIBIT G

Gopher Express Logo

### Gopher Express

Gopher Express is your convenient on-campus option for meals, snacks and beverages on-the-go. This convenience store offers many vegan, gluten-free and organic food options, as well as craveable classic snacks and soft drinks.

Goldys Gameroom logo

### Goldy's Gameroom

Enjoy bowling, billiards, arcade games, and a full-service snack bar at Goldy's Gameroom.

Campus Club

### Campus Club

The Campus Club provides an inviting ambiance for an enjoyable members-only dining experience.

MN Marketplace Logo

### Minnesota Marketplace

Offers several food options including Baja Sol Tortilla Grill, Topio's Pizza, Chick-fil-A, Einstein Bros. Bagels, and more.

Erberts & Gerbarts

### Erbert & Gerbert's

This Bistro sandwich shop serves flavorful hot and cold sandwiches and soup.

Panda

## Panda Express

Chinese cuisine at a great price. Enjoy traditional favorites like Orange Chicken, Mandarin Chicken, and more.

Starbucks

## Starbucks

Starbucks offers gourmet brewed coffee, espresso specialties and snacks.

Jamba Juice

## Jamba Juice

Delicious smoothies and juices including many vegetarian, vegan, dairy-free and gluten-free options.

# Coffman Memorial Union Study Spaces

## Basement

Goldys 400x300

## Goldy's Gameroom

Need background noise while you study? Goldy's Gameroom offers music, a food bar, and tables & chairs for studying.

## Computer Lab

If you need a computer to study, the computer lab will be perfect. They have Macs and Windows PCs, along with tables and couches.

EXHIBIT G

The Whole

## Whole Music Club

When it is not being used for concerts, the Whole Music Club is open for public study space. There are many tables and couches, which makes it perfect for your personal or group study needs.

### Outside Goldy's and Near the Escalator

This study location has chairs and couches that can be used for studying. Vending machines are nearby.

### Ground Floor

### The Ground Floor Main Study Area

This space has a several chairs, tables, and couches and surrounds the Minnesota Marketplace if you need food while you study.

### The UDS Cafeteria

This area is located at the back of the Minnesota Marketplace and has plenty of tables and chairs.

### The Cube

Located at the west end of the ground floor, this space has tables and couches for studying and is located next to Starbucks, the Post Office, and the Gopher Express convenience store.

### First Floor

### Commuter Lounge

Located on the east end of the building near Jamba Juice, this space has computer kiosks, bus schedules, a plasma TV, and vending area with a microwave. It also has a secluded room for quite study spaces.

### The East and West Fireplace Lounges

These lounges have comfortable leather couches and chairs. In the winter, this is a great place to nap and lounge near the warmth of a fire. Vending machines are nearby.

### The Fountain Terrace

Located at the south end of Coffman, this is a great outdoor study space during the warmer months. Sit on the edge of the Pietro Tacca fountain or on one of the terrace's many tables or benches.

### Third Floor

Mississippi Lounge

The Mississippi Lounge

EXHIBIT G

With views of the Mississippi River and Fountain Terrace, this lounge is a wonderful place to study. When not reserved for a private event, this location is open to all students. Vending machines are nearby.

## Main Hallway

The main hallway on the third floor has many comfortable leather chairs that are perfect for reading. Vending machines are nearby.

## Coffman Memorial Union Cultural Centers

To learn more, visit the second floor of Coffman Memorial Union or GopherLink.

Al-Madinah Cultural Center (AMCC)

American Indian Student Cultural Center (AISCC)

Asian-American Student Union (ASU)

Black Student Union (BSU)

Disabled Student Cultural Center (DSCC)

Feminist Student Activist Collective (FSAC)

La Raza Student Cultural Center

Minnesota International Student Association (MISA)

Queer Student Cultural Center (QSCC)

Search

Q [_____]
Search

Connect With Us

f
y
@
▲
▢

Events Newsletter

┌─Events Newsletter Signup─────
E-mail Address
Join

Quick Links

HomecomingSpring JamThe Whole Music ClubSuggest An EventCare PackagesContact UsSUA Media PolicySUA Style Guide

Coffman Memorial Union

300 Washington Ave. S.E.
Minneapolis, MN 55455

St. Paul Student Center

2017 Buford Ave
St. Paul, MN 55108

West Bank Skyway

219 19th Ave S
Minneapolis, MN 55455

© 2019 Regents of the University of Minnesota. All rights reserved. The University of Minnesota is an equal opportunity educator and employer. Privacy Statement

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME     EVENTS     ORGANIZATIONS     NEWS     FORMS

 Al-Madinah
Cultural Center

Al-Madinah will help educate the
University of Minnesota community by
creating a better understanding and
appreciation for the diverse cultures
and traditions of Islam and Muslims
through educational, social, and
community activities.

✉
CONTACT

## Contact Information

236 Coffman Union
300 Washington Ave SE
Minneapolis, MN 55455
United States
**E:** madinah@umn.edu

     

## Additional Information

**Please list your principal activities, events,
or programs.**
Al-Madinah hosts a variety of events and
collaborates with other organizations. Some of
the main events include: welcoming events for
the incoming freshman, Fast-a-Thon, Eid
celebrations, Islam Awareness Week.
Additionally, Al-Madinah provides many

EXHIBIT G

leadership development opportunities, open
by application, through organization of these
events.

### How do your activities benefit the University community?

Al-Madinah specifically aims to provide a home
on campus for students of the many cultures of
Islam while building bridges with the rest of the
University community. Events serve to expose
the cultures and traditions of Islam while
providing universal entertainment. In addition,
our center serves as an excellent space for
anyone to meet others, use our various
resources for studying, as well as to simply
relax!

### How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

Al-Madinah welcomes new members anytime!
Anyone can get involved with AMCC simply by
subscribing to our mailing list or registering to
become a member, both of which are available
through our website. Al-Madinah holds several
scheduled general body meetings a year that
are open to all members. Individuals are
encouraged to visit us in our space (Coffman
Memorial Union, room 236) where they can
meet the board through scheduled office
hours. Regardless, contact information for the
board is available through our website.

### Student Group ID Number
612

### Department *(required only for Campus Life Programs)*
No Response

### Standing (view student group status levels here)
Currently Registered until September 30, 2020

### Classification

EXHIBIT G

Registered Student Organization

**Constitution** *(for student groups only)*
612_Al-Madinah_Cultural_Center_082213.pdf

# Public Events

VIEW MORE EVENTS

There are currently no upcoming events. View past events.

# Officers

VIEW FULL ROSTER

This organization has no officers.

# Documents

Al-Madinah Cultural Center



EXHIBIT G

 UNIVERSITY OF MINNESOTA

HOME        EVENTS        ORGANIZATIONS        NEWS        FORMS



# American Indian Student Cultural Center (AISCC)

The mission of AISCC is to promote cultural diversity develop leadership in American Indian students of the U of M, assisting building understanding of American Indian people, issues, history and culture by bringing in native scholars and hosting events open to the entire university campus.

☑

CONTACT

VIEW ALL PHOTOS

## Contact Information

234 Coffman Memorial Union
300 Washington Ave SE
Minneapolis, MN 55455
E: aiscc@umn.edu
P: 612-624-0243



# Additional Information

**Please list your principal activities, events, or programs.**

EXHIBIT G

Frybread Fridays, Winter Storytelling and
Feast, Honoring American Indian Women
Luncheon, Fall Round Dance, Spring Powwow,
as well as various other events throughout the
school year.

### How do your activities benefit the University community?

Our activities provide education about and
exposure of American Indian cultures and
people to the campus community, in addition
to providing opportunities to have fun and
make new friends. We also act as an academic
support resource and facilitator for community
organizations.

### How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

The best way to get involved in our group is to
visit the AISCC on the second floor of Coffman
Memorial Union! You can get information
about upcoming events and activities, and sign
up for our mailing list to receive updates about
upcoming AISCC events.

### Student Group ID Number
274

### Department *(required only for Campus Life Programs)*
No Response

### Standing (view student group status levels here)
Currently Registered until September 30, 2020

### Classification
Registered Student Organization

### Constitution *(for student groups only)*
274_American_Indian_Student_Cultural_Center_050715.pdf

**EXHIBIT G**

# Public Events

VIEW MORE EVENTS

There are currently no upcoming events. View past events.

# Officers

VIEW FULL ROSTER

## M

**SECRETARY**

Maggie Greenleaf

## H

**CO-TREASURER**

Hannah Bossert

## T

**CO-TREASURER**

Tyler Moose

## K

**COMMUNITY OUTREACH COORDINATOR**

Kayla Duane

## A

**UNIVERSITY OUTREACH COORDINATOR**

Alex DuFault

## P

**MEDIA DIRECTOR**

Pauly Soulia

## L

**DIRECTOR OF CENTER**

Lecia Mata

# Documents

American Indian Student Cultural Center

EXHIBIT G

Privacy   Support                                                © Campus Labs 2019

EXHIBIT G

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME     EVENTS     ORGANIZATIONS     NEWS     FORMS

 Asian-American Student Union

☑

CONTACT

The Asian-American Student Union aims to advocate its educational, cultural, social and community pillars through activities and events for students within and outside the U of M, and to promote understanding of the diverse Asian Pacific Islander Desi American cultures to the U at large.

## Contact Information

300 Washington Ave SE - Suite 226A
Minneapolis, MN 55455
United States
**E:** asu@umn.edu

  

# Additional Information

**Please list your principal activities, events, or programs.**
ASU begins each school year with our annual Kick-Off Month which is comprised of a series of events to welcome both new and returning UMN students. These events serves as a means of introducing ASU and our affiliate organizations to the student body and is a

**EXHIBIT G**

great time for students to socialize and get introduced to the new board. Following winter break, we also host an annual Winter Gala to celebrate the new year. Usually, we end the year with our week-long Spring Conference comprised of 5 workshops as well as a finale banquet/performance that embodies culture and exhibits success in the Asian-American community. This year, we will be working with the MAASU (Midwest Asian-American Studens Union) team in holding their conference some time in spring. MAASU is an organization that strives to promote leadership among APIDA students and address the educational needs and rights among APIDA students, among other things. The conference will feature many educational and cultural workshops, culminating in a banquet that displays the culture and success of the APIDA community.

## How do your activities benefit the University community?

ASU seeks to promote cultural diversity and awareness to the University population at large through the events we host each year. These events are open to all University students and staff and are a great means by which to build relationships and connect with students from a wide array of cultures and backgrounds.

## How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

ASU holds Hours of Perspective events biweekly in Memorial Union Room 226. This is a great chance to come meet our board and affiliate boards as well as socialize and mingle with other members in a casual setting. We will also be present at both the Activities Fair and Explore-U in the Fall, and Activities Fair in the spring. Otherwise, please feel free to stop by our room, MU 226, anytime between the hours

EXHIBIT G

of 9AM-5PM, whenever school is in session! For more information, feel free to contact any of our board members.

**Student Group ID Number**
157

**Department** *(required only for Campus Life Programs)*
No Response

**Standing (view student group status levels here)**
Currently Registered until September 30, 2020

**Classification**
Registered Student Organization

**Constitution** *(for student groups only)*
157_Asian-American_Student_Union_090418.pdf

# Officers

VIEW FULL ROSTER

| P | G | E | K | M |
|---|---|---|---|---|
| **OFFICER** | **ADVOC...** **CHAIR** | **ASU AMBASSAI** | **ACTIVIT...** **COORDIN/** | **EXTER...** **FINANCE CHAIR** |
| Peter Stammers | Gao Nu yang | Emma Vanhdy | Kevin Le | Melissa Nguyen |

# Documents

Asian-American Student Union Constitution 2019-2020.pdf



**EXHIBIT G**

ASU Constitution 2018-19

© Campus Labs 2019

**EXHIBIT G**

11/21/2019

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME      EVENTS      ORGANIZATIONS      NEWS      FORMS

 Black Student
Union

☑
CONTACT

The Black Student Union shall strive to
embrace Blackness in all its forms by
creating an ideal intellectual, cultural,
and social environment for students of
the University of Minnesota through
awareness, education and action.

The Black Student Union strives to:
-Promote a culture of *Unity* for Black
Students
-Cultivate young *Leaders*
-Extend a hand of *Service*
-Set the standard of *Excellence* in **all** of
its endeavors

VIEW ALL PHOTOS

The Black Student Union was formally
established on January 14, 1969 as a
means for Black students to advocate
for one another and to work or the
interest of all Black students, faculty,
staff, and members of the Black
community. Through BSU, Black
students at the University of Minnesota
Twin Cities (U of MN) came to realize
there was a need for them to come
together as a group to discuss several
issues faced by Black college students.
Our initiatives we will be acting on in
response to those issues are as follows:

EXHIBIT G

Further Black awareness at
University of Minnesota Twin Cities
Communicate and explain the
University of Minnesota Twin Cities
policies and practices that effect
Black students.
Advocate for black students on and
off campus

Create successful communication
and collaborate with black student
organizations on and off campus
Make significant contributions in the
community in the form of service
Help ensure Black students progress
towards an academic degree and
fulfilling college social experience.

## Contact Information

Coffman Memorial Union #209
300 Washington Ave SE
Minneapolis, MN 55455
United States
**E:** bsu@umn.edu

    

# Additional Information

### Please list your principal activities, events, or programs.

We provide a place for students on campus to
relax, socialize, and take a break from classes.
We are involved with greater Twin-Cities
community political issues facing minorities
and students on campus. The Black Student
Union carries out annual events such as Unity

**EXHIBIT G**

Dinner, Political Awareness Events, Black
History Events, Ebony Ball, Conversations That
Matter and many more.

## How do your activities benefit the University community?

The Black Student Union ensures that students
not only have a safe haven to go to but also
provides academic support for the students.
We also keep the campus community
connected to the off campus community
because it easy for students to lose track of
what is happening off campus.

## How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

The Black Student Union is an inclusive
organization; everyone is welcome to become
a member in our organization. The only
requirement for membership is being added to
our listserv; to be added, please send your
name and x500 (email) to bsu@umn.edu. Also,
if you have any opportunities to provide our
membership or interests in collaboration,
please email bsu@umn.edu.

## Student Group ID Number
243

## Department *(required only for Campus Life Programs)*
No Response

## Standing (view student group status levels here)
Currently Registered until September 30, 2020

## Classification
Registered Student Organization

## Constitution *(for student groups only)*
243_Black_Student_Union_071415.pdf

EXHIBIT G

# Officers

VIEW FULL ROSTER



M

**ADVISOR**
Syressa
Lewis

**UNIVER...**
**ENGAGEM**
**CHAIR**
Majeste
Phillip

## Documents

📄   Black Student Union 2018 Election Process.pdf   

📄   BLACK STUDENT UNION CONSTITUTION.pdf   

Privacy   Support

© Campus Labs 2019

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME      EVENTS      ORGANIZATIONS      NEWS      FORMS

DSCC Disabled Student Cultural Center

☐
CONTACT

The organization shall exist for the following purposes: - To serve as a social area for disabled students. - To foster the culture of disabled individuals. - To provide learning opportunities for all students. - To ensure a completely accessible environment. - To increase the level of disability awareness on campus. - To work as a resource for disabled students and other students alike.

VIEW ALL PHOTOS

## Contact Information

300 Washington Ave SE
Suite 213
Minneapolis, MN 55455
**E:** dscc@umn.edu
**P:** (612) 624-2602

  

# Additional Information

**Please list your principal activities, events, or programs.**

**EXHIBIT G**

CASE 0:20-cv-01055-PJS-TNL   Document 1-1   Filed 04/30/20   Page 147 of 212
Disabled Student Cultural Center - University of Minnesota

Page 2 of 4

The DSCC is currently working to engage in creating learning opportunities on campus through a variety of events throughout the school year such as Intro to ASL, Caffeine Connections where we have coffee and discuss different topics related to disabilities. Every December 3rd, we celebrate International Day of Persons with Disabilities which is our largest event of the year. See our website or social media for a full list of events. The DSCC is also home to the Disability Advocacy Collective. The DAC meets regularly in the DSCC to discuss concerns students have regarding disability advocacy on campus.

### How do your activities benefit the University community?

Often, the DSCC is approached by students doing research papers or accessibility studies in hopes to get the perspective of disabled students. Without the DSCC as a resource, students would have a difficult time finding out what the voice of disabled students is. The DSCC also serves as an advocacy organization where students can bring their problems and concerns. Finally, the DSCC works hard to increase the level of diversity, tolerance and acceptance across campus in order to make it a more welcoming place for everyone.

### How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

The DSCC encourages involvement by students with and without disabilities. Students may attend our weekly meetings, volunteer, or participate in any of our events. Students do not need to fill out any membership forms, but are encouraged to sign up on our e-mail list to stay connected. Students who are interested in learning more about the DSCC can e-mail any

**EXHIBIT G**

of our officers or stop by our office in room 213,
Coffman Union.

**Student Group ID Number**
230

**Department** *(required only for Campus Life Programs)*
No Response

**Standing (view student group status levels here)**
Currently Registered until September 30, 2020

**Classification**
Registered Student Organization

**Constitution** *(for student groups only)*
230_Disabled_Student_Cultural_Center_061014.pdf

# Public Events

VIEW MORE EVENTS

There are currently no upcoming events. View past events.

# Officers

VIEW FULL ROSTER

| C | C | S | O | H | S |
|---|---|---|---|---|---|
| **EVENT PLANNING COORDIN/**<br>Carter Greenland | **OFFICER**<br>Carter Greenland | **OFFICER**<br>Sophie O'Rourke | **OFFICER**<br>Ondrew Tillotson | **OFFICER**<br>Husni Hussein | **VICE PRESIDEN**<br>Sophie O'Rourke |

EXHIBIT G

# Documents

DSCC Constitution.pdf



---

Privacy   Support

© Campus Labs 2019

**EXHIBIT G**

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME    EVENTS    ORGANIZATIONS    NEWS    FORMS

 Feminist
Student Activist
Collective

☑
CONTACT

Our mission: The purpose of the
Feminist Student Activist Collective is
to empower women, transgender, and
gender non-conforming people to
make positive changes in society by
eliminating interrelated inequalities
that produce oppression, with a focus
on gender and sexuality.
Our affiliates include: University Pro-
Choice Coalition (UPCC) and Women
For Political Change (WFPC)

VIEW ALL PHOTOS

## Contact Information

300 Washington Ave. SE.
Coffman Memorial Union, Rm 215
Minneapolis, MN 55455
**E:** wsac@umn.edu
**P:** 612-321-8019



# Additional Information

**Please list your principal activities, events,
or programs.**

**EXHIBIT G**

►Collective meetings: (Fridays 3-4PM) when our voting/deciding body meets. You need only be a registered member via Gopherlink/email wsac@umn.edu to attend! ►Fwords: Our monthly feminist roundtable series where we explore other topics outside of our weekly programming as they relate to feminism through informal discussions, presentations, and activities. ►Final exam cram jam: We provide snacks, coloring supplies, & a quiet study/relaxing space during finals week. Weekly programs ►Feminist Book Club: (Spring meetings: Tuesdays 2-2:30PM) Discuss various books by, for, and about feminism/social justice or analyzing through a intersectional feminist lens. ►Spill The Tea: (Spring meetings: Thursdays 2-3PM) learn & discuss issues that you face as students from any identity. Tea/coffee & snacks are provided! ►Feminism & Food: (Spring meetings: Every other Friday 1-2PM) Join us for feminist roundtable discussion as we make and enjoy a meal from various cultures every other week. ►Feminism & Film: (Spring meetings: Fridays 4-5PM) discuss various pop culture media through an intersectional feminist lens.

## How do your activities benefit the University community?

Our group is one of only a few student organizations that focuses programming on gender and sexuality issues, bringing attention to causes, movements, and current events that affect women, transgender, and gender non-conforming individuals. We are also active participants in the wider community social justice movements, making our group ideal for students who wish to make change here on campus and also create partnerships with community groups. We strive to create a University community that is safe and welcoming for all people regardless of gender or sexuality.

**EXHIBIT G**

**How can someone get involved with your group?** *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*
1) Visit us during our Hours of Operation: (M-F 11AM-6PM)We strive to create a safe space for women, transgender, and gender non-conforming individuals to study, hang out, or do activist work in our office space, but we are open to all genders. See our space guidelines in documents tab!!! 2) Attend collective meetings: (Spring meetings: See above) Our group is run by a collective that meets weekly to vote on what events to do for the semester, what organizations to support, what activist actions to take, etc. & is usually followed by a discussion about any topic those present decide on. You need only be a registered member via Gopherlink/email wsac@umn.edu to attend! 3) Attend weekly subgroups (see principle events section above) 4) Attend our other programming: ~Fwords: Our monthly informal discussion series where we explore other topics outside of our subgroups as they relate to feminism (i.e. mental illness, resisting trump, etc.) ~Final exam cram jam: We provide snacks, coloring supplies, & a quiet study/relaxing space during finals week. ~As well as the occasional other semester based events (e.g. craft nights, movie screenings, charity concerts, etc.) 5) Hold office hours/be an officer for FSAC: Help us keep our space open and safe to all visitors. You must be a registered member of FSAC via Gopherlink/email wsac@umn.edu. Training will be provided! Email us or message us here if interested. 6) Apply to be a part of the coordinator team for FSAC! In addition to our collective voting structure we also have a coordinator team that acts to advise the collective & manage the basic functions of

EXHIBIT G

FSAC. We will be opening applications early
Spring semester for AY19-20.

**Student Group ID Number**
266

**Department** *(required only for Campus Life Programs)*
No Response

**Standing (view student group status levels here)**
Currently Registered until September 30, 2020

**Classification**
Registered Student Organization

**Constitution** *(for student groups only)*
266_Feminist_Student_Activist_Collective_030915.pdf

# Public Events

VIEW MORE EVENTS

There are currently no upcoming events. View past events.

# Officers

VIEW FULL ROSTER

# G

**OFFICE MANAGER**
Gretchen
Stahle

**EXHIBIT G**

# News

### 2016 FSAC Meeting Dates: Poll

Tuesday, September 6, 2016
*Posted by Alaina DeSalvo for Feminist Student
Activist Collective*

Help decide when FSAC will meet this year!

# Documents

| | Women's Buildings in 1890-1910 | ⬇ |
| | FSAC safer space guidelines.pdf | ⬇ |
| | Feminist Student Activist Collective | ⬇ |

Privacy   Support                                        © Campus Labs 2019

EXHIBIT G

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME     EVENTS     ORGANIZATIONS     NEWS     FORMS

 # La Raza Latinx Student Cultural Center

☑

CONTACT

Our missions is to achieve a greater historical, political and cultural awareness concerning the Chicano/a, Xicano/a and Latino/a communities, through cultural and educational programs and events.

We strive to provide a safe space and supportive environment, advocate for the representation and engagement of our communities, create alliances with academic and other communities, and assist in the recruitment, retention and graduation of Chicanx/Latinx students.

We are located in Coffman Memorial Union - Room #211

VIEW ALL PHOTOS

## Contact Information

300 Washington Ave SE Room 211
Minneapolis, MN 55455
**E:** laraza@umn.edu

  

# Additional Information

**EXHIBIT G**

La Raza Latinx Student Cultural Center - University of Minnesota

**Please list your principal activities, events, or programs.**
- El Grito: Unidos en Un Solo Grito | A Celebration of Latin American Independence - Dia de Los Muertos | Day of the Dead - Nuestra Cultura | Celebration of LatinX culture with a cultural fashion show, dancing, performances, and food. - Latino Socials | weekly smaller events - Yo Te Veo| Latinx Achievement Conference - High Schooler Conference - Primavera | Semi Formal Dance - Un Paso Al Futuro| Bilingual Bicultural Graduation Ceremoney

**How do your activities benefit the University community?**
We provide programming and learning opportunities to those interested in Latinx topics such as: culture, race, gender, sexuality, class and ethnicity.

**How can someone get involved with your group?** *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*
Please stop by Room 211 CMU to check out our space and attend any of our free events or join our e-mail list. Like us on Facebook to see our future events & follow us on Instagram! E-mail any of our officers for more information or email us at laraza@umn.edu.

**Student Group ID Number**
131

**Department** *(required only for Campus Life Programs)*
No Response

**Standing (view student group status levels here)**
Currently Registered until September 30, 2020

**Classification**
Registered Student Organization

EXHIBIT G

**Constitution** *(for student groups only)*
Constitution Revision 9 10 (1) (1).pdf

# Officers

VIEW FULL ROSTER

## M            K            L            A            L            A

**EVENT**      **OFFICER**   **OFFICER**   **OFFICER**      **OFFICER**   **OFFICER**
**PLANNING**   Katherine     Luis          Angel            Lesley        Andrea
**COORDIN/**   Alvarado-     Ramirez       Hernandez-       Blanco        Catarino
Maria          Campoverde                  Romero                         Mendoza
Castanon
Gonzalez

## J            J            D            J

**PRESID...**  **TREAS...**  **TREAS...**  **HISTOR...**
Joselin        Jennifer      Devin         Johnny
Navarro-       Robles        Luque         Mejia
Cano                                       Quintanilla

# Documents

☐  Constitution/Bylaws                                          ⬇

☐  La Raza Student Cultural Center                              ⬇

EXHIBIT G

Privacy    Support                                                           © Campus Labs 2019

**EXHIBIT G**

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME      EVENTS      ORGANIZATIONS      NEWS      FORMS

# Minnesota International Student Association

☑

CONTACT

## Contact Information

300 Washington Ave SE #232
Minneapolis, MN 55455
**E:** misa@umn.edu

      

# Additional Information

### Please list your principal activities, events, or programs.

Our main focus is to help international students get accustomed to the new environment. We do this by hosting events such as Feast of Nations, International Music Night, Spring Carnival and more. We also try to involve local students and help them learn about the new cultures from around the world through Culture Days.

### How do your activities benefit the University community?

**EXHIBIT G**

Our activities bring together local and international students. This helps international students familiarize themselves with the local environment while giving the rest of the student body a chance to learn something new.

**How can someone get involved with your group?** *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*
Signing up on our mailing list through our website makes a student an official member. MISA also attends all of the international orientation year round; introducing newly arrived international students to MISA and encouraging them to become members. We also have this sheet available at all of our events. MISA also has a room in Coffman where a student can stop by for any help they need. We have a board member available from 9am to 5pm on weekdays in MISA room (Coffman 232).

**Student Group ID Number**
184

**Department** *(required only for Campus Life Programs)*
No Response

**Standing (view student group status levels here)**
Currently Registered until September 30, 2020

**Classification**
Registered Student Organization

**Constitution** *(for student groups only)*
184_Minnesota_International_Student_Association_081319.pdf

# Officers

EXHIBIT G

# K         L          A

VIEW FULL ROSTER

| EVENT PLANNING COORDINA | PRESID... | SECRET... |
|---|---|---|
| Kenho Yakushiji | Lanya Mohammed | Aaron Tran |

## Documents

📄   Constitution/Bylaws                                               ⬇

📄   Minnesota International Student Association (MISA)                 ⬇

EXHIBIT G

 UNIVERSITY OF MINNESOTA                                      SIGN IN

HOME        EVENTS        ORGANIZATIONS        NEWS        FORMS

 Queer Student Cultural Center

┌─────────┐
│    ☒    │
└─────────┘
CONTACT

The Queer Student Cultural Center is
the legacy organization of one the
oldest LGBT student groups in the
United States, founded in 1969. The
first incarnation of this group was
originally known as FREE (Fight
Repression of Erotic Expression).

The QSCC has existed in its current
form since 1998, and we are located at
the University of Minnesota in Union
room 217.

## Contact Information

300 Washington Ave SE #217
Minneapolis, MN 55455
**E:** qscc@umn.edu

  

# Additional Information

### Please list your principal activities, events, or programs.
The QSCC is open during academic year
Monday-Friday from 10:00 am - 5:00 pm, with 9
different member groups in the evening. We

EXHIBIT G

are located in Memorial Union on the 2nd floor in room 217. We provide a social space that welcomes all students. Feel free to stop by to play video games, nap, enjoy free coffee, tea, and printing, and to meet some really incredible LGBTQ+ students! p The "Q" facilitates a number of member groups during the academic year. Our groups meet on a biweekly schedule. Each of these groups exist to fulfill a specific community purpose, and to give members of the LGBT community a safe space to celebrate our culture and our history. These groups include: Biversity: Biversity is a group for non-monosexual individuals—people who are sexually and or romantically attracted to more than one gender—to discuss issues that are relevant to their identities. fACES: fACES is a group for asexual and or aromantic individuals to gather, discuss issues, and meet other students who are on the asexual or aromantic spectrum. GeeQs: GeeQs is a student group that meets weekly to play a variety of video, board, and strategy games. Any queer-identified individuals and allies may attend. NeuroQueers: NeuroQueers is a group centered around LGBTQ+ people who would benefit from a space that celebrates neurodiversity. The group will feature discussions of mental health topics, ways to healthily cope, resources on and off campus, venting, and just having a moment to relax and de-stress. Since the QSCC is a safe space, there will be minimal talk of triggering topics. **Disclaimer: This is not a therapy group; No one is a licensed therapist here and this should not be used as a replacement for therapy. N0nb1n4ry: N0nb1n4ry is a group for nonbinary students that offers discussions, activities, and presentations related to nonbinary identities. qARTZ: QuARTZ is a group for queer and trans students that meets every other week to create art. Queer Men: Queer Men is a group for gay and bi men/male-

EXHIBIT G

aligned people. ROOTS: Roots is a group for queer-identified students of color that offers discussions, activities, and media presentations relating to the intersection of racial and queer identities. SapphiQ SapphiQ is a group for lesbians and bi women/woman-aligned people. Tranarchy: Tranarchy is a student group for trans, non-binary, and otherwise gender-nonconforming individuals, and for those questioning their gender identity. This group offers discussions and activities relating to gender identity and gender presentation.

## How do your activities benefit the University community?

The Queer Student Cultural Center functions as a community center for all LGBT students, staff, and alumni at the University of Minnesota. All contact with or at the QSCC is completely confidential.

## How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

The QSCC is open to all students. There is no membership required to come to our space or our meetings - just stop by! For more information, visit qscc.org or email us at qscc@umn.edu. If you would like to be added to our email list, visit https://z.umn.edu/qsccnewsletter. For our scheduled events and group meeting times, visit us at Union 217 or check our website qscc.org for more information. The Queer Student Cultural Center offers a limited number of hourly and stipend positions. We will begin hiring for the Spring 2019 semester based on need beginning in October.

## Student Group ID Number
238

**EXHIBIT G**

**Department** *(required only for Campus Life Programs)*
No Response

**Standing (view student group status levels here)**
Currently Registered until September 30, 2020

**Classification**
Registered Student Organization

**Constitution** *(for student groups only)*
Constitution_(2).pdf

# Officers

VIEW FULL ROSTER

A            L

| **PROJECT** | **EXECU…** |
| **MANAGER** | **ASSISTANT** |
| Alexei | Luis |
| Askvig | Mendoza |

# News

### Fall 2017 Group Schedule

Thursday, August 31, 2017
*Posted by Queer Student Cultural Center for Queer Student Cultural Center*

Here are the new times for groups meeting in the QSCC this Fall!

EXHIBIT G

### Spring Meeting Times

Sunday, January 22, 2017
*Posted by John Steinmann for Queer Student Cultural Center*

Here are the new times for groups meeting in the QSCC!

# Documents

| | Constitution/Bylaws | ⬇ |
| | QSCC Constitution Bylaws and Safer Space Policies 17-18.pdf | ⬇ |
| | Queer Students Cultural Center | ⬇ |

Privacy   Support

© Campus Labs 2019

EXHIBIT G

One Stop    MyU   : For Students, Faculty, and Staff

MENU

# Multicultural Center for Academic Excellence (MCAE)

# Student Cultural Centers

There are nine student cultural centers located on the second floor of Coffman Memorial Union.

Student organizations are a great way to meet people, build leadership experience, learn more about the university, and explore things you may be interested in.

Visit the GopherLink website for more information about student organizations.

## Check out one of these organizations:

American Indian Student Cultural Center (AISCC)

Asian American Student Union (ASU)

Black Student Union (BSU)

Disabled Student Cultural Center (DSCC)

La Raza Student Cultural Center

Queer Student Cultural Center (QSCC)

Al-Madinah Student Cultural Center (AMCC)

Minnesota International Student Association (MISA)

EXHIBIT H

Women's Student Collective Activist (WSAC)

## The Multicultural Center for Academic Excellence is a unit of
### the Office for **Equity and Diversity**

© 2019 Regents of the University of Minnesota . All rights reserved. The University of Minnesota
is an equal opportunity educator and employer. Privacy Statement

Report Web Disability-Related Issue

**EXHIBIT H**

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME        EVENTS        ORGANIZATIONS        NEWS        FORMS



# American Indian Student Cultural Center (AISCC)

The mission of AISCC is to promote cultural diversity develop leadership in American Indian students of the U of M, assisting building understanding of American Indian people, issues, history and culture by bringing in native scholars and hosting events open to the entire university campus.

☐

CONTACT

VIEW ALL PHOTOS

## Contact Information



234 Coffman Memorial Union
300 Washington Ave SE
Minneapolis, MN 55455
**E:** aiscc@umn.edu
**P:** 612-624-0243

f

# Additional Information

**Please list your principal activities, events, or programs.**

EXHIBIT H

Frybread Fridays, Winter Storytelling and
Feast, Honoring American Indian Women
Luncheon, Fall Round Dance, Spring Powwow,
as well as various other events throughout the
school year.

## How do your activities benefit the University community?

Our activities provide education about and
exposure of American Indian cultures and
people to the campus community, in addition
to providing opportunities to have fun and
make new friends. We also act as an academic
support resource and facilitator for community
organizations.

## How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

The best way to get involved in our group is to
visit the AISCC on the second floor of Coffman
Memorial Union! You can get information
about upcoming events and activities, and sign
up for our mailing list to receive updates about
upcoming AISCC events.

## Student Group ID Number
274

## Department *(required only for Campus Life Programs)*
No Response

## Standing (view student group status levels here)
Currently Registered until September 30, 2020

## Classification
Registered Student Organization

## Constitution *(for student groups only)*
274_American_Indian_Student_Cultural_Center_050715.pdf

EXHIBIT H

# Public Events

VIEW MORE EVENTS

There are currently no upcoming events. View past events.

# Officers

VIEW FULL ROSTER

| M | H | T | K |
|---|---|---|---|
| **SECRETARY** | **CO-TREASURER** | **CO-TREASURER** | **COMMUNITY OUTREACH COORDINATOR** |
| Maggie Greenleaf | Hannah Bossert | Tyler Moose | Kayla Duane |

| A | P | L |
|---|---|---|
| **UNIVERSITY OUTREACH COORDINATOR** | **MEDIA DIRECTOR** | **DIRECTOR OF CENTER** |
| Alex DuFault | Pauly Soulia | Lecia Mata |

# Documents

American Indian Student Cultural Center

EXHIBIT H

Privacy   Support

© Campus Labs 2019

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME     EVENTS     ORGANIZATIONS     NEWS     FORMS

 Asian-American Student Union

☑

CONTACT

The Asian-American Student Union aims to advocate its educational, cultural, social and community pillars through activities and events for students within and outside the U of M, and to promote understanding of the diverse Asian Pacific Islander Desi American cultures to the U at large.

## Contact Information

300 Washington Ave SE - Suite 226A
Minneapolis, MN 55455
United States
**E:** asu@umn.edu

  

# Additional Information

### Please list your principal activities, events, or programs.

ASU begins each school year with our annual Kick-Off Month which is comprised of a series of events to welcome both new and returning UMN students. These events serves as a means of introducing ASU and our affiliate organizations to the student body and is a

**EXHIBIT H**

great time for students to socialize and get introduced to the new board. Following winter break, we also host an annual Winter Gala to celebrate the new year. Usually, we end the year with our week-long Spring Conference comprised of 5 workshops as well as a finale banquet/performance that embodies culture and exhibits success in the Asian-American community. This year, we will be working with the MAASU (Midwest Asian-American Studens Union) team in holding their conference some time in spring. MAASU is an organization that strives to promote leadership among APIDA students and address the educational needs and rights among APIDA students, among other things. The conference will feature many educational and cultural workshops, culminating in a banquet that displays the culture and success of the APIDA community.

### How do your activities benefit the University community?

ASU seeks to promote cultural diversity and awareness to the University population at large through the events we host each year. These events are open to all University students and staff and are a great means by which to build relationships and connect with students from a wide array of cultures and backgrounds.

### How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

ASU holds Hours of Perspective events biweekly in Memorial Union Room 226. This is a great chance to come meet our board and affiliate boards as well as socialize and mingle with other members in a casual setting. We will also be present at both the Activities Fair and Explore-U in the Fall, and Activities Fair in the spring. Otherwise, please feel free to stop by our room, MU 226, anytime between the hours

**EXHIBIT H**

Asian-American Student Union - University of Minnesota

of 9AM-5PM, whenever school is in session! For more information, feel free to contact any of our board members.

**Student Group ID Number**
157

**Department** *(required only for Campus Life Programs)*
No Response

**Standing (view student group status levels here)**
Currently Registered until September 30, 2020

**Classification**
Registered Student Organization

**Constitution** *(for student groups only)*
157_Asian-American_Student_Union_090418.pdf

# Officers

VIEW FULL ROSTER

## P

**OFFICER**
Peter Stammers

## G

**ADVOCACY CHAIR**
Gao Nu yang

## E

**ASU AMBASSADOR**
Emma Vanhdy

## K

**ACTIVITIES COORDINATOR**
Kevin Le

## M

**EXTERNAL**

EXHIBIT H

# Documents

🗋   Asian-American Student Union Constitution 2019-2020.pdf                    ⬇

🗋   ASU Constitution 2018-19                                                    ⬇

---

Privacy   Support                                        © Campus Labs 2019

EXHIBIT H

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME     EVENTS     ORGANIZATIONS     NEWS     FORMS

 # Black Student Union

✉

CONTACT

The Black Student Union shall strive to embrace Blackness in all its forms by creating an ideal intellectual, cultural, and social environment for students of the University of Minnesota through awareness, education and action.

The Black Student Union strives to:
-Promote a culture of *Unity* for Black Students
-Cultivate young *Leaders*
-Extend a hand of *Service*
-Set the standard of *Excellence* in **all** of its endeavors

VIEW ALL PHOTOS

The Black Student Union was formally established on January 14, 1969 as a means for Black students to advocate for one another and to work or the interest of all Black students, faculty, staff, and members of the Black community. Through BSU, Black students at the University of Minnesota Twin Cities (U of MN) came to realize there was a need for them to come together as a group to discuss several issues faced by Black college students. Our initiatives we will be acting on in response to those issues are as follows:

EXHIBIT H

Further Black awareness at
University of Minnesota Twin Cities
Communicate and explain the
University of Minnesota Twin Cities
policies and practices that effect
Black students.
Advocate for black students on and
off campus

Create successful communication
and collaborate with black student
organizations on and off campus
Make significant contributions in the
community in the form of service
Help ensure Black students progress
towards an academic degree and
fulfilling college social experience.

## Contact Information

Coffman Memorial Union #209
300 Washington Ave SE
Minneapolis, MN 55455
United States
**E:** bsu@umn.edu

    

# Additional Information

### Please list your principal activities, events, or programs.

We provide a place for students on campus to
relax, socialize, and take a break from classes.
We are involved with greater Twin-Cities
community political issues facing minorities
and students on campus. The Black Student
Union carries out annual events such as Unity

EXHIBIT H

Dinner, Political Awareness Events, Black
History Events, Ebony Ball, Conversations That
Matter and many more.

### How do your activities benefit the University community?

The Black Student Union ensures that students
not only have a safe haven to go to but also
provides academic support for the students.
We also keep the campus community
connected to the off campus community
because it easy for students to lose track of
what is happening off campus.

### How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

The Black Student Union is an inclusive
organization; everyone is welcome to become
a member in our organization. The only
requirement for membership is being added to
our listserv; to be added, please send your
name and x500 (email) to bsu@umn.edu. Also,
if you have any opportunities to provide our
membership or interests in collaboration,
please email bsu@umn.edu.

### Student Group ID Number
243

### Department *(required only for Campus Life Programs)*
No Response

### Standing (view student group status levels here)
Currently Registered until September 30, 2020

### Classification
Registered Student Organization

### Constitution *(for student groups only)*
243_Black_Student_Union_071415.pdf

**EXHIBIT H**

# Officers

VIEW FULL ROSTER



# M

**ADVISOR**
Syressa Lewis

**UNIVERSITY**
**ENGAGEMENT**
**CHAIR**
Majeste Phillip

## Documents

📄  Black Student Union 2018 Election Process.pdf                    ⬇

📄  BLACK STUDENT UNION CONSTITUTION.pdf                            ⬇

Privacy   Support                                        © Campus Labs 2019

 UNIVERSITY OF MINNESOTA

HOME    EVENTS    ORGANIZATIONS    NEWS    FORMS

DSCC Disabled Student Cultural Center

The organization shall exist for the following purposes: - To serve as a social area for disabled students. - To foster the culture of disabled individuals. - To provide learning opportunities for all students. - To ensure a completely accessible environment. - To increase the level of disability awareness on campus. - To work as a resource for disabled students and other students alike.

☑ CONTACT

VIEW ALL PHOTOS

## Contact Information

300 Washington Ave SE
Suite 213
Minneapolis, MN 55455
**E:** dscc@umn.edu
**P:** (612) 624-2602

  

# Additional Information

**Please list your principal activities, events, or programs.**

The DSCC is currently working to engage in creating learning opportunities on campus through a variety of events throughout the school year such as Intro to ASL, Caffeine Connections where we have coffee and discuss different topics related to disabilities. Every December 3rd, we celebrate International Day of Persons with Disabilities which is our largest event of the year. See our website or social media for a full list of events. The DSCC is also home to the Disability Advocacy Collective. The DAC meets regularly in the DSCC to discuss concerns students have regarding disability advocacy on campus.

## How do your activities benefit the University community?

Often, the DSCC is approached by students doing research papers or accessibility studies in hopes to get the perspective of disabled students. Without the DSCC as a resource, students would have a difficult time finding out what the voice of disabled students is. The DSCC also serves as an advocacy organization where students can bring their problems and concerns. Finally, the DSCC works hard to increase the level of diversity, tolerance and acceptance across campus in order to make it a more welcoming place for everyone.

## How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

The DSCC encourages involvement by students with and without disabilities. Students may attend our weekly meetings, volunteer, or participate in any of our events. Students do not need to fill out any membership forms, but are encouraged to sign up on our e-mail list to stay connected. Students who are interested in learning more about the DSCC can e-mail any

**EXHIBIT H**

of our officers or stop by our office in room 213,
Coffman Union.

**Student Group ID Number**
230

**Department** *(required only for Campus Life
Programs)*
No Response

**Standing (view student group status
levels here)**
Currently Registered until September 30, 2020

**Classification**
Registered Student Organization

**Constitution** *(for student groups only)*
230_Disabled_Student_Cultural_Center_061014.pdf

# Public Events

VIEW MORE EVENTS

There are currently no upcoming events. View past events.

# Officers

VIEW FULL ROSTER

C               C               S               O

**EVENT PLANNING**    **OFFICER**       **OFFICER**       **OFFICER**
**COORDINATOR**       Carter            Sophie            Ondrew
                      Greenland         O'Rourke          Tillotson
Carter
Greenland

EXHIBIT H

# Documents

DSCC Constitution.pdf

Privacy    Support                                © Campus Labs 2019

EXHIBIT H

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME          EVENTS          ORGANIZATIONS          NEWS          FORMS

 # La Raza Latinx Student Cultural Center

☑
CONTACT

Our missions is to achieve a greater historical, political and cultural awareness concerning the Chicano/a, Xicano/a and Latino/a communities, through cultural and educational programs and events.
We strive to provide a safe space and supportive environment, advocate for the representation and engagement of our communities, create alliances with academic and other communities, and assist in the recruitment, retention and graduation of Chicanx/Latinx students. We are located in Coffman Memorial Union - Room #211

VIEW ALL PHOTOS

## Contact Information

300 Washington Ave SE Room 211
Minneapolis, MN 55455
**E:** laraza@umn.edu

    

# Additional Information

## Please list your principal activities, events, or programs.

- El Grito: Unidos en Un Solo Grito | A Celebration of Latin American Independence - Dia de Los Muertos | Day of the Dead - Nuestra Cultura | Celebration of LatinX culture with a cultural fashion show, dancing, performances, and food. - Latino Socials | weekly smaller events - Yo Te Veo| Latinx Achievement Conference - High Schooler Conference - Primavera | Semi Formal Dance - Un Paso Al Futuro| Bilingual Bicultural Graduation Ceremoney

## How do your activities benefit the University community?

We provide programming and learning opportunities to those interested in Latinx topics such as: culture, race, gender, sexuality, class and ethnicity.

## How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

Please stop by Room 211 CMU to check out our space and attend any of our free events or join our e-mail list. Like us on Facebook to see our future events & follow us on Instagram! E-mail any of our officers for more information or email us at laraza@umn.edu.

## Student Group ID Number

131

## Department *(required only for Campus Life Programs)*

No Response

## Standing (view student group status levels here)

Currently Registered until September 30, 2020

## Classification

Registered Student Organization

EXHIBIT H

**Constitution** *(for student groups only)*
Constitution_Revision_9_10_(1)_(1).pdf

# Officers

VIEW FULL ROSTER

## M

**EVENT PLANNING
COORDINATOR**

Maria Castanon
Gonzalez

## K

**OFFICER**

Katherine
Alvarado-
Campoverde

## L

**OFFICER**

Luis Ramirez

## A

**OFFICER**

Angel
Hernandez-
Romero

## L

**OFFICER**

Lesley Blanco

## A

**OFFICER**

Andrea
Catarino
Mendoza

## J

**PRESIDENT**

Joselin
Navarro-Cano

## J

**TREASURER**

Jennifer Robles

## D

**TREASURER**

Devin Luque

## J

**HISTORIAN**

Johnny Mejia
Quintanilla

# Documents

| | Constitution/Bylaws | ⬇ |
| --- | --- | --- |
| | La Raza Student Cultural Center | ⬇ |

© Campus Labs 2019

**EXHIBIT H**                     11/21/2019

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME        EVENTS        ORGANIZATIONS        NEWS        FORMS

 Queer Student Cultural Center

☐
CONTACT

The Queer Student Cultural Center is the legacy organization of one the oldest LGBT student groups in the United States, founded in 1969. The first incarnation of this group was originally known as FREE (Fight Repression of Erotic Expression).

The QSCC has existed in its current form since 1998, and we are located at the University of Minnesota in Union room 217.

## Contact Information

300 Washington Ave SE #217
Minneapolis, MN 55455
**E:** qscc@umn.edu

  

# Additional Information

### Please list your principal activities, events, or programs.
The QSCC is open during academic year Monday-Friday from 10:00 am - 5:00 pm, with 9 different member groups in the evening. We

**EXHIBIT H**

are located in Memorial Union on the 2nd floor
in room 217. We provide a social space that
welcomes all students. Feel free to stop by to
play video games, nap, enjoy free coffee, tea,
and printing, and to meet some really
incredible LGBTQ+ students! p The "Q"
facilitates a number of member groups during
the academic year. Our groups meet on a
biweekly schedule. Each of these groups exist
to fulfill a specific community purpose, and to
give members of the LGBT community a safe
space to celebrate our culture and our history.
These groups include: Biversity: Biversity is a
group for non-monosexual individuals—people
who are sexually and or romantically attracted
to more than one gender—to discuss issues
that are relevant to their identities. fACES:
fACES is a group for asexual and or aromantic
individuals to gather, discuss issues, and meet
other students who are on the asexual or
aromantic spectrum. GeeQs: GeeQs is a
student group that meets weekly to play a
variety of video, board, and strategy games.
Any queer-identified individuals and allies may
attend. NeuroQueers: NeuroQueers is a group
centered around LGBTQ+ people who would
benefit from a space that celebrates
neurodiversity. The group will feature
discussions of mental health topics, ways to
healthily cope, resources on and off campus,
venting, and just having a moment to relax and
de-stress. Since the QSCC is a safe space, there
will be minimal talk of triggering topics.
**Disclaimer: This is not a therapy group; No
one is a licensed therapist here and this should
not be used as a replacement for therapy.
N0nb1n4ry: N0nb1n4ry is a group for
nonbinary students that offers discussions,
activities, and presentations related to
nonbinary identities. qARTZ: QuARTZ is a group
for queer and trans students that meets every
other week to create art. Queer Men: Queer
Men is a group for gay and bi men/male-

**EXHIBIT H**

aligned people. ROOTS: Roots is a group for queer-identified students of color that offers discussions, activities, and media presentations relating to the intersection of racial and queer identities. SapphiQ SapphiQ is a group for lesbians and bi women/woman-aligned people. Tranarchy: Tranarchy is a student group for trans, non-binary, and otherwise gender-nonconforming individuals, and for those questioning their gender identity. This group offers discussions and activities relating to gender identity and gender presentation.

## How do your activities benefit the University community?

The Queer Student Cultural Center functions as a community center for all LGBT students, staff, and alumni at the University of Minnesota. All contact with or at the QSCC is completely confidential.

## How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

The QSCC is open to all students. There is no membership required to come to our space or our meetings - just stop by! For more information, visit qscc.org or email us at qscc@umn.edu. If you would like to be added to our email list, visit https://z.umn.edu/qsccnewsletter. For our scheduled events and group meeting times, visit us at Union 217 or check our website qscc.org for more information. The Queer Student Cultural Center offers a limited number of hourly and stipend positions. We will begin hiring for the Spring 2019 semester based on need beginning in October.

## Student Group ID Number

238

**Department** *(required only for Campus Life Programs)*
No Response

**Standing (view student group status levels here)**
Currently Registered until September 30, 2020

**Classification**
Registered Student Organization

**Constitution** *(for student groups only)*
Constitution (2).pdf

# Officers

VIEW FULL ROSTER

# A                        L

**PROJECT**              **EXECUTIVE**
**MANAGER**              **ASSISTANT**
Alexei Askvig            Luis Mendoza

# News

### Fall 2017 Group Schedule

Thursday, August 31, 2017
*Posted by Queer Student Cultural Center for
Queer Student Cultural Center*

Here are the new times for groups meeting in
the QSCC this Fall!

EXHIBIT H

**Spring Meeting Times**

Sunday, January 22, 2017
*Posted by John Steinmann for Queer Student
Cultural Center*

Here are the new times for groups meeting in
the QSCC!

# Documents

| | |
|---|---|
| Constitution/Bylaws | |
| QSCC Constitution Bylaws and Safer Space Policies 17-18.pdf | |
| Queer Students Cultural Center | |

Privacy    Support                                    © Campus Labs 2019

CASE 0:20-cv-01055-PJS-TNL   Document 1-1   Filed 04/30/20   Page 194 of 212
Al-Madinah Cultural Center - University of Minnesota

Page 1 of 3

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME       EVENTS        ORGANIZATIONS        NEWS        FORMS

 Al-Madinah
Cultural Center

☐
CONTACT

Al-Madinah will help educate the
University of Minnesota community by
creating a better understanding and
appreciation for the diverse cultures
and traditions of Islam and Muslims
through educational, social, and
community activities.

## Contact Information

236 Coffman Union
300 Washington Ave SE
Minneapolis, MN 55455
United States
**E:** madinah@umn.edu

     

# Additional Information

### Please list your principal activities, events,
### or programs.

Al-Madinah hosts a variety of events and
collaborates with other organizations. Some of
the main events include: welcoming events for
the incoming freshman, Fast-a-Thon, Eid
celebrations, Islam Awareness Week.
Additionally, Al-Madinah provides many

**EXHIBIT H**

leadership development opportunities, open
by application, through organization of these
events.

## How do your activities benefit the University community?

Al-Madinah specifically aims to provide a home
on campus for students of the many cultures of
Islam while building bridges with the rest of the
University community. Events serve to expose
the cultures and traditions of Islam while
providing universal entertainment. In addition,
our center serves as an excellent space for
anyone to meet others, use our various
resources for studying, as well as to simply
relax!

## How can someone get involved with your group? *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*

Al-Madinah welcomes new members anytime!
Anyone can get involved with AMCC simply by
subscribing to our mailing list or registering to
become a member, both of which are available
through our website. Al-Madinah holds several
scheduled general body meetings a year that
are open to all members. Individuals are
encouraged to visit us in our space (Coffman
Memorial Union, room 236) where they can
meet the board through scheduled office
hours. Regardless, contact information for the
board is available through our website.

## Student Group ID Number
612

## Department *(required only for Campus Life Programs)*
No Response

## Standing (view student group status levels here)
Currently Registered until September 30, 2020

## Classification

Registered Student Organization

**Constitution** *(for student groups only)*
612_Al-Madinah_Cultural_Center_082213.pdf

# Public Events

VIEW MORE EVENTS

There are currently no upcoming events. View past events.

# Officers

VIEW FULL ROSTER

This organization has no officers.

# Documents

Al-Madinah Cultural Center



 UNIVERSITY OF MINNESOTA                                    SIGN IN

HOME        EVENTS        ORGANIZATIONS        NEWS        FORMS


CONTACT

# Minnesota International Student Association

## Contact Information

300 Washington Ave SE #232
Minneapolis, MN 55455
**E:** misa@umn.edu

   

# Additional Information

**Please list your principal activities, events, or programs.**
Our main focus is to help international students get accustomed to the new environment. We do this by hosting events such as Feast of Nations, International Music Night, Spring Carnival and more. We also try to involve local students and help them learn about the new cultures from around the world through Culture Days.

**How do your activities benefit the University community?**

Our activities bring together local and international students. This helps international students familiarize themselves with the local environment while giving the rest of the student body a chance to learn something new.

**How can someone get involved with your group?** *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*
Signing up on our mailing list through our website makes a student an official member. MISA also attends all of the international orientation year round; introducing newly arrived international students to MISA and encouraging them to become members. We also have this sheet available at all of our events. MISA also has a room in Coffman where a student can stop by for any help they need. We have a board member available from 9am to 5pm on weekdays in MISA room (Coffman 232).

**Student Group ID Number**
184

**Department** *(required only for Campus Life Programs)*
No Response

**Standing (view student group status levels here)**
Currently Registered until September 30, 2020

**Classification**
Registered Student Organization

**Constitution** *(for student groups only)*
184_Minnesota_International_Student_Association_081319.pdf

# Officers

VIEW FULL ROSTER

# K

**EVENT PLANNING COORDINATOR**
Kenho Yakushiji

# L

**PRESIDENT**
Lanya Mohammed

# A

**SECRETARY**
Aaron Tran

## Documents

| | Constitution/Bylaws | ⬇ |
| | Minnesota International Student Association (MISA) | ⬇ |

Privacy   Support

© Campus Labs 2019

CASE 0:20-cv-01055-PJS-TNL Document 1-1 Filed 04/30/20 Page 200 of 212
Feminist Student Activist Collective - University of Minnesota

Page 1 of 5

 UNIVERSITY OF MINNESOTA

SIGN IN

HOME          EVENTS          ORGANIZATIONS          NEWS          FORMS

 Feminist Student Activist Collective

☑

CONTACT

Our mission: The purpose of the Feminist Student Activist Collective is to empower women, transgender, and gender non-conforming people to make positive changes in society by eliminating interrelated inequalities that produce oppression, with a focus on gender and sexuality.
Our affiliates include: University Pro-Choice Coalition (UPCC) and Women For Political Change (WFPC)

VIEW ALL PHOTOS

## Contact Information

300 Washington Ave. SE.
Coffman Memorial Union, Rm 215
Minneapolis, MN 55455
**E:** wsac@umn.edu
**P:** 612-321-8019



# Additional Information

**Please list your principal activities, events, or programs.**

**EXHIBIT H**

►Collective meetings: (Fridays 3-4PM) when our voting/deciding body meets. You need only be a registered member via Gopherlink/email wsac@umn.edu to attend! ►Fwords: Our monthly feminist roundtable series where we explore other topics outside of our weekly programming as they relate to feminism through informal discussions, presentations, and activities. ►Final exam cram jam: We provide snacks, coloring supplies, & a quiet study/relaxing space during finals week. Weekly programs ►Feminist Book Club: (Spring meetings: Tuesdays 2-2:30PM) Discuss various books by, for, and about feminism/social justice or analyzing through a intersectional feminist lens. ►Spill The Tea: (Spring meetings: Thursdays 2-3PM) learn & discuss issues that you face as students from any identity. Tea/coffee & snacks are provided! ►Feminism & Food: (Spring meetings: Every other Friday 1-2PM) Join us for feminist roundtable discussion as we make and enjoy a meal from various cultures every other week. ►Feminism & Film: (Spring meetings: Fridays 4-5PM) discuss various pop culture media through an intersectional feminist lens.

## How do your activities benefit the University community?

Our group is one of only a few student organizations that focuses programming on gender and sexuality issues, bringing attention to causes, movements, and current events that affect women, transgender, and gender non-conforming individuals. We are also active participants in the wider community social justice movements, making our group ideal for students who wish to make change here on campus and also create partnerships with community groups. We strive to create a University community that is safe and welcoming for all people regardless of gender or sexuality.

**EXHIBIT H**

**How can someone get involved with your group?** *For example, do you have a consistent meeting time, location? Do they need to fill out a membership application? Who should they contact for more information?*
1) Visit us during our Hours of Operation: (M-F 11AM-6PM)We strive to create a safe space for women, transgender, and gender non-conforming individuals to study, hang out, or do activist work in our office space, but we are open to all genders. See our space guidelines in documents tab!!! 2) Attend collective meetings: (Spring meetings: See above) Our group is run by a collective that meets weekly to vote on what events to do for the semester, what organizations to support, what activist actions to take, etc. & is usually followed by a discussion about any topic those present decide on. You need only be a registered member via Gopherlink/email wsac@umn.edu to attend! 3) Attend weekly subgroups (see principle events section above) 4) Attend our other programming: ~Fwords: Our monthly informal discussion series where we explore other topics outside of our subgroups as they relate to feminism (i.e. mental illness, resisting trump, etc.) ~Final exam cram jam: We provide snacks, coloring supplies, & a quiet study/relaxing space during finals week. ~As well as the occasional other semester based events (e.g. craft nights, movie screenings, charity concerts, etc.) 5) Hold office hours/be an officer for FSAC: Help us keep our space open and safe to all visitors. You must be a registered member of FSAC via Gopherlink/email wsac@umn.edu. Training will be provided! Email us or message us here if interested. 6) Apply to be a part of the coordinator team for FSAC! In addition to our collective voting structure we also have a coordinator team that acts to advise the collective & manage the basic functions of

**EXHIBIT H**                                          11/21/2019

FSAC. We will be opening applications early
Spring semester for AY19-20.

**Student Group ID Number**
266

**Department** *(required only for Campus Life Programs)*
No Response

**Standing (view student group status levels here)**
Currently Registered until September 30, 2020

**Classification**
Registered Student Organization

**Constitution** *(for student groups only)*
266_Feminist_Student_Activist_Collective_030915.pdf

# Public Events

VIEW MORE EVENTS

There are currently no upcoming events. View past events.

# Officers

VIEW FULL ROSTER

# G

**OFFICE MANAGER**
Gretchen
Stahle

# News

### 2016 FSAC Meeting Dates: Poll

Tuesday, September 6, 2016
*Posted by Alaina DeSalvo for Feminist Student
Activist Collective*

Help decide when FSAC will meet this year!

# Documents

📄 Women's Buildings in 1890-1910                    ⬇

📄 FSAC safer space guidelines.pdf                    ⬇

📄 Feminist Student Activist Collective                ⬇

© Campus Labs 2019

Description – Email conversation between CFACT student officer Nathan Amundson with SUA administrator Jason Hancock regarding applying for student group office space in Coffman Union.

(Attachment is referenced in emails and is attached separately as - FY 18 space renewal process (1).pdf)

From: **Nathan Amundson** <amund360@umn.edu>
Date: Wed, Dec 14, 2016 at 6:57 PM
Subject: Second Floor Office Space
To: sao Student Activities Office <sao@umn.edu>

To Whom it may concern:

Several student groups to whom I belong are looking to apply for group-designated office space in Coffman Union. Is there an application for that available or anyone who would be able to assist me with that request?

If not, may I please receive in writing Coffman Memorial Union's policy on designating second-floor space to various student organizations and why any other group may not apply for annual group-designated office space?

Best,

--
Nathan L. Amundson
University of Minnesota

From: **Student Activities** <sao@umn.edu>
Date: Thu, Dec 15, 2016 at 2:13 PM
Subject: Fwd: Second Floor Office Space
To: Jason Hancock <hanco005@umn.edu>
Cc: Erik Dussault <dussa001@umn.edu>

Hi Jason,

Could you look into how we should move on with Nathan's question in regards to the second floor space?

Best,
Ken

Student Activities Assistant
Student Activities Office | sua.umn.edu
300 Washington Ave SE, Suite 126
University of Minnesota | umn.edu
sao@umn.edu | 612-626-6919

EXHIBIT I

From: "Jason Hancock" <hanco005@umn.edu>
Date: Dec 27, 2016 12:29 PM
Subject: Fwd: Second Floor Office Space
To: "Nathan Amundson" <amund360@umn.edu>
Cc: "Erik Dussault" <dussa001@umn.edu>

Nathan,
I was forwarded your email regarding student group office space from the Student
Activities Office.   There are currently no office spaces available in Coffman
Union. There is some multi-use space that is designed for all student groups in the north
and center sections of the 2nd floor of Coffman.  There are also some small rooms on
the 2nd floor that can be reserved for a short amount of time for group meetings for
event planning or other purposes.  The rooms can be reserved through the Student
Activities Office.

In terms of designating space to the various student organizations, here is a link to all of
the information on the history of the space allocation process and the changes to it that
occurred in 2013.  On the left side of the page, there are additional links, including a
FAQ page that may be helpful.

http://sua.umn.edu/board/space/allocation/

Also, last Spring semester, MSA began some discussions regarding the need for
student group office space on campus and may look to expand student group space in
some other facilities across campus. Erin Deal is the the Facilities and Transit
Committee Director for MSA for the upcoming year.  I'm not sure of their progress at this
point, but you may want to contact Erin at dealx036@umn.edu for an update on the
status.

Please let me know if you have any other questions. Thanks.
Jason

On Wed, Dec 28, 2016 at 5:47 PM, Nathan Amundson <amund360@umn.edu> wrote:

Dear Jason,

From my reading of the SSFC handbook, there is supposed to be a grievance procedure for the allocation of
student organization spaces.

From the SSFC handbook:
-----
Funding Support for Student Organization Office Space (as determined by the Student Services Fee Review
Task Force, 2012) Student organizations that are granted office space in the Student Unions & Activities

EXHIBIT I

facilities (by the SUA Space Allocation Process) may not be charged rent, Student Unions & Activities shall include the cost of the space assigned to registered student groups into their SSF operating budget request. Student Unions & Activities must establish and maintain a grievance procedure for student organizations in the event that a space allocation issue arises.
-----

You state that their are no office spaces available.  Can you show me the process for submitting a grievance that you must establish and maintain?

Sincerely,

Nathan


On Wed, Jan 25, 2017 at 3:11 PM, Jason Hancock <hanco005@umn.edu> wrote:

Nathan,
I apologize for the delay.  In looking into this further, my understanding of the fees grievance process you referenced was related to the change in not charging rent to student groups.  Given student groups did not have an option to withhold rent in lease disputes, the fees committee included a grievance process in their language.  There is no grievance process related to the allocation of space through the fees committee.

Also, in looking in the fees handbook for 2017-2018, it appears that the language regarding the fees grievance process has been removed.  I'm not involved in the fees process, but I suggest that you contact Sara Carvell at scarvell@umn.edu if you have any questions regarding the 2017-2018 process.

I hope this helps.  Thanks.
Jason


On Mon, Jan 30, 2017 at 6:29 PM, Nathan Amundson <amund360@umn.edu> wrote:

Hi Jason,

I would like to see the policy and learn what organization, board, or entity allocates space on Coffman's second floor.

It is extremely unclear online who manages the allocation of such space, whether applications for such space are accepted, and the policies regarding the retention of second-floor office space.

Best,


Nathan Amundson


EXHIBIT I

On Fri, Feb 3, 2017 at 2:11 PM, Nathan Amundson <amund360@umn.edu> wrote:

Hi Jason,

I haven't heard back from you yet. Do you have those policies I've asked for?

Best,

Nathan Amundson

From: **Jason Hancock** <hanco005@umn.edu>
Date: Fri, Feb 3, 2017 at 4:30 PM
Subject: Re: Fwd: Second Floor Office Space
To: Nathan Amundson <amund360@umn.edu>
Cc: Erik Dussault <dussa001@umn.edu>

Hi Nathan,
Sorry for the delay.  I've been tied up in meetings all week.  The space renewal process
is managed by the Student Unions & Activities Board of Governors. I've attached the
space renewal process document for FY18 that should provide the information you
need.  Please let me know if you have any further questions.  Thanks.
Jason

EXHIBIT I

FY18

# Student Group Space Renewal Process
## Philosophy

Space provided for student groups is based upon the principle of contribution to the life of the community and the student experience at the University of Minnesota. The goal of the space is to create an everlasting design that will strengthen community and it will be open to all students.

To be considered, renewal applications must be typed and submitted on time. The SUA BOG Policies Committee may proceed to make recommendations without consideration of those applications that are not typed or submitted on time.

## References

References in this procedure to various groups will be as follows:

- University: University of Minnesota
- SUA: Student Unions and Activities
- BOG: Board of Governors
- The Board: SUA Board of Governors
- Policy Committee: SUA BOG Policy Committee

## Preface Notes

Student group space is to be used as a supporting resource to the main activities of the group. If groups regularly need space for large group meetings or social events, they are to reserve other rooms in the Student Unions & Activities facilities through SUA Event and Conference services.

## General Criteria for Space Renewal

Student groups applying for space must be currently registered student groups with the Student Activities Office and have no outstanding financial dues or obligations to the Student Unions & Activities such as rent and room rentals, the Policies Committee will take into consideration the payment history of each group. Student groups should also have no outstanding financial obligations to the University of Minnesota. Student groups also agree to be in compliance with federal, state and municipal laws, as well as Student Unions & Activities' policies. All of these conditions must exist at the time of application and throughout the term of their lease. Furthermore, all members must be in compliance with the University of Minnesota Board of Regents Policy Student Conduct Code at all times. Individual members not in compliance may be denied access to space, facilities, and services of the Student Unions & Activities. Information on the conduct code can be found at:

http://www1.umn.edu/regents/policies/academic/Student_Conduct_Code.html.

Assignment of space to student groups will be decided based on the following:

1. History and Uniqueness within the campus and greater community
   a. This includes:
      i. How long a group has had a presence on campus
      ii. Why the group is unique to other groups on campus
      iii. How the group has shown appreciation for or involvement in the greater community, within or beyond the University of Minnesota.

2. Programs, services, and/or events provided by the student organization. The Policies Committee will consider each group's personal definition of utilization during the group's individual review.
   a. This includes:

EXHIBIT J

4. The group is in compliance with the Student Group Space Procedures and University of Minnesota Student Code of Conduct, and all other SUA policies, procedures, and regulations.
5. Vitality of the group
    a. This includes
        i. Active membership
            1. Active membership is defined as either sustained membership numbers, or members taking an active or involved role within the group.
6. Future planning
    a. This includes
        i. Goals for the upcoming lease period
        ii. Changes to the group (scope, size, leadership, purpose, etc) since the last review
        iii. Assisting groups with event planning and sponsorship
7. Mission of the group complements the mission of SUA and the U of M
8. Demonstrated student leadership with clearly defined roles and responsibilities. The BOG Policies Committee will consider each group's personal definition of roles and responsibilities during the group's individual review.
9. Advising support from Student Activities and clearly defined roles and responsibilities for advisors as needed
10. Commitment to student life and student experiences on campus
    a. This includes
        i. Collaboration with other groups to build community and continuity
            1. Sharing space
            2. Providing work and planning space for groups
        ii. Demonstrated commitment to diversity and appreciation of differences of students

EXHIBIT J

# Renewal Process and Procedures

The following requirements and procedures must be completed in order to gain or retain space in the union. Any violation of these rules shall be kept on file as they occur and may result in the loss of space and/or the loss of space in subsequent space allocation decisions.

I.   **REQUIREMENTS FOR GROUPS WITH SPACE**

    A.    Groups applying for space must be registered student groups recognized by the Student Activities Office.
    B.    SUA Space will not be used by non-student staff on a permanent basis.
    C.    Upon allocation of space, groups must sign a lease.
    D.    Groups must be in compliance with federal, state, municipal, and tax laws, as well as University of Minnesota and Student Unions and Activities policies and procedures, throughout the application process and during their tenancy.

II.   **PROCESS FOR SPACE REVIEW**

Groups will be required to make a presentation to SUA BOG Policies Committee based on the criteria listed above.  The presentations will take place in the group's current space and can follow any format the group chooses as long as it addresses the criteria above.  Time and date for the presentation will be scheduled by SUA BOG Policies Chair.

III.   **STATUS OF STUDENT GROUP FOLLOWING THE REVIEW**

Upon completion of the review process, BOG Policies Committee will place each group into one of the following three categories and will make recommendations regarding space assignments to the BOG. Groups will be granted 'green' status until decided otherwise. No recommendation to reduce the status of a student group from 'green' to 'yellow' or from 'yellow' to 'red' may occur without a minimum two-thirds majority Such recommendation must have  explicit explanation of clear insufficiency according to the criteria stated above.

    A.    Green
        1.    This status indicates that the student group is meeting the criteria and is in good standing regarding space
        2.    The BOG may make suggestions to the group regarding changes, but the group is recognized as in good standing
        3.    Groups in this standing will present to the BOG Policies Committee on an every other year basis

    B.    Yellow
        1.    This status indicates that the group is not meeting the minimum criteria for maintaining their space
        2.    Groups in this status are reviewed by the BOG Policies Committee on the year mark since being placed on this status to provide updates on steps the group has taken to address the issues
        3.    At the scheduled 2 year review, the group may move to Green status if they have demonstrated improvement.  If demonstrated improvement is not shown, they will move to Red status
    C.    Red
        1.    Groups are intended to vacate their space upon the expiration of their existing lease
        2.    Groups that are removed from their space may re-apply as part of the open process

IV.   **VACATED SPACE**

In the event that any space is vacated, the BOG will implement an application process to assign the space to another group.  The process will be determined by the BOG.

EXHIBIT J

V.      **TERMS OF LEASE**

A lease runs from September 1 to August 31 unless a group becomes a tenant after the regular allocation process. If this happens, the lease will begin at the time of occupancy and end on June 30th.

VI.     **FINAL WORD**

This policy supersedes any previous policies adopted by the SUA Board of Governors and is subject to modifications by that body. In that event, reasonable attempts will be made to give notice to those groups affected. It is hoped that applicants will acknowledge the extent of facilities provided and the inherent obstacle of allocating a finite number of spaces to an ever-increasing pool of applicants.

EXHIBIT J