UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| VIEWPOINT NEUTRALITY NOW!, EVAN SMITH, and ISAAC SMITH, | Case No. 20-CV-1055 (PJS/TNL) |
| Plaintiffs, | |
| v. | ORDER |
| REGENTS OF THE UNIVERSITY OF MINNESOTA; KENDALL J. POWELL, Chair; STEVEN A. SVIGGUM, Vice Chair; THOMAS J. ANDERSON; RICHARD B. BEESON; MARY A. DAVENPORT; KAO LY ILEAN HER; MICHAEL D. HSU; MIKE O. KENYANYA; JANIE S. MAYERON; DAVID J. MCMILLAN; DARRIN M. ROSHA; and RANDY R. SIMONSON, in their respective official capacities or their successors; JOAN T.A. GABEL, President of the University of Minnesota, in her respective official capacity or her successor; and MAGGIE TOWLE, Interim Vice Provost For Student Affairs and Dean of Students, in her respective official capacity or her successor, | |
| Defendants. | |

Erick G. Kaardal, MOHRMAN, KAARDAL & ERICKSON, P.A., for plaintiffs.

Carrie Ryan Gallia, UNIVERSITY OF MINNESOTA OFFICE OF THE GENERAL COUNSEL, for defendants.

The University of Minnesota collects a mandatory student-services fee each

semester at its Twin Cities campus.  The fee is used to fund registered student

organizations ("RSOs"), media groups, and administrative units; support student health

and wellness services; and subsidize the student union, known as the Coffman

Memorial Union ("Coffman").

Plaintiffs Evan Smith and Isaac Smith are students at the University[1] who have

paid this mandatory fee.  The Smiths, along with plaintiff Viewpoint Neutrality Now!

(an unregistered[2] student organization), bring this lawsuit to challenge the manner in

which the University distributes the fee.  Plaintiffs argue that the process used by the

University is not viewpoint neutral and therefore violates the First Amendment.

Plaintiffs seek injunctive and declaratory relief against a number of defendants,

including the Board of Regents of the University of Minnesota ("Board of Regents"), the

individual members of the Board of Regents, the President of the University, and the

Interim Vice Provost for Student Affairs/Dean of Students ("VPSA/DoS") (collectively,

the "University").  This matter is before the Court on the University's motion to dismiss.

For the reasons that follow, the Court grants the motion in part and denies it in part.

---

[1]Both Evan and Isaac are enrolled at the Twin Cities campus.  Although the complaint pleads facts about other campuses, plaintiffs have clarified that the Twin Cities campus is "the campus at issue in this case."  Pls.' Mem. Opp. Mot. Dismiss 26. Accordingly, the Court limits its analysis to the Twin Cities campus.

[2]As an unregistered group, Viewpoint Neutrality Now! has never applied for or received any funding from the University.  Compl. ¶ 5.

# I.  BACKGROUND

## A.  The Student-Services Fee

Each semester, the University collects a mandatory[3] student-services fee of approximately $443.00 from every student enrolled in six or more credits.[4]  Compl. ¶ 43; Compl. Ex. C, at 1.  The fee "funds non-instructional programs and activities; supplements the academic curriculum; and is an integral part of the University's educational experience."  Compl. Ex. C, at 1.  The fee is divided into three parts:  a $411.50 Student Life, Health, and Wellbeing Fee; an $18.91 Student Activity Fee; and a $12.59 Media Fee.  Compl. ¶ 43.  A total of about $36,000,000 is collected each year.  *Id.* ¶ 40.

The Board of Regents has adopted a broad policy governing the distribution of the fee.  That policy has four overarching principles:  (1) "Fee-supported programs, activities and services shall be available to all students assessed the fee"; (2) the fee is developed in recognition of the total cost of tuition; (3) "The University's educational mission is well served when students have the means to engage in dynamic discussions of diverse topics in their extracurricular campus life"; and (4) "Decisions regarding the

---

[3]Non-degree seeking students, post-secondary education option students, concurrent high-school students, not-designated students, and other students approved by the president or her delegate are exempt from the fee.  Compl. Ex. C, at 2.

[4]Students enrolled in three or more credits during the summer session are also charged the fee.  Compl. Ex. C, at 1.

allocation of fees among student groups shall be made in a viewpoint-neutral manner."[5]

Compl. Ex. C, at 1–2.

The broad policy adopted by the Board of Regents is implemented through three handbooks that provide specific rules governing the allocation of the student-services fee:  the Student Services Fee Request Handbook For Media Groups ("media-groups handbook"), the Student Services Fee Request Handbook for [Registered] Student Organizations ("RSO handbook"), and the Student Services Fee Request Handbook for Administrative Units ("administrative-units handbook").[6]  Compl. Exs. D, E, F.  The Student Services Fee Committee ("SSFC") is tasked with distributing the student-services fee in a manner that is consistent with the handbooks.  The SSFC is itself composed of two committees:  (1) the administrative-units and media-groups committee and (2) the student-groups committee.  Each committee is composed of students, faculty, and administrators.  Compl. Ex. D, at 5–6.

Although there are differences in the funding-application processes for media groups, RSOs, and administrative units, the processes have a number of similarities.  In

---

[5]The University revamped its process for distributing student-services fees after the Supreme Court issued its decision in *Board of Regents of the University of Wisconsin System v. Southworth*, 529 U.S. 217 (2000); the University's goal was to comply with the decision's viewpoint-neutrality requirement.  *See* Compl. Ex. B.

[6]Citations to all exhibits, including the three handbooks, use the internal page numbers of the documents.

-4-

order for any group to apply for funding, the group must meet 15 "minimum

requirements,"[7] two of which are challenged by plaintiffs in this litigation:  First, the

financial-documents requirement provides that the "group must be able to provide

financial documentation . . . for the 12 (consecutive) months prior to applying."  *Id.*

at 10.  And second, the partisan-political-organizations requirement provides that:

> Partisan political organizations are not eligible for the
> general student services fee funding.  "Partisan political
> organizations" are organizations affiliated with a registered
> political party or candidates for election which are formed
> for the purpose of supporting a political party or candidate
> for election.  Such groups may seek funding for their
> nonpartisan political activities . . . through other University
> grant and student funding programs.

---

[7]The applicant must:  (1) be an administrative unit, RSO, or campus-life program registered and in good standing with Student Unions and Activities; (2) not receive pass-through funding from special-assessment groups; (3) provide financial documents for the 12 consecutive months prior to applying; (4) comply with Student Activities Financial Policies for RSOs (if it is an RSO); (5) complete the Student Services Fee Canvas Course; (6) complete the Financial Management Workshop; (7) operate as a non-profit; (8) not be a partisan political organization; (9) have students participate in applying for and spending fees; (10) demonstrate expenditures in compliance with the budget; (11) make all budgets and financial records available upon request; (12) meet audit requirements; (13) comply with the University's Equal Opportunity Statement; (14) adhere to approved accounting procedures; and (15) indicate "SSF Funded" on all marketing for events funded with SSF funds.  Compl. Ex. D, at 10.  The record includes the 2019–2020 versions of the media-groups and administrative-units handbooks, and the 2020–2021 version of the RSO handbook.  The RSO handbook has 14 requirements; it omits the requirement to complete the Financial Management Workshop.  Compl. Ex. E, at 12–13.

*Id.* If a group meets the minimum requirements, the SSFC will consider its application, provided that the application meets eight more criteria. *Id.* at 11.[8] (The University does not lack for rules.)

After submitting an application for funding, each media group, RSO, and administrative unit is required to make a public presentation to its respective fee committee. During that presentation, each applicant justifies its funding request and answers questions. In addition, each of the two committees holds a public forum at which any member of the University community may provide input and ask questions. *Id.* at 9. Following the public forums, the two fee committees publicly deliberate on the applications. Every SSFC meeting is open to the public, and members deliberate pursuant to parliamentary rules. *Id.* at 8–9.

The SSFC "is charged with making responsible, viewpoint-neutral recommendations for awarding fee funding to administrative units, student groups, and media groups." *Id.* at 11. The SSFC is required to consider 13 factors[9] when

---

[8]An applicant must: (1) request a minimum of $2,000 for programming or a minimum of $1,000 per year for operations; (2) comply with accountability procedures; (3) provide requested documentation within five business days; (4) accurately complete standardized request forms; (5) consider operating its own bank account; (6) present requests to the SSFC; (7) comply with deadlines; and (8) submit original application documents. Compl. Ex. D, at 11. The RSO handbook includes a ninth criteria: describe advertising plans in the request. Compl. Ex. E, at 13.

[9]The factors are: (1) contributions to the student body, academic curriculum, or
(continued...)

evaluating an application, such as the group's contributions to the student body, the

quality and quantity of the group's events, and the group's justification for its request.

*Id.* at 11–12.  Compliance with all 13 factors does not, however, guarantee funding.  *Id.*

After evaluating the applications, the SSFC makes funding recommendations to the

VPSA/DoS.  The SSFC will also describe the reasoning behind the recommendations,

summarize any dissenting views, and provide advice for next year's committee.  *Id.* at 8.

All SSFC records are publicly available.  *Id.* at 9.

   After receiving recommendations from the SSFC, the VPSA/DoS accepts or

rejects the recommendations and then forwards her decision to the Executive Vice

President and Provost, so that the funding approved by the VPSA/DoS can be included

in the University's proposed annual budget.  The Board of Regents gives final approval

to the University's annual budget.  *Id.* at 6.

_____

   [9](...continued)
community; (2) quality and quantity of events and services provided to students;
(3) extent of and demand for events and services provided; (4) breadth of services to
students across academic departments or academic units; (5) targeting of events to the
largest number of students consistent with need; (6) demonstration of benefits to
students who do not participate in events; (7) efforts to secure funding in addition to the
student-services fee; (8) demonstration of financial need that cannot be fulfilled with
alternative funds; (9) justification of the fee request, including any financial reserves;
(10) compliance with accountability procedures; (11) ability to manage the amount of
requested funds; (12) written justification of a large deviation from the prior year's
proposed budget; and (13) previous access to funding does not guarantee future
funding.  Compl. Ex. D, at 11–12.  The RSO handbook replaces the sixth criteria with the
requirement that events and services be open to all fee-paying students.  Compl. Ex. E,
at 14.

In addition to these general rules, each of the three handbooks includes rules and procedures that apply only to the group that is the subject of the particular handbook:

### 1. Media Groups

Student media groups are funded through the Media Fee. Compl. ¶ 43. To apply for funding, a media group must meet four requirements: First, the group's "mission" must be "to provide a media-related service (not exclusive to social media) to campus." Second, the group must be registered and in good standing. Third, the group must meet the 15 minimum requirements (described above) that apply to any group that seeks student-services-fee funding. And fourth, the group must "[g]ain approval from the VPSA/DoS (or designee) to apply for SSF funds as a Media Group." Compl. Ex. D, at 15. The VPSA/DoS has "exclusive authority to determine which applicants may apply" for funding. *Id.* There is no appeal from the VPSA/DoS's decision.

After receiving approval from the VPSA/DoS and attending an information session, a media group may apply for funds. The group can request any amount for operational[10] costs and up to $30,000[11] for event or project[12] costs. *Id.* at 17; Compl. ¶ 53.

---

[10]Operational costs include expenditures on such things as equipment, space, utilities, stipends, and supplies. Compl. Ex. D, at 16.

[11]Plaintiffs allege that there is no cap on event or project funds. Plaintiffs are incorrect; the media-groups handbook provides a cap of $30,000. Compl. Ex. D, at 17.

[12]Project costs include expenditures on such things as space rental, speaker fees,
(continued...)

Following submission of the media group's application, the group's public

presentation, and the public forum, the administrative-units and media-groups

committee publicly deliberates and then posts its recommendations online.  Compl.

Ex. D, at 3, 18–19.  A second public forum is held following the posting of the

recommendations to collect feedback from the University community.  *Id.* at 19.

Finally, an appeals process is available to the group and any fee-paying student.

*Id.* at 20.  There are three grounds for appeal:  (1) the SSFC violated its own rules; (2) the

SSFC exhibited bias against the group; and (3) the SSFC did not make a viewpoint-

neutral decision.  *Id.*  The VPSA/DoS reviews the appeal and determines whether a

formal hearing is required; if she decides to convene a formal hearing, the appellant, the

VPSA/DoS, and the chair of the administrative-units and media-groups committee will

participate in that hearing.  *Id.*  The appeal is then decided by the VPSA/DoS.  *Id.* at 21.

## 2.  RSOs

RSOs are funded through the Student Activity Fee.  An RSO that meets the

minimum requirements (discussed above) may apply for up to $30,000 per academic

year for event- or project-related costs and up to $25,000 for operational costs.  Compl.

Ex. E, at 17, 21–23.  Following submission of the RSO's application, the group's public

presentation, and the public forum, the student-groups committee publicly deliberates

---

[12](...continued)
and advertising.  Compl. Ex. D, at 16.

and then posts its recommendations online.  *Id.* at 23–24.  Feedback is collected from the University community a second time after the process is completed.  *Id.* at 24.

An RSO or any student who paid the student-services fee may appeal.  *Id.*  An appeal must be based on one of three grounds:  (1) the SSFC violated its own rules; (2) the SSFC exhibited bias against the RSO; or (3) the SSFC did not make a decision in a viewpoint-neutral manner.  *Id.*  The Appeals Committee reviews the forms submitted by the appealing party and recommends to the VPSA/DoS whether or not to schedule a formal hearing.  If the VPSA/DoS does schedule a hearing, the appellant, the chair of the SSFC, and the members of the Appeals Committee will participate in that hearing. Following the hearing, the Appeals Committee makes a recommendation to the VPSA/DoS regarding the disposition of the appeal and the VPSA/DoS makes the final decision.  *Id.* at 25.

### 3.  Administrative Units

Administrative units are funded through the Student Life, Health, and Wellbeing Fee.  Compl. ¶ 43.  Administrative units are "non-academic units whose mission is to provide programming, services and facilities to support students and enhance their experience while at the University."  Compl. Ex. F, at 14.[13]  Generally speaking, an

---

[13]There are currently eight administrative units:  The Aurora Center for Education and Advocacy, Boynton Health Services, University Recreation and Wellness, the Student Conflict Resolution Center, the Student Parent Help Center,

(continued...)

administrative unit that wishes to apply for funding must meet this definition, have a

student advisory board, get approval from the Dean or Department Head, and gain

approval from the VPSA/DoS.  *Id.*  After the applicants make public presentations and

the committee holds a public forum, the SSFC will publicly deliberate and make

recommendations to the VPSA/DoS.  The VPSA/DoS makes the final funding decisions;

there is no right to appeal.  *Id.* at 15–16.  A second public forum is held after the process

is complete to gain feedback from the University community.  *Id.* at 16.

### B.  *Coffman Memorial Union*

The Student Life, Health, and Wellbeing Fee is also used to subsidize the

Coffman Memorial Union, which is the campus's "prestigious, centrally-located"

student union.  Compl. ¶¶ 43, 62, 69.  The building has nine student lounges, which are

occupied by nine RSOs that have been permanently designated by the University as

Coffman Memorial Union Student Cultural Centers ("cultural centers"):  the Black

Student Union, La Raza Student Cultural Center, Disabled Student Cultural Center,

Feminist Student Activist Collective, Queer Student Cultural Center, Asian-American

Student Union, Minnesota International Student Association, American Indian Student

---

[13](...continued)
Student Services Fee Administration, Student Unions and Activities, and University
Student Legal Service.  Compl. Ex. F, at 14.

Cultural Center, and Al-Madinah Cultural Center.[14]  *Id.* ¶¶ 66, 72.  The University

assigned the lounges to the nine cultural centers after Coffman was renovated in the

early 2000s, without any type of application or appeal process.[15]  *Id.* ¶¶ 125, 152, 198.

The cultural centers are run by students and are independent from the University.  *Id.*

¶ 132.  All of the cultural centers engage in expressive activities.  *Id.* ¶ 133.

Every year, each of the nine cultural centers must apply to renew its lease.

Compl. Exs. I, J.  The Space Renewal Policy governs the application process.  In order to

apply, a cultural center must be registered with the Student Activities Office; have no

outstanding financial obligations; and comply with federal, state, and municipal laws,

Student Unions and Activities' policies, and the Board of Regents' Policy Student

Conduct Code.  Compl. Ex. J.  If these minimum requirements are met, Student Unions

---

[14]The University also provides a lounge for commuter students and office space for the student government in Coffman.  Compl. ¶¶ 100, 163.

[15]It appears that the cultural centers occupied the lounges before the renovation and were "grandfathered" into the remodeled lounges by the University.  Compl. ¶ 152.

and Activities decides whether to renew the cultural center's lease using ten criteria.[16]
*Id.*

The vast majority of RSOs are not assigned a lounge in Coffman.  Those RSOs
can lease off-campus space (which is costly) or reserve classrooms for temporary use (at
no cost).  Compl. ¶¶ 73–75.  In contrast, the cultural centers are able to occupy their
lounges—which have a prime location in the heart of campus—without paying rent,
even though each lease is valued at $30,000 per year.  *Id.* ¶ 97.  In addition, the cultural
centers are featured on the University's website, which provides them with free
promotion that is unavailable to other RSOs.  *Id.* ¶¶ 70, 78; Compl. Ex. G.

## II.  ANALYSIS

### A.  Standard of Review

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must
"state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content

---

[16]The third of the ten factors does not appear in the record.  The others are:
(1) history and uniqueness of the group, including the length of its presence on campus,
uniqueness compared to other groups, and involvement with the greater community;
(2) the group's programs, services, and events; (4) compliance with procedures and
regulations; (5) vitality; (6) future planning, goals for the lease period, and changes to
the group's size, scope, leadership, and purpose since the last review; (7) the group's
mission and how it complements the mission of the University; (8) the group's
demonstrated student leadership; (9) advising support from Student Activities; and
(10) commitment to student life and student experiences, including by collaborating
with other groups and demonstrating a commitment to diversity.  Compl. Ex. J.

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  In assessing the sufficiency of the complaint, the Court need not consider legal conclusions that are couched as factual allegations. *Iqbal*, 556 U.S. at 678–79.  The Court must, however, accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiffs' favor. *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012).

Ordinarily, if the parties present, and a court considers, matters outside of the pleadings, the motion to dismiss must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d).  But a court may consider materials that are necessarily embraced by the complaint, as well as any exhibits attached to the complaint, without converting the motion into one for summary judgment. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).  In this case, the Court considers the policies, handbooks, emails, and website images that were attached to the complaint, as well as a settlement agreement that was referred to in ¶ 173 of the complaint and later submitted by the University.[17]

_____

[17]Since plaintiffs relied on the agreement in the complaint but did not provide a copy, the University "is free to do so." *BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 688 (8th Cir. 2003).

-14-

One final issue regarding the standard of review:  Plaintiffs make the rather startling argument that, under *Johnson v. City of Shelby*, 574 U.S. 10 (2014), a court may not "dismiss [a] complaint based on incorrect legal theories."  Pls.' Mem. Opp. Mot. Dismiss 29.  If plaintiffs were correct, thousands of judges have misapplied Rule 12(b)(6) in hundreds of thousands of cases over the last 80-plus years.  Fortunately, however, plaintiffs are not correct.

In *City of Shelby*, a group of police officers sued a municipality, alleging that the municipality had violated their rights under the Fourteenth Amendment by firing them without due process.  The lower courts had dismissed the complaint because the plaintiffs did not expressly invoke 42 U.S.C. § 1983.  The Supreme Court reversed, holding that "no heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim." 574 U.S. at 11.  After noting *Iqbal*'s and *Twombly*'s requirement that "[a] plaintiff . . . must plead facts sufficient to show that her claim has substantive plausibility," the Supreme Court concluded that "[h]aving informed the city of the factual basis for their complaint, [plaintiffs] were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim."  *Id.* at 12.

Plaintiffs read this last sentence literally (and out of context) to mean that, as long as a plaintiff pleads *some* facts (i.e., "the factual basis for the[] complaint"), the plaintiff's complaint cannot be dismissed under Rule 12(b)(6).  That is obviously not the law.

First, it is clear that, to stave off dismissal, a plaintiff must identify the legal right that he alleges was violated (e.g., a violation of the Free Speech Clause of the First Amendment or a violation of a particular section of the Fair Credit Reporting Act).  The Supreme Court has consistently held that a complaint must "'give the defendant fair notice'" *both* "'of what the . . . claim is'" *and* of "'the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint could not give fair notice of "what the claim is" without identifying the legal wrong allegedly committed by the defendant.  In *City of Shelby*, for example, the plaintiffs clearly alleged that they were fired without procedural due process in violation of the Fourteenth Amendment.

Second, it is also clear that a court may indeed "dismiss [a] complaint based on incorrect legal theories."  Pls.' Mem. Opp. Mot. Dismiss 29.  As the Supreme Court has explained,

> Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).  This procedure, operating on the assumption that the factual allegations in the complaint are true, streamlines litigation by dispensing with needless discovery and

> factfinding.  Nothing in Rule 12(b)(6) confines its sweep to
> claims of law which are obviously insupportable.  On the
> contrary, if as a matter of law "it is clear that no relief could
> be granted under any set of facts that could be proved
> consistent with the allegations," *Hishon, supra*, 467 U.S., at 73,
> a claim must be dismissed, without regard to whether it is
> based on an outlandish legal theory or on a close but
> ultimately unavailing one.

*Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).[18]

Without doubt, then, a claim may be dismissed if it is "based on an . . . unavailing [legal theory]."  *Id.* at 327.  If, for example, the plaintiffs in *City of Shelby* had asserted their due-process claim against a private actor instead of a municipality, their complaint could have been dismissed under Rule 12(b)(6) because the Fourteenth Amendment does not apply to private actors.  *See Rendell-Baker v. Kohn*, 457 U.S. 830, 837 (1982) ("[T]he Fourteenth Amendment, which . . . guarantees due process, applies to acts of the states, not to acts of private persons or entities.").  This is true even if the plaintiffs had "informed the city of the factual basis for their complaint."  *City of Shelby*, 574 U.S. at 12.  *City of Shelby* was not a case about the *correctness* of a legal theory pleaded in a complaint; it was a case about the *specificity* with which a legal theory must be pleaded.

---

[18]The "any set of facts" standard of *Conley v. Gibson* was, of course, superseded by the "plausibility" standard of *Twombly* and *Iqbal*.

In sum, a complaint may fail to state a claim—and thus be dismissed under Rule 12(b)(6)—*either* because the factual allegations are insufficient *or* because the claim is based on an "unavailing" legal theory. *Neitzke*, 490 U.S. at 327.  With that in mind, the Court now turns to plaintiffs' claims.

### B.  Claims Against the Board of Regents

As an initial matter, the Court dismisses all claims against the entity identified in the complaint as the "Regents of the University of Minnesota."  The Board of Regents *is* the University; they are analytically the same.  *See* 1851 Minn. Terr. Laws ch. 28, § 7 (providing that the Regents form a "body corporate" with the right to sue and be sued).  Neither the Board nor the University is a "person" that can be sued under 42 U.S.C. § 1983.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989) ("[A] State is not a person within the meaning of § 1983."); *Raymond v. Bd. of Regents of Univ. of Minn.*, 140 F. Supp. 3d 807, 813 (D. Minn. 2015) (finding the University of Minnesota is not a "person" subject to suit under § 1983); *cf. Prostrollo v. Univ. of S.D.*, 507 F.2d 775, 777 n.1 (8th Cir. 1974) ("[T]he University of South Dakota and the corporate body constituting the Board of Regents, both political subdivisions of the state, may not be sued under the Civil Rights Act since neither entity constitutes a 'person' within the meaning of § 1983.").  And both the Board and the University are immune from suit under the Eleventh Amendment.  *See Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996)

("[T]he University of Minnesota is an instrumentality of the state and entitled to share in the state's Eleventh Amendment immunity."); *Walstad v. Univ. of Minn. Hosps.*, 442 F.2d 634, 641 (8th Cir. 1971) ("Article VIII, § 3 of the Minnesota Constitution . . . expressly reserves all immunities to the University.").

That said, the Court notes that its dismissal of the Board of Regents is of no practical consequence. Plaintiffs have sued every individual member of the Board of Regents in his or her official capacity, and thus, if plaintiffs establish that their rights have been violated, the Court will be able to award the injunctive and declaratory relief that plaintiffs seek.

### C.  Facial Challenge

The Court now turns to plaintiffs' First Amendment claims. Plaintiffs bring a facial, rather than an as-applied, challenge to the University's policies, and as a result face an uphill battle. Compl. ¶ 241; *see Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) ("Facial invalidation 'is, manifestly, strong medicine' that 'has been employed by the Court sparingly and only as a last resort.'" (citation omitted)). Facial challenges are disfavored because "they 'often rest on speculation' and 'raise the risk of premature interpretation of statutes on the basis of factually barebones records.'" *Roach v. Stouffer*, 560 F.3d 860, 869 n.5 (8th Cir. 2009) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Indeed, "[n]either the Supreme Court nor

-19-

[the Eighth Circuit] has ever applied a stringent, facial standard of judicial oversight to

the discretionary decisions of school officials administering a nonpublic[19] educational

forum." *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640

F.3d 329, 337 (8th Cir. 2011).  Plaintiffs can prevail on their facial challenge only if they

show "'that application of the provision will lead to the suppression of speech.'"  *Id.*

(quoting *Finley*, 524 U.S. at 580).

### D.  The Southworth Framework

The framework under which this Court must analyze plaintiffs' First

Amendment claims was established in *Board of Regents of the University of Wisconsin*

*System v. Southworth*, 529 U.S. 217 (2000).  In *Southworth*, the Supreme Court considered

a First Amendment challenge to the distribution of the allocable[20] portion of the

mandatory student-activities fee assessed by the University of Wisconsin ("UW").  At

UW, the funds collected through the student-activities fee were distributed to RSOs

through three processes:  (1) the Student Government Activity Fund, which was

_____

[19]The Supreme Court uses the terms "nonpublic forum" and "limited public forum" interchangeably.  Both refer to situations in which the government has created a forum for expressive activity but limited that forum to certain speakers or certain topics or in some other respect.  *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 334 (8th Cir. 2011).

[20]RSOs received the allocable portion.  The non-allocable portion was split among student health services, intramural sports, debt service, and the student union.  The plaintiffs only challenged the allocable portion.  *Southworth*, 529 U.S. at 223.

administered by the student government; (2) the General Student Services Fund, which was administered by the student government's finance committee; and (3) a referendum in which the student body voted to approve or disapprove funding for a particular RSO (the student government "voluntarily" treated the result of a referendum as "binding"). *Id.* at 223–25.

*Southworth* established three principles that are relevant to this litigation:

First, *Southworth* held that the speech that is funded through a student-services fee is student speech (i.e., private speech), not the university's own speech (i.e., government speech). This is true not because of the source of the funds, but because of the use that the university makes of the funds—specifically, the university's use of the funds to create a limited public forum to facilitate student expression.[21] Because the

---

[21]Plaintiffs disagree. Plaintiffs argue that the applicability of the *Southworth* framework depends on the *source* of money that the University spends. Pls.' Mem. Opp. Mot. Dismiss 31–32. Specifically, plaintiffs argue that the viewpoint-neutrality analysis applies to distributions of student-services fees, while the government-speech doctrine applies to distributions of non-student-services fees. This argument rests on the first part of a single sentence of dicta in *Southworth*: "If the challenged speech here were financed by tuition dollars and the University and its officials were responsible for its content, the case might be evaluated on the premise that the government itself is the speaker." 529 U.S. at 229. The source of funds is never again mentioned in *Southworth*.

The distinction urged by the plaintiffs does not make sense. *See* Randall P. Bezanson & William G. Buss, *The Many Faces of Government Speech*, 86 Iowa L. Rev. 1377, 1428–30 (2001) (noting that the distinction between tuition and student-services fees is "evanescent at best and is not explained at all by the Court's opinion"). Why should a university's use of mandatory student-services fees to fund the speech of an RSO be

(continued...)

speech that is being funded is the private speech of students (and not the university's

own speech), the University is not sheltered by the government-speech doctrine, *id*.

at 234–35, which exempts government speech from First Amendment scrutiny and

allows the government "to say what it wishes," *Rosenberger v. Rector & Visitors of Univ.*

*of Va.*, 515 U.S. 819, 833 (1995).

Second, *Southworth* found that the fund created by the collection of the student-

services fee at UW was a limited public forum, much as *Rosenberger* found that the

University of Virginia's Student Activities Fund was a "metaphysical" limited public

---

[21](...continued)

subject to viewpoint-neutrality analysis, while a university's use of mandatory tuition
dollars collected from the very same students to fund the very same speech of the very
same RSO be subject to the government-speech doctrine?  Plaintiffs have no answer.

   Given that the source-of-funds distinction does not make sense, and given that it
is mentioned only fleetingly and in dicta in *Southworth*, the Court concludes that it is the
*use* of the funds, not the *source* of the funds, that determines the nature of the
constitutional inquiry.  The *Southworth* Court itself emphasized that the speech at issue
was student speech because the University did not control the speech and did not use it
"to promote its own policies."  529 U.S. at 235.  Cases applying the government-speech
doctrine likewise focus on whether the government controls the message.  *See, e.g.*,
*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213, 216 (2015); *Pleasant
Grove City v. Summum*, 555 U.S. 460, 468 (2009) ("A government entity may exercise this
same freedom to express its views when it receives assistance from private sources for
the purpose of delivering a government-controlled message.").

   The Court therefore concludes that if a university uses funds (regardless of their
source) to *speak* (that is, communicate its *own* message), the government-speech doctrine
applies.  But if a university uses funds to promote the speech of *others*—here,
students—the viewpoint-neutrality analysis applies.

-22-

forum. *See Southworth*, 529 U.S. at 234; *Rosenberger*, 515 U.S. at 830. As a result, a

university may constitutionally limit the funding to particular subjects or speakers. *See*

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S.

661, 679 n.11 (2010) ("[G]overnmental entities establish limited public forums by

opening property 'limited to use by certain groups or dedicated solely to the discussion

of certain subjects.'" (citation omitted)); *Rosenberger*, 515 U.S. at 829.

Third, *Southworth* made clear that, although a university can require students to

fund the speech of their fellow students through mandatory fees—and although a

university can limit the access of students to those funds—the university may do so

only if "certain safeguards" are in place. *Southworth*, 529 U.S. at 229. In particular, there

must be "viewpoint neutrality in the allocation of funding support." *Id.* at 233.

The *Southworth* Court set up an analytical framework, but did not apply it,

because the parties had stipulated that the processes for distributing the fees through

the Student Government Activity Fund and the General Student Services Fund were

viewpoint neutral. As a result, the *Southworth* Court provided little guidance about

how courts should apply the viewpoint-neutrality requirement, save for suggesting that

UW's student-referendum process might provide inadequate protection for viewpoint

neutrality. *Id.* at 235. Fortunately, though, other decisions of the Supreme Court—and

decisions of the lower federal courts—have fleshed out the viewpoint-neutrality

requirement.

### 1. Viewpoint Neutrality

A limited public forum is *limited*—and thus it follows that the government may

confine the forum "to the limited and legitimate purposes for which it was created."

*Rosenberger*, 515 U.S. at 829.  In placing limits on the forum, the government cannot

engage in viewpoint discrimination, but it can engage in content discrimination to

preserve "the purposes of that limited forum."  *Id.* at 829–30.  The difference between

viewpoint discrimination and content discrimination is, at times, "'slippery.'"  *Iancu v.*

*Brunetti*, 139 S. Ct. 2294, 2313 (2019) (Sotomayor, J., concurring in part).  "Content

discrimination occurs whenever a government regulates 'particular speech because of

the topic discussed or the idea or message expressed.'"  *Id.* (quoting *Reed v. Town of*

*Gilbert*, 576 U.S. 155, 163 (2015)).  Viewpoint discrimination occurs whenever a

government targets "particular views taken by speakers on a subject."  *Rosenberger*, 515

U.S. at 829.  At its core, then, viewpoint discrimination is "an egregious form of content

discrimination."  *Id.*

Hence, once a university chooses to create a limited public forum and restrict it

to a particular type of speaker (e.g., RSOs) or a particular subject (e.g., abortion), the

university cannot then exclude speakers based on their ideology (e.g., conservative or

liberal) or based on their viewpoint (e.g., pro-life or pro-choice).  For example, a university would engage in viewpoint discrimination if it allowed "a group of Republicans or Presbyterians to [speak on campus] while denying Democrats or Mormons the same privilege."  *Widmar v. Vincent*, 454 U.S. 263, 281 (1981) (Stevens, J., concurring); *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) (school's denial of after-school meeting space to club that wanted to discuss permissible topics, like child rearing, from a religious perspective was not viewpoint neutral); *Rosenberger*, 515 U.S. at 837 (university's refusal to pay printing fees for student newspaper publishing on permissible topics from a religious perspective was viewpoint discriminatory); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) (school's denial of after-school meeting space to church to screen films with religious views on permissible topics, like family values, violated viewpoint neutrality).

In the context of funding RSOs through mandatory student-services fees, viewpoint neutrality requires that funding decisions be unrelated to an RSO's ideology or views about specific issues.  And to ensure viewpoint neutrality, courts have invalidated aspects of the disbursement process that are facially neutral but could result in viewpoint discrimination.  For example, courts have invalidated advisory student referenda, *Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 103–04 (2d Cir. 2007); giving long-established RSOs an advantage over new RSOs, *Southworth v.*

*Bd. of Regents of Univ. of Wis. Sys.* ("*Southworth II*"), 307 F.3d 566, 594 (7th Cir. 2002); and a requirement to consider an RSO's history and need to return to campus, *Apodaca v. White*, 401 F. Supp. 3d 1040, 1056 (S.D. Cal. 2019).

2.   Reasonableness

In addition to being viewpoint neutral, a restriction on access to a limited public forum must be "reasonable in light of the purpose served by the forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).  When reviewing the reasonableness of a restriction on an educational limited public forum, courts should consider "(1) the University trustees' and administrators' expertise in creating educational policies; (2) the purpose served by the forum; and (3) the alternative channels of communication available." *Turning Point USA at Ark. State Univ. v. Rhodes*, 973 F.3d 868, 876 (8th Cir. 2020); *see also Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 53 (1983) (noting reasonableness of restriction is supported when "substantial alternative channels" remain open for restricted speech).

The First Amendment does not require that a limitation placed on a limited public forum "be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808; *see also Martinez*, 561 U.S. at 692 (advising courts not to confuse the advisability of a university's restriction on a limited public forum with its permissibility).  Restrictions "on the subject matter of the speech, on the identity or

status of the speaker," and "[on] access for reasons of manageability or the lack of

resources" may all be reasonable.  *See Victory Through Jesus*, 640 F.3d at 335.

### 3.   Unbridled Discretion

In *Southworth II*, the Seventh Circuit held that viewpoint-neutrality analysis

includes a third consideration—whether a restriction vests unbridled discretion in a

decision-maker.  307 F.3d at 580.  Although the Supreme Court has never applied the

unbridled-discretion doctrine to a limited public forum, the rationale for its application

is apparent from the Supreme Court's cases evaluating the adequacy of safeguards in

schemes that license access to public forums.  *See, e.g., Shuttlesworth v. City of*

*Birmingham*, 394 U.S. 147 (1969) (parade permit ordinance); *City of Lakewood v. Plain*

*Dealer Publ'g Co.*, 486 U.S. 750 (1988) (news rack ordinance); *Forsyth County v. Nationalist*

*Movement*, 505 U.S. 123 (1992) (assembly ordinance); *Thomas v. Chi. Park Dist.*, 534 U.S.

316 (2002) (park permit ordinance).

The Seventh Circuit identified two concerns about unbridled discretion that run

through the Supreme Court's public-forum cases:  (1) the risk that the potential

licensees will engage in self-censorship so as to avoid governmental censorship (i.e.,

being denied a license); and (2) the risk that the decision-maker will engage in

undetectable viewpoint discrimination.  *Southworth II*, 307 F.3d at 579; *see also City of*

*Lakewood*, 486 U.S. at 759 (identifying "self-censorship by speakers in order to avoid

being denied a license to speak; and the difficulty of effectively detecting, reviewing, and correcting content-based censorship" as risks of unbridled discretion).  The Seventh Circuit reasoned that "the risks which the Supreme Court sought to protect against in adopting the unbridled discretion standard are risks to the constitutional mandate of viewpoint neutrality," and therefore the Seventh Circuit incorporated "the prohibition against unbridled discretion [as] a component of the viewpoint-neutrality requirement." *Southworth II*, 307 F.3d at 579.

Applying the unbridled-discretion doctrine in this context finds support in *Southworth* itself.  First, the Supreme Court said that its "public forum cases are instructive here by close analogy" and that the "standard of viewpoint neutrality" articulated in those cases is "controlling."  *Southworth*, 529 U.S. at 229–30.  Second, the Court expressed concern about the student referendum, which allowed the student body to make funding decisions without any "protection . . . for viewpoint neutrality." *Id.* at 235.  The Court explained that the "whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views."  *Id.*  Drawing again on its public-forum cases, the Court explained that the principle that "[a]ccess to a public forum . . . does not depend upon majoritarian consent . . . is controlling here."  *Id.* Because students could vote however they wanted—including, of course, based on viewpoint—the Court feared that groups espousing minority viewpoints would fare

-28-

poorly in referenda and thus lose access to funds.  At bottom, the Court was concerned

that the referendum process gave unbridled discretion to a decision-maker—

specifically, the student body.  *Cf. Amidon*, 508 F.3d at 103 (noting that an advisory

student referendum for fee allocation was "analogous" to vesting unbridled discretion

in the decision-maker).

Unfortunately, the Eighth Circuit has not clearly described its views about the

application of the unbridled-discretion doctrine to educational limited public forums.

In *Victory Through Jesus*, the court expressed skepticism that the unbridled-discretion

doctrine applied "to the discretionary decisions of school officials administering a

nonpublic educational forum."  640 F.3d at 337.  In other cases, though, the Eighth

Circuit has said that the unbridled-discretion doctrine applies *without regard* to the type

of forum (limited or not limited, educational or not educational).  *See Roach*, 560 F.3d

at 868 n.4 ("[B]ecause we find that the statute unconstitutionally failed to provide

standards or guidelines to prevent viewpoint discrimination, we need not reach the

issue [of identifying the type of forum]."); *Lewis v. Wilson*, 253 F.3d 1077, 1079 (8th Cir.

2001) ("[T]he statute at issue is unconstitutional whatever kind of forum a license plate

might be.  A restriction on speech is constitutional only if certain principles are adhered

to . . . [including] that the restriction be specific enough that it does not delegate unbridled discretion to the government officials entrusted to enforce the regulation.").[22]

This Court concludes that, if the Eighth Circuit were directly confronted with the question, it would find that the unbridled-discretion doctrine applies to a public university's use of mandatory student-services fees to fund private student speech through the creation of a limited public forum. Several circuits—in addition to the Seventh Circuit in *Southworth II*—have concluded that the unbridled-discretion doctrine is a component of the viewpoint-neutrality analysis that applies to limited public forums.[23] This Court has done likewise. *See Young Am.'s Found. v. Kaler*, 370 F. Supp. 3d

_____

[22]The Eighth Circuit noted in *Victory Through Jesus*, 640 F.3d at 337, that *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998), may undercut the application of the unbridled-discretion doctrine to limited public forums. *Forbes* upheld the exclusion of a political candidate from a televised debate—a nonpublic forum—over the dissent's objection that the process for selecting participants vested unbridled discretion in the decision-maker and violated viewpoint neutrality. 523 U.S. at 691–94 (Stevens, J., dissenting). But *Victory Through Jesus* did not discuss *Southworth*, which was decided after *Forbes*, and which (as this Court has explained) provides considerable support for applying the unbridled-discretion doctrine in the precise educational context at issue here.

[23]*See Child. First Found., Inc. v. Fiala*, 790 F.3d 328, 343–44 (2d Cir. 2015), *superseded in part on rehearing*, 611 F. App'x 741 (2d Cir. 2015); *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 428 (5th Cir. 2020); *Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012); *Summum v. Callaghan*, 130 F.3d 906, 919–20 (10th Cir. 1997); *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1199–205 (11th Cir. 1991); *Preminger v. Sec'y of Veterans Affs.*, 517 F.3d 1299, 1314–16 (Fed. Cir. 2008). The Fourth Circuit also applied the unbridled-discretion doctrine to a limited public forum in *Child Evangelism Fellowship of South Carolina v. Anderson School District Five*, 470 F.3d 1062, 1068–69 (4th Cir. 2006), but the

(continued...)

967, 987 n.2 (D. Minn. 2019) (noting Eighth Circuit precedent is unclear, and applying the unbridled-discretion doctrine to an educational limited public forum because "multiple other circuit courts have squarely held that the 'unbridled discretion doctrine' applies to limited public forums").

In sum, in order to pass constitutional muster, the University's process for allocating student-services fees must be viewpoint neutral, the University's restrictions on any limited public forum created by those fees must be reasonable, and the University must not vest unbridled discretion in the decision-makers responsible for enforcing those restrictions.

### E.  Count I: Media Groups

Plaintiffs contend that both the University's preferential treatment of media groups and the process by which a media group seeks approval to apply for media-group funding violate the First Amendment.  Compl. ¶¶ 242–45.  Both of these claims pertain to the University's use of the Media Fee to create a public forum limited to media groups.  *See Southworth*, 529 U.S. at 229 (exacting fee to facilitate student speech creates limited public forum).  As the parties agree, viewpoint-neutrality analysis applies to plaintiffs' constitutional challenges.

---

[23](...continued)
Eighth Circuit declined to follow this case in *Victory Through Jesus*, 640 F.3d at 337 n.5.

1.  Preferential Treatment

Plaintiffs allege that the University has provided preferential treatment to media groups because media groups may apply for unlimited operational funding, whereas other RSOs may apply for no more than $25,000 in annual operational funding.  Compl. ¶ 255.  According to plaintiffs, this preferential treatment is not viewpoint neutral and thus violates the First Amendment.

It is important to understand what plaintiffs are *not* challenging.  Plaintiffs do not challenge the adequacy of the safeguards that apply to the allocation of funds *among* eligible media groups.  The media-groups handbook includes a prohibition on viewpoint discrimination; numerous specific viewpoint-neutral standards for evaluating applications for funding; deadlines for the application and decision-making processes; public presentations and deliberations; and a right to appeal.  *See* Compl. Ex. D.  These safeguards are sufficient to ensure that the allocation of funds among eligible media groups is viewpoint neutral.  *See Southworth II*, 307 F.3d at 587–88 (finding policy prohibiting viewpoint discrimination, criteria guiding funding decisions, hearings, deadlines, and appeals processes were adequate safeguards).

Plaintiffs also do not allege that any viewpoint discrimination has in fact occurred in connection with the allocation of funds among eligible media groups.  To

the contrary, the complaint acknowledges that both liberal and conservative media

groups have received media-group funding.  Compl. ¶ 43.

Instead, plaintiffs argue that viewpoint discrimination occurred when the

University *established* this public forum limited to media groups.  According to

plaintiffs, the University thereby engaged in viewpoint discrimination against RSOs

that are not media groups.  In other words, plaintiffs argue that the First Amendment

bars the University from *creating* a public forum that is limited to media groups.

The Court disagrees.  The University can limit access to a limited public forum so

long as that limitation is viewpoint neutral.  *See Rosenberger*, 515 U.S. at 829 (defining

characteristic of limited public forum is that the State may "reserv[e] it for certain

groups"); *Turning Point USA*, 973 F.3d at 876 (noting "status-based distinctions are

'inherent and inescapable' in limited public forums" (citation omitted)).  Here, access to

the forum is limited to media groups, a restriction that has nothing to do with

viewpoint.  *Cf. Good News Club*, 533 U.S. at 109 (denying club access to classroom

because of its religious views on topics violated viewpoint neutrality).  Plaintiffs have

not put forth a coherent theory for how discriminating in favor of media groups (no

matter their viewpoint) and against non-media groups (no matter their viewpoint)

could possibly be considered discrimination on the basis of viewpoint.  Plaintiffs' claim

is therefore dismissed.

2.  Access

Plaintiffs next argue that, even if the University is permitted to establish a public

forum limited to media groups, the process used by the University for determining who

may participate in that forum—i.e., who may apply for media-group funding—is

unconstitutional because it vests unbridled discretion in the VPSA/DoS.  The Court

agrees.

Before a group can apply for media-group funding, the group must meet four

"minimum" criteria:

1. Have a mission that indicates that the group's primary focus is to provide a media-related service (not exclusive to social media) to campus

2. Be a University Unit, Registered Student Organization (RSO), or Campus Life Program (CLP) currently registered and in good standing with Student Unions and Activities

3. Meet all minimum requirements for applying for Student Services Fee Funding (see pages 10-11)

4. Gain approval from the VPSA/DoS (or designee) to apply for SSF funds as a Media Group.  The VPSA/DoS shall have the exclusive authority to determine which applicants may apply to a[n] SSF committee[.]

Compl. Ex. D, at 15.  If the VPSA/DoS does not invite a group to apply for media-group funding, that group is excluded from participating in the limited public forum.  Compl. ¶ 48.

Like a school administrator who decides which clubs can use classroom space, *see Good News Club*, 533 U.S. at 108; *Lamb's Chapel*, 508 U.S. at 391–93,[24] the VPSA/DoS acts as a gatekeeper to a limited public forum by deciding which groups may have access to the forum (here, to media-group funding).  And although a governmental entity may restrict access to a limited public forum—after all, that's what makes a public forum a *limited* public forum—those restrictions must be viewpoint neutral and reasonable and, most importantly for present purposes, cabin the discretion of the decision-maker.  Here, the VPSA/DoS's discretion is not limited in any meaningful way, as the University's process lacks most of the basic safeguards identified in the unbridled-discretion cases:

First, the VPSA/DoS has "exclusive authority" to determine whether a group may apply for media-group funding.  Compl. Ex. D, at 15.  The decision is hers and hers alone.  *See Niemotko v. Maryland*, 340 U.S. 268, 271–72 (1951) ("absolute power" of decision-maker to grant access to park supported a finding of unbridled discretion);

---

[24]In both cases, the Supreme Court assumed without deciding that the forum was nonpublic or limited.  *Good News Club*, 533 U.S. at 106; *Lamb's Chapel*, 508 U.S. at 392.

*Young Am.'s Found.*, 370 F. Supp. 3d at 988 ("collaborative" process among various stakeholders was a safeguard against unbridled discretion).

Second, the handbook does not specify on what basis the VPSA/DoS must make her decision; it does not even require that her decision be viewpoint neutral.[25] The University says that the VPSA/DoS applies the definition of "media group" found in the first criteria—that is, she asks whether a potential applicant has "a mission that indicates that the group's primary focus is to provide a media-related service (not exclusive to social media) to campus." Defs.' Mem. Supp. Mot. Dismiss 21 (quoting Compl. Ex. D, at 15). But the handbook provides no criteria to guide the decision of the VPSA/DoS as to *which* media groups will be invited to apply for funding.

Third, there is no deadline for the VPSA/DoS's decision. She can sit on a request for permission to apply for funding indefinitely. Compl. Ex. D, at 3; *see Thomas*, 534 U.S. at 324 (requirement to process applications within 28 days went against a finding of unbridled discretion); *City of Lakewood*, 486 U.S. at 771 (ordinance did not require mayor or City Council "to act with reasonable dispatch," supporting a finding of unbridled discretion).

_____

[25]The media-groups handbook provides that "[d]ecisions regarding the allocation of fees among student groups shall be made in a viewpoint-neutral manner." Compl. Ex. D, at 4; *see also* Compl. Ex. C, at 2. But this restriction applies only to decisions about allocating fees among groups that have been invited to apply for funding; it does not apply to the VPSA/DoS when she decides whether a group should be invited to apply for funding.

-36-

Fourth, the VPSA/DoS is not required to participate in any kind of public deliberations, explain the reasons for her decision, or publish her decision. *See Thomas*, 534 U.S. at 324 (requirement to provide reasons for denial weighed against a finding of unbridled discretion); *Forsyth County*, 505 U.S. at 133 (administrator did not need to provide reasons for decision, supporting a finding of unbridled discretion). She can simply say "no" to a group that wants to apply for funding without explaining her reasons to the group or anyone else.

Finally, the VPSA/DoS's decision is final. A group that is denied permission to apply for media-group funding has no right to appeal. Compl. ¶ 49; *see Thomas*, 534 U.S. at 324 (appeals process supported finding adequate safeguards); *Forsyth County*, 505 U.S. at 133 (administrator's decision was unreviewable, supporting a finding of unbridled discretion).

None of these factors alone would be dispositive, but, taken together, they indicate that "[n]othing in the [policy] or its application prevents the [VPSA/DoS] from encouraging some views and discouraging others through the arbitrary" granting of permission to apply for media-group funding. *Forsyth County*, 505 U.S. at 133. Nothing forbids the VPSA/DoS from discriminating on the basis of viewpoint in deciding who may apply for media-group funding—and, even if the VPSA/DoS was so forbidden, there are no safeguards in place to ensure that she complies with that restriction. *See*

*Amidon*, 508 F.3d at 104 (finding general viewpoint-neutrality requirement in policy "insufficient" because "the bare statement without meaningful protections is inadequate to honor its commands").

In sum, the VPSA/DoS has unbridled discretion to determine whether a media group will be invited to participate in a limited public forum, which creates both the risk of self-censorship by media groups who wish to be invited and the risk of the VPSA/DoS engaging in undetectable viewpoint discrimination in deciding who will be invited.  *See Southworth II*, 307 F.3d at 579 (listing the two risks of unbridled discretion). The University's motion to dismiss Count I is therefore denied insofar as it applies to the process by which the University determines which groups will be invited to apply for media-group funding.

*F.  Count II: Cultural Centers*

In Count II, plaintiffs challenge two aspects of the University's treatment of the cultural centers:  the allocation of lounges in Coffman to the cultural centers and the promotion of the cultural centers on the University's website.  Compl. ¶¶ 271, 276.  The Court considers each issue in turn.[26]

1.  Designation of Lounges

Plaintiffs argue that the process for designating lounges in Coffman violates the First Amendment.  In response, the University makes a number of arguments, two of which can be quickly dispatched:

_____

[26]The complaint also alleges that the University does not have a take-all-comers policy that applies to cultural centers and that, in the absence of such a policy, the cultural centers have been allowed to create "safe spaces" by excluding students based on race, sex, ethnicity, and other protected traits.  According to plaintiffs, this discrimination violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  Compl. ¶ 304.

Plaintiffs would have a strong claim if their premise was correct, but their premise is refuted by the very materials that are attached to their complaint.  The University's policies establish that all fee-supported services—including the lounges—"shall be available to all students assessed the fee."  Compl. Ex. C, at 1. Moreover, a "minimum requirement" for an RSO (including a cultural center) to be eligible for funding is that "membership . . . and access to events and services must comply with the University of Minnesota's Equal Opportunity Statement."  Compl. Ex. E, at 13.  The only exception is for religious groups, which must accept all students as members, but "may require their voting members and officers to adhere to the organization's statement of faith and its rules of conduct."  Ryan Gallia Decl. Ex. A, at 3. In light of these policies, plaintiffs' claim regarding the lack of a take-all-comers policy is dismissed as implausible.

First, the University argues that the portion of the student-services fee that is used to subsidize Coffman (including its lounges) is akin to the *non*-allocable portion of the student-activities fee in *Southworth*, which supported the upkeep of the student union.  Because the Supreme Court did not subject the non-allocable portion of the fee in *Southworth* to viewpoint-neutrality analysis, the University argues that its spending on Coffman should likewise be exempt.  The Court disagrees.  The reason that the Supreme Court did not analyze the constitutionality of the non-allocable portion of the fee in *Southworth* is because the plaintiffs did not *challenge* its constitutionality, most likely because UW was not using it to establish a limited public forum.  529 U.S. at 223. The Supreme Court in no way suggested that funds used to support a student union are exempt from the viewpoint-neutrality analysis when (as in this case) those funds are used to create a limited public forum.

Second, the University argues that its allocation of the lounges is the University's own speech and thus exempt from First Amendment scrutiny by virtue of the government-speech doctrine.  Again, the Court disagrees.  The designation of the lounges in this case is materially indistinguishable from the designation of the classrooms in *Good News Club* and *Lamb's Chapel*.  The schools in *Lamb's Chapel* and *Good News Club* opened their classrooms to after-school meetings and decided which clubs could use the classrooms, just as the University opened Coffman to student groups and

-40-

decided which groups could use the lounges.  In this case—as in *Good News Club* and

*Lamb's Chapel*—the purpose of opening the spaces was to facilitate private expression,

not to engage in governmental speech.  And thus in this case—as in *Good News Club* and

*Lamb's Chapel*—the allocation of the spaces must be viewpoint neutral.  *Good News Club*,

533 U.S. at 106–07; *Lamb's Chapel*, 508 U.S. at 391–93.  Indeed, the University concedes

that it has "created a limited public forum on the second floor of the Union by setting

aside space for identity-based cultural centers."  Defs.' Mem. Supp. Mot. Dismiss 28.

And limited public forums are subject to the three-part viewpoint-neutrality analysis.

Turning to that analysis:

As noted, the University admits that, consistent with its mission to promote

diversity, it restricted access to the limited public forum that is Coffman by allocating

space only to "identity-based" groups.  According to the University, however, this did

not represent viewpoint discrimination.  One lounge is allocated to the Black Student

Union, but Black students have different viewpoints.  Another lounge is allocated to the

Feminist Student Activist Collective, but feminist students have different viewpoints.

And so on.  Thus, says the University, it did not discriminate among viewpoints in

allowing only identity-based groups to have access to the limited public forum.  *See*

*Good News/Good Sports Club v. Sch. Dist.*, 28 F.3d 1501, 1505 (8th Cir. 1994) ("'Control

-41-

over access to a nonpublic forum can be based on subject matter and speaker

identity . . . .'" (quoting *Cornelius*, 473 U.S. at 806)).

Plaintiffs disagree.  According to plaintiffs, limiting the public forum to only

identity-based groups is itself a form of viewpoint discrimination, because the one thing

that every identity-based group has in common is the viewpoint that identity-based

groups are a good thing and should be privileged by the University.  This is a

"viewpoint," say plaintiffs—and it is a viewpoint not shared by those who believe that

it is illegal, immoral, or divisive to encourage identity-based groups or give them

preferential treatment.  *Cf. Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2215–43 (2016)

(Alito, J., dissenting) (arguing affirmative-action program was discriminatory); *Grutter*

*v. Bollinger*, 539 U.S. 306, 378 (2003) (Thomas, J., concurring in part) (arguing affirmative

action undercuts equality).  Limiting space in Coffman only to groups that share the

University's viewpoint that identity-based student groups should be promoted—and

completely excluding groups that do not share that viewpoint—is viewpoint

discrimination, according to plaintiffs.

The Court finds this to be a difficult issue.  The Court need not decide the issue,

however, because plaintiffs have pleaded facts that—if true—establish that the

University violated *Southworth* in a different way when it decided who would have

access to the limited public forum that is Coffman.  According to plaintiffs, the process

of allocating space in Coffman vested unbridled discretion in the decision-maker.  In other words, plaintiffs argue that even if discriminating in favor of identity-based groups over other groups is not viewpoint discrimination, the allocation was nevertheless unconstitutional.  There was no application process; the decision-maker (whomever that was) was not forbidden from discriminating on the basis of viewpoint; no standards of any kind guided the decision-maker; no deadlines applied to the decision-making process; the decision-making was not done publicly; and there was no right to appeal.  Compl. ¶¶ 65–67, 125, 152, 198.

If plaintiffs are correct—and, at this stage of the litigation, the Court must assume that they are—then the discretion of the decision-maker who allocated the space in Coffman was about as "unbridled" as discretion gets.  *None* of the criteria on which courts have insisted were in place.  *See Niemotko*, 340 U.S. at 271–72 (invalidating "amorphous" practice for granting permits that lacked any definite or written standards); *Southworth II*, 307 F.3d at 592 (finding lack of any criteria for awarding travel grants vested unbridled discretion in SSFC).

The University may point to the Space Renewal Policy as providing safeguards.  Compl. Ex. J.  But, as its name suggests, this policy applies only to attempts by the cultural centers to *renew* their leases.  Thus, the policy perpetuates the original allocation.  Given that the original allocation process had no safeguards, and given that

only the cultural centers that were chosen during that process can now apply for renewal, the impact of any constitutional violations continues to this day. *See Southworth II*, 307 F.3d at 594 (noting UW's policy "institutionalized" pre-existing viewpoint discrimination into new system).

Admittedly, in arguing that the allocation of the space in Coffman was unconstitutional, plaintiffs' complaint primarily focused on the University's privileging of identity-based groups and only briefly touched upon the unbridled discretion of the decision-maker. But the complaint gives the University fair notice of the unbridled-discretion claim—and the Court, after fleshing out the claim at the hearing, finds that the claim is plausible. For these reasons, the Court denies the motion of the University to dismiss plaintiffs' claims regarding the allocation of the lounges in Coffman.

### 2. Promotion on the University's Website

Plaintiffs also object that the University's website promotes the cultural centers but no other RSOs. Compl. ¶ 280; Compl. Ex. G. Plaintiffs contend that this preferential treatment of the cultural centers violates viewpoint neutrality. That may be true, but because what the University says on its own website is government speech—and because the *Southworth* framework applies only when the government promotes private speech—the University does not *have* to act with viewpoint neutrality in deciding what to say on its website.

-44-

In *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015), the Supreme Court identified three characteristics, which if present, indicate that a particular medium is government speech. First, "the government has long used the particular medium at issue to speak"; second, "the medium is 'often closely identified in the public mind with the' state"; and third "the state 'maintains direct control over the messages conveyed' through the medium." *Gerlich v. Leath*, 861 F.3d 697, 708 (8th Cir. 2017) (internal citations omitted) (quoting *Walker*, 576 U.S. at 210–13).

All three factors support categorizing the University's website (and its decision as to which groups to promote on its website) as government speech. First, the University has used its official website to communicate with the rest of the world for many years. Second, although the *internet* is not "closely identified in the public mind" with the University, the *University's website* surely is. Finally, the University exercises total control over its website; plaintiffs themselves allege that students have no input as to the website's content. For these reasons, the Court concludes that the University's promotion of the cultural centers on its website is government speech. *See Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 329 (1st Cir. 2009) (finding the town's decision not to post the plaintiff's hyperlink on the town's website was government speech); *Page v. Lexington Cnty. Sch. Dist. One*, 531 F.3d 275, 288 (4th Cir. 2008) (finding content on school website was government speech).

As the Court has already noted, government speech is "exempt from First Amendment scrutiny." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (quotation and citation omitted). Therefore, plaintiffs' constitutional challenge to the University's promotion of the cultural centers on its website is dismissed.

### G. Count III: Partisan Political Organizations

In Count III, plaintiffs claim that the University's prohibition on student-services-fee funding for partisan political organizations is viewpoint discriminatory.[27] Partisan political organizations are defined as "organizations affiliated with a registered political party or candidates for election which are formed for the purpose of supporting a political party or candidate for election." Compl. Ex. E, at 12. These "organizations are not eligible for the general student services fee funding." *Id.*

The RSO handbook characterizes the prohibition on funding of partisan political organizations as a "minimum requirement[] for applying for student services fee funding" that must be met "in order for a group to be eligible to apply for funds." *Id.* (cleaned up). At first glance, then, the partisan-political-organizations provision appears to create a threshold that an RSO must meet in order to *access* the limited public

---

[27]Plaintiffs appear to limit their challenges in Counts III and IV to the RSO handbook, which covers administration of the Student Activity Fee. But the partisan-political-organizations and financial-documents provisions are also found in the media-groups and administrative-units handbooks. The Court's analysis of the RSO handbook would apply to the other two handbooks as well.

forum—that is, in order to submit an *application* for funding—similar to the requirement that a media group must secure the approval of the VPSA/DoS before it can apply for media-group funding.

On closer examination, however, the RSO handbook does not describe any process for determining whether an RSO can apply for funding, nor does the handbook identify a person or entity that is responsible for making that decision.  In contrast, the media-groups handbook specifically identifies the VPSA/DoS as the person who decides whether a media group may apply for funding.  It therefore appears that the "minimum requirements" listed in the RSO handbook are not used to exclude RSOs from *applying* for funding, but instead are consulted when the SSFC decides whether an RSO should *receive* funding.[28]

Plaintiffs argue that the University discriminates on the basis of viewpoint by denying funding to all partisan political organizations.  The Court disagrees.  The partisan-political-organizations provision is a content-based distinction that is not based on a group's ideology or views on particular issues but on its status—specifically, on its affiliation with a political party.  *See Turning Point USA*, 973 F.3d at 876 (accepting "status-based distinctions" in limited public forums); *cf. Minn. Majority v. Mansky*, 708

---

[28]The University confirmed at the hearing that any group can apply for RSO funds, but if a group fails to meet a minimum requirement, the group will receive no funding.

F.3d 1051, 1057 (8th Cir. 2013) ("The third sentence of the Minnesota statute is viewpoint neutral because it applies to all political material, regardless of viewpoint. It does not define 'political' to include or exclude any view.").

Plaintiffs do not allege that the restriction on the funding of partisan political organizations is applied in a way that is not viewpoint neutral. To the contrary, plaintiffs note that a conservative RSO affiliated with the Republican party did not receive funding, but that very same RSO received funding after dropping its affiliation. Compl. ¶ 319. This is further evidence that the partisan-political-organizations provision does not discriminate on the basis of viewpoint, as this RSO did not change its viewpoint in any way in order to become eligible to receive funds.

Plaintiffs complain that the prohibition on funding partisan political organizations is not a "carefully-drafted rule" and does not "ma[ke] sense." Compl. ¶ 320. They point out that an RSO can transport its members to a partisan rally at the headquarters of a political party and still be eligible for funding; yet if that same RSO formally affiliates with a political party, it will no longer be eligible for funding. However, restrictions on limited public forums "need not be the most reasonable or the only reasonable limitation" to satisfy the First Amendment. *Cornelius*, 473 U.S. at 808. The distinction made by the University between *supporting* a political party and formally *affiliating* with a political party is perhaps curious, but it is not unreasonable.

*See Martinez*, 561 U.S. at 692 (distinguishing the reasonability of a university's restriction on a limited public forum from its advisability). The Court cannot find that this restriction is unconstitutional just because plaintiffs, if given the chance, would have drafted it differently.

Finally, the SSFC does not have unbridled discretion in allocating funds to RSOs within the limited public forum. The safeguards include a prohibition on viewpoint discrimination; numerous specific standards for evaluating applications; a set timeline for the application and decision processes; public deliberations and presentations; and a readily available appeals process. *See* Compl. Ex. E; *Southworth II*, 307 F.3d at 587–88 (finding similar safeguards sufficient). These safeguards easily pass constitutional muster.

Since plaintiffs have not pleaded facts establishing that the restriction on the funding of partisan political organizations violates the First Amendment, Count III is dismissed.

### H.  Count IV: Financial-Documents Requirement

Plaintiffs argue that the University's requirement that RSOs "must be able to provide financial documentation . . . for the 12 (consecutive) months prior to applying" is viewpoint discriminatory. Compl. Ex. E, at 12. Plaintiffs find support for their claim in *Southworth II*, in which the Seventh Circuit posited that UW's "consideration of the

-49-

length of time an organization has been in existence . . . discriminates against less traditional viewpoints."  307 F.3d at 594; *see also Apodaca*, 401 F. Supp. 3d. at 1056 (considering RSO's history discriminated against new parties with new views).

*Southworth II* is, of course, not binding on this Court, and the Court respectfully disagrees with its reasoning.  In this Court's view, the Seventh Circuit wrongly conflated the age of a *group* with the age of that group's *views*.  Old groups can espouse novel views, and new groups can espouse traditional views.  For example, a new student group can be formed to advocate in favor of immigration or against tariffs—two ancient viewpoints.  And an old group can turn its attention to a novel issue, such as whether the First Amendment permits governmental regulation of social-media giants such as Facebook and Twitter.

In addition, two key facts that influenced the Seventh Circuit's analysis in *Southworth II* are not present in this case.  First, the Seventh Circuit was concerned that considering the length of an RSO's existence disadvantaged religious and political groups, which had only recently been allowed to receive student-services funding at UW.  Second, the Seventh Circuit was concerned that privileging old groups over new groups would perpetuate the viewpoint discrimination that had existed in UW's fee-distribution system prior to *Southworth*.  *Southworth II*, 307 F.3d at 594.  Neither of these concerns are present in this case.

For these reasons, the Court finds that the financial-documents requirement does not discriminate on the basis of viewpoint.  The requirement is also reasonable, as it ensures that RSOs have demonstrated fiscal responsibility before receiving funds.  And the SSFC's discretion is not unbridled, for the reasons explained by the Court in its discussion of the partisan-political-organizations restriction.  Count IV is therefore dismissed.

*I.   Count V: Appeals Process*

Finally, plaintiffs argue that the University violates the First Amendment[29] in three other ways:

First, plaintiffs argue that the University violates the First Amendment because it does not provide a way to appeal its policy decisions, such as the decision to *create* the limited public forums that are the subject of this lawsuit.  Compl. ¶ 344.  Plaintiffs' claim is frivolous.  Like every other unit of federal, state, and local government, the University makes thousands of policy decisions—e.g., decisions to raise or lower tuition, to expand or shrink the size of the English Department, to require or not require applicants to take standardized tests, or to create or not create a limited public forum. Nothing in the Constitution requires that the government must provide a way to

_____

[29]Plaintiffs clarified that Count V focuses on the First Amendment and not on the Due Process Clause.  Pls.' Mem. Opp. Mot. Dismiss 44.  In any event, a due-process claim would fail for lack of a protected liberty or property interest.  *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (listing requirements of due-process claim).

"appeal" every policy decision that it makes—including a decision to establish a limited public forum.  *See Turning Point USA*, 973 F.3d at 877 ("How, and whether, to run a registered student organization program . . . is largely up to the [University's] discretion, which for the most part we leave unquestioned.").

Second, plaintiffs argue that the University violates the First Amendment by failing to provide a way for "a student paying student services fees" to appeal decisions about how those fees are used.  Pls.' Mem. Opp. Mot. Dismiss 42.  This claim is based on a faulty premise.  As the Court has explained—and as plaintiffs' own complaint asserts—the University *does* permit any student who pays the student-services fee to appeal decisions about the funding of RSOs and media groups.  Compl. Ex. D, at 20–21; Compl. Ex. E, at 24–25.  And even if the University did not do so, plaintiffs cite no case holding that the First Amendment requires an appeals process notwithstanding the existence of other safeguards.

Finally, plaintiffs contend that the "lack of verbatim transcripts of proceedings for the students to review for appeal" violates the First Amendment.  Pls.' Mem. Opp. Mot. Dismiss 42.  Again, plaintiffs cite no legal authority supporting their argument, and again the Court disagrees.  All SSFC meetings are open to the public, the SSFC's recommendations are posted online, and the SSFC publicly discloses the reasons for its

recommendations and any dissenting opinions.  The First Amendment does not require the University to create a transcript of every meeting of the SSFC.

The claims made in Count V are meritless, and the Court dismisses them.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT defendants' motion to dismiss [ECF No. 7] is

GRANTED IN PART and DENIED IN PART as follows:

1.    Defendant Regents of the University of Minnesota is DISMISSED as a party to this case.

2.    Counts III, IV, and V of plaintiffs' complaint [ECF No. 1] are DISMISSED WITH PREJUDICE.

3.    Count I of plaintiffs' complaint is DISMISSED WITH PREJUDICE insofar as plaintiffs allege that giving preferential treatment to media groups is unconstitutional.

4.    Count II of plaintiffs' complaint is DISMISSED WITH PREJUDICE insofar as plaintiffs allege that the promotion of the cultural centers on the University's website is unconstitutional and insofar as plaintiffs allege that defendants have violated the Equal Protection or Due Process Clause of the Fourteenth Amendment.

5.      The motion to dismiss is DENIED in all other respects.

Dated:  February 2, 2021                    s/Patrick J. Schiltz
                                            Patrick J. Schiltz
                                            United States District Judge