# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

VIEWPOINT NEUTRALITY NOW!, et al.,

Plaintiffs,

v.

REGENTS OF THE UNIVERSITY OF
MINNESOTA, et al.,

Defendants.

Case No. 20-cv-01055 (PJS/JFD)

**PLAINTIFFS' SUMMARY
JUDGMENT RESPONSE AND
REPLY MEMORANDUM**

## Table of Contents

Response and Reply Introduction.................................................................................................1

I.    Late stage changes to media groups process do not render constitutional
      challenges moot.................................................................................................................5

II.   The University's embrace of "minoritized identities" ideologies does so
      at the expense of other student groups and other students. ...............................10

III.  Access to Coffman is a result of unbridled discretion. .......................................11

Conclusion...................................................................................................................................13

## Response and Reply Introduction

The Viewpoint Neutrality Now! complaint challenged the University of Minnesota's adoption of policies, handbooks, and practices which violate viewpoint neutrality principles. (Plt's Compl. Doc. 1 (Apr. 30, 2020)). Specifically, the complaint's allegations asserted the University violated the First and Fourteenth Amendments because it has failed to administer the disbursement of mandatory student-services fees and the related allocation of student lounges in a public forum—Coffman Memorial Student Union—consistent with viewpoint neutrality principles. *Id.* The current University officials have been on notice of the constitutional infirmities alleged in the complaint since at least 2018 through a state court action resulting in an unpublished decision in *Collegians for a Constructive Tomorrow v. U. of Minnesota, Bd. of Regents*, A17-1311, 2018 WL 2293341 (Minn. App. May 21, 2018) ("CFACT II").

The University of Minnesota, responding to the instant action and previous warnings of its constitutional infirmities, suggests that it has corrected University policies as it relates to media groups. But, on close examination, little, if anything, has changed. The University insists that "where the earlier handbook vested exclusive authority in the Vice-Provost to determine whether a group constituted a media group, the current handbook provides a process by which a group can petition to become a media group." (UofM S.J.-Opp. Memo. at 4 citing Carvell Decl. Ex. 3 at UMN00133395.)

To the contrary, the document cited reveals not a separate and distinctive petitioning process.  Instead, under the heading "Petitioning to become a Media Group," the petitioning process remains within the sole approval of the Vice-Provost of Student Affairs:

> If the group meets the above criteria and has not previously received SSF Media Group funding, they may follow the process outlined below in order to be recognized as a Media Group in the SSF request process.

(*Id.*) First, "the above criteria" refers to the minimum criteria that *must* be met "to gain *approval* to apply as a Media Group." (*Id.* Emphasis added.) Of the listed four criteria, the last states that the group "[g]ain approval from the VPSA/DoS (or designee) to apply for SSF funds as a Media Group." (*Id.*) The "VPSA/DoS" is the Vice-Provost for Student Affairs and Dean of Students.

Second, the so-called petitioning process is not available unless the "above criteria" are met. The petitioning process is "outlined below." But, to get to the "below" petitioning process, the "above criteria" is a prerequisite because of the conjunctive word "and":

> If the group meets the above process *and* has not previously ….

(*Id.* Emphasis added.)

Notably, the petitioning process itself is discriminatory in effect. Under paragraph 1, to be considered in the SSF process for the first time, the group would have to have applied for and received SSF operations funds through the student groups SSF process "for the past *three consecutive years*." (*Id.*) Thus, the University's freshmen seeking this process would only be considered, and moneys awarded, if at all (since they must gain VPSA/DoS approval first) after they have graduated. So, undergraduates fail to enjoy the full panoply of benefits sought as a media group already enjoyed by existing media groups. Similarly, law school students and other students with three-year academic experiences or less, are totally devoid of any benefit the petitioning process is meant to provide. (*Id.*)

2

Finally, even in the petitioning process, the Vice-Provost continues to have the final decision regarding a new media group applicant and without a fair administrative appeal process because the Vice-Provost is the final arbiter of an "appeal":

> 4. The VPSA (or designee) will review the committee's recommendation and provide a decision to the group within 10 business days.
>
> 5. If the group disagrees with the recommendation, they may appeal to the VPSA, who will consult with the Student Groups SSFC appeals chair, the SSF advisor [an University administrator-employee], and the Student Affairs Chief Financial Manager [an University administrator-employee] and issue a final decision.

(*Id.* at UMN0013336.) As used here, the word "appeal" is a misnomer; it's more like a "reconsideration" by the same Vice-Provost.

So, the University's policy amendments have done nothing to render the VNN's complaint moot. In fact, the attempt to modify policies or practices is a tacit acknowledgment that the complaint's asserted claims have merit. And, the amendments to the policies have not fixed the constitutional problems.

Meanwhile, the University reviewed the long history and process for its cultural centers and their purpose to "provide representation and space for students with minoritized identities as part of the community at the University." (Uof M S.J.-Opp. Memo. at 7. *See also* 6–11.) In a footnote, the University also asserts the benefits of the cultural centers for students "including students with minoritized identities, who feel welcome and at home on a college campus enjoy higher rates of retention and graduation…." (*Id.* at 7 n.5.) Whatever the history and the current claimed benefits, the University did not cure the existing constitutional infirmities alleged regarding cultural centers. First, the University admits to the

3

stagnation of the existing nine cultural centers in Coffman. Second, the University admits that no other student groups with "minoritized identities" may apply to lease the Coffman's student lounges. Third, the University cannot deny that other groups with "minoritized identities"—as well as other groups—would equally benefit from the welcoming atmosphere on the college campus and "enjoy higher rates of retention and graduation" if they leased Coffman's student lounges instead of the current nine cultural centers which have been occupants there for decades.

Indeed, the Board of Governors Policy Committee report the University cites "specifically" found "'the majority of students said cultural center spaces should be maintained and they expressed willingness to share resources and space with other groups." (*Id.* at 10.) It is not necessary that Coffman's student lounges be continuing violations of viewpoint neutrality principles. Maintaining "cultural centers" is one thing; but, it is another thing for the University to continue leasing to the same nine student groups for decades without rotating other student groups with "minoritized identities" (as well as other groups) through Coffman's student lounges.

The University suggests that the space renewal process cures the issue. (*Id.* at 11.) Yet, as VNN maintains, the University's process is a process to renew *existing* cultural centers and not a deliberate process to modify or deconstruct the existing monopoly to allow fair and balanced opportunities for other student groups. (VNN S.J. Memo. at 25.) Rotating student groups through Coffman's student lounges would not be contrary to the University's policies stated in "*Equity, Diversity, Equal Opportunity, and Affirmative Action*" since the policies apply to *all* student groups equally. (UofM S.J.-Opp. Memo. at 7 citing Towle Decl. Ex. A.)

4

## I.   Late stage changes to media groups process do not render constitutional challenges moot.

The voluntary cessation of unconstitutional conduct does not moot a case. In general, a case becomes moot "when changed circumstances already provide the requested relief and eliminate the need for court action." *Hillesheim v. Holiday Stationstores, Inc.,* 903 F.3d 786, 791 (8th Cir. 2018) (citing *McCarthy v. Ozark Sch. Dist.,* 359 F.3d 1029, 1035 (8th Cir. 2004)). If an action becomes moot, the court must dismiss it for lack of jurisdiction. *Ali v. Cangemi,* 419 F.3d 722, 723 (8th Cir. 2005). In some instances, a defendant may argue that a case is automatically moot because the defendant has voluntarily ceased to engage in the challenged conduct. Such "voluntary cessation" does not necessarily moot a case, however, since the defendant is "free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 189 (2000) (citation omitted). A case can become moot by the defendant's voluntary cessation only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Wright v. RL Liquor,* 887 F.3d 361, 363 (8th Cir. 2018) (quoting *Friends of the Earth,* 528 U.S. at 189 (2000)).

As for timing, a defendant's cessation before receiving notice of a legal challenge weighs in favor of mootness, *Troiano v. Supervisor of Elections in Palm Beach County, Fla.,* 382 F.3d 1276, 1285 (11th Cir. 2004), while cessation that occurs "late in the game" will make a court "more skeptical of voluntary changes that have been made." *Harrell v. The Fla. B.,* 608 F.3d 1241, 1266–67 (11th Cir. 2010) *quoting Burns v. PA Dept. of Correction,* 544 F.3d 279, 284 (3d Cir. 2008). Similarly, the timing and content of the decision are also relevant in assessing whether the defendant's "termination" of the challenged conduct is sufficiently "unambiguous" to warrant application of the *Troiano* presumption in favor of governmental

5

entities. *Id. Cf. Rothe Dev. Corp. v. Dep't of Def.,* 413 F.3d 1327, 1333–34 (Fed.Cir. 2005) (holding that *Troiano* presumption "[did] not apply" because, inter alia, "the government ha[d] not provided sufficient evidence that the allegedly offending conduct w[ould] not recur"). Short of repealing a statute, if a governmental entity decides in a clandestine or irregular manner to cease a challenged behavior, it can hardly be said that its "termination" of the behavior is unambiguous.

The party asserting mootness under the voluntary cessation theory bears a "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth*, 528 U.S. at 189 (internal quotations and citation omitted). Governmental entities and officials "[are] given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities.*" Prowse v. Payne*, 984 F.3d 700 (8th Cir. 2021) (citation omitted)). But where circumstances suggest that by ceasing to engage in the challenged conduct, the defendant is simply "attempting to manipulate [the court's] jurisdiction to insulate a favorable decision from review," *City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000), courts are unlikely to find a case moot. See *Already*, 568 U.S. at 91.

Here, for instance, the University has been on notice of potential constitutional infirmities in the media groups designation at least since *CFACT II* was filed in 2018. *CFACT II* involved a student group applying for fees. Here, the federal case is brought by a group of students paying mandatory fees. But, the issues presented in the two cases are similar. *Id.* 2018 WL 2293341, at *5.

6

While aware of these constitutional infirmities, the University imposed the media group policy for four consecutive school years.[1] It is only on the eve of the VNN's summary judgment motion that the University makes cosmetic changes to the policy that results in no substantive changes, no new applicants and no new awards to new media groups. The University presents no evidence that its change in policy has made a substantive difference.

The lack of media applicants or awards is part of the historical record carried through to today. The University created the protected category of student speech called "Media Groups." This what the U.S. Court of Appeals for the Seventh Circuit warned of in *Southworth II*: "Moreover, as the University admitted at oral argument, if the SSFC or the ASM Finance Committee were to treat one RSO's speech and expressive activities as a student service, but conclude that another RSO's speech and expressive conduct did not constitute a student service, that would constitute proof of viewpoint discrimination." *Southworth v. Bd. of Regents of U. of Wisconsin System*, 307 F.3d 566, 590 (7th Cir. 2002). While the University will not admit it, Radio K and the Minnesota Daily, through the University-created category of "Media Groups," a "student service," represent an institutional decision about which student speech is valued, protected, and provided with seemingly unlimited student fee funding now, into the future and beyond.

Thus, because the "change" in the University's policy did *not* occur *before* receiving notice of a legal challenge, this factor weighs in VNN's favor because the "late in the game"

---

[1] Notably, although the University Regents have not acted on the 2022-23 budget, the initial recommendations indicate that virtually the same groups receive funding under the old policy as the new policy. *See e.g.,* Second Kaardal Decl. Exs. 132, 133, 135. https://drive.google.com/drive/folders/15J3JNTqA1kA83JUtpmta2CPDL0cjvl9A (last visited May 2, 2022).

strategy does not moot the claims asserted. *See Troiano,* 382 F.3d at 1285; *Harrell,* 608 F.3d at 1266–67.

The University asserts that the amended policy regarding decisions of the Vice-Provost for approval to apply for funds as a media group by the elimination of "exclusive authority" is legally sufficient and is a "clear shift in policy." (UofM S.J.-Opp. Memo. at 16.) Not accurate. As explained above, under the heading "Petitioning to become a Media Group," the petitioning process remains within the sole approval of the Vice-Provost of Student Affairs:

> If the group meets the above criteria and has not previously received SSF Media Group funding, they may follow the process outlined below in order to be recognized as a Media Group in the SSF request process.

(UofM S.J.-Opp. Memo. at 4 citing Carvell Decl. Ex. 3 at UMN00133395.)

"The above criteria" refers to the minimum criteria that *must* be met "to gain *approval* to apply as a Media Group." (*Id.* Emphasis added.) Of the listed four criteria, the last states that the group "[g]ain approval from the VPSA/DoS (or designee) to apply for SSF funds as a Media Group." (*Id.*)

Further, the so-called petitioning process is not available unless the "above criteria" are met. The petitioning process is "outlined below." But, to get to the "below" petitioning process, the "above criteria" is a prerequisite because of the conjunctive word "and:"

> If the group meets the above process *and* has not previously ….

(*Id.* Emphasis added.) Nothing has changed. The Vice-Provost has the final decision *and* there is no separate unbiased administrative appeal from that decision. The University would

contest this statement. (*Id.* at 16 citing UMN0013396.) But, looking at the appeal process, the final arbiter of that "appeal" process remains the Vice-Provost as well:

> If the group disagrees with the recommendation, they may appeal to the VPSA, who will consult with the Student Groups SSFC appeals chair, the SSF advisor [also an University administrator], and the Student Affairs Chief Financial Manager and issue a final decision.

(*Id.* at UMN0013336.)

Consulting with other administrators or a student chair is nothing more than seeking advice. "Consult" means "seek information or advice from (someone with expertise in a particular area…Have discussions or confer with (someone), typically before undertaking a course of action…." *New Oxford American Dictionary* 373 (Angus Stevenson, Christian A. Lindberg eds., 3rd ed., Oxford University Press 2010). The appeal reverts back to the original decision-maker—meaning it is not really an "appeal," but more a "reconsideration" by the same Vice-Provost.

In other words, the University has done nothing more than "repackage" the previous policy under a new banner. (*See* UofM S.J.–Opp. Memo. at 17.) The policy remains as it was: providing unbridled discretion to the Vice-Provost to control "media group" speech. *See Roach v. Stuffer,* 560 F.3d 860, 869 (8th Cir. 2009).

The University has presented nothing to this Court that makes it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Wright*, 887 F.3d at 363 (citation omitted). And, because the University has created doubt to its "changed" policy, summary judgment cannot be granted to the University as the doubt presents a disputed material fact.

The constitutional claims presented in the complaint are not moot. Based on VNN's presentation of undisputed material facts, its request for summary judgment should be granted because the University's media group policy violates viewpoint neutrality.

## II.   The University's embrace of "minoritized identities" ideologies does so at the expense of other student groups and other students.

The University insists that its restriction to Coffman space is within its rights as a property owner in which the creation of a "limited public forum for expressive activity…[permits] boundaries on the forum to ensure it serves its intended purposes." (UofM S.J.-Opp. Memo. at 18, *citing Rosenberg v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995).  In turn, the University contends, the renovation of Coffman was the motivating factor, and no evidence shows a specific motivating ideology or opinion or perspective drove the decision to rent space because the "cultural centers do not share a specific motivating ideology." (UofM S.J.-Opp. Memo. at 21.)

To the contrary, the University embraced the ideology of the nine historical cultural centers as sole representatives of the "minoritized identities" of the college community to the exclusion of other similarly situated student organizations for Coffman use. (VNN S.J. Memo. at 23–24.) The University admits the allocation of Coffman space was intentional and permanent in favor of the nine cultural centers. (UofM S.J.-Opp. Memo. at 25.) But, the nine cultural centers do not represent the panorama of viewpoints on campus. The viewpoint-neutrality requirement ensures that—once the government has permitted speech on a given topic—it cannot "regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Byrne v. Rutledge*, 623 F.3d 46, 55 (2d Cir. 2010).

The University's system that has preserved eight incumbent groups for three decades, and has preserved a lone religious group for two decades, is not viewpoint neutral. The renewal policy of "green," "yellow," and "red" becomes a ruse—it is *not* an open application process to other existing cultural groups consistent with the University's statement of purpose for cultural centers in the first instance. (VNN S.J. Memo. at 23.) Moreover, the University cannot discriminate based upon viewpoint even if the demand for space, here 68% of Coffman, exceeds availability. A public university may never justify viewpoint discrimination on the economic fact of scarcity. *Rosenberger v. Rector and Visitors of U. of Virginia*, 515 U.S. 819, 835 (1995).

Indeed, the University has permitted only nine cultural groups to represent the panorama of campus communities. The University cannot assert that the cultural centers, as representing categories of speech, are not viewpoint neutral. For example, a single Muslim cultural center does not represent all viewpoints, religious and non-religious. Neither can the Black Student Union or American Indian Student Cultural Center represent all viewpoints as other examples. In *Rosenberger,* 515 U.S. at 831, the Supreme Court struck down the false distinction that non-religious speech could only be countered with other non-religious speech. Even so, even if a single cultural center could be a clearinghouse for all viewpoints, delegation of government decision-making to a student religious entity in a public forum is not viewpoint neutral. *See Larkin v. Grendel's Den*, 459 U.S. 116 (1982).

## III.   Access to Coffman is a result of unbridled discretion.

The University suggests that Coffman's second floor, as a limited public forum, allows it to discriminate against other similarly situated student organizations seeking an

opportunity to lease one of the nine cultural centers. The University couches it as "discretionary decisions of school officials." (UofM S.J.-Opp. Memo. at 26.)

However, it was the University that gave rent subsidies to the nine cultural centers in 2010 which is a violation of viewpoint neutrality. Currently, rent is completely waived under existing lease agreements. In this way, the University has been for years providing preferential treatment to the nine cultural centers over other similarly situated student groups.

Unbridled discretion exists, not through "input" or consultation with others (*id.,* at 26), but by the decisions made to permanently favor the nine cultural centers with rent-free leases over other student organizations who would have received the same benefits from the space. There is no policy to allow a challenge to the University's decisions. There is no appeal of any denial of a student lounge application by a non-Coffman student group, even though student fees are subsiding the cultural groups and the Coffman. And, the constitutional violations occur with every lease renewal, every year, for the nine cultural centers at Coffman.

The University relies upon *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.,* 640 F.3d 329, 337 (8th Cir. 2011) (regarding a backpack distribution system), to assert that because Coffman is a limited public forum, its decision to exclusively grant 68% of Coffman space to the nine cultural centers is not unbridled: because of longstanding ties to the nine cultural centers; because the University received input from others; and because other student groups and other students have other options. (Uof M S.J.-Opp. at 26–27.) However, the University's thinking runs afoul of *Southworth II,* wherein "consideration of the

length of time an organization has been in existence and the amount of funding an organization has received in the past discriminates against less traditional viewpoints." *Southworth II,* 397 F.3d at 594. The University's discrimination imposes a substantial restriction upon all student groups by completely denying them access to the leases to Coffman's limited public forum that the nine cultural centers have. *Victory,* 640 F.3d at 337.

## Conclusion

Viewpoint Neutrality Now!'s motion for summary judgment should be granted. The University's motion for summary judgment should be denied.

Dated: May 2, 2022     /s/Erick G. Kaardal
           Erick G. Kaardal (#229647)
           William F. Mohrman (#168816)
           Mohrman, Kaardal & Erickson, P.A.
           150 South Fifth Street, Suite 3100
           Minneapolis, MN 55402
           Telephone: (612) 341-1074
           Facsimile: (612) 341-1076
           Email: kaardal@mklaw.com
           Email: mohrman@mklaw.com
           *Attorneys for Plaintiffs*