UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| VIEWPOINT NEUTRALITY NOW!; EVAN SMITH; and ISAAC SMITH, | Case No. 20-CV-1055 (PJS/JFD) |

Plaintiffs,

v.

| | |
|---|---|
| KENDALL J. POWELL, Regent Chair, in her official capacity; STEVEN A. SVIGGUM, Regent Vice Chair, in his official capacity; MARY A. DAVENPORT; JAMES T. FARNSWORTH; KAO LY ILEAN HER; DOUGLAS A. HUEBSCH; RUTH E. JOHNSON; MIKE O. KENYANYA; JANIE S. MAYERON; DAVID J. MCMILLAN; DARRIN M. ROSHA; KODI J. VERHALEN, Regents, in their respective official capacities; JOAN T.A. GABEL, President of the University of Minnesota, in her official capacity; and CALVIN D. PHILLIPS, Vice President for Student Affairs and Dean of Students, in his official capacity, | ORDER |

Defendants.

Erick G. Kaardal and William F. Mohrman, MOHRMAN, KAARDAL & ERICKSON, P.A., for plaintiffs.

Carrie Ryan Gallia, UNIVERSITY OF MINNESOTA OFFICE OF THE GENERAL COUNSEL, for defendants.

Defendant University of Minnesota–Twin Cities (the "University")[1] collects a mandatory student-services fee that is used to fund registered student organizations ("RSOs"), media groups, and administrative units; support student health and wellness services; and subsidize the student union, known as Coffman Memorial Union ("Coffman").  Plaintiffs Evan Smith and Isaac Smith are University students who are required to pay the student-services fee.  Plaintiff Viewpoint Neutrality Now! is an unregistered student organization at the University.  Plaintiffs brought this lawsuit to challenge the manner in which the University distributes the student-services fee, arguing that it violates the First Amendment.

In February 2021, the Court granted in part and denied in part the University's motion to dismiss. *Viewpoint Neutrality Now! v. Regents of Univ. of Minn.* ("*Viewpoint Neutrality Now! I*"), 516 F. Supp. 3d 904 (D. Minn. 2021).  Only two of plaintiffs' claims remain.  First, plaintiffs challenge the University's process for determining which student groups may apply for funds that are restricted to media groups.  Second, plaintiffs challenge the University's decision to allocate lounge space in Coffman to nine student cultural centers.

---

[1]Although plaintiffs' complaint pleads facts about other University of Minnesota campuses, plaintiffs have clarified that they are challenging only the actions of the Twin Cities campus.  Pl. Memo. Opp. Mot. Dismiss at 26 [ECF No. 14].

This matter is before the Court on the parties' cross-motions for summary judgment. For the reasons that follow, the Court grants the University's motion and denies plaintiffs' motion.

## I. BACKGROUND

In its ruling on the University's motion to dismiss, the Court thoroughly described the facts underlying this lawsuit. *See Viewpoint Neutrality Now! I*, 516 F. Supp. 3d at 909–14. The Court provides only a summary here.

### A. Student-Services Fee

Each semester, all University students who are enrolled in at least six credits must pay a mandatory student-services fee to fund "student programs, activities, and services on each campus." Carvell Decl. Ex. 1 at 1[2] [ECF No. 58-1]. The fee is comprised of three components: a student life, health, and wellbeing fee; a media fee; and a student-activity fee. Carvell Decl. ¶ 4 [ECF No. 58]. Plaintiffs' two remaining claims relate to the media fee (which funds media-related student groups) and the student life, health, and wellbeing fee (which supports Coffman and the other operations and facilities of Student Unions and Activities ("SUA")). *Id*.

A Board of Regents policy governs the student-services fee and establishes four guiding principles related to the fee:

---

[2]Citations to exhibits use the internal page numbers of the documents, unless otherwise noted.

(a)     Fee-supported programs, activities, and services shall be available to all students assessed the fee.

(b)     All persons involved in the development of the student services fee shall recognize the relationship of the student services fee to the total tuition and other costs of education for students.

(c)     The University's educational mission is well served when students have the means to engage in dynamic discussions of diverse topics in their extracurricular campus life.

(d)     Decisions regarding the allocation of fees among student groups shall be made in a viewpoint-neutral manner.

Carvell Decl. Ex. 1 at 1–2. The Board of Regents policy (including these principles) is implemented through three handbooks that govern the allocation of the student-services fee: the Student Services Fee Request Handbook for Media Groups ("media-groups handbook"), the Student Services Fee Request Handbook for [Registered] Student Organizations ("RSO handbook"), and the Student Services Fee Request Handbook for Administrative Units ("administrative-units handbook"). *See* Compl. Exs. D, E, F [ECF No. 1-1].

## B. Media Groups

### 1. 2019–2020 and 2020–2021 Process

As noted, student media groups are funded through the media-fee component of the student-services fee. Carvell Decl. ¶ 4. During the 2019–2020 and 2020–2021

academic years, a group that wished to apply for media funding was required to meet

four criteria:

> 1.      Have a mission that indicates that the group's
>         primary focus is to provide a media-related service
>         (not exclusive to social media) to campus
>
> 2.      Be a University Unit, Registered Student
>         Organization (RSO), or Campus Life Program (CLP)
>         currently registered and in good standing with
>         Student Unions and Activities
>
> 3.      Meet all minimum requirements for applying for
>         Student Services Fee Funding[3] . . .
>
> 4.      Gain approval from the VPSA/DoS [Vice Provost for
>         Student Affairs/Dean of Students] [hereafter "VPSA"]
>         (or designee) to apply for SSF [student-services fee]
>         funds as a Media Group.  The VPSA/DoS shall have
>         the exclusive authority to determine which applicants
>         may apply to a SSF committee

---

[3]These requirements include that the applicant must: (1) be an administrative unit, RSO, or campus-life program registered and in good standing with SUA; (2) not receive pass-through funding from special-assessment groups; (3) provide financial documents for the 12 consecutive months prior to applying; (4) comply with Student Activities Financial Policies for RSOs (if it is an RSO); (5) complete the Student Services Fee Canvas Course; (6) operate as a non-profit; (7) not be a partisan political organization; (8) have students participate in applying for and spending fees; (9) demonstrate expenditures in compliance with the budget; (10) make all budgets and financial records available upon request; (11) meet audit requirements; (12) comply with the University's Equal Opportunity Statement; (13) adhere to approved accounting procedures; and (14) indicate "SSF Funded" on all marketing for events funded with SSF funds.  Carvell Decl. Ex. 2 at 10–11.  In 2019–2020, applicants were also required to complete a Financial Management Workshop.  Compl. Ex. D at 10.

Carvell Decl. Ex. 2 at 15 [ECF No. 58-2].[4]

If an applicant group met the four minimum criteria, the group could apply for funds to cover operational, event, and project costs.  *Id*. at 16–17.  A recommendation to grant or deny the applied-for funding was initially made by a SSF committee, after which the broader University community had the opportunity to give feedback.  *Id*. at 19–21.  If a group was dissatisfied with the committee's recommendation, and if the group could provide evidence that the committee "violated its own rules," "exhibited bias against an organization," or "did not make a decision in a viewpoint-neutral manner," the group had the opportunity to appeal the committee's recommendation to the VPSA, who made the ultimate decision on any appeal.  *Id*. at 21–22.

### 2.  2021–2022 and 2022–2023 Processes

After the Court issued its ruling on the University's motion to dismiss, the University responded by revising the media-groups handbook for the 2021–2022 academic year.  Like the earlier handbooks, the 2021–2022 handbook requires any group applying for media-group funding to have a media-related primary focus; be a registered University Unit, RSO, or CLP in good standing with SUA; meet all of the general requirements for applying for Student Services Fee Funding; and gain approval

---

[4]The Court cites to the 2020–2021 handbook in describing the University's prior media-group-funding application process because the 2020-2021 process was largely unchanged from the 2019–2020 process.  *See* Compl. Ex. D.

from the VPSA.[5]  Carvell Decl. Ex. 3 at 16 [ECF No. 58-3].  The new handbook also

requires an applicant group to "have applied for and received SSF operations funds

through the student groups SSF Process . . . for the past three consecutive academic

years," provide evidence that the group has fulfilled all reporting requirements to the

University during the past three years, and "[j]ustify a budget request that exceeds the

parameters of the operations guidelines for student groups."  *Id.*

In contrast to prior versions of the handbooks, the 2021–2022 media-groups

handbook eliminates the requirement that "[t]he VPSA/DoS shall have the exclusive

authority to determine which applicants may apply to a SSF committee."  *Compare*

Carvell Decl. Ex. 2 at 15, *with* Carvell Decl. Ex. 3 at 16.  The new handbook also

establishes a new application process for groups to follow after they meet the minimum

funding requirements.  Under the updated process, an applicant group must meet with

the SSF advisor and present its petition to a group of University stakeholders.

Following that presentation, the Student Affairs Senior Finance Manager, the leadership

team of the Student Groups SSF committee (minus the appeals chair), and the Chair of

the Media Groups SSF committee deliberate and provide a recommendation to the

---

[5]During the hearing on this motion, the University's attorney represented to the
Court that the requirement that an applicant group gain approval from the VPSA was
not intended to operate as a pre-approval requirement or serve a gate-keeping function
to apply for funding.  If that is true, the Court recommends that the University amend
the text of the policy so that it is consistent with the representations of the University's
attorney.

VPSA.  After receiving and reviewing the recommendation, the VPSA informs the applicant group of her decision.  If the group disagrees with the VPSA's decision, the group may appeal the VPSA's decision to the VPSA (i.e., the group may ask the VPSA to reconsider her decision).  The VPSA must then consult with the Student Groups SSF committee appeals chair, the SSF advisor, and the Student Affairs Senior Finance Manager before reaching a final decision.  *Id.* at 16–17.

The University amended the media-group handbook again for the 2022–2023 academic year.  The 2022–2023 media-group funding application process is nearly identical to the 2021–2022 process, with the exception that the Senior Assistant to the VPSA, in consultation with the Senior Associate Vice President for Student Affairs, makes initial funding decisions.  If a group appeals the decision, the VPSA rules on the appeal.  *See* Carvell 2nd Decl. Ex. 4 at 14 [ECF No. 65-1].  The 2022–2023 media-group-funding process thus eliminates one of the more troublesome aspects of the 2021–2022 process, which required the VPSA to rule on appeals of her own decisions.  Under the 2022–2023 process, the person who makes the initial decision is no longer the same as the person who rules on an appeal of that decision.

## C.  *Space in Coffman*

A portion of the student-services fee is also used to subsidize the Coffman Memorial Union.  Carvell Decl. ¶ 4.  Several student groups have dedicated space in

Coffman, including nine student cultural centers: American Indian Student Cultural Center, Al-Madinah Cultural Center ("AMCC"), Asian-American Student Union, Black Student Union ("BSU"), Disabled Student Cultural Center, Feminist Student Activist Collective ("FSAC"), Mi Gente Latinx Student Cultural Center (formerly "La Raza"), Minnesota International Student Association, and Queer Student Cultural Center ("QSCC") (collectively, the "cultural centers").  Towle Decl. ¶ 8 [ECF No. 57].

These cultural centers were allocated their current space in Coffman in 2011, following a renovation of the Union.  *Id.* ¶¶ 10, 12–13.  The then-VPSA used the occasion of Coffman's renovation to seek a long-term solution to the challenge of allocating student-group space in the Union, *id.* ¶ 10, which had been an "ongoing issue" since 1940, Towle Decl. Ex. B [ECF No. 57-2], because the demand for student-group office space always surpassed the space available, Kaardal Decl. Ex. 26 [ECF No. 50-3 at 9–11].

The VPSA asked the Board of Governors to propose a solution to the space-allocation problem.  Towle Decl. Ex. B.  The Board "researched office space allocation practices of comparable schools nationally, conducted a survey, formed an ad-hoc committee and held three public forums." *Id.*  On April 7, 2011, the Board issued its recommendation to the VPSA.  *Id.*  The Board recommended that the cultural centers be allocated "68% of the assignable square feet of [the] second floor" in Coffman, which is

the amount of space the centers had been using prior to the renovation.  *Id.*  After reviewing the Board's findings and recommendations and meeting with a group of concerned students, the VPSA approved the Board's plan on May 16, 2011, finding that it was "reasonable and appropriate."  Towle Decl. Ex. C [ECF No. 57-3].

The cultural centers moved into their dedicated space in Coffman following completion of the renovation on August 26, 2013, and have remained there since. Kaardal Decl. Ex. 27 [ECF No. 50-3 at 17]; Towle Decl. ¶ 13.  The cultural centers hold their spaces on a "semi-permanent basis subject to periodic renewal."  Towle Decl. ¶ 13; Kaardal Decl. Ex. 9 [ECF No. 50-1 at 67–71].

Other than the cultural centers, the only student groups with dedicated space in Coffman are Commuter Connection ("a campus life program of SUA that serves commuter students"), Towle Decl. ¶ 6, and the University's registered student governance associations (the Minnesota Students Association, the Council of Graduate Students, and the Professional Student Government), *id.* ¶ 7.  Other RSOs do not have permanent space in Coffman, but they are able to use "multi-use space that is designed for all student groups" and reserve small rooms for short-term needs (such as event-planning meetings).  Kaardal Decl. Ex. 14 [ECF No. 50-2 at 14].

## II.  LEGAL STANDARDS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### B.  First Amendment Framework[6]

"In defining the parameters of a speaker's First Amendment right of access to public property, the Supreme Court looks first to the nature of the forum the public entity is providing." *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 334 (8th Cir. 2011).  It is now well-established that the "metaphysical" forum created by a student-services-fee fund is a limited public forum. *See Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth ("Southworth I")*, 529 U.S. 217, 233 (2000); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995); *Gerlich*

---

[6]The Court discussed the applicable legal standards at great length in its prior order on the University's motion to dismiss.  *See Viewpoint Neutrality Now! I*, 516 F. Supp. 3d at 917–22.  The Court provides only a brief summary here.

*v. Leath*, 861 F.3d 697, 705 (8th Cir. 2017); *Viewpoint Neutrality Now! I*, 516 F. Supp. 3d at

918.  Accordingly, the Court looks to the First Amendment standards applicable to

limited public forums in analyzing plaintiffs' challenges to the University policies at

issue here.  *Viewpoint Neutrality Now! I*, 516 F. Supp. 3d at 919–22.  The Court previously

summarized those standards as follows:

> [I]n order to pass constitutional muster, [1] the University's
> process for allocating student-services fees must be
> viewpoint neutral, [2] the University's restrictions on any
> limited public forum created by those fees must be
> reasonable, and [3] the University must not vest unbridled
> discretion in the decision-makers responsible for enforcing
> those restrictions.

*Viewpoint Neutrality Now! I*, 516 F. Supp. 3d at 922.

## 1.  Viewpoint Neutral

The government may restrict a limited public forum "to the limited and

legitimate purposes for which it was created" without running afoul of the First

Amendment, as long as the government does not engage in viewpoint discrimination.

*Rosenberger*, 515 U.S. at 829–30.  Viewpoint discrimination occurs when the government

targets "particular views taken by speakers on a subject," *id.* at 829, or "when the

rationale for its regulation of speech is 'the specific motivating ideology or the opinion

or perspective of the speaker.'" *Gerlich*, 861 F.3d at 705 (quoting *Rosenberger*, 515 U.S. at

829).

As this Court previously explained,

> [O]nce a university chooses to create a limited public forum
> and restrict it to a particular type of speaker (e.g., RSOs) or a
> particular subject (e.g., abortion), the university cannot then
> exclude speakers based on their ideology (e.g., conservative
> or liberal) or based on their viewpoint (e.g., pro-life or
> pro-choice).  For example, a university would engage in
> viewpoint discrimination if it allowed "a group of
> Republicans or Presbyterians to [speak on campus] while
> denying Democrats or Mormons the same privilege."
> *Widmar v. Vincent*, 454 U.S. 263, 281 (1981) (Stevens, J.,
> concurring); *see also Good News Club v. Milford Cent. Sch.*, 533
> U.S. 98 (2001) (school's denial of after-school meeting space
> to club that wanted to discuss permissible topics, like child
> rearing, from a religious perspective was not viewpoint
> neutral); *Rosenberger*, 515 U.S. at 837 (university's refusal to
> pay printing fees for student newspaper publishing on
> permissible topics from a religious perspective was
> viewpoint discriminatory); *Lamb's Chapel v. Ctr. Moriches
> Union Free Sch. Dist.*, 508 U.S. 384 (1993) (school's denial of
> after-school meeting space to church to screen films with
> religious views on permissible topics, like family values,
> violated viewpoint neutrality).

*Viewpoint Neutrality Now! I*, 516 F. Supp. 3d at 919.

### 2.  Reasonable

In addition to being viewpoint neutral, restrictions on access to a limited public

forum must be reasonable—although they do not need to be the "most reasonable or

the only reasonable limitation[s]."  *Cornelius v. NAACP Legal Def. & Educ. Fund., Inc.*, 473

U.S. 788, 808 (1985).  Factors relevant to the reasonableness of restrictions include

"(1) the University trustees' and administrators' expertise in creating educational

policies; (2) the purpose served by the forum; and (3) the alternative channels of communication available." *Turning Point USA at Ark. State Univ. v. Rhodes*, 973 F.3d 868, 876 (8th Cir. 2020).

### 3.  Unbridled-Discretion Doctrine

The unbridled-discretion doctrine grew out of Supreme Court decisions addressing the licensing of public forums—and, in particular, out of concerns that licensing decisions can operate as prior restraints on protected speech.  *See, e.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) ("[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.").  The doctrine addresses two primary concerns: "(1) the risk that the potential licensees [or applicants] will engage in self-censorship so as to avoid governmental censorship (i.e., being denied a license [or access to the forum]); and (2) the risk that the decision-maker will engage in undetectable viewpoint discrimination." *Viewpoint Neutrality Now! I*, 516 F. Supp. 3d at 920 (citing *Southworth v. Bd. of Regents of Univ. of Wis. Sys.* ("*Southworth II*"), 307 F.3d 566, 579 (7th Cir. 2002), and *City of Lakewood*, 486 U.S. at 759).

The Supreme Court has never applied the unbridled-discretion doctrine to a limited public forum, but this Court previously predicted that "if the Eighth Circuit were directly confronted with the question," the court would find that the unbridled-

-14-

discretion doctrine applies in cases such as this, in which a public university funds

private student speech through a mandatory student-services fee.  *Viewpoint Neutrality*

*Now! I*, 516 F. Supp. 3d at 922.  Accordingly, the Court held that "the University must

not vest unbridled discretion in the decision-makers responsible for enforcing [the

restrictions on the limited public forum created by the student-services-fee fund]."  *Id.*

## III.  ANALYSIS

With these First Amendment principles in mind, the Court turns to plaintiffs'

remaining claims.

### A.  *Media-Group Claim*

Plaintiffs argue that the University's media-group-funding process is

unconstitutional because "[t]he Vice-Provost for Student Affairs and Dean of Students

[VPSA] has unbridled discretion as to whom may apply for media-group funding

violating viewpoint neutrality principles."  Pl. Memo. Supp. Summ. J. ("Pl. Memo.") at

27 [ECF No. 49].  The University does not deny that the media-group-funding process

challenged in plaintiffs' complaint was unconstitutional for this reason.  But the

University points out that the process challenged in plaintiffs' complaint is no longer in

effect, and plaintiffs have not moved to amend their complaint to challenge the current

process.  According to the University, this moots the case.

The jurisdiction of federal courts is limited to "actual, ongoing cases and controversies." *Young Am.'s Found. v. Kaler*, 14 F.4th 879, 886 (8th Cir. 2021) (quoting *Ali v. Cangemi*, 419 F.3d 722, 723 (8th Cir. 2005) (en banc)). "A case is considered moot when, during the course of litigation, the issues presented in a case lose their life because of the passage of time or a change in circumstances and a federal court can no longer grant effective relief." *Id.* (quoting *Ali*, 419 F.3d at 723) (alterations omitted).

There are limited exceptions to the mootness doctrine. For example, a case is not moot when a "defendant attempts to avoid appellate review by voluntarily ceasing allegedly illegal conduct" or when a case is "capable of repetition, yet evading review." *Iowa Prot. & Advoc. Servs. v. Tanager, Inc.*, 427 F.3d 541, 543–44 (8th Cir. 2005). Here, plaintiffs argue that their challenge to the University's media-group-funding process is not moot because "[i]t is only on the eve of the VNN's summary judgment motion that the University makes cosmetic changes to the [challenged] policy." Pl. Summ. J. Resp. & Reply ("Pl. Resp. & Reply") at 7 [ECF No. 61].

Plaintiffs' argument relies on the Supreme Court's opinion in *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000), and particularly on the Court's assertion that "[a] case can become moot by the defendant's voluntary cessation only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" Pl. Resp. & Reply at 5 (quoting *Laidlaw*, 528 U.S. at 190). But

-16-

plaintiffs ignore more recent cases that clarify that the mootness analysis differs when

the defendant is a government entity and the allegedly wrongful behavior is a

government policy.  Just last year, the Eighth Circuit explained that an allegedly

unlawful government policy that has been revoked or superseded

> is not "capable of repetition yet evading review" merely
> because the governing body has the power to reenact the
> policy after the lawsuit is dismissed.  Instead, "the
> exceptions are rare and typically involve situations where it
> is virtually certain that the repealed policy will be
> reenacted."

*Kaler*, 14 F.4th at 886 (alterations omitted) (quoting *Teague v. Cooper*, 720 F.3d 973, 977

(8th Cir. 2013)).

In *Kaler*, the court considered whether a student group's constitutional challenge

to a University of Minnesota events policy was mooted because the University had

changed the policy after the student group's lawsuit had been filed.  The court noted

that "[t]he University did not merely repackage the [old policy] under a new banner but

instead amended the substance of the policy seemingly to address [plaintiffs']

concerns."  *Id*.  The court also concluded that the plaintiffs had "not shown that it is

'virtually certain' that the [policy] will be reenacted."  *Id.* at 887.  In light of these two

facts, the court concluded the student group's claim was moot.

For the same reasons, plaintiffs' challenge to the University's media-group-

funding process is moot.  Plaintiffs' complaint refers only to the University's media-

group-funding process for the 2019–2020 academic year.  *See* Compl. Ex. D.  However, the University changed the process for the 2021–2022 and 2022–2023 academic years. Despite making arguments about the new process in their briefs, plaintiffs have not made any effort to amend their complaint to explicitly challenge the new process.

Like the policy at issue in *Kaler*, the new media-group-funding process is not a mere repackaging of the old process; instead, the University amended the process to address plaintiffs' First Amendment concerns.[7]  For instance, the University omitted the policy language vesting the VPSA with the "exclusive authority" to decide who may apply for media-group funding.  *Compare* Carvell Decl. Ex. 3 at 16–17, *with* Compl. Ex. D at 15.  The new process also clarifies that before a funding request reaches the VPSA, the request will be evaluated by a separate committee, and that committee will give the VPSA a recommendation as to the request.  And the new process sets forth a clearer mechanism by which a group whose funding request is denied may appeal the decision.  Carvell Decl. Ex. 3 at 17.  These changes are clearly meant to address plaintiffs' concerns about the unbridled discretion previously granted to the VPSA.

_____

[7]Plaintiffs argue that the fact that the University changed its policy in response to this litigation and the Court's prior order should cause the Court to doubt that the changes are permanent and weigh *against* a finding of mootness.  *See* Pl. Resp. & Reply at 5–7.  This argument is inconsistent with *Kaler*, in which the Eighth Circuit treated the fact that the University responded to constitutional concerns raised by the litigation as a reason to *dismiss* the claims as moot.  14 F.4th at 887.  This Court does likewise.  The University deserves credit for voluntarily addressing the constitutional concerns identified by this Court.

Not only has the University made substantive changes to the media-group-funding process, but plaintiffs have not cited any evidence that it is "virtually certain" that the University will revert to the old process in the future. *Cf. Kaler*, 14 F.4th at 887. Instead, plaintiffs repeatedly cite to case law applying a different, inapplicable standard for determining whether their claim is moot.

To be clear:  The Court has found only that plaintiffs' media-groups claim is moot.  The Court has not held that the University's new media-group-funding process is constitutional.  That issue is not before the Court, as the new process is not mentioned in the complaint.  For present purposes, the fact that the new process (especially the 2022–2023 process) appears to address the concerns that this Court expressed about the old process is relevant only to show that the University did more than repackage the old process.[8]

In sum, plaintiffs' constitutional attack on the process by which groups apply for media-specific funding is moot because the University has substantively changed the process since plaintiffs filed their complaint and there is no evidence that the University

---

[8]If the new process operates as the University represented to the Court during oral argument, the new process may pass constitutional muster.  Counsel for the University acknowledged, however, that much of her understanding of how the new process works relies upon assumptions that are not explicitly spelled out in the media-groups handbook.  The University might avoid a lawsuit by incorporating counsel's assumptions into its written policy.

is certain (or even likely) to resurrect the old process in the future.  The Court therefore dismisses plaintiffs' media-group claim as moot.

## B. *Coffman-Space Claim*

Plaintiffs' other remaining claim is that the University violated the First Amendment when it allocated space in Coffman to the nine student cultural centers. Plaintiffs acknowledge that the University was permitted to allocate space in Coffman to some groups but not to others because the space is a limited public forum. Nevertheless, plaintiffs allege that the University engaged in viewpoint discrimination by allocating space to the nine cultural centers at the exclusion of "other minority groups [and] ideological cultural groups."  Pl. Memo. at 24.  According to plaintiffs, the University impermissibly "embraced the ideology of the nine historical cultural centers as sole representatives of the 'minoritized identities' of the college community."  Pl. Resp. & Reply at 10.  In addition, plaintiffs allege that, in deciding to allocate the space in Coffman, University officials exercised discretion that was unbridled and hence unconstitutional.

### 1.  There Is No Evidence of Viewpoint Discrimination

The record does not support plaintiffs' contention that the University's decisions regarding the allocation of Coffman space were motivated by viewpoint discrimination. Indeed, the only viewpoint plaintiffs have identified is that the University intended "to

promote one student organization over that of another with preferential treatment by

providing Coffman space."  Pl. Memo. at 26.  They argue that while the University is

permitted to limit a forum to certain groups, *see id.* at 21–22, it cannot endorse the

"viewpoint" that the groups to which it limits the forum are a "good thing," *id*. at 26.

Plaintiffs' argument conflates content and viewpoint discrimination.  As this

Court previously explained:

> A limited public forum is *limited*—and thus it follows that
> the government may confine the forum "to the limited and
> legitimate purposes for which it was created." *Rosenberger*,
> 515 U.S. at 829.  In placing limits on the forum, the
> government cannot engage in viewpoint discrimination, but
> it can engage in content discrimination to preserve "the
> purposes of that limited forum."  *Id.* at 829–30.  The
> difference between viewpoint discrimination and content
> discrimination is, at times, "'slippery.'"  *Iancu v. Brunetti*, 139
> S. Ct. 2294, 2313 (2019) (Sotomayor, J., concurring in part).
> "Content discrimination occurs whenever a government
> regulates 'particular speech because of the topic discussed or
> the idea or message expressed.'"  *Id.* (quoting *Reed v. Town of
> Gilbert*, 576 U.S. 155, 163 (2015)).  Viewpoint discrimination
> occurs whenever a government targets "particular views
> taken by speakers on a subject."  *Rosenberger*, 515 U.S. at 829.
> At its core, then, viewpoint discrimination is "an egregious
> form of content discrimination."  *Id.*

*Viewpoint Neutrality Now! I*, 516 F. Supp. 3d at 919.

The problem with plaintiffs' challenge is that it could be made to *any* limited forum, as *every* limited forum includes some participants and excludes others.[9]  It may be true that the University's allocation of space was motivated by its belief that supporting cultural centers is a worthwhile goal, but that is not viewpoint discrimination.  It is inherent in the concept of a limited public forum that some groups or speakers will have access to the forum and others will not.  It is only when access to the forum is granted or denied based on a group's or speaker's *opinion* or *perspective* (i.e. viewpoint)—rather than based on the *nature* of the group or speaker—that a restriction becomes unconstitutional.[10]  *See Gerlich*, 861 F.3d at 705 ("The state engages in viewpoint discrimination when the rationale for its regulation of speech is 'the specific motivating ideology or the opinion or perspective of the speaker.'" (quoting *Rosenberger*, 515 U.S. at

---

[9]By way of example, suppose that the University had limited the space in Coffman to music groups—that is, to groups that are interested in playing music.  That decision would be classic (and permissible) content discrimination.  *See Brunetti*, 139 S. Ct. at 2313 (Sotomayor, J., concurring) (describing content discrimination).  An opponent of the University's decision might argue that the University has endorsed the "viewpoint" that "music groups are good."  If such an argument were successful, then no limited forum would be constitutional, as an opponent of the forum could always argue that, by including *x* and excluding *not x*, the University had endorsed the "viewpoint" that "*x* is good."

[10]And thus, if the University did limit space in Coffman to only music groups, the University could favor certain music groups over others based on content (*e.g.*, the University could favor groups that play string instruments over those that do not), but the University could not favor certain music groups over others based on viewpoint (e.g., the University could not favor groups that played "patriotic" music over those that do not).

829)); *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 694–95 (2010) (policy that draws "draws no distinction between groups based on their message or perspective" is "textbook viewpoint neutral").

The record does not provide evidence of viewpoint discrimination.  Instead, the record shows that the cultural centers engage in a wide range of expressive activity that is untethered to any specific issue, let alone to any specific viewpoint.  *See* Pl. Memo. at 12–15 (describing examples of expressive activity undertaken by the cultural centers, including La Raza's advocacy to make the University a "sanctuary campus," the QSCC's sponsorship of "Kinky U" meetings, the FSAC's sponsorship of pro-choice events, the BSU's organization of a protest related to policing, and AMCC's organization of events for Ramadan).  Moreover, plaintiffs have not cited any evidence that the student groups who do not have dedicated space allocated to them in Coffman are denied such access because of their viewpoints.  *Cf. id.* at 26 (arguing that "the University has preferred the [cultural centers] over others . . . that may be different or opposed to the historical cultural ideologies the University has aligned itself," without explaining what these different or opposite ideologies might be and without citing to anything in the record that would support the claim).

Plaintiffs' argument boils down to this:  Plaintiffs want the University to adopt a different allocation of space in Coffman than the one the University implemented when

-23-

it renovated the Union in 2011.  Plaintiffs believe that their preferred allocation would

serve the University's goals better than the University's allocation.  *See* Pl. Resp. &

Reply at 4 (arguing that the University should "rotat[e] other student groups with

'minoritized identities' (as well as other groups) through Coffman's student lounges").

But disagreement with the University over how its goals can best be achieved does not

make a constitutional claim.  *Cf. Cornelius*, 473 U.S. at 808 ("The Government's decision

to restrict access to a nonpublic forum need only be *reasonable*; it need not be the *most*

reasonable or the *only* reasonable limitation." (emphasis added)).[11]

 Plaintiffs cannot survive the University's motion for summary judgment without

pointing the Court to *any* record evidence that supports their claim.  *See Bedford v. Doe*,

880 F.3d 993, 996 (8th Cir. 2018) ("A principal purpose of the summary-judgment

procedure 'is to isolate and dispose of factually unsupported claims or defenses' . . . .

[A] movant will be entitled to summary judgment 'against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial.'" (quoting *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322–24, 327 (1986))).  On this record, a reasonable jury could not

---

[11]Plaintiffs did not explicitly allege that the University's space-allocation decision was unreasonable.  Even if they had, however, the Court would find that the University's decision was reasonable in light of the University's expertise in creating policies that benefit the campus community, the purposes served by Coffman, and the alternative channels of communication and spaces available to RSOs.  *See Rhodes*, 973 F.3d at 876.

find that viewpoint discrimination occurred, and thus the University is entitled to summary judgment.

     2.  Plaintiffs Cannot Prevail on Their Unbridled-Discretion Theory

Plaintiffs also argue that the University's decision about how to allocate space in Coffman should be invalidated because when the VPSA made that decision in 2011, the VPSA's discretion was "unbridled."  Pl. Resp. & Reply at 11.

A policy providing unbridled discretion to a decision-maker is most concerning when future speech might be chilled by the policy, *see, e.g.*, *City of Lakewood*, 486 U.S. at 757 ("[A] licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."); *Victory Through Jesus*, 640 F.3d at 337 (same); *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) (explaining that First Amendment facial challenges present an "exception from general standing rules" because of the risk that expressive activity will be chilled), and when it would be difficult for a court to detect impermissible viewpoint discrimination, *Viewpoint Neutrality Now!*, 516 F. Supp. 3d at 920 (citing *City of Lakewood*, 486 U.S. at 759).  As explained in the Court's prior order, the unbridled-discretion doctrine developed out of Supreme Court jurisprudence "evaluating the adequacy of safeguards in schemes that license access to public forums."  *Id.* (collecting cases).

Facial unbridled-discretion challenges are most often raised by plaintiffs who are concerned about the chilling of future speech.

Such concerns are not present in this case.  Plaintiffs do not challenge an ongoing process or policy.  Instead, they challenge a one-time decision that was made long before they enrolled at the University.  *See* Towle Decl. ¶ 10 (University's allocation of space was intended to be a "long-term solution"); *id.* ¶ 13 (cultural centers hold space in Coffman on a "semi-permanent basis," subject only to "periodic renewal").  That decision could not possibly chill plaintiffs' speech.  Moreover, the Court has just found that the University's decision was untainted by viewpoint discrimination, so any concern about undetectable discrimination is greatly diminished.

Plaintiffs have not cited—and the Court has not found—any case that suggests that a plaintiff may overturn a *past* decision based on the "unbridled discretion" that was enjoyed by the decision-maker at the time that the decision was made, particularly when the Court has determined that the past decision was not motivated by viewpoint discrimination.  In fact, the Supreme Court appeared to have rejected just such a challenge in *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998).  In *Forbes*, the Court upheld a broadcaster's decision to exclude a political candidate from a televised debate because there was no evidence linking the candidate's exclusion to his viewpoints.  The Court upheld the decision notwithstanding the dissent's complaints

-26-

about the "ad hoc" and "standardless" nature of the decision and the "nearly limitless discretion" of the broadcaster.  *Id*. at 682–86.

In the same way, this Court finds no reason to invalidate the University's decision to allocate space in Coffman to the cultural centers, even if the decision was not limited by a clearly articulated set of standards.[12]  The decision was "a reasonable, viewpoint-neutral exercise of . . . discretion," *see id*. at 683, which is all that the Constitution requires.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      Plaintiffs' motion for summary judgment [ECF No. 47] is DENIED.

2.      Defendants' motion for summary judgment [ECF No. 54] is GRANTED.

---

[12]The Eighth Circuit relied on similar reasoning when it rejected a facial challenge to a school district's procedure for granting access to a "Backpack Flyers for Students" program, despite the plaintiff organization's argument that the procedure granted a school official unbridled discretion to grant access to the program.  *See Victory for Jesus*, 640 F.3d at 337.  In explaining its decision, the court noted: "Neither the Supreme Court nor this court has ever applied a stringent, facial standard of judicial oversight to the discretionary decisions of school officials administering a nonpublic educational forum. In our view, Victory's contrary contention cannot be squared with the Supreme Court's decision in *Forbes*, which upheld a public broadcaster's *ad hoc* but reasonable exclusion of a qualified candidate from a campaign debate over a dissent that objected to the exercise of 'nearly limitless discretion' in controlling a nonpublic forum for *political* speech."  *Id*. (citation omitted) (emphasis in original).

3.      Plaintiffs' complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND

ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  January 30, 2023                          s/Patrick J. Schiltz
                                                  Patrick J. Schiltz, Chief Judge
                                                  United States District Court